COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
CIVIL ACTION, FILE NO. 19-CI-_40_____
DIVISION _I_

FILED
TIME_____ A.M./P.M.

JAN 29 2019

MADISON CIRCUIT COURT
D FERNANDEZ, CLERK

Dr. DAVID B. PORTER,                                              PLAINTIFF,

VS.

BEREA COLLEGE (With Process Agent:
Lyle D. Roelofs C/O Berea College
Lincoln Hall
CPO 2182 Berea, KY 40404),                                       DEFENDANT.

****************************
COMPLAINT
****************************

COMES NOW the Plaintiff Dr. David B. Porter ("Dr. Porter"), by and through his

counsel, who hereby brings this Complaint against the Defendant Berea College ("the

College") for breach of contract, and for employment discrimination resulting in his

wrongful termination, and retaliation, all in violation of the Kentucky Civil Rights Act,

KRS 344.010, et seq., and who further states as follows:

## PARTIES

1.     Dr. Porter is a resident of the City of Berea, Madison County, Kentucky.

2.     The College is a private liberal arts college and a Kentucky corporation

situated in the City of Berea, Madison County, Kentucky.

## JURISDICTION AND VENUE

3.     Paragraphs 1-2 are hereby restated and incorporated by reference.

4.     This Court has personal jurisdiction over the College as it is a

corporation situated in and with its principal place of business in Madison County,

Kentucky, and the relevant facts hereof occurred in said county.

5.     This Court has subject matter jurisdiction over a claim for breach of

contract under KY Const. § 112(5) and KRS 23A.010.

1

6.     This Court has subject matter jurisdiction over a claim for employment discrimination in violation of the Kentucky Civil Rights Act, KRS 344.010, et seq., under KRS 344.450, and under KY Const. § 112(5) and KRS 23A.010.

7.     This Court is the proper venue for this Complaint under KRS 452.450.

## I. **STATEMENT OF FACTS**

A. Dr. Porter's Qualifications for Employment at the College.

8.     Paragraphs 1-7 are hereby restated and incorporated by reference.

9.     Dr. Porter is a 69-year-old, white male and was a tenured professor and employee of the College for more than 17 years, serving as academic vice president and provost from 2001 – 2005 and as a member of the Psychology Department thereafter until the termination of his employment on Oct 1, 2018.

10.     At all pertinent times, Dr. Porter was qualified for his position at the College as a tenured professor of psychology.

11.     Dr. Porter is a partially disabled United States Air Force veteran who holds a Doctorate of Philosophy from Oxford University, United Kingdom, a Master of Science from the University of California at Los Angeles, and a Bachelor of Science from the United States Air Force Academy.  He has extensive training and leadership in claims of wrongful workplace harassment.

12.     Prior to joining the College, Dr. Porter taught for the United States Air Force as Permanent Professor and Head of the Air Force Academy Department of Behavioral Sciences and Leadership.

13.     Dr. Porter is the author of some sixty (60) professional publications, and has given roughly an equal number of professional presentations.

2

14.    In his position at the College, as a part of his employment duties, Dr. Porter advocated using peer-reviewed, scientifically approved analysis rather than subjective opinions to assess administrative policies and programs. His observations and advocacy, at times, annoyed and rankled members of the College administration and faculty and student factions in campus workplace matters. Dr. Porter's advocacy of science and skepticism was incorporated in many of the courses he taught, including GSTR 110 (*Questioning Authority; Skepticism and Science and Antidotes for Oppression*), GST 232 (*Introduction to the Behavioral Sciences*); PSY 208 (*Cognitive Psychology*), PSY 210 (*Industrial/Organizational Psychology*), and PSY 424 (*Senior Research*).

15.    In 2018 the Berea College Student Government Association chose Dr. Porter for its Student Service Award. Dr. Porter received other distinguished teaching and service awards from the College during his tenure. His students consistently placed him in the highest professional ranking at the College, and his students consistently scored in the highest academic ranking.

B. **Pattern of Discrimination by Berea College Against Older, White Male Employees at the College, and the Prior Civil Rights Grievance Filed Against Dr. Wayne Messer in Which Dr. Porter Participated as Dr. Messer's "Adviser".**

16.    In 2013 a Caucasian male faculty member made an inappropriate post on social media sarcastically suggesting that little should be expected from one of his African American students named "Tequila". The response to the tweet from the campus community was, appropriately, immediate outrage. The College's response was to declare a mandatory "Diversity Day" training for all faculty members. Most, but not all, faculty members attended, but two senior white male professors who had nothing to do with the post did not attend and criticized the endeavor as demeaning to

3

them and counterproductive. The College harshly punished the two men for their criticism and noncompliance, including imposing restrictions on pay, benefits, and academic promotion. The names of these men are known to the Plaintiff and Defendant, but will not be identified in this Complaint.

17. In 2015 during a faculty meeting discussion of institutionally provided health insurance, a young, female African American faculty member related her difficulties and traumas related to several unsuccessful pregnancies. Shortly thereafter at a Walmart, a senior, white male faculty member in the same department as the female faculty member expressed his sympathy and condolences for her traumas. The College charged him with a breach of confidentiality and forced him to resign.

18. At the close of the 2017 school year, a quite competent and approximately ten-year employed administrator at Berea College ~~was being~~ _chose to leave the College because he was_ told by another senior administrator that he would not be further promoted because he was a Caucasian male. The name of this individual is known to both the Plaintiff and Defendant, but will not be identified in this Complaint.

19. In March of 2017 the chairman of the psychology department, Dr. Wayne Messer, was subject to a civil rights grievance brought by fellow psychology professors Dr. Wendy R. Williams, Dr. Amanda Wyrick, and Dr. Sarah Jones, brought against him alleging his discrimination in hiring and promotion, retaliation, and creation of a hostile workplace environment.

20. In the proceedings against Dr. Messer, before the Campus College Hearing Board (CCHB) and the Faculty Appeals Committee (FAC), concerning the civil rights Complaint, the College deemed his (appropriate) motives to be irrelevant, and he was not allowed to defend or explain his intentions. The focus of the investigation was

4

entirely on the claimed subjective emotional impact on the three grievants. One of the grievants incorrectly, but successfully, asserted that the Faculty Manual states that mediation is inappropriate for cases of "sexual discrimination," and the College accepted this position in its investigation. The Faculty Manual, however (at its page 19, "Resolving Complaints Informally"), provides that mediation is inappropriate only for charges of sexual assault, for which Dr. Messer was not charged. The campus investigative committees, the CCHB and the FAC, recommended punishment for Dr. Messer, rather than mediation between the parties, confirming that the grievant's false claim was adopted. President Lyle Roelofs summarily dismissed, without explanation, Dr. Messer's appeal alleging violations of Dr. Messer's rights to administrative due process under the terms of the Faculty Manual.

21. One of the charges against Dr. Messer was that he had demonstrated a bias against women in hiring. This charge was demonstrably false in every way. A contemporaneous Excel spreadsheet introduced by Dr. Messer showed the ratings each of the five psychology department selection committee members had given to approximately 100 applicants. The sheet showed that the top six ratings Dr. Messer gave were all assigned to women. Testimony of other selection panel participants supported the absence of Dr. Messer's bias.

22. In contrast, the grievant, Dr. Williams, had proclaimed during a selection panel meeting that, "The last thing we need in this department is any more old white guys!" A closer examination of Dr. Williams' own ratings of applicants revealed other incidents of her discrimination against white males. Although white males made up about 25% of the applicant pool, none appeared in Dr. Williams' top-seven rated applicants. Unlike the other four professors in the department making ratings, she had used a scale of 0-5 to rate the applicants rather than the 1-5 scale to which all of

the selection panel members had agreed prior to rating.  White males received a disproportionately high number of Dr. Williams' "0" ratings.  Similarly, she awarded disproportionately more below-average ratings to white males whom the other professors had rated in the top third of applicants.  Dr. Williams also withheld her ratings until after she had seen all the other ratings of applicants.  Her anomalous rating scale served to discriminate in hiring against all white males.  Nonetheless, the College took no action against her, despite having knowledge of her unlawful racial, age, and gender discrimination.

23.  The grievants in Dr. Messer's case also asserted that due to the hostility in the department, they had been forced to use the copier on a different floor rather than the copier next to the department chair's office. This, too, was a demonstrably false charge. Dr. Williams had, in fact, used this alternative copier only about 6% of the time during the semester.  The copier records also revealed that the grievant, Dr. Wyrick, had used the alternative copier less than 2% of the time, and nearly all these uses had been during the week in which her grievance had been filed.  The College was aware of this false claim, but took no action despite the Faculty Manual's warning that false testimony in such proceedings could result in serious sanctions, up to and including dismissal. *See* page 92, "General Guidelines," of the Faculty Manual: "Fabricated charges of alleged violations or false testimony are serious offenses. Persons found to have fabricated charges or testified falsely will be subject to disciplinary action up to and including termination or expulsion."

24. After the civil rights investigation and hearing, many of the charges against Dr. Messer were dismissed, but the College found that Dr. Messer had created a "hostile workplace environment" based on sex.  The College found Dr. Messer guilty based on three incidents over a two-year period: telling an inappropriate joke about a

"Jewish American Princess" prior to a department meeting; attempting to engage his psychology department colleagues in conversations about the public backlash to rock singer Chrissy Hynde's recent NPR interview about her rape; and his use of the phrase "militant lesbian" during an animated faculty discussion regarding one of his student's disciplinary problems. These findings led to the College removing Dr. Messer as psychology department chair and revoking his then office space and banishing him to an office in the basement of the psychology department building.

25. Dr. Porter acted as Dr. Messer's "adviser" throughout his grievance hearing and appeals, as allowed under the Faculty Manual. See page 92 of the FM. Dr. Porter argued that Dr. Messer's alleged infractions were neither severe nor pervasive enough to create a "hostile workplace environment" on the basis of sex or to warrant the punishments levied against him. Dr. Porter, during the proceedings before the CCHB and the FAC, and in correspondence with President Roelofs and Dean Chad Berry, and in a letter, expressed his disappointment with the unfairness of the College's civil rights process, and the result in Dr. Messer's case. This advocacy subjected Dr. Porter to unlawful workplace hostility from members of the College's senior faculty and administration, and from the grievants who had placed the charges against Dr. Messer. These grievants later unlawfully retaliated against Dr. Porter as hereafter described.

26. College administrators rebuffed Dr. Porter's attempts to have them address his concerns about the College's unfair lack of administrative due process and its misapplications of workplace policies and procedures in Dr. Messer's case. While many senior faculty members and mid-level administrators unofficially acknowledged problems with the Hostile Environment Program at the College, President Roelofs and Dean Berry refused to discuss Dr. Porter's specific concerns.

27. In accordance with Faculty Manual procedure, President Roelofs and Dean Berry decided to order the psychology department faculty members to meet face-to-face in the aftermath of Dr. Messer's contentious defense, in order to broker some sort of a peace. However, the three female grievants refused to meet or interact directly with the male department members, claiming that the acting department chair Dr. Jackie Burnside, an African-American female, had treated them with "contempt.". In response, Dean Berry acquiesced and rescinded the requirement for face-to-face department meetings, even though the Faculty Manual states that attendance at "faculty meetings" is a job requirement. See its page 34. This same provision had been the College's exact justification for severely punishing the two senior, white male faculty members for not attending "Diversity Day" training. *See* Paragraph 16, *supra*.

28. During several meetings of the College's Strategic Planning Council, Dean Berry and the College's Vice President for Diversity, stated that only those who share a "minority identity" should have significant input on policies of the College involving inclusivity and diversity.

29. Later, during the 2018 fall semester, the College, through Dean Berry, advised faculty members that all faculty hires would be "either black or brown".

30. Following the unpleasant proceedings against Dr. Messer, in the late fall semester of 2017, Berea College employed a quite distinguished expert by the name of W. Scott Lewis to advise it about its policies and procedures regarding wrongful workplace hostility in the College's psychology department. Dr. Lewis has trained thousands of faculty and staff members on how to prevent, address and properly report wrongful workplace issues. He is also a law enforcement trainer on how to investigate sensitive matters, such as abuse and assault.

8

Dr. Lewis did a thorough investigation of workplace issues in the College's psychology department. His report supported the prior criticisms made by Dr. Porter. As part of its pattern of wrongful workplace discrimination, and in support thereof, the College refused to release Dr. Lewis' report, embargoed it, kept it confidential, and took no responsible actions to implement its recommendations, or to address Dr. Porter's prior recommendations supported by Dr. Lewis' report.

31.   The abovementioned instances of unlawful discrimination based on age, sex, and race are not intended to be exhaustive. Plaintiff states that other instances known to the defendant will be presented as they become known to Plaintiff.

C.   <u>Dr. Porter's Survey for his PSY 210 Industrial/Organizational Psychology Class, and the College's Resulting Suspension, and His Banishment From Campus.</u>

32.   For over a decade Dr. Porter had taught the PSY 210 Industrial /Organizational Psychology course at the College. A regular feature of this course was large, integrative student projects that apply the scientific method through the examination of archival and survey data to assess college policies, practices, and programs and to identify areas where there are opportunities for improvement. These studies had included, for example, reviews of the effects of characteristics of first year general studies courses on student retention and academic success and the relation between the first-year student labor positions, and other measures of student satisfaction and motivation. These projects were integral to the academic content of the course and often received praise from students and officials of the College. To

Dr. Porter's knowledge, there had been no objection to Porter's methodology or subject matter prior to February, 2018.

33. After the contentious proceedings against Dr. Messer, it appeared to Dr. Porter that the College's Civil Rights Program enforcement relied almost entirely on asserting and re-asserting the charged assumptions of the College administration, with little attention to actual evidence of the program's effectiveness or consequences. As an academic researcher having authored over fifty published articles and several book chapters concerning psychology, Dr. Porter decided to engage his Spring 2018 PSY 210 Industrial/Organizational Psychology class in developing a survey of community perceptions and attitudes about academic freedom, freedom of speech, and hostile work environments under KRS Chapter 344 ("the Survey"). This research employed survey methods similar to those Dr. Porter had used in the past in his classes.

34. The heart of the Survey was a set of some 20 posed scenarios. Respondents were asked to read the scenarios and decide whether each situation reflected a "hostile environment," and if academic freedom should protect the action taken in the scenario. The use of such scenarios (i.e., situational judgement tasks) is common in industrial/organizational psychology studies and often provides reliable information about implicit attitudes which may differ from explicit beliefs. In no respect did the scenarios suggest (push) a preferred, or "right," response.

35. Dr. Porter drew about one half of the Survey's scenarios from issues, arguments, and events he had observed as faculty adviser for Dr. Messer in the prior civil rights case. The Survey carefully concealed participant identity by obscuring dates and altering the identification of gender, race, and other personal characteristics. No names or other information identifying the participants were presented in any of the scenarios. The Survey instructions carefully stated that "[n]o

claims are made about the relationship between these hypothetical situations and actual occurrences here at Berea College or elsewhere."

36. Before disseminating the Survey, Dr. Porter shared drafts of it with many other faculty members and received feedback from five of them including, the academic division chair, the chair of the College's Institutional Review Board (IRB), the Director of Academic Assessment, his departmental chair, Dr. Jay Baltisberger, and other tenured faculty members with applicable research experience in the social sciences. None of them flagged any potential breaches of confidentiality, ethical concerns, or harm to others, as possible problems. Two reviewers did express concern about controversy the Survey might elicit by presenting issues that the College administration did not want to have debated. Dr. Porter sent a copy of the Survey to Dean Berry three days before it was to be posted.

37. The survey was launched on Monday, February 19, 2018. That day Dr. Porter received a polite e-mail request from Dean Berry that they meet to discuss it, to which Dr. Porter quickly replied affirmatively.

38. Meanwhile, that same day, Dr. Williams published a Facebook post incorrectly claiming that all the fact patterns in the Survey's scenarios were expressly about her and the other grievants in Dr. Messer's KRS Chapter 344 proceedings, that the Survey improperly repeated allegations of cognitive impairment against her, and that the Survey targeted them and was intended to punish and silence them. Dr. Williams posted:

> I've said this elsewhere, so I'll post it here, too. As one of the not anonymous targets of this survey I can tell you that I, and the other women who filed (and won-at every level of the process) the [civil rights] hostile work environment complaint on which this survey is based, would be thrilled with some support on this. Every scenario in the survey is either a biased portrayal of what we claimed in our complaint, or it was given by the defense to show that we were the biased ones or that we were cognitively compromised in our judgment, or it was given as

11

examples of how other people had done much worse so the behavior we objected to isn't *that bad* in comparison to "real" hostile environments. Let me repeat again-we won at every stage of the process. Yet despite the conclusion of that process three months ago (after 9 months of the process) <u>this is another attempt to silence us (and those like us)</u>. That said, <u>if this kind of behavior by a colleague in response to losing a Title IX complaint is tolerated by the community, then this is certainly one way to make sure no one ever brings another [civil rights] complaint on this campus</u>. If you feel upset by this unethical use of students under the guise of "research' or the not subtle attack on your female colleagues/faculty, <u>please do more than write it here. If you want to know more ways to help, let me know</u>.   (Emphasis added).

39.  Dr. Williams' Facebook post falsely claimed that nearly every scenario was about her and the other grievants in Dr. Messer's case, and improperly revealed identities of persons she believed were involved to the entire campus community, who were not familiar with the particular fact patterns posed.

40.  In her Facebook post Dr. Williams specifically exhorted campus activists to take action to "support" her and to do "more" than just write about their anger.

41.  Dr. Williams's Facebook post predictably aroused a small group of campus activists who made their anger known to Dr. Porter's students, the College civil rights coordinator, Dean Berry, and President Roelofs.

42.  On Tuesday, February 20, 2018, in a message sent to the entire College campus, Dean Berry publicly requested that Dr. Porter remove the Survey and apologize to the campus community.  However, two hours later in a phone call, Dean Berry promised to forward some of the grievances to Dr. Porter directly and to provide him with a list of the most "problematic" Survey scenarios, so they could be deleted or amended.  The Dean never sent this information to Dr. Porter.  Dr. Porter awaited this list before withdrawing the survey.

43. Data from the Survey's 160 valid responses yielded a surfeit of psychologically and scientifically valid results:

- The respondents' biographic characteristics predicted their political beliefs, and these beliefs predicted most of the variance in the perceptions and judgments people make about hostile environments and academic freedom.

- A large majority of the respondents stated that they did not express their beliefs on campus because of fear of judgment and retaliation.

- The Survey results revealed that most of the College's current "diversity training" programs did little to affect awareness, attitudes, or perceptions, and one such program appeared to be having a polarizing effect on its participants.

- Over half of the respondents did not see the survey as contributing to a hostile environment, and nearly three-quarters of them believed academic freedom protected the dissemination of the Survey.

- The Survey also uncovered evidence that at the College that race was unrelated to the respondents' attitudes and perceptions about civil rights or academic freedom.

- About a quarter of the Survey's respondents expressed support for denying others the opportunity to express beliefs that could be considered potentially harmful or hurtful.

- Women rather than men at the College were more likely to express strong activist views. Respondents who endorsed the need for hostile environment protection were also more likely to express support for academic freedom.

- Judgments about hostile environments and academic freedom protection were significantly negatively correlated. What respondents claimed to be true was just the opposite of the pattern of what their responses to the scenarios showed to be true.

44.     Therefore, the Survey provided valid psychological evidence that because beliefs or viewpoints determine one's perception of hostility, relying primarily on subjective reports of offense can be very problematic. The College administration's

interest in suppressing these results was clear, given past disciplinary and KRS Chapter 344 controversies.

45. On Thursday, February 22, 2018 Dean Berry summoned Dr. Porter and his academic division chair to the Dean's office, where Dean Berry advised Dr. Porter that charges of "incompetence" would be brought against him. Pursuant to Faculty Manual procedure at its page 121, Dr. Porter asked to discuss the matter. Dean Berry stated that the time for discussion had ended two days earlier when Dr. Porter had not immediately withdrawn the Survey and apologized to the campus.

46. Dean Berry presented the charges against Dr. Porter to the Faculty Status Committee (FSC) at a hearing that afternoon, that Dr. Porter did not know was taking place. A majority concurred with the Dean and recommended termination. Dean Berry claimed that the Survey was only an instrument of malicious retaliation against Dr. Messer's grievants. He did not inform the Committee of the survey's academic value. The FSC hearing took place without notice to, or an appearance by, Dr. Porter. The College engaged in no investigation of the charges against him before a majority of the FSC voted to support termination.

47. Shortly thereafter, President Roelofs summarily suspended Dr. Porter, and the College reassigned his classes to other faculty members. It prohibited him from communicating with students, labeled him as "dangerous" to the students, and banished him from campus. During the ten weeks between the distribution of the Survey and the eventual FAC hearing, President Roelofs and Dean Berry repeatedly refused Dr. Porter's requests that they specify the nature of the "danger" Dr. Porter supposedly posed to others that justified his continuing suspension. The College refused any conversation aimed at informally resolving the issues involved. It also rebuffed Dr. Porter's attempts to understand the nature of the charges against him.

14

48. The College administrators treated other faculty who posted surveys completely differently from their treatment of Dr. Porter. In the spring semester of 2018, several other surveys, completed by the College campus community, similarly studied campus attitudes and opinions. The College's Institutional Review Board (IRB) was not involved, because the College interpreted that since the surveys did not identify particular individuals, they did not meet the definition of "human subjects research". The IRB did not review these surveys from the Student Counseling Center and the Interracial Education Center, both led by female faculty members. In Dr. Porter's case, however, the College used an arbitrary and contradictory standard from other IRB procedures in the Faculty Manual to justify President Roelofs' decision to embargo the Survey data. Without allowing Dr. Porter any opportunity to defend his work, the College prohibited him from using the Survey data.

49. In the midst of the controversy, the Berea College Student Government Association ("SGA") voted to award Dr. Porter its 2018 Student Service Award. While notifying the College's administration of his actions, Dr. F. Tyler Sergeant, the husband of Dr. Wendy Williams, a primary Porter grievant, and a junior faculty member, emailed SGA members as "Faculty Advisor to the SGA" attacking the award, and making false claims linking Dr. Messer, Dr. Porter's advocacy of Dr. Messer, and the Survey. Dr. Sergeant's emails threatened the SGA board members with reprisal and retaliation by negative educational repercussions if they went through with the award to Dr. Porter. See exhibited emails between Dr. Sergeant and student Yabsira Ayele (Exhibit 1). Though aware of Dr. Sergeant's unlawful retaliation against the SGA, Dr. Porter, and Dr. Messer, the College administration did nothing to investigate or repudiate Dr. Sergeant's unlawful retaliation against Dr. Porter, or the unlawful retaliation against him, or the unlawful threats to SGA members. On the contrary, the

15

College unlawfully enabled Dr. Sergeant's retaliation by interpreting, without precedent or authority, that the SGA award could not be given to a person charged with an offence. The College's support of Dr. Sergeant's behavior constituted specifically unlawful conspired retaliation prohibited by KRS 344.280, and other applicable law.

**D.** The College's Wrongful Disciplinary Proceedings Against Dr. Porter, Leading to His Termination.

50. Dean Berry and the Faculty Status Council on behalf of the College ostensibly sought the termination of Dr. Porter under a section of the Faculty Manual entitled "Professional Competence and Dismissal for Cause." The College specified charges against Dr. Porter for trial before the FAC, accusing him of "incompetence" and also of (i) disclosing personal information of Dr. Williams, and harassing her, Dr. Wyrick, and Dr. Jones, (ii) retaliating against them for their participation in the prior proceedings against Dr. Messer, (iii) causing them emotional distress, (iv) jeopardizing trust in the process, and (v) perpetuating a hostile environment in the psychology department.

51. The Faculty Manual states: "Once the question of competence or effectiveness has [a]risen, the Division Chair, the Academic Vice President and Dean of the Faculty, and the faculty member shall discuss the matter in personal conference." *See* Faculty Manual, page 121. However, Dean Berry refused to allow any such mediation of these issues.

52. At the FAC hearing, Dean Berry both prosecuted and acted as a witness in the case against Dr. Porter, over Porter's objection. Dean Berry had been involved in, and had been criticized by Dr. Porter, about the proceedings against Dr. Messer, and the Dean also headed the College's response to the Survey and its aftermath. The

16

Dean acted as a witness and the prosecutor at the FAC hearing, while also being the direct supervisor of the FAC members concerning their compensation and the terms of their employment at the College. This behavior was in clear conflict with administrative due process.

53.     At Dean Berry's insistence and over Dr. Porter's objections that the Faculty Manual and administrative due process required a standard of "clear and convincing evidence," the FAC adopted the minimal "preponderance of the evidence" standard in the proceedings. The FAC allowed Dr. Porter only a single day to present his defense rather than the two days he had requested, precluding Dr. Porter from presenting all of his witnesses and evidence.

54.    The grievants, Dr. Williams and Dr. Wyrick, did not testify at the FAC hearing, but submitted written witness statements concerning the events at issue and their alleged emotional distress resulting from the Survey and Dr. Porter's acts and statements in defense of Dr. Messer. Dr. Porter did not have opportunity to cross examine Dr. Williams or Dr. Wyrick, or to serve any interrogatories on them. He wished to inquire how each learned of the contents of the Survey, and what alleged objections they had to its academic rigor and its appropriateness. Dr. Porter was unable even to ask Dr. Williams as to why she publicized the Survey on Facebook. Dr. Porter could not question Dr. Williams and Dr. Wyrick about the authenticity of their emotional distress, or the nature of their alleged personal or professional harm. He was not allowed to confront her about her wrongful identification of individuals in her email post.

55.    Dr. Porter defended his use and distribution of the Survey on the basis of the College's contractual promise of academic freedom as defined and guaranteed in the Faculty Manual. Dr. Porter submitted written and telephonic testimony from

national experts familiar with the research the Survey represented. These experts supported the use of situational judgment indexes (i.e., scenarios) composed of incidents drawn from real life events.

56. At the hearing, one member of the FAC showed his preconceived bias by likening Dr. Porter's Survey to pouring gasoline in a dry forest, and then argued that the inflammatory Facebook posting was the equivalent of someone dropping a match. Later, that same FAC member compared the Survey and the grievants' alleged harm to that done to the Tuskegee inmates being infected with syphilis. Contrary to the College's policies, this FAC member failed to disclose his motives or conflict prior to the proceedings.

57. Following the FAC report, Dr. Porter learned that two members of the FAC committee had, contrary to Faculty Manual procedures and administrative due process, blatantly participated in biased and preconceived actions which disqualified them from participating in adjudication of Dr. Porter's case. In the first of such instances, Dr. Ed McCormack, on February 20, 2018, along with Dr. Ian Norris, and Dr. ~~Karin~~ Caryn Vazzana, who had been a Chair of the FSC committee that had recommended Dr. Porter's termination to the FAC, discussed together the charges against Dr. Porter. Dr. Vazzana adamantly claimed that Dr. Porter's survey was wrong. Dr. McCormack asked: "is this the consensus....all right."

Dr. McCormack afterwards participated on the FAC that heard Dr. Porter's case. As a member of the FAC, the Faculty Manual requires his lack of bias and preconceived opinion. He wrongfully failed to reveal his preconceptions, bias or ex parte influence.

58. The second instance of blatant action contrary to the Faculty Manual and administrative due process involved Dr. Jay Baltisberger, Chair of the FAC that heard

18

Dr. Porter's charges.  On or about February 19, 2018, Dr. Baltisberger expressed his clear bias and preconceived opinion that Dr. Porter had violated provisions of the conduct code of the College by the publishing of the Psychology 210 class survey.  He advised the College administration, including President Roelofs, of his preconceptions.  Over objection by Dr. Porter about Dr. Baltisberger's admitted bias, President Roelofs permitted Dr. Baltisberger to remain on, and as Chair, of the FAC that heard Dr. Porter's charges.

This was a blatant violation of Faculty Manual procedures and administrative due process.

59.  The FAC Report submitted to President Roelofs found that academic freedom did not protect the Survey.  The FAC Report states that two conditions are necessary for academic freedom protection at the College: (i) the speech must be made in an academic occasion, and (ii) the participants must speak and conduct themselves in a manner consistent with the motives, methods, and ends of the academic enterprise.  The FAC found only that the survey was inconsistent with the "methods" of the academic enterprise.  This was contrary to both the procedures in the Faculty Manual, and to administrative due process.

60.  The FAC Report relied on a factual error claiming that the Survey identified Dr. Williams as having a "documented disability" pertaining to an alleged post-chemotherapy cognitive impairment.  The Survey's reference to a "documented disability" actually referred to Dr. Messer's post-hearing diagnosis of having Attention Deficit Hyperactivity Disorder, which manifested itself in the "impulsive", "aggressively oblivious", and "erratic" behaviors about which the College accused Dr. Messer during his KRS Chapter 344 proceedings as having exhibited in creating a hostile work environment.  Dr. Messer had no objection to this characterization by his "adviser."

19

61. The FAC had cautioned the parties that written witness statements would be given little weight, but the FAC Report relied frequently on the un-cross-examined written statements of Dr. Williams and of Dr. Wyrick describing their knowledge of and reactions to the Survey, including the harm they allegedly suffered in response to it.

62. Despite Dean Berry's arguments that Dr. Porter's intentions did not matter (as the Dean had also argued with respect to Dr. Messer), the FAC Report specifically found that in creating and distributing the Survey Dr. Porter had *not* intended to retaliate against the grievants in Dr. Messer's proceedings. The FAC Report found that it was Dr. Williams' publicizing of the existence of the Survey to the campus community which ignited the campus conflict.   It excused Dr. Williams' unlawful retaliation by finding that the Survey was like a "match thrown into a dry forest." The FAC Report stated that "[t]hough social media surely played a part in escalating the backlash on the PSY 210 students, social media could only have done so after and in light of the [S]urvey's dissemination." This finding constitutes an unlawful "heckler's veto" of protected speech.

63.     The FAC Report specifically found that Dr. Porter's actions in pursuing the Survey were properly based on academic principle. The FAC found that Dr. Porter created and used the Survey in an academic setting for "a reasonable and proper (albeit controversial) purpose". The FAC acknowledged that criticism of the College's hostile environment procedures is a permissible topic of academic discussion and inquiry, relevant to Dr. Porter's PSY 210 Industrial / Organizational Psychology class.

64. The FAC Report faulted Dr. Porter for not "disclosing" to his PSY 210 students the factual events which served as the basis of the scenarios in the Survey. In contradiction, the FAC Report criticized the Survey's alleged disclosure of "confidential information" to the campus community concerning the prior Dr. Messer

proceedings, and the alleged resulting harm to Dr. Porter's colleagues. Accordingly, while the FAC Report claimed that Dr. Porter's "methods" precluded an academic freedom defense, the stated basis for the FAC Report's conclusion that Dr. Porter should be terminated was that he "cannot be trusted" to handle "confidential" information in the future and that "the personal conduct of Dr. Porter has hindered his professional responsibilities to an extent" that he should be dismissed. No criticism of Dr. Williams' identification of individuals was mentioned.

65.  Following the recommended action by the FAC, Dr. Porter appealed its action to President of Berea College, Dr. Lyle D. Roelofs.  Prior to Dr. Roelof's decision to terminate Dr. Porter from the faculty, the diversity Chair of the College contacted selected members of the campus community and asked them to communicate directly with the College Administration, including Dr. Roelofs, to express their wishes that Dr. Porter be terminated.  At least eleven (11) persons, overwhelmingly female, responded to the orchestrated effort by a major College administrator to wrongfully pressure Dr. Roelofs to terminate Dr. Porter.

The action of the diversity administrator and the responding letter-writers was intentionally secreted from Dr. Porter.  The action of these persons, and the response to it by the College, was a wrongful conspiracy in violation of KRS 344.280, and was wrongful retaliation in violation of KRS 344.280 (1), and other applicable law.

The action by the diversity administrator and the communicants was in stark contrast to Dr. Roelofs' prohibition of Dr. Porter from having similar contact with members of the campus community during the period of his adjudication.

66.  President Roelofs in a letter dated June 13, 2018 affirmed the FAC Report's recommendation and ordered Dr. Porter's termination.

21

67.   The Faculty Manual expressly states that there is no enforceable guarantee of confidentiality in the College's civil rights proceedings. *See* FM, page 92. The only circumstance where confidentiality is guaranteed in such proceedings is "[u]pon receipt of a complaint of Sexual Violence." President Roelofs' concluding letter in Dr. Messer's case confirmed that the College administration knew this, by stating that "I have scanned our policy documents in vain for any requirement of confidentiality and so do not have the latitude to impose it." This finding was blatantly ignored in Dr. Porter's case.

68.   Under the terms of the Faculty Manual, Dr. Porter had a right to appeal the President's decision to the Berea College Board of Trustees Executive Committee. He made such appeal.

69.   On July 27, 2018 the College Executive Committee issued a Resolution describing the possible grounds for reversal of Dr. Porter's termination on appeal, pursuant to the Committee's duty to hear any such appeal as provided in the Faculty Manual and, as such, part of Dr. Porter's employment contract. In pertinent part, these grounds concluded that President Roelofs' decision was not:

(i)    In violation of Faculty Manual provisions;

(ii)   In excess of the authority granted to the Faculty Appeals Committee or the President in the Faculty Manual;

(iii)  Without support of substantial evidence on the whole record;

(iv)   Arbitrary, capricious, or characterized by abuse of discretion;

* * *

(vi)   Prejudiced by a failure of

[a]   any member of the Faculty Appeals Committee, prior to the evidentiary hearing, or

[b]   the President, prior to any involvement in the faculty disciplinary process, to disclose any conflict of

22

interest or bias which would prevent the faculty
member or Berea College from receiving an impartial
evidentiary hearing or decision; or

(vii)    Deficient as otherwise provided by the Faculty Manual or Berea
College policies.

70. In his appeal, Dr. Porter pointed out the obvious contradiction between the
stated basis for his termination and the lack of any confidentiality requirements. He
also argued, in pertinent part, that:   (i) his termination violated his right to academic
freedom, (ii) the Dean's failure to allow mediation prior to bring charges against Dr.
Porter was contrary to the terms of the Faculty Manual, (iii) the Dean's multi-part role
as participant, witness, and prosecutor violated Dr. Porter's right under the Faculty
Manual to fundamental fairness in the termination proceedings, (iv) the FAC's denial
of Dr. Porter's right to confront all of the witnesses against him was contrary to the
terms of the Faculty Manual and administrative due process; and (v) that the
Committee use of the preponderance of the evidence standard violated his rights
under the Faculty Manual and administrative due process.  In summation, the
proceedings against Dr. Porter were a sham, a show trial.

71. Nonetheless, the Executive Committee affirmed President Roelofs' decision,
and Dr. Porter's employment at Berea College officially ended on September 30, 2018.

72. As a result of the College's false charges against him, his suspension and
banishment from campus, and his ultimate termination, Dr. Porter has suffered severe
humiliation, embarassment, stress and mental anguish, manifesting in a stroke
(cerebral vascular accident) he suffered on November 12, 2018, when he was treated
in the emergency room of St. Joseph Berea Hospital, transferred via ambulance to the
Neurological Intensive Care Unit and St Joseph Lexington Hospital, and released on

23

November 14th, 2018. Dr. Porter's consequent prolonged stress and mental anguish has also contributed to his high blood pressure and greatly disturbed sleep patterns.

F.  Dr. Porter's Contractual Rights to Continued Employment,
    Academic  Freedom, and Administrative Due Process According to
    the Faculty Manual.

73.  As a tenured member of the College faculty, Dr. Porter had an employment contract with the College which was subject to automatic annual renewal. The last executed annual employment contract the College provided to Dr. Porter was dated June 1, 2018, which stated in part that  was re-hired for the school year 2018-2019 at a small increase in salary. This letter followed the action of termination by Dr. Roelofs. It creates an estoppel on actions to terminate Dr. Porter. *(See Exhibit 2)*

74.  Dr. Porter's employment contract expressly stated that it was subject to the terms of the Berea College Faculty Manual ("the Faculty Manual"), which sets forth the College's policies on appointment, promotion, tenure, academic freedom, non-discrimination, harassment, retaliation, sexual misconduct, and KRS Chapter 344 proceedings, as published on the College's website at http://catalog.berea.edu /en/Current/Faculty-Manual.

75.  As a tenured member of the faculty, Dr. Porter was entitled to continued employment and the protection of academic freedom at the College according to the Faculty Manual, except for a showing of "adequate cause" for his termination:

> A tenured appointment represents Berea College's commitment to
> academic freedom, and its trust in the appointee's promise as teacher
> and scholar. The granting of tenure is not automatic; it is the result of a
> considered judgment that the faculty member will make a significant,
> long-term contribution to the fulfillment of the College's purposes.
> Tenure is a continuous appointment. It continues until (1) the appointee
> resigns or retires, or chooses to reduce teaching responsibilities below
> one-half of a normal teaching load, or (2) a situation develops that is
> demonstrably adequate cause for discontinuation of the appointment.
> Academic freedom is essential to the College's success in meeting its

educational obligations to its students and the larger society. A well-conceived and soundly administered tenure system is considered the best means to assure such freedom. (Emphasis added).

76. The Faculty Manual states that the specific principles of academic freedom are substantially based on "[t]he substance and the wording of this statement are drawn in part from the 1940 Statement of Principles on Academic Freedom and Tenure, developed by the Association of American Colleges and the American Association of University Professors" (AAUP), and that each faculty member is entitled to academic freedom in the classroom and in his or her research:

> This statement summarizes the understanding between the faculty and administration of Berea College on the principles and practices of academic freedom at this institution . . .
>
> * * *
>
> Freedom in the Classroom
>
> The faculty member is entitled to freedom in the classroom and should be supported by the College administration and colleagues in its exercise. Academic freedom, however, carries with it duties correlative with rights. In exercising freedom in discussion of the subject matter, the faculty member should be careful not to introduce controversial matter which has no relation to the subject. This should not be narrowly construed, but the faculty member has a responsibility to the entire College community to refrain from habitually substituting extraneous materials for the proper subject matter of the course.
>
> Freedom of Research
>
> Freedom of research is fundamental to the advancement of truth. The faculty member is entitled to full freedom in ordering and recommending library materials, presenting a variety of perspectives, and in research and in the publication of the results. . .
>
> * * *
>
> (Emphasis added).

77. In its report upon Dr. Messer's appeal in the prior disciplinary proceedings, the FAC outlined the College's interpretation of its academic freedom policy which it applied in its Report on Dr. Porter's case:

Two conditions must be met . . . to create an "environment that is protected by academic freedom": (1) it must be an academic occasion, and (2) the participants must speak and conduct themselves in a manner consistent with the motives, methods, and ends of the academic enterprise.

. . . Where the academic purpose is not apparent or where the academic purpose is plainly not significant enough to warrant the offense, it will be safe to conclude that the speaker has not been conducting himself or herself in a manner consistent with the motives, methods, and ends of the academic enterprise.

. . . [T]he academic enterprise, as understood by the Committee presumes that no subjects are inherently taboo or off-limits because they are 'objectively offensive'; and it nurses no phobic aversion to controversial topics or strong emotions.

The content and/or viewpoint of speech by [itself] will very seldom, if ever, disqualify speech from protection by academic freedom. In intramural academic occasions, self-disqualification occurs when a speaker departs from an academic agenda to further personal grievances, animosities, or grudges; to exert power for private gain or satisfaction; to advocate (rather than to analyze) partisan political causes; to stage an emotional catharsis before a captive audience; to browbeat or shame interlocutors into submission, acquiescence, or agreement; in short, to pursue any ulterior purpose likely to thwart the motives, methods, and ends of the academic enterprise. (Emphasis added).

78.    The Faculty Manual states the College's "Harassment Policy" and expressly subjects the policy to a balancing test with a faculty member's right to academic freedom:

Harassment prohibited by this policy includes verbal or physical conduct that, because of its severity and/or persistence, substantially interferes with the mutual respect and collegiality afforded all individuals at Berea College. In particular, harassment may include verbal or physical behavior directed at an individual that is abusive of that individual's distinguishing characteristics, including race, gender, age, religion, sexual orientation, or national origin, to such an extent as to substantially interfere with the individual's work or education or adversely affect one's living conditions.

In prohibiting harassment in all its forms, Berea seeks to preserve and enhance academic freedom for all members of the campus community. Nothing in this policy is intended to limit the freedom of inquiry, teaching, or learning necessary to the College's educational purposes, or to inhibit scholarly, scientific, or artistic treatment of subject matter appropriate to an institution of higher education.

26

(Emphasis added).

79. The Faculty Manual specifies the promised procedures in the formal hearing process in the event a complaint is made against a faculty member for conduct in violation of civil rights, and makes clear that an accused has the right to confront all witnesses under the College's incorporated AAUP standards. The AAUP burden of proof is set at "clear and convincing evidence" which, as stated in Paragraph 74 above, has been incorporated in the College's Faculty Manual. *There is no right to confidentiality for any participant in the proceedings* including criticisms of Dr. Porter. Specifically:

Resolving Complaints through the Formal Hearing Process

\*\*\*

4. Except in extraordinary circumstances, the respondent is entitled to confront his or her accuser and any witnesses at the hearing. The right of confrontation may be waived by the absence or gross misconduct of the respondent.

6. The standard of proof in a formal hearing is whether, based on all the evidence presented, a reasonable person would conclude that it is more likely than not that the alleged Violation did occur (preponderance of evidence standard).

\* \* \*

General Guidelines

1. In the reporting, investigating, and hearing of alleged Violations, every effort shall be made to ensure confidentiality and the privacy of the parties involved, but complete confidentiality cannot be guaranteed, particularly if formal charges are filed. Requests for confidentiality shall be addressed to and decided by the College's Title IX Coordinator. At all stages, investigations, administrative hearings, and formal hearings complaints are to be handled discreetly and expeditiously. Every effort will be made to contain hearsay and to minimize the potential for harmful effects on the individuals involved and the College community.

2. Both the complainant and the respondent shall be assured of fair treatment throughout the investigation, administrative hearing and formal hearing processes. Retaliation or intimidation by either party is prohibited by law and College policy; neither will be tolerated. Any such retaliation or intimidation is subject to disciplinary action up to and including termination or expulsion. (Emphasis added).

80. In the stated procedure in a proceeding for dismissal with cause, the Faculty Manual provides that the College will provide the accused with the right to confront any witnesses against him, except where there are "unusual" or "urgent" reasons to take a witness' written statement:

> The faculty member and advisor should have the opportunity to question all persons who testify orally and to confront all who testify adversely. When unusual and urgent reasons move the Committee to deny this opportunity, or when the knowledgeable person cannot appear, the identity of the person, as well as the person's statements, should nevertheless be disclosed to the faculty member. Subject to these safeguards, statements may, when necessary, be taken outside the hearing and reported to it. (Emphasis added).

In Dr. Porter's case, no findings of "unusual" or "urgent" reasoning were made for allowing the two (2) most crucial witnesses, Drs. Williams and Wyrick, to submit written statements.

81. The Faculty Manual defines "retaliation" for the purposes of the College's Sexual Harassment Policy" and "Sexual Misconduct Policy" as "[t]he act of seeking revenge upon another person." The FAC specifically found that Dr. Porter *had not* committed this act.

82. The Faculty Manual includes the College's "Nondiscrimination Policy," and its "Community Aspirations Statement" provides that "[h]indrances to dialogue and free expression can very much impede learning. The concept and application of academic freedom at Berea College protect these values and are articulated in the Faculty Manual." The "Community Aspirations Statement" further provides that "[t]his statement does not mandate these values and is not intended to restrict any person's conscience or academic or personal freedoms."

83. The Faculty Manual states the following possible grounds for the termination of a faculty member for "incompetence" in the performance of his duties:

28

The following are considered adequate cause for dismissal of tenured faculty, or of faculty under term appointment before the appointment expires:

- Demonstrated incompetence or dishonesty in teaching or research.
- Substantial, persistent and demonstrated neglect of professional responsibilities or failure to observe the terms of appointment to the faculty.
- Personal conduct which demonstrably hinders fulfillment of professional responsibilities.
- Infirmities serious enough to qualify for total disability payments under the College's disability plan and/or social security.

84.  These abovestated protections were not accorded Dr. Porter.

*********************

## CAUSES OF ACTION

### COUNT I:
Breach of Contract for Suspension from Employment in Violation of the Required Due Process, and Dr. Porter's Academic Freedom

85.  Paragraphs 1-84 are hereby restated and incorporated by reference.

86.  The Faculty Manual, which is part of Dr. Porter's employment contract with the College, states that during proceedings for termination for cause "the faculty member shall be suspended only if continuance threatens immediate danger to persons or property." (Emphasis added).

87.  In the present case, after Dean Berry initially charged Dr. Porter, President Roelofs summarily suspended Dr. Porter and barred him from campus without any prior notice nor any evidence or reasonable basis to determine that he posed any "immediate danger to persons or property." This was a forbidden "prior restraint." It was forbidden by both clear language in the Faculty Manual and by administrative due process. Neither President Roelofs nor Dean Berry specified to Dr. Porter the nature of any such "immediate danger" he may pose and refused to discuss the Survey with him or to convene any mediation between the parties about the controversy.

29

88.   The College's unfounded suspension and banishment of Dr. Porter from campus needlessly tarnished his reputation, denied him access to materials needed to defend himself, and interfered with his academic work by denying his access to crucial resources such as a library, licensed computer software, and his own office.

89.   The College's unfounded suspension and banishment of Dr. Porter from campus, without the opportunity for mediation, created a presumption of his guilt, impeded his ability to defend myself, and strongly prejudiced the case against him prior to the FAC hearing.

90.   The College suspended Dr. Porter from employment, banished him from campus, and refused mediation in breach of his employment contract and the terms of the Faculty Manual.

91.   Dr. Porter's employment contract and the Faculty Manual guarantee him the right of academic freedom in the classroom and in his research, when such speech and conduct pertains to an academic occasion and is made in a manner consistent with the motives, methods, and ends of the academic enterprise.

92.   Dr. Porter, at all pertinent times, created and distributed the Survey pursuant to legitimate academic inquiry and in a manner consistent with the motives, methods, and ends of the academic enterprise.  Particularly, he tendered the Survey to the required persons for vetting prior to its release, and received no feedback forbidding its release.  Accordingly, all of Dr. Porter's speech and conduct associated with or related to the creation and distribution of the Survey was protected under his right to academic freedom and free speech under his employment contract and the terms of the Faculty Manual.

93.   The College denied Dr. Porter his right to academic freedom and free speech by bringing false charges of "incompetence" against him, suspending him, and

banishing from campus in breach of his employment contract and the terms of the Faculty Manual.

94. Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of the College's breaches of contract, including but not limited to his reputation, loss of income and benefits, physical injury, and emotional distress and mental anguish.

COUNT II:
Breach of Contract for Termination of Dr. Porter's Employment
after the College's Denial of the Required Administrative Due Process.

95. Paragraphs 1-9⁴ are hereby restated and incorporated by reference.

96. The College's unfounded suspension and banishment of Dr. Porter, without proper notice, without the opportunity for mediation, without any reasonable basis or evidence that Dr. Porter was an "immediate danger to persons or property" on campus, and without affording him any due process with a reasonable investigation, specification of charges, discovery of evidence, or opportunity to defend himself, was in breach of his employment contract and the terms of the Faculty Manual.

97. The FAC Chair advised Dr. Porter prior to the hearing that the FAC would give "little weight" to written witness statements. This was not done.

98. The charges brought against Dr. Porter at the FAC hearing involved alleged "incompetence" but also accused him of specific violations of the College's civil rights policies concerning harassment, creation of a hostile work environment, and retaliation.

99. The grouping or conflation of charges seeking Dr. Porter's dismissal for cause based on "incompetence" while also accusing him of violations of the College's civil rights policies on harassment, creation of a hostile work environment, and

31

retaliation accordingly rendered the FAC hearing a proceeding under and subject to the requirements of both the dismissal with cause and the civil liberty hearing procedures set forth in the Faculty Manual.

100. In breach of the Faculty Manual's promise that Dr. Porter would be able to confront all witnesses against him at the FAC hearing, the College terminated Dr. Porter's employment without allowing him to confront or cross examine his main accusers, Dr. Williams or Dr. Wyrick, who instead only submitted written statements to the FAC about the alleged hostile work environment in the psychology department, the alleged sexual harassment and retaliation against them, and the alleged harm and emotional distress they suffered as a result. The grievants did not offer "unusual" or "urgent" reasons for not testifying in person.

101. The FAC Report then frequently referred to Dr. Williams' and Dr. Wyrick's written testimony in concluding that Dr. Porter's Survey had caused them professional and personal harm and emotional distress, contrary to the FAC's stated promise to place little weight on such statements and in breach of Dr. Porter's right under his employment contract and the Faculty Manual to confront and cross examine the witnesses against him.

102. Dean Berry was a participant in the prior hostile environment proceedings against Dr. Messer and was also an actor in and witness of the events and circumstances involved in the termination proceedings against Dr. Porter. The Dean served as a witness and the prosecutor at the FAC hearing, while also being the direct supervisor of the FAC members concerning their compensation and the terms of their employment at the College. This was over Dr. Porter's written objection., and was a blatant violation of the Plaintiff's administrative due process.

103.   The Faculty Manual states that the College's stated procedures in a termination proceeding against a faculty member "are intended to insure fair process." *See* FM, page 129.

104.   However, the College allowed Dean Berry to assume the multi-part role as participant, witness, and prosecutor in the termination proceedings against Dr. Porter in violation of Dr. Porter's right to fundamental fairness in the proceedings under the terms of his employment contract, the Faculty Manual, and the Executive Committee Resolution, at Items (i) - (iv).

105.   Also, at least three members of the FAC displayed a previously undisclosed and unfair prejudgment and bias against Dr. Porter's defense at the hearing. See paragraphs 54 and 55 above, in violation of Dr. Porter 's right to fundamental termination proceedings under the terms of the Faculty Manual and the Executive Committee Resolution, at its Items (iii) - (iv).

104.   The College denied Dr. Porter his guaranteed administrative due process throughout the termination proceedings against him in breach of his employment contract, the terms of the Faculty Manual, and the Executive Committee Resolution.

105.   Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of the College's breaches of contract, including but not limited to irreparable harm to his reputation, loss of income and benefits, physical injury, and emotional distress and mental anguish.

COUNT III:

Breach of Contract for Termination of Dr. Porter's Employment
in Violation of His Academic Freedom.

108.   Paragraphs 1-105 are hereby restated and incorporated by reference.

109.   Dr. Porter's employment contract and the Faculty Manual offered him continued employment under a guarantee of tenure, absent an "adequate cause" for

33

his termination, and the College breached his employment contract by terminating him without adequate cause.

110.   Dr. Porter's employment contract and the Faculty Manual guarantee him the right of academic freedom in the classroom and in his research, when such speech and conduct pertains to an academic occasion and is made in a manner consistent with the motives, methods, and ends of the academic enterprise.

111.   Dr. Porter, at all pertinent times, created and distributed the Survey pursuant to legitimate academic inquiry and in a manner consistent with the motives, methods, and ends of the academic enterprise.  Accordingly, all of Dr. Porter's speech and conduct associated with or related to the creation and distribution of the Survey was protected under his right to academic freedom under his employment contract, the terms of the Faculty Manual, and the Executive Committee Resolution, at Items (i) – (iv), and his right to free speech.

112.   The College denied Dr. Porter his right to academic freedom throughout the termination proceedings against him in breach of his employment contract, the terms of the Faculty Manual, and the Executive Committee Resolution.

113.   Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of the College's breaches of contract, including but not limited to irreparable harm to his reputation, loss of income and benefits, physical injury, and emotional distress and mental anguish.

COUNT IV:

Violations of the KCRA for Employment Discrimination.

114.   Paragraphs 1-113 are hereby restated and incorporated by reference.

115.   The College has participated in and supported a pattern and practice of illegal discrimination based on age, race, and sex against white males over the age of

40 in the College's employment, discipline, and termination of members of the faculty in the psychology department and in the overall faculty of the College.

116. As part of this pattern and practice and because of the illegal discriminatory animus against Dr. Porter on the part of President Roelofs and Dean Berry, and due to the severe personal and political coercion of other College faculty members and administrators, with the knowing participation of the College, the College intentionally discriminated against Dr. Porter in suspending him, banishing him from campus, and ultimately terminating his employment without adequate cause and based on his age, race, and sex in violation of KRS 344.040(1)(a).

A. Discrimination Based on Age.

117. Paragraphs 1-116 are hereby restated and incorporated by reference.

118. Dr. Porter is a 69-year-old, white male.

119. Under KRS 344.040(1)(a) "[i]t is an unlawful practice for an employer: (a) To fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's [age  forty (40) and over]."

120. The College, in furthering its prior pattern of age discrimination, intentionally discriminated against Dr. Porter because of his age and in violation of KRS 344.040(1)(a) when the College brought false charges of "incompetence" against him, suspended him, and banished him from campus without any evidence of showing that he posed any "immediate danger to persons or property."

121. The Faculty Manual expressly states that there is no enforceable guarantee of confidentiality in the College's civil rights proceedings. The only circumstance where confidentiality is guaranteed in such proceedings is "[u]pon

receipt of a complaint of Sexual Violence." President Roelofs' concluding letter in Dr. Messer's case confirmed the College administration knew this by stating that "I have scanned our policy documents in vain for any requirement of confidentiality and so do not have the latitude to impose it."

122. The College intentionally discriminated against Dr. Porter because of his age and in violation of KRS 344.040(1)(a) when the College brought false charges of "incompetence" against him and terminated him on the pretext that he had allegedly violated a fabricated requirement for all participants in the College's civil rights proceedings to maintain confidentiality, and specifically concerning Dr. Porter's knowledge of and involvement in the prior proceedings against Dr. Messer. The College knowingly and unlawfully treated Dr. Porter differently from and less favorably than other similarly situated, younger employees, and differently and less favorably than persons who supported Dr. Messer's punishment, and condoned the unlawful discriminatory treatment of other faculty who participated as grievants against Dr. Messer and, later, against Dr. Porter.

123. Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of the College's illegal discrimination based on age in violation of KRS 344.040(1)(a), including but not limited to irreparable harm to his reputation, loss of income and benefits, physical injury, injury to his reputation, embarrassment, humiliation, emotional distress, and mental anguish.

B. Discrimination Based on Race.

124. Paragraphs 1-123 are hereby restated and incorporated by reference.

125. Dr. Porter is a 69-year-old, white male.

126. Under KRS 344.040(1)(a) "[i]t is an unlawful practice for an employer: (a) To fail or refuse to hire, or to discharge any individual, or otherwise to discriminate

36

against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's [race]"

127.   The College, in furthering its prior pattern of race discrimination, intentionally discriminated against Dr. Porter because of his race and in violation of KRS 344.040(1)(a) when the College brought false charges of "incompetence" against him, suspended him, and banished him from campus without any evidence of showing that he posed any "immediate danger to persons or property."

128.   The Faculty Manual expressly states that there is no enforceable guarantee of confidentiality in the College's civil rights proceedings. The only circumstance where confidentiality is guaranteed in such proceedings is "[u]pon receipt of a complaint of Sexual Violence." President Roelofs' concluding letter in Dr. Messer's case confirmed the College administration knew this by stating that "I have scanned our policy documents in vain for any requirement of confidentiality and so do not have the latitude to impose it."

129.   The College intentionally discriminated against Dr. Porter because of his race and in violation of KRS 344.040(1)(a) when the College brought false charges of "incompetence" against him and terminated him on the pretext that he had allegedly violated a fabricated requirement for all participants in the College's Civil Rights proceedings to maintain their confidentiality and specifically concerning Dr. Porter's knowledge of and involvement in the prior proceedings against Dr. Messer. The College knowingly and unlawfully treated Dr. Porter differently and less favorably than similarly situated non-white employees, and differently and less favorably from persons who supported Dr. Messer's punishment, and condoned the unlawful discriminatory treatment of other faculty who participated as grievants against Dr. Messer, and, later, against Dr. Porter.

130.   Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of the College's illegal discrimination based on race, in violation of KRS 344.040(1)(a), including, but not limited to, irreparable harm to his reputation, loss of income and benefits, physical injury, injury to his reputation, embarrassment, humiliation, emotional distress, and mental anguish.

C. Discrimination Based on Sex

131.   Paragraphs 1-130 are hereby restated and incorporated by reference.

132.   Dr. Porter is a 69-year-old, white male.

133.   Under KRS 344.040(1)(a) "[i]t is an unlawful practice for an employer: (a) To fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's [sex]"

134.   The College, in furthering its previous pattern of sex discrimination, intentionally discriminated against Dr. Porter because of his sex and in violation of KRS 344.040(1)(a) when the College brought false charges of "incompetence" against him, suspended him, and banished him from campus without any evidence of showing that he posed any "immediate danger to persons or property."

135.   The Faculty Manual expressly states that there is no enforceable guarantee of confidentiality in the College's civil rights proceedings. The only circumstance where confidentiality is guaranteed in such proceedings is "[u]pon receipt of a complaint of Sexual Violence." President Roelofs' concluding letter in Dr. Messer's case confirmed the College administration knew this by stating that "I have scanned our policy documents in vain for any requirement of confidentiality and so do not have the latitude to impose it."

38

136.   The College intentionally discriminated against Dr. Porter because of his sex and in violation of KRS 344.040(1)(a) when the College brought false charges of "incompetence" against him and terminated him on the pretext that he had allegedly violated a fabricated requirement for all participants in the College's civil rights proceedings to maintain their confidentiality and specifically concerning Dr. Porter's knowledge of and involvement in the prior proceedings against Dr. Messer.  The College knowingly and unlawfully treated Dr. Porter differently and less favorably than other similarly situated female faculty, and differently and less favorably from persons who supported Dr. Messer's punishment, and condoned the unlawful discriminatory treatment of other faculty who participated as grievants against Dr. Messer, and, later, against Dr. Porter.

137.   Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of the College's illegal discrimination based on sex in violation of KRS 344.040(1)(a), including but not limited to irreparable harm to his reputation, loss of income and benefits, physical injury, injury to his reputation, embarrassment, humiliation, emotional distress, and mental anguish.

### COUNT V:
### Violation of the KCRA for Illegal Retaliation

138.   Paragraphs 1-137 are hereby restated and incorporated by reference.

139.   Under KRS 344.280(1) "[i]t shall be an unlawful practice for a person, or for two (2) or more persons to conspire: (1) To retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this chapter, or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter . . ."

39

140. Dr. Porter acted as Dr. Messer's "adviser" throughout his hostile environment hearing and appeals, as allowed under the Faculty Manual. Dr. Porter argued that Dr. Messer's alleged infractions were neither severe nor pervasive enough to create a "hostile workplace environment" on the basis of sex or to warrant the punishments levied against him. Dr. Porter, during the proceedings before the CCHB and the FAC and in correspondence with President Roelofs and with Dean Berry and in an open letter to the campus, expressed his disappointment with the unfairness of the College's processes and the result in Dr. Messer's case, thereby antagonizing the College's administration as well as the grievants who had placed the charges against Dr. Messer. This animus is blatantly expressed in the postings by Dr. Sergeant and Dr. Williams, in which the College conspired and enabled.

141. The College intentionally retaliated against Dr. Porter because of his participation in Dr. Messer's defense in the proceedings against him and because of Dr. Porter's verbal and written criticism of the College's civil liberties procedures in general, the College's Civil Liberties proceedings against Dr. Messer in particular, and of the roles and actions President Roelofs and Dean Berry took with regard to both and in violation of KRS 344.280(1), when the College brought false charges of "incompetence" against him, suspended him, and banished him from campus without any evidence of showing that he posed any "immediate danger to persons or property." The College, particularly, enabled the retaliation against Dr. Porter by Dr. Williams and Dr. Sergeant, generally, and particularly because of his defense of himself and Dr. Messer as older white males.

142. The Faculty Manual expressly states that there is no enforceable guarantee of confidentiality in the College's hostile environment proceedings. The only circumstance where confidentiality is guaranteed in such proceedings is "[u]pon

40

receipt of a complaint of Sexual Violence." President Roelofs' concluding letter in Dr. Messer's case confirmed the College administration knew this by stating that "I have scanned our policy documents in vain for any requirement of such confidentiality and so do not have the latitude to impose it."

143.    The College intentionally retaliated against Dr. Porter because of his participation in Dr. Messer's defense in the proceedings against him and because of Dr. Porter's verbal and written criticism of the College's civil rights procedures in general, the College's hostile environment proceedings against Dr. Messer, in particular, and of the roles and actions President Roelofs and Dean Berry took with regard to both and in violation of KRS 344.280(1), when the College brought false charges of "incompetence" against him and terminated him on the pretext that he had allegedly violated a fabricated requirement for all participants in the College's civil rights proceedings to maintain their confidentiality and specifically concerning Dr. Porter's knowledge of and involvement in the prior proceedings against Dr. Messer. The College's treatment of Dr. Porter was directly retaliatory against him because of his defense of Dr. Messer, and, later, himself, as an older white male.

144.    Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of the College's illegal retaliation against him in violation of KRS 344.280(1), including but not limited to irreparable harm to his reputation, loss of income and benefits, physical injury, injury to his reputation, embarassment, humiliation, emotional distress, and mental anguish.

145.    So far as is known, this Complaint implicates only Kentucky state law, including the KCRA, state contract law, and the Kentucky State Constitution. No known federal claims are raised herein.

WHEREFORE, Dr. Porter hereby respectfully requests this Court enter Judgment against the Defendant on each and all counts in this Complaint and for the following relief, including, but not limited to:

1. Injunctive relief under KRS 344.450 ordering the College to reinstate Dr. Porter in his position as a tenured professor in the College's psychology department with full reinstatement of his rights under his tenured employment contract, including his salary and benefits, and with full restitution of his lost income and benefits, with interest thereon;

2. Compensatory damages under KRS 344.450, in an amount in excess of the minimum jurisdictional limits of this Court, including but not limited to:

    a.    Back pay.
    b.    Front pay.
    c.    Lost employment benefits.
    d.    Lost future employment benefits.
    e.    Damages for injury to reputation, embarrassment, humiliation, physical and emotional distress and mental anguish, including all damages for any manifestation of physical injury resulting from the above.
    f.    Interest at the legal rate from October 1, 2018.
    g.    Reasonable costs and attorney's fees.
    h.    All other equitable and legal relief which this Court deems just and due.

3. Plaintiff specifically requests trial by jury on all issues so triable.

Respectfully Submitted,

*John F. Lackey*

HON. JOHN F. LACKEY
214 West Main Street
Richmond KY 40475
(859) 575-7206
lackeylaw@att.net

*Debra Doss* by JFL

HON. DEBRA DOSS
108 Pasadena Dr.
Lexington, Kentucky 40503
(859) 260-1980
debra.doss@qx.net
**Attorneys for the Plaintiff**

Exhibit 1

**Have heard that SGA did vote for Porter to receive SGA 2017-18 Outstanding Service Award but administration decided Porter was ineligible because he had been placed on suspended status by executive action and that when the college policy states "faculty member" it means "faculty member in good standing" (i.e., not suspended).**

**From:** Tyler Sergent  **Sent:** Monday, April 9, 2018 12:09 AM
**To:** Yabsira H. Ayele
**Cc:** Osvaldo Flores; Rachel S. Vagts; Sierra N. Turner; Kelley S. Farley; Martin Kameya
**Subject:** Re: Concern about SGA service award

Yabsira,

Until you actually know something about the situation, there is no basis for debate or dialogue. I voiced my advice as part of my role as elected SGA faculty advisor. Again, I am not the only one, and so you need to include Rachel Vagts in your messages.

Clearly you have no interest in my advice or the advice of your other faculty advisor, both of whom know much more than you about a great many things directly related to this situation. So I hope you at least listen to those around you among the SGA leadership who are wiser and better informed.

One last bit of advice: I would caution you against burning bridges this early in your education, particularly for the wrong side of a cause.

Do not email me again regarding this issue.

Dr. Sergent

*F. Tyler Sergent, PhD*
*Assistant Professor*
*General Studies and History*

**From:** Yabsira H. Ayele  **Sent:** Sunday, April 8, 2018 11:51 PM
**To:** Tyler Sergent  **Subject:** Re: Concern about SGA service award

You are entitled your opinions I am entitled to mine.
Out of the 3 nominees, Dave was recognized as the most noteworthy. I urge you to let the students choose who served the students best.
I am disappointed in your objection and I believe they are without merit because I do not believe you have read the nominations. The college body nominated and we chose on behalf of them as elected officials.

I quote you the definition of a Biggot:  "a person who is obstinately or intolerantly devoted to his or her own opinions and prejudices; especially: one who regards or treats the members of a group with hatred and intolerance".

'I am not inviting a debate with you or anyone else who would defend the unethical actions of David Porter--they are indefensible just like racism and any other of form discrimination--or any other faculty member who has caused harm to other members of our community"

If you are willing to disseminate information, when the persons aforementioned, do not have the ability to defend themselves, is wrong, and that is unethical. To threaten me is unethical. I do not know the entire situation and you don't either. My point is with the information available to the general public the nominations were brought forth and democracy prevailed. If next, you say democracy is unethical then I cannot emphasize how problematic that is.

Our job is to bring these candidates forward, the rest is democracy, you have to respect that.

On a side note, I have no allegiance to anyone but truth and the right of equity and fairness, if I receive information that truly draws Professor Porter in a bad light, I am more than willing to change my stance. Hence my invitation to dialogue.

best,

**Yabsira Ayele** *Speaker of the Senate* *Program Specialist- Deep Green Residence Hall* Business Admin & Psychology  CPO 32

*The contents of this e-mail message and any attachments are confidential and are intended solely for addressee.*

---

**From:** Tyler Sergent  **Sent:** Sunday, April 8, 2018 11:07:03 PM
**To:** Yabsira H. Ayele; Rachel S. Vagts; Osvaldo Flores
**Cc:** Sierra N. Turner; Kelley S. Farley  **Subject:** Re: Concern about SGA service award

Yabsira,

There are many faculty and staff members who do this and much more for students and do so without bringing harm to other members of our community and without ever being accused of unfairness or unethical actions. That is the reason for my strong objection to the SGA in my capacity as faculty advisor. If you do not think other faculty members have done every good thing you attribute to David Porter plus much more, than you are uninformed about the unending, tireless work and support the rest of us give to students day in and day out.

I am not inviting a debate with you or anyone else who would defend the unethical actions of David Porter--they are indefensible just like racism and any other of form discrimination--or any other faculty member who has caused harm to other members of our community. Rewarding those actions and the harm coming from them is not the Berean way. The administration has good reasons for suspension and the case will be adjudicated.

I gave my advice and detailed my reasons for that advice. I have no doubt that you believe you are doing what is right. But there are people giving you advice who know a great deal more about this situation than you do. You should heed their advice.

To be clear, SGA has two faculty advisors, and we are both in agreement with our objections. We are attempting to keep the SGA from making a mistake today that will not only bring additional harm to those already harmed and hurting but that will be recorded for all time in Berea College history. I'm an historian and Rachel Vagts is an archivist and the head of the college archives--you do not want to be among a group of

student leaders on the wrong side of Berea's history. Therefore, I urge the SGA to heed our advice.

Tyler

**F. Tyler Sergent, PhD**
*Assistant Professor*
*General Studies and History*

---

**From:** Yabsira H. Ayele  **Sent:** Sunday, April 8, 2018 10:22 PM
**To:** Rachel S. Vagts; Tyler Sergent; Osvaldo Flores
**Cc:** Sierra N. Turner; Kelley S. Farley
**Subject:** Re: Concern about SGA service award

Dr. Sergent,
The reason why we chose to nominate Professor Porter is because of the excellence in service to students he has exhibited. His service to students towered over the other candidates.

I ask you when was the last time a professor bought groceries for students because they do not make enough money? When was the lasts time a professor provided housing free of charge for multiple students because they did not make enough money? When was the last time a professor got a student a full ride to Cambridge? When was the last time a professor actively helped students publish papers outside of class?

Professor Porter did all of this and then some more.  The choice of nominating Professor Porter was not made lightly, it was made because we believe he deserves this award. For you to bring up something that deals with faculty and an ongoing investigation is not fair, to say the slightest; the senators made their decision cognizant of the available information at hand ( The vote was 7-2-4).  Secondly, your characterization of people who disagree with you is not fair. I am more than willing to have a conversation with you one on one if need be. But I do not believe this should be shared any further. I urge that your personal involvement in Faculty matter does not cloud your judgment on Student matters.

With all respect,


**Yabsira Ayele**  *Speaker of the Senate*

---

**From:** Rachel S. Vagts  **Sent:** Sunday, April 8, 2018 7:13:01 PM
**To:** Tyler Sergent; Osvaldo Flores  **Cc:** Sierra N. Turner; Kelley S. Farley; Yabsira H. Ayele    **Subject:** Re: Concern about SGA service award

I would like to echo Tyler's concerns and include my strong objection as well. I did not have as many of the facts of the situation before, so I was reluctant to assert that objection at the Senate meeting, but now that they have been detailed here, I feel compelled to advise you to  reconsider Dr. Porter's nomination for the SGA Service award.

All my best,  Rachel

**Rachel Vagts** Head of Special Collections & Archives
Hutchins Library - Berea College  Berea, KY 40404
859-985-3267  Rachel.Vagts@berea.edu

**From:** Tyler Sergent  **Sent:** Sunday, April 8, 2018 6:23:35 PM
**To:** Osvaldo Flores  **Cc:** Rachel S. Vagts; Sierra N. Turner; Kelley S. Farley
**Subject:** Concern about SGA service award

Hi, Osvaldo and SGA Executive Committee,

I just heard that the SGA Senate has voted to give David Porter the SGA Service Award
this year. I am compelled to let you know my issues with and vehement objection to this
decision. I ask that you please share this with everyone else on the executive committee
for tonight's meeting.

I am aware that some of Porter's supporters among students--who have publicly said
they will support him "no matter what to the bitter end"--are also involved in SGA. I'm
surprised how they are able to convince others in SGA that Porter's actions aren't so
bad. That's the first issue I want to address with some background and details.

Porter supported Wayne Messer throughout a Title IX/VII complaint this last year that
was upheld against Messer at every level, including appeals, in which Messer was found
guilty of creating a hostile work environment for racist, sexist, and homophobic
comments. Messer was removed as chair of the Psychology Department and removed
from his office near the other Psychology faculty members as an outcome of his actions.
Porter argued on Messer's behalf that the racist, sexist, homophobic comments were
academic freedom and that Messer had the right to say these things to colleagues and
students. This took place from February 2017 until the present, as Porter has
continued to express this view about the case that was fully adjudicated several months
ago. In the process of this case, Porter also publicly in writing and in testimony made
sexist, disparaging remarks about each of the three female faculty members in
Psychology, including disclosing personal medical records of one, which
he characterized falsely, rising to the level of slander, libel, and defamation.

**The reasons for which Porter has been suspended and is in the process of being
fired for cause center on five major wrongful acts.**

**First is academic dishonesty.** The survey he sent out to the whole community was not
a valid survey, and he was well aware of that, and made it available to the entire
campus community anyway. Even after being told to remove it because of its
invalidation (for reasons explained below), he refused.

**Second is gross ethical violations.** In the survey, Porter included actual cases from
this past year's Title IX/VII case against Messer. That is a serious violation of
professional ethics in itself. To make it even more unethical, Porter falsely stated in the
discloser section of the survey that the scenarios were not based on any actual events.

**Third is incompetence along with manipulation of students.** Porter also sent the
survey out with students' names attached without having gotten those students express
permission, and many among those students had already expressed their own ethical
concerns about the survey. Porter has continued to manipulate students--like those in
SGA supporting this award--to rally for his cause. Hero-worship is not education; this
cultish approach to answering for his unethical acts is yet another level of unethical
behavior and breach of the student-teacher relationship.

**Fourth is refusal to abide by IRB (Institutional Review Board) and college policies for research.** Porter refused to send his survey to the IRB for review as required by college policy (and APA standards for research and ethics). When the IRB did review the survey at the request of the administration, against Porter's objections, the IRB rejected the survey as unethical for the reasons stated above.

**Fifth is harm to human subjects (and the campus community).** The people whose personal and private information was made public in the survey have been seriously harmed by Porter's actions and are having to seek care for both physical and mental health that has been damaged willfully by Porter. Contrary to what some students may have claimed, Porter has not apologized for this harm and has made no effort to repair the harm he has caused. By extension, Porter's continued manipulation of students to support him--no matter how much in the wrong he is--has caused serious (if not permanent) rifts between groups of students, and the animosity has spilled over into other classroom space, other campus spaces, and social media. Porter is actively fueling this animosity, among students and among faculty members.

The second issue at stake, however, regarding the SGA service award, is that the SGA not be reactionary in its decisions. The service award is a serious matter and should not be victim to manipulation by students who themselves are victims of manipulation by an unethical, unrepentant, academically dishonest person who is in process of rightly being fired from Berea College. That students like him is irrelevant; that his colleagues dislike him is irrelevant. Evaluate Porter--and other nominees for the award--as you would evaluate anyone: based on what they do and how they treat others. In this case, giving a service award to David Porter would add additional injury to those who Porter has already injured. This in itself would outweigh the good SGA has accomplished all year long.

Because there are remarkable people at Berea College who are worthy of the SGA service award and whose continuous work is always for the good people at all times (i.e, not unethical, not harmful, not malicious, not getting fired), I'm hoping SGA Senate will reconsider its decision. I know BOR has not yet voted on the matter. As one faculty advisor to SGA and voting member of the Senate and BOR, I will vote against this nomination. I've been so impressed with the work of SGA since my coming to Berea in 2011, and especially over the last two years when I've had the pleasure to work directly and closely with SGA leadership and members. On this particular matter, SGA can and ought to do better.

Sincerely,
Tyler

_F. Tyler Sergent, PhD_



**BEREA COLLEGE**

Office of the Academic Vice President and Dean of the Faculty
Chad Berry
CPO 2204, Berea, KY 40404
Phone: 859.985.3486
chad_berry@berea.edu

June 1, 2018

David Porter
CPO 1995

*Exhibit 2*

Dear David,

As we approach the end of another academic and fiscal year, I am writing to thank you for your service and to inform you of your salary increase for 2018-19.  Berea College benefits from a staff and teaching faculty of extraordinary dedication and commitment, and we are pleased to be able to provide raises this year for all successful employees.  The typical increase College-wide for 2018-19 is 2 percent.

Enclosed is a data sheet that shows how the salaries of Berea faculty compare to those in our faculty salary benchmark group for the last academic year (2017-18).  The aim of the College in determining faculty salaries has been to have the average Berea College salary in each rank be as near as possible to the median salary among the average salaries in the benchmark group.  The sheet also includes new information at the bottom for the upcoming academic year (2018-19).

Your salary effective with the first payroll period following August 1, 2018, will be at the annualized rate of $108,340, subject to taxes and other withholdings.

In addition to employees' salaries and wages, the College's payments for all employee benefits average an additional 26 percent of salaries.  The benefits paid by the College for eligible employees include (a) contributions to retirement, health insurance, and dental plans, and (b) providing for payroll taxes (FICA and Medicare), life and disability insurance, the employee assistance program, workers' compensation, vacation and sick leave, as well as most administrative costs of the employee benefits programs.

The terms and conditions of your employment remain subject to the provisions of the Berea College Faculty Manual and the Berea College Employee Handbook.  Current versions of the Manual and the Handbook are available online at http://www.berea.edu. The Handbook includes a description of the comprehensive benefits offered through the College.

I look forward to working with you in the coming year as we all seek to advance Berea's extraordinary mission.

Sincerely,

Chad Berry
Academic Vice President and Dean of the Faculty

cc: Steve Lawson
Sara Clements

1192-2175-6101-400

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
CIVIL ACTION, FILE NO. 19-CI-_____
DIVISION ___

Dr. DAVID B. PORTER,                                        PLAINTIFF,

VS.

BEREA COLLEGE
(With Process Agent:
President Lyle D. Roelofs
c/o Berea College
Lincoln Hall, CPO 2182
 Berea, KY 40404),                                        DEFENDANT.

****************************
PLAINTIFF'S FIRST SET OF INTERROGATORIES
AND REQUESTS FOR PRODUCTION OF DOCUMENTS
****************************

Comes the Plaintiff, David B. Porter, by counsel, and pursuant to Kentucky

Rules of Civil Procedure 33 and 34, hereby propound to the defendant, Berea College,

his following first set of Interrogatories and Requests for Production of Documents, to

wit:


I. INTERROGATORIES AND REQUESTS.

1.   Please furnish true copies of any mailed, emailed, texted, or memorialized

     communications from, to, or between the President of the College, the Dean

     of Students, the Diversity Compliance Director, the Chair of any of the

     College's departments, the College's Executive Committee, and, particularly,

     the Dean of Students of Berea College, relating to the charges placed against

     Plaintiff, relating to his subject class survey, between January 1, 2018 and

     October 1, 2018, including, particularly, but without limitation, the

     communications from, to, or between Dr. Ed McCormack, Dr. Karin

     Vazzano, Dr. Jay Baltisberger, Ms. Katie Basham, or any communications

otherwise sought or solicited by the office or director of diversity or of civil rights compliance, described in Plaintiff's Complaint at Paragraph 63 thereof, and any similar communications from or to Dean Chad Berry, Dr. Wendy Williams, Dr. F. Tyler Sergeant, and Dr. Amanda Wyrick, and including, particularly, all letters sent in response to the request by Ms. Basham or her office.

ANSWER:

2. Please furnish a true copy of the report or other analysis provided to the College by F. Scott Lewis, described in paragraph 29 of Plaintiff's Complaint, along with communications and contract(s) regarding the employment of F. Scott Lewis, the responses of the College to Mr. Lewis' report or analysis, and the College's reasons for keeping the report confidential from the college community.

ANSWER:

3. Please furnish true copies of any communication from any of the College's Board of Trustees to the College's Administration relating to the charges placed against Dr. Porter leading to the termination of his employment by the College.

ANSWER:

4. Please furnish any copies of any communication from, to, or between the College community to or from the defendant, regarding the proposed

Student Government Association award to Dr. Porter, described at
Paragraph 36 of Plaintiff's Complaint.

ANSWER:

5. Please furnish true copies of any communication to, between, or from the
   College Executive Committee to President Roelofs or Dean Chad Berry,
   regarding the charges against Plaintiff and his subject survey.

   ANSWER:

6. Please furnish to plaintiff true copies of any recorded or transcribed hearing,
   or interview, or statements given, relating to the charges against Dr. Porter,
   and tell whether the recorded or transcribed interviewer and interviewee
   were made aware of the recording transcription prior to, during, or after its
   completion.

   ANSWER:

7. Please furnish all records of any stripe memorializing the allegations set
   forth in Plaintiff's Complaint at its paragraphs 21, 26, 27, 28 and 119.

   ANSWER:

8. Please furnish true copies of the College's entire personnel file of Dr. David
   B. Porter, including, without limitation, his contract, letters of renewal,
   Administrative and student evaluations, notes to his file, commendations
   and awards, recognitions, counselling and disciplinary actions.

   ANSWER:

9. Please furnish the annual values of each and every employee benefit to which Dr. Porter was entitled in the school years of 2016-2018, prior to his termination.

ANSWER:

10. Please furnish true copies of any and all agreements or policies with declarations under which any insurance company may be liable to satisfy part or all of any judgment or settlement which may be rendered in this action, or to indemnify or reimburse the College or any of its employees for payments made to satisfy the judgment or settlement.

ANSWER:

11. Please furnish true copies of, and give details, including dates, names of persons involved, and responses of Berea College to all civil rights/workplace hostility claims made to the College since January 1, 2012.

ANSWER:

These interrogatories and requests for production of documents are to be taken as continuing, so as to require the defendant to supplement and amend its responses as any new or different information comes to it.  The Certificate of Service for these Requests and Interrogatories is by and with, and accompanying,  the service of the Complaint herein upon the defendant, Berea College.

HON. JOHN F. LACKEY
214 West Main Street
Richmond KY 40475
(859) 575-7206
lackeylaw@att.net

HON. DEBRA DOSS
108 Pasadena Dr.
Lexington, Kentucky 40503
(859) 260-1980
debra.doss@qx.net
**Attorneys for the Plaintiff**

AOC-105    Summons Type: CI
Rev. 11-95

Commonwealth of Kentucky
Court of Justice

CR 4.02; CR Official Form 1

CASE NO. 19-CI-100  I

COURT:  CIRCUIT

COUNTY:  Madison

## CIVIL SUMMONS

Dr. DAVID B. PORTER,

**PLAINTIFF**

**VS.**

BEREA COLLEGE
(With Process Agent:
Lyle D. Roelofs
c/o Berea College
Lincoln Hall
CPO 2182 Berea, KY 40404),

**DEFENDANT**.

THE COMMONWEALTH OF KENTUCKY
TO THE ABOVE-NAMED DEFENDANT(S):

    You are hereby notified that a legal action has been filed against you in this court demanding relief as
shown on the document delivered to you with this summons.  Unless a written defense is made by you or by an
attorney on your behalf and filed in the clerk's office within 20 days following the day this paper is delivered to you,
judgment by default may be taken against you for the relief demanded in the attached complaint.

    The name(s) and address(es) of the party or parties demanding such relief against you or his (their)
attorney(s) are shown on the document delivered to you with this summons.

DATE  1-29-19                                CLERK:  *Paul M. Lemmerly*

                                            By *Allison Hemsley*        , D.C.

## PROOF OF SERVICE

This Summons was served by delivering a true copy and the complaint (or other initiating document) to:

_____

This the ___ day of _____, 2019.

                                    Served By:_____

# MADISON County

# Random Judge Assignment Report

**Court:** | Circuit Court

**Requestor:** | ALLISON_HEMSLEY | **Reference/Case Number:** | 19-CI-60

**This Case has been Assigned to:** | 1 | **Division**

Judge Brandy Oliver Brown | 625387

**Control Date/Time:** | 01/29/2019   9:47:56AM

Commonwealth of Kentucky
Madison County
David M. Fernandez
Circuit Court Clerk

Receipt Number: 03-0059797-A
DATE: 01/29/2019
TIME: 09:19 AM
*** (I) CIRCUIT CIVIL FILING ***

CASE NO: 19-CI-00060
RECEIVED FROM: JOHN LACKEY
ACCOUNT OF: DR. DAVID B. PORTER V. BEREA COLLEGE

PARTY NAME: DR. PORTER

| | | |
|---|---|---|
| 1. | Civil Filing Fee (Q) | 150.00 |
| 2. | ATJ Fee (I) | 20.00 |
| 3. | Court Technology MCFO(K(CT)) | 20.00 |
| 4. | Library Fee (L) | 1.00 |
| 5. | Court Facilities Fee (I) | 25.00 |
| 6. | Attorney Tax Fee MCFO(K(Q)) | 5.00 |
| 7. | Jury Demand /12 CS(W(M)) | 70.00 |
| 8. | Postage MCFO(K(H)) | 8.15 |

TOTAL:            $299.15

CHECK:            $299.15

***DIFF:            0.00

*** Check Number: 8849
*** Credit Card Invoice #:
Balance Due :

Prepared By: Mallory McGhee
** MCFO=Money Collected for Others
** CS=Charge for Services
Filing (KYCOURTS)                    Page 1 of 1

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
CIVIL ACTION, FILE NO. 19-CI-60
DIVISION I

Dr. DAVID B. PORTER,                                    PLAINTIFF,

VS.

BEREA COLLEGE (With Process Agent:
Lyle D. Roelofs c/o Berea College
Lincoln Hall, CPO 2182 Berea, KY 40404),      DEFENDANT.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
FIRST AMENDED COMPLAINT
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

COMES NOW the Plaintiff Dr. David B. Porter ("Dr. Porter"), by and through his

counsel, who hereby files this, his First Amended Complaint as "a matter of course,"

pursuant to C.R. 15.01, before any responsive pleading has been filed herein by the

defendant, against the Defendant Berea College ("the College") for breach of contract,

and for employment discrimination resulting in his wrongful termination, and

retaliation, all in violation of the Kentucky Civil Rights Act, KRS 344.010, et seq., and

who further states as follows:

**PARTIES**

1.    Dr. Porter is a resident of the City of Berea, Madison County, Kentucky.

2.    The College is a private liberal arts college and a Kentucky corporation

situated in the City of Berea, Madison County, Kentucky.

**JURISDICTION AND VENUE**

3.    Paragraphs 1-2 are hereby restated and incorporated by reference.

4.    This Court has personal jurisdiction over the College as it is a

corporation situated in and with its principal place of business in Madison County,

Kentucky, and the relevant facts hereof occurred in said county.

5.    This Court has subject matter jurisdiction over a claim for breach of

contract under KY Const. § 112(5) and KRS 23A.010.

1

6.     This Court has subject matter jurisdiction over a claim for employment discrimination in violation of the Kentucky Civil Rights Act, KRS 344.010, et seq., under KRS 344.450, and under KY Const. § 112(5) and KRS 23A.010.

7.     This Court is the proper venue for this Complaint under KRS 452.450.

## I. **STATEMENT OF FACTS**

A.  <u>Dr. Porter's Qualifications for Employment at the College.</u>

8.     Paragraphs 1-7 are hereby restated and incorporated by reference.

9.     Dr. Porter is a 69-year-old, white male and was a tenured professor and employee of the College for more than 17 years, serving as academic vice president and provost from 2001 – 2005 and as a member of the Psychology Department thereafter until the termination of his employment on Oct 1, 2018.

10.     At all pertinent times, Dr. Porter was qualified for his position at the College as a tenured professor of psychology.

11.     Dr. Porter is a partially disabled United States Air Force veteran who holds a Doctorate of Philosophy from Oxford University, United Kingdom, a Master of Science from the University of California at Los Angeles, and a Bachelor of Science from the United States Air Force Academy.  He has extensive training and leadership in claims of wrongful workplace harassment.

12.     Prior to joining the College, Dr. Porter taught for the United States Air Force as Permanent Professor and Head of the Air Force Academy Department of Behavioral Sciences and Leadership.

13.     Dr. Porter is the author of some sixty (60) professional publications, and has given roughly an equal number of professional presentations.

2

14.     In his position at the College, as a part of his employment duties, Dr. Porter advocated using peer-reviewed, scientifically approved analysis rather than subjective opinions to assess administrative policies and programs.  His observations and advocacy, at times, annoyed and rankled members of the College administration and faculty and student factions in campus workplace matters.  Dr. Porter's advocacy of science and skepticism was incorporated in many of the courses he taught, including GSTR 110 (*Questioning Authority; Skepticism and Science and Antidotes for Oppression*), GST 232 (*Introduction to the Behavioral Sciences*); PSY 208 (*Cognitive Psychology*), PSY 210 (*Industrial/Organizational Psychology*), and PSY 424 (*Senior Research*).

15.     In 2018 the Berea College Student Government Association chose Dr. Porter for its Student Service Award.  Dr. Porter received other distinguished teaching and service awards from the College during his tenure.  His students consistently placed him in the highest professional ranking at the College, and his students consistently scored in the highest academic ranking.

B.   Pattern of Discrimination by Berea College Against Older, White Male Employees at the College, Including, Without Limitation, the Prior Civil Rights Grievance Filed Against Dr. Wayne Messer in Which Dr. Porter Participated as Dr. Messer's "Adviser".

16.     In 2013 a Caucasian male faculty member made an inappropriate post on social media sarcastically suggesting that little should be expected from one of his African American students named "Tequila".  The response to the tweet from the campus community was, appropriately, immediate outrage.  The College's response was to declare a mandatory "Diversity Day" training for all faculty members.  Most, but not all, faculty members attended, but two senior white male professors who had nothing to do with the post did not attend and criticized the endeavor as demeaning to

3

them and counterproductive. The College harshly punished the two men for their criticism and noncompliance, including imposing restrictions on pay, benefits, and academic promotion. The names of these men are known to the Plaintiff and Defendant, but will not be identified in this Complaint.

17.     In 2015 during a faculty meeting discussion of institutionally provided health insurance, a young, female African American faculty member related her difficulties and traumas related to several unsuccessful pregnancies. Shortly thereafter at a Walmart, a senior, white male faculty member in the same department as the female faculty member expressed his sympathy and condolences for her traumas. The College charged him with a breach of confidentiality and forced him to resign.

18.  At the close of the 2017 school year, a quite competent and approximately ten-year employed administrator at Berea College chose to leave the College because he was told by another senior administrator that he would not be further promoted because he was a Caucasian male. The name of this individual is known to both the Plaintiff and Defendant, but will not be identified in this Complaint.

19. In March of 2017 the chairman of the psychology department, Dr. Wayne Messer, was subject to a civil rights grievance brought by fellow psychology professors Dr. Wendy R. Williams, Dr. Amanda Wyrick, and Dr. Sarah Jones, alleging his discrimination in hiring and promotion, retaliation, and creation of a hostile workplace environment.

20.  In the proceedings against Dr. Messer, before the Campus College Hearing Board (CCHB) and the Faculty Appeals Committee (FAC), concerning the civil rights Complaint, the College deemed his (appropriate) motives to be irrelevant, and he was not allowed to defend or explain his intentions. The focus of the investigation was

4

entirely on the claimed subjective emotional impact on the three grievants. One of the grievants incorrectly, but successfully, asserted that the Faculty Manual states that mediation is inappropriate for cases of "sexual discrimination," and the College accepted this position in its investigation. The Faculty Manual, however (at its page 19, "Resolving Complaints Informally"), provides that mediation is inappropriate only for charges of sexual assault, for which Dr. Messer was not charged. The campus investigative committees, the CCHB and the FAC, recommended punishment for Dr. Messer, rather than mediation between the parties, confirming that the grievant's false claim was adopted. President Lyle Roelofs summarily dismissed, without explanation, Dr. Messer's appeal alleging violations of Dr. Messer's rights to administrative due process under the terms of the Faculty Manual.

21. One of the charges against Dr. Messer was that he had demonstrated a bias against women in hiring. This charge was demonstrably false in every way. A contemporaneous Excel spreadsheet introduced by Dr. Messer showed the ratings each of the five psychology department selection committee members had given to approximately 100 applicants. The sheet showed that the top six ratings Dr. Messer gave were all assigned to women. Testimony of other selection panel participants supported the absence of Dr. Messer's bias.

22. In contrast, the grievant, Dr. Williams, had proclaimed during a selection panel meeting that, *"The last thing we need in this department is any more old white guys!"* A closer examination of Dr. Williams' own ratings of applicants revealed other incidents of her discrimination against white males. Although white males made up about 25% of the applicant pool, none appeared in Dr. Williams' top-ten rated applicants. Unlike the other four professors in the department making ratings, she had used a scale of 0-5 to rate the applicants rather than the 1-5 scale to which all of

5

the selection panel members had agreed prior to rating. White males received a disproportionately high number of Dr. Williams' "0" ratings. Similarly, she awarded disproportionately more below-average ratings to white males whom the other professors had rated in the top third of applicants. Dr. Williams also withheld her ratings until after she had seen all the other ratings of applicants. Her anomalous rating scale served to discriminate in hiring against all white males. Nonetheless, the College took no action against her, despite having knowledge of her unlawful racial, age, and gender discrimination.

23. The grievants in Dr. Messer's case also asserted that due to the hostility in the department, they had been forced to use the copier on a different floor rather than the copier next to the department chair's office. This, too, was a demonstrably false charge. Dr. Williams had, in fact, used this alternative copier only about 6% of the time during the semester. The copier records also revealed that the grievant, Dr. Wyrick, had used the alternative copier less than 2% of the time, and nearly all these uses had been during the week in which her grievance had been filed. The College was aware of this false claim, but took no action despite the Faculty Manual's warning that false testimony in such proceedings could result in serious sanctions, up to and including dismissal. *See* page 92, "General Guidelines," of the Faculty Manual: "Fabricated charges of alleged violations or false testimony are serious offenses. Persons found to have fabricated charges or testified falsely will be subject to disciplinary action up to and including termination or expulsion."

24. After the civil rights investigation and hearing, many of the charges against Dr. Messer were dismissed, but the College found that Dr. Messer had created a "hostile workplace environment" based on sex. The College found Dr. Messer guilty based on three incidents over a two-year period: telling an inappropriate joke about a

6

"Jewish American Princess" prior to a department meeting; attempting to engage his psychology department colleagues in conversations about the public backlash to rock singer Chrissy Hynde's recent NPR interview about her rape; and his use of the phrase "militant lesbian" during an animated faculty discussion regarding one of his student's disciplinary problems. These findings led to the College removing Dr. Messer as psychology department chair and revoking his then office space and banishing him to an office in the basement of the psychology department building.

25. Dr. Porter acted as Dr. Messer's "adviser" throughout his grievance hearing and appeals, as allowed under the Faculty Manual. See page 92 of the Faculty Manual. Dr. Porter argued that Dr. Messer's alleged infractions were neither severe nor pervasive enough to create a "hostile workplace environment" on the basis of sex or to warrant the punishments levied against him. Dr. Porter, during the proceedings before the CCHB and the FAC, and in correspondence with President Roelofs and Dean Chad Berry, and in a letter, expressed his disappointment with the unfairness of the College's civil rights process, and the result in Dr. Messer's case. This advocacy subjected Dr. Porter to unlawful workplace hostility from members of the College's senior faculty and administration, and from the grievants who had placed the charges against Dr. Messer. These grievants later unlawfully retaliated against Dr. Porter as hereafter described.

26. College administrators rebuffed Dr. Porter's attempts to have them address his concerns about the College's unfair lack of administrative due process and its misapplications of workplace policies and procedures in Dr. Messer's case. While many senior faculty members and mid-level administrators unofficially acknowledged problems with the Hostile Work Environment Program disciplinary process at the

College, President Roelofs and Dean Berry refused to discuss Dr. Porter's specific concerns.

27. In accordance with Faculty Manual procedure, President Roelofs and Dean Berry decided to order the psychology department faculty members to meet face-to-face in the aftermath of Dr. Messer's contentious defense, in order to broker some sort of a peace. However, the three female grievants refused to meet or interact directly with the male department members, claiming that the acting department chair Dr. Jackie Burnside, an African-American female, had treated them with "contempt.". In response, Dean Berry acquiesced and rescinded the requirement for face-to-face department meetings, even though the Faculty Manual states that attendance at "faculty meetings" is a job requirement. See its page 34.  This same provision had been the College's exact justification for severely punishing the two senior, white male faculty members for not attending "Diversity Day" training. *See* Paragraph 16, *supra*.

28. During several meetings of the College's Strategic Planning Council, Dean Berry and the College's Vice President for Diversity, stated that only those who share a "minority identity" should have significant input on policies of the College involving inclusivity and diversity.

29. Later, during the 2018 fall semester, the College, through Dean Berry, advised faculty members that all faculty hires would be "either black or brown".

30. Following the unpleasant proceedings against Dr. Messer, in the late fall semester of 2017, Berea College employed a quite distinguished expert by the name of W. Scott Lewis to advise it about its policies and procedures regarding wrongful workplace hostility in the College's psychology department.  Dr. Lewis has trained thousands of faculty and staff members on how to prevent, address and properly

8

report wrongful workplace issues.  He is also a law enforcement trainer on how to investigate sensitive matters, such as abuse and assault.

Dr. Lewis did a thorough investigation of workplace issues in the College's psychology department.  His report supported the prior criticisms made by Dr. Porter. As part of its pattern of wrongful workplace discrimination, and in support thereof, the College refused to release Dr. Lewis' report, embargoed it, kept it confidential, and took no responsible actions to implement its recommendations, or to address Dr. Porter's prior recommendations supported by Dr. Lewis' report.

31.  The abovementioned instances of unlawful discrimination based on age, sex, and race are not intended to be exhaustive.  Plaintiff states that other instances known to the defendant will be presented as they become known to Plaintiff.

C.  <u>Dr. Porter's Survey for his PSY 210 Industrial/Organizational Psychology Class, and the College's Resulting Suspension, and His Banishment From Campus.</u>

32.  For over a decade Dr. Porter had taught the PSY 210 Industrial /Organizational Psychology course at the College.  A regular feature of this course was large, integrative student projects that apply the scientific method through the examination of archival and survey data to assess college policies, practices, and programs and to identify areas where there are opportunities for improvement.  These studies had included, for example, reviews of the effects of characteristics of first year general studies courses on student retention and academic success and the relation between the first-year student labor positions, and other measures of student satisfaction and motivation.  These projects were integral to the academic content of the course and often received praise from students and officials of the College.

To Dr. Porter's knowledge, there had been no objection to Porter's methodology or subject matter prior to February, 2018.

9

33.  After the contentious proceedings against Dr. Messer, it appeared to Dr. Porter that the College's Civil Rights Program enforcement relied almost entirely on asserting and re-asserting the charged assumptions of the College administration, with little attention to actual evidence of the program's effectiveness or consequences. As an academic researcher having authored over fifty published articles and several book chapters concerning psychology, Dr. Porter decided to engage his Spring 2018 PSY 210 Industrial/Organizational Psychology class in developing a survey of community perceptions and attitudes about academic freedom, freedom of speech, and hostile work environments under KRS Chapter 344 ("the Survey"). This research employed survey methods similar to those Dr. Porter had used in the past in his classes.

34.  The heart of the Survey was a set of some 20 posed scenarios. Respondents were asked to read the scenarios and decide whether each situation reflected a "hostile environment," and if academic freedom should protect the action taken in the scenario. The use of such scenarios (i.e., situational judgement tasks) is common in industrial/organizational psychology studies and often provides reliable information about implicit attitudes which may differ from explicit beliefs. In no respect did the scenarios suggest (push) a preferred, or "right," response.

35.  Dr. Porter drew about one half of the Survey's scenarios from issues, arguments, and events he had observed as faculty adviser for Dr. Messer in the prior civil rights case. The Survey carefully concealed participant identity by obscuring dates and altering the identification of gender, race, and other personal characteristics. No names or other information identifying the participants were presented in any of the scenarios. The Survey instructions carefully stated that "[n]o

10

claims are made about the relationship between these hypothetical situations and actual occurrences here at Berea College or elsewhere."

36.   Before publicly releasing the Survey, Dr. Porter shared drafts of it with many other faculty members, and requested and received feedback from six (6) of them.   These six included the Chair of the College's Institutional Review Board (IRB) and its Director of Academic Assessment, Dr. Robert Smith, Dr. Porter's academic and departmental division chair, Dr. Jackie Burnisde, and other tenured faculty members with applicable experience in the social sciences, including Dr. Wayne Messer, Dr. Jose Bey, and Dr. Ian Norris.   No person who was asked to vet the Survey flagged any potential breaches of confidentiality, ethical concerns, or harm to the former grievants.

Two reviewers did express concern about controversy the survey might elicit by presenting issues the College administration did not want to have debated.

Dr. Porter sent a copy of the Survey to Dean Chad Berry three days before it was posted.

Dr. Jay Baltisberger, later Chair of the Faculty Affairs Committee (FAC), which heard the claims against Dr. Porter, was one of the six persons who both received an early vetting copy of the Survey, and who responded to Dr. Porter's pre-published inquiry.   Dr. Baltisberger did not offer a critique, but by email, responded to Dr. Porter by observing that since the Survey was for class use, he would not comment.   Dr. Porter took Dr. Baltisberger's silence to mean that he had no ethical or professional objection to the Survey. Dr. Baltisberger, while serving as FAC Chair, did not acknowledge his review of the Survey prior to its release.

37.   The survey was launched on Monday, February 19, 2018.   That day Dr. Porter received a polite e-mail request from Dean Berry that they meet to discuss it, to which Dr. Porter quickly replied affirmatively.

11

38.  Meanwhile, that same day, Dr. Williams published a Facebook post incorrectly claiming that nearly all the fact patterns in the Survey's scenarios were expressly about her and the other grievants in Dr. Messer's disciplinary proceedings, that the Survey improperly repeated allegations of cognitive impairment against her, and that the Survey targeted them and was intended to punish and silence them.  Dr. Williams posted:

> I've said this elsewhere, so I'll post it here, too. <u>As one of the not anonymous targets of this survey</u> I can tell you that I, and the other women who filed (and won-at every level of the process) the [civil rights] hostile work environment complaint on which this survey is based, <u>would be thrilled with some support on this. Every scenario in the survey</u> is either a biased portrayal of what we claimed in our complaint, or it was given by the defense to show that we were the biased ones <u>or that we were cognitively compromised in our judgment</u>, or it was given as examples of how other people had done much worse so the behavior we objected to isn't *that bad* in comparison to "real" hostile environments. Let me repeat again-we won at every stage of the process. Yet despite the conclusion of that process three months ago (after 9 months of the process) <u>this is another attempt to silence us (and those like us)</u>. That said, <u>if this kind of behavior by a colleague in response to losing a Title IX complaint is tolerated by the community, then this is certainly one way to make sure no one ever brings another [civil rights] complaint on this campus.</u> If you feel upset by this unethical use of students under the guise of "research" or the not subtle attack on your female colleagues/faculty, <u>please do more than write it here. If you want to know more ways to help, let me know.</u>   (Emphasis added).

Dr. Williams made other hostile postings on other dates.

39.  Dr. Williams' Facebook post falsely claimed that nearly every scenario was about her and the other grievants in Dr. Messer's case, and, importantly, *improperly revealed identities of persons she believed were involved to the entire campus community*, who were not familiar with the particular fact patterns posed.

40.  In her Facebook post Dr. Williams specifically exhorted campus activists to take action to "support" her and to do "more" than just write about their anger.

41.  Dr. Williams's Facebook post predictably aroused a small group of campus activists who made their anger known to Dr. Porter's students, the College civil rights coordinator, Dean Berry, and President Roelofs.

42.  On Tuesday, February 20, 2018, in a message sent to the entire College campus, Dean Berry publicly requested that Dr. Porter remove the Survey and apologize to the campus community.  However, two hours later in a phone call, Dean Berry promised to forward some of the grievances to Dr. Porter directly and to provide him with a list of the most "problematic" Survey scenarios, so they could be deleted or amended.  The Dean never sent this information to Dr. Porter.  Dr. Porter awaited this response from Dean Berry before withdrawing the survey.

43. Data from the Survey's 160 valid responses yielded a surfeit of psychologically and scientifically valid results:

- The respondents' biographic characteristics predicted their political beliefs, and these beliefs predicted most of the variance in the perceptions and judgments people make about hostile environments and academic freedom.
- A large majority of the respondents stated that they did not express their beliefs on campus because of fear of judgment and retaliation.
- The Survey results revealed that most of the College's current "diversity training" programs did little to affect awareness, attitudes, or perceptions, and one such program appeared to be having a polarizing effect on its participants.
- Over half of the respondents did not see the survey as contributing to a hostile environment, and nearly three-quarters of them believed academic freedom protected the dissemination of the Survey.
- The Survey also uncovered evidence that at the College that race was unrelated to the respondents' attitudes and perceptions about civil rights or academic freedom.

13

- About a quarter of the Survey's respondents expressed support for denying others the opportunity to express beliefs that could be considered potentially harmful or hurtful.
- Women rather than men at the College were more likely to express strong activist views. Respondents who endorsed the need for hostile environment protection were also more likely to express support for academic freedom.
- Judgments about hostile environments and academic freedom protection were significantly negatively correlated. What respondents claimed to be true was just the opposite of the pattern of what their responses to the scenarios showed to be true.

44.     Therefore, the Survey provided valid psychological evidence that because beliefs or viewpoints determine one's perception of hostility, relying primarily on subjective reports of offense can be very problematic. The College administration's interest in suppressing these results was clear, given past disciplinary and KRS Chapter 344 controversies.

45.     On Thursday, February 22, 2018 Dean Berry summoned Dr. Porter and his academic division chair to the Dean's office, where Dean Berry advised Dr. Porter that charges of "incompetence" would be brought against him. Pursuant to Faculty Manual procedure at its page 121, Dr. Porter asked to discuss the matter. Dean Berry stated that the time for discussion had ended two days earlier when Dr. Porter had not immediately withdrawn the Survey and apologized to the campus.

46.     Dean Berry presented the charges against Dr. Porter to the Faculty Status Committee (FSC) at a hearing that afternoon, that Dr. Porter did not know was taking place. A majority concurred with the Dean and recommended termination. Dean Berry claimed that the Survey was only an instrument of malicious retaliation against Dr. Messer's grievants. He did not inform the Committee of the survey's academic

14

value. The FSC hearing took place without notice to, or an appearance by, Dr. Porter. The College engaged in no investigation of the charges against him before a majority of the FSC voted to support termination.

47.   Shortly thereafter, President Roelofs summarily suspended Dr. Porter, and the College reassigned his classes to other faculty members. It prohibited him from communicating with students, labeled him as "dangerous" to the students, and banished him from campus. During the ten weeks between the distribution of the Survey and the eventual FAC hearing, President Roelofs and Dean Berry repeatedly refused Dr. Porter's requests that they specify the nature of the "danger" Dr. Porter supposedly posed to others that justified his continuing suspension. The College refused any conversation aimed at informally resolving the issues involved. It also rebuffed Dr. Porter's attempts to understand the nature of the charges against him.

48. The College administrators treated other faculty who posted surveys completely differently from their treatment of Dr. Porter. In the spring semester of 2018, several other surveys, completed by the College campus community, similarly studied campus attitudes and opinions. The College's Institutional Review Board (IRB) was not involved, because the College interpreted that since the surveys did not identify particular individuals (as Dr. Porter's had not), they did not meet the definition of "human subjects research". The IRB did not review these surveys from the Student Counseling Center and the Interracial Education Center, both led by female faculty members. In Dr. Porter's case, however, the College used an arbitrary and contradictory standard from other IRB procedures in the Faculty Manual to justify President Roelofs' decision to embargo the Survey data. Without allowing Dr. Porter any opportunity to defend his work, the College prohibited him from using the Survey data.

15

49. In the midst of the controversy, the Berea College Student Government Association ("SGA") voted to award Dr. Porter its 2018 Student Service Award. While notifying the College's administration of his actions, Dr. F. Tyler Sergent, the husband of Dr. Wendy Williams, a primary Porter grievant, and a junior faculty member, acting in his role as faculty advisor to the SGA, emailed SGA members as "Faculty Advisor to the SGA" attacking the award, and making false claims linking Dr. Messer, Dr. Porter's advocacy of Dr. Messer, and the Survey. Dr. Sergent's emails threatened the SGA board members with reprisal and retaliation by negative educational repercussions if they went through with the award to Dr. Porter. See exhibited emails between Dr. Sergent and student Yabsira Ayele (Exhibit 1). Though aware of Dr. Sergent's unlawful retaliation against the SGA, Dr. Porter, and Dr. Messer, the College administration did nothing to investigate or repudiate Dr. Sergent's unlawful retaliation against Dr. Porter, or the unlawful retaliation against Mr. Ayele, or the unlawful threats to SGA members. On the contrary, the College unlawfully enabled Dr. Sergent's retaliation by interpreting, without precedent or authority, that the SGA award could not be given to a person charged with an offence. The College's support of Dr. Sergent's behavior constituted specifically unlawful conspired retaliation prohibited by KRS 344.280, and other applicable law.

**D.** **The College's Wrongful Disciplinary Proceedings Against Dr. Porter, Leading to His Termination.**

50. Dean Berry and the Faculty Status Council on behalf of the College ostensibly sought the termination of Dr. Porter under a section of the Faculty Manual entitled "Professional Competence and Dismissal for Cause." The College specified charges against Dr. Porter for trial before the FAC, accusing him of "incompetence" and also of (i) disclosing personal information of Dr. Williams, and harassing her, Dr.

16

Wyrick, and Dr. Jones, (ii) retaliating against them for their participation in the prior

proceedings against Dr. Messer, (iii) causing them emotional distress, (iv) jeopardizing

trust in the process, and (v) perpetuating a hostile environment in the psychology

department.

51.  The Faculty Manual states: "Once the question of competence or

effectiveness has [a]risen, the Division Chair, the Academic Vice President and Dean of

the Faculty, and the faculty member shall discuss the matter in personal conference."

*See* Faculty Manual, page 121.  However, Dean Berry refused to allow any such

mediation of these issues.

52.  At the FAC hearing, Dean Berry both prosecuted and acted as a witness

in the case against Dr. Porter, over Porter's objection.  Dean Berry had been involved

in, and had been criticized by Dr. Porter, about the proceedings against Dr. Messer,

and the Dean also headed the College's response to the Survey and its aftermath.  The

Dean acted as a witness and the prosecutor at the FAC hearing, while also being the

direct supervisor of the FAC members concerning their compensation and the terms of

their employment at the College.  This behavior was in clear conflict with

administrative due process.

53.  At Dean Berry's insistence and over Dr. Porter's objections that the

Faculty Manual and administrative due process required a standard of "clear and

convincing evidence," the FAC adopted the minimal "preponderance of the evidence"

standard in the proceedings.  The FAC allowed Dr. Porter only a single day to present

his defense rather than the two days he had requested, precluding Dr. Porter from

presenting all of his witnesses and evidence.

54.  The grievants, Dr. Williams and Dr. Wyrick, did not testify at the FAC

hearing, but submitted written witness statements concerning the events at issue and

17

their alleged emotional distress resulting from the Survey and Dr. Porter's acts and statements in defense of Dr. Messer. Dr. Porter did not have opportunity to cross examine Dr. Williams or Dr. Wyrick, or to serve any interrogatories on them. He wished to inquire how each learned of the contents of the Survey, and what alleged objections they had to its academic rigor and its appropriateness. Dr. Porter was unable even to ask Dr. Williams as to why she publicized the Survey on Facebook. Dr. Porter could not question Dr. Williams and Dr. Wyrick about the authenticity of their emotional distress, or the nature of their alleged personal or professional harm. He was not allowed to confront Dr. Williams about her wrongful identification of individuals in her email post.

55. Dr. Porter defended his use and distribution of the Survey on the basis of the College's contractual promise of academic freedom as defined and guaranteed in the Faculty Manual. Dr. Porter submitted written and telephonic testimony from national experts familiar with the research the Survey represented. These experts supported the use of situational judgment indexes (i.e., scenarios) composed of incidents drawn from real life events.

56. At the hearing, one member of the FAC showed his preconceived bias by likening Dr. Porter's Survey to pouring gasoline in a dry forest, and then argued that the inflammatory Facebook posting was the equivalent of someone dropping a match. Later, that same FAC member compared the Survey and the grievants' alleged harm to that done to the Tuskegee inmates being infected with syphilis. Contrary to the College's policies, this FAC member failed to disclose his motives or conflict prior to the proceedings. His metaphor, however, was commended in the FAC report.

57. Following the FAC report, Dr. Porter learned that two members of the FAC committee had, contrary to Faculty Manual procedures and administrative due

18

process, blatantly participated in biased and preconceived actions which disqualified them from participating in adjudication of Dr. Porter's case. In the first of such instances, Dr. Ed McCormack, on February 20, 2018, along with Dr. Ian Norris, and Dr. Caryn Vazzana, who had been a Chair of the FSC committee that had recommended Dr. Porter's termination to the FAC, discussed together the charges against Dr. Porter. Dr. Vazzana adamantly claimed that Dr. Porter's survey was wrong. Dr. McCormack asked: "is this the consensus....all right."

Dr. McCormack afterwards participated on the FAC that heard Dr. Porter's case. As a member of the FAC, the Faculty Manual requires his lack of bias and preconceived opinion. He wrongfully failed to reveal his preconceptions, bias or ex parte influence.

58. The second instance of blatant action contrary to the Faculty Manual and administrative due process involved Dr. Jay Baltisberger, Chair of the FAC that heard Dr. Porter's charges. On or about February 19, 2018, Dr. Baltisberger expressed his clear bias and preconceived opinion that Dr. Porter had violated provisions of the conduct code of the College by the publishing of the Psychology 210 class survey. He advised the College administration, including President Roelofs, of his preconceptions. Despite Dr. Baltisberger's admitted bias, President Roelofs selected Dr. Baltisberger to chair the FAC hearing panel that heard Dr. Porter's charges!

This, along with the inaction of Dr. Baltisberger, described in Paragraph 36, above, were blatant violations of Faculty Manual procedures and administrative due process.

59. The FAC Report submitted to President Roelofs found that academic freedom did not protect the Survey. The FAC Report states that two conditions are necessary for academic freedom protection at the College: (i) the speech must be made in an academic occasion, and (ii) the participants must speak and conduct themselves

in a manner consistent with the motives, methods, and ends of the academic

enterprise. The FAC found only that the survey was inconsistent with the "methods"

of the academic enterprise. This was contrary to both the procedures in the Faculty

Manual, and to administrative due process.

60. The FAC Report relied on a factual error claiming that the Survey identified

Dr. Williams as having a "documented disability" pertaining to an alleged post-

chemotherapy cognitive impairment. The Survey's reference to a "documented

disability" actually referred to Dr. Messer's post-hearing diagnosis of having Attention

Deficit Hyperactivity Disorder, which manifested itself in the "impulsive", "aggressively

oblivious", and "erratic" behaviors about which the College accused Dr. Messer during

his KRS Chapter 344 proceedings as having exhibited in creating a hostile work

environment. Dr. Messer had no objection to this characterization by his "adviser."

61. The FAC had cautioned the parties that written witness statements would

be given little weight, but the FAC Report relied frequently on the un-cross-examined

written statements of Dr. Williams and of Dr. Wyrick describing their knowledge of and

reactions to the Survey, including the harm they allegedly suffered in response to it.

62. Despite Dean Berry's arguments that Dr. Porter's intentions did not matter

(as the Dean had also argued with respect to Dr. Messer), the FAC Report specifically

found that in creating and distributing the Survey Dr. Porter had *not* intented to

retaliate against the grievants in Dr. Messer's proceedings. The FAC Report found that

it was Dr. Williams' publicizing of the existence of the Survey to the campus

community which ignited the campus conflict. It excused Dr. Williams' unlawful

retaliation by finding that the Survey was like a "match thrown into a dry forest." The

FAC Report stated that "[t]hough social media surely played a part in escalating the

backlash on the PSY 210 students, social media could only have done so after and in

light of the [S]urvey's dissemination." This finding constitutes an unlawful "heckler's veto" of protected speech.

63.    The FAC Report specifically found that Dr. Porter's actions in pursuing the Survey were properly based on academic principle. The FAC found that Dr. Porter created and used the Survey in an academic setting for "a reasonable and proper (albeit controversial) purpose". The FAC acknowledged that criticism of the College's hostile environment procedures is a permissible topic of academic discussion and inquiry, relevant to Dr. Porter's PSY 210 Industrial / Organizational Psychology class.

64.   The FAC Report faulted Dr. Porter for not "disclosing" to his PSY 210 students the factual events which served as the basis of the scenarios in the Survey. In contradiction, the FAC Report criticized the Survey's alleged disclosure of "confidential information" to the campus community concerning the prior Dr. Messer proceedings, and the alleged resulting harm to Dr. Porter's colleagues. Accordingly, while the FAC Report claimed that Dr. Porter's "methods" precluded an academic freedom defense, the stated basis for the FAC Report's conclusion that Dr. Porter should be terminated was that he "cannot be trusted" to handle "confidential" information in the future and that "the personal conduct of Dr. Porter has hindered his professional responsibilities to an extent" that he should be dismissed. No criticism of Dr. Williams' identification of individuals was mentioned.

65. Following the recommended action by the FAC, Dr. Porter appealed its action to the President of Berea College, Dr. Lyle D. Roelofs. Prior to Dr. Roelofs' decision to terminate Dr. Porter from the faculty, the College's "Title IX Coordinator" (i.e., civil rights coordinator) contacted selected members of the campus community and asked them to communicate directly with the College Administration, including Dr. Roelofs, to express their wishes that Dr. Porter be terminated. At least eleven (11) persons,

21

overwhelmingly female, responded to the Diversity Chair's orchestrated effort to wrongfully pressure Dr. Roelofs to terminate Dr. Porter.

The College intentionally hid from Dr. Porter the actions of the Diversity Chair, and the letters written in response to those actions. The actions of these persons, and the College's response, constitute a wrongful conspiracy in violation of KRS 344.280, and was wrongful retaliation in violation of KRS 344.280 (1), and other applicable law.

The action by the diversity administrator and the communicants was in stark contrast to Dr. Roelofs' prohibition of Dr. Porter from having similar contact with members of the campus community during the period of his adjudication.

66. President Roelofs in a letter dated June 13, 2018 affirmed the FAC Report's recommendation and ordered Dr. Porter's termination.

67. The Faculty Manual expressly states that there is no enforceable guarantee of confidentiality in the College's civil rights proceedings. *See* FM, page 92. The only circumstance where confidentiality is guaranteed in such proceedings is "[u]pon receipt of a complaint of Sexual Violence." President Roelofs' concluding letter in Dr. Messer's case confirmed that the College administration knew this, by stating that "I have scanned our policy documents in vain for any requirement of confidentiality and so do not have the latitude to impose it." This finding was blatantly ignored in Dr. Porter's case.

68. Under the terms of the Faculty Manual, Dr. Porter had a right to appeal the President's decision to the Berea College Board of Trustees Executive Committee. He made such appeal.

69. On July 27, 2018 the College Executive Committee issued a Resolution describing the possible grounds for reversal of Dr. Porter's termination on appeal, pursuant to the Committee's duty to hear any such appeal as provided in the Faculty

22

Manual and, as such, part of Dr. Porter's employment contract. In pertinent part, these grounds concluded that President Roelofs' decision was not:

(i)    In violation of Faculty Manual provisions;

(ii)    In excess of the authority granted to the Faculty Appeals Committee or the President in the Faculty Manual;

(iii)    Without support of substantial evidence on the whole record;

(iv)    Arbitrary, capricious, or characterized by abuse of discretion;

\* \* \*

(vi)    Prejudiced by a failure of

[a]    any member of the Faculty Appeals Committee, prior to the evidentiary hearing, or

[b]    the President, prior to any involvement in the faculty disciplinary process, to disclose any conflict of interest or bias which would prevent the faculty member or Berea College from receiving an impartial evidentiary hearing or decision; or

(vii)    Deficient as otherwise provided by the Faculty Manual or Berea College policies.

70. In his appeal, Dr. Porter pointed out the obvious contradiction between the stated basis for his termination and the lack of any confidentiality requirements. He also argued, in pertinent part, that: (i) his termination violated his right to academic freedom, (ii) the Dean's failure to allow mediation prior to bring charges against Dr. Porter was contrary to the terms of the Faculty Manual, (iii) the Dean's multi-part role as participant, witness, and prosecutor violated Dr. Porter's right under the Faculty Manual to fundamental fairness in the termination proceedings, (iv) the FAC's denial of Dr. Porter's right to confront all of the witnesses against him was contrary to the terms of the Faculty Manual and administrative due process; and (v) that the Committee use of the preponderance of the evidence standard violated his rights

23

under the Faculty Manual and administrative due process. In summation, the proceedings against Dr. Porter were a sham, a show trial.

71. Nonetheless, the Executive Committee affirmed President Roelofs' decision, and Dr. Porter's employment at Berea College officially ended on September 30, 2018.

72. As a result of the College's false charges against him, his suspension and banishment from campus, and his ultimate termination, Dr. Porter has suffered severe humiliation, embarassment, stress and mental anguish, manifesting in a stroke (cerebral vascular accident) he suffered on November 12, 2018, when he was treated in the emergency room of St. Joseph Berea Hospital, transferred via ambulance to the Neurological Intensive Care Unit and St Joseph Lexington Hospital, and released on November 14th, 2018. Dr. Porter's consequent prolonged stress and mental anguish has also contributed to his high blood pressure and greatly disturbed sleep patterns.

F. Dr. Porter's Contractual Rights to Continued Employment, Academic Freedom, and Administrative Due Process According to the Faculty Manual.

73. As a tenured member of the College faculty, Dr. Porter had an employment contract with the College which was subject to automatic annual renewal. The last executed annual employment contract the College provided to Dr. Porter was dated June 1, 2018, which stated in part that he was re-hired for the school year 2018-2019 at a small increase in salary. This letter made no reference to, or qualification about, Dr. Porter termination. It creates an estoppel on actions to terminate Dr. Porter (See Exhibit 2).

74. Dr. Porter's employment contract expressly stated that it was subject to the terms of the Berea College Faculty Manual ("the Faculty Manual"), which sets forth the College's policies on appointment, promotion, tenure, academic freedom, non-

24

discrimination, harassment, retaliation, sexual misconduct, and KRS Chapter 344

proceedings, as published on the College's website at http://catalog.berea.edu

/en/Current/Faculty-Manual.

75. As a tenured member of the faculty, Dr. Porter was entitled to continued

employment and the protection of academic freedom at the College according to the

Faculty Manual, except for a showing of "adequate cause" for his termination:

> A tenured appointment represents Berea College's commitment to
> academic freedom, and its trust in the appointee's promise as teacher
> and scholar. The granting of tenure is not automatic; it is the result of a
> considered judgment that the faculty member will make a significant,
> long-term contribution to the fulfillment of the College's purposes.
> Tenure is a continuous appointment. It continues until (1) the appointee
> resigns or retires, or chooses to reduce teaching responsibilities below
> one-half of a normal teaching load, or (2) a situation develops that is
> demonstrably adequate cause for discontinuation of the appointment.
> Academic freedom is essential to the College's success in meeting its
> educational obligations to its students and the larger society. A well-
> conceived and soundly administered tenure system is considered the
> best means to assure such freedom. (Emphasis added).

76. The Faculty Manual states that the specific principles of academic freedom

are substantially based on "[t]he substance and the wording of this statement are

drawn in part from the 1940 Statement of Principles on Academic Freedom and

Tenure, developed by the Association of American Colleges and the American

Association of University Professors" (AAUP), and that each faculty member is entitled

to academic freedom in the classroom and in his or her research:

> This statement summarizes the understanding between the faculty and
> administration of Berea College on the principles and practices of
> academic freedom at this institution . . .
>
> * * *
>
> Freedom in the Classroom
>
> The faculty member is entitled to freedom in the classroom and should
> be supported by the College administration and colleagues in its exercise.
> Academic freedom, however, carries with it duties correlative with rights.
> In exercising freedom in discussion of the subject matter, the faculty

member should be careful not to introduce controversial matter <u>which has no relation to the subject</u>. This should not be narrowly construed, but the faculty member has a responsibility to the entire College community <u>to refrain from habitually substituting extraneous materials for the proper subject matter of the course</u>.

Freedom of Research

Freedom of research is fundamental to the advancement of truth. The faculty member is entitled <u>to full freedom in ordering and recommending library materials, presenting a variety of perspectives, and in research and in the publication of the results</u>. . .

\* \* \*

(Emphasis added).

77. In its report upon Dr. Messer's appeal in the prior disciplinary proceedings, the FAC outlined the College's interpretation of its academic freedom policy which it applied in its Report on Dr. Porter's case:

Two conditions must be met . . . to create an "environment that is protected by academic freedom": (1) it must be an academic occasion, and (2) the participants must speak and conduct themselves in a manner consistent with the motives, methods, and ends of the academic enterprise.

. . . <u>Where the academic purpose is not apparent or where the academic purpose is plainly not significant enough to warrant the offense</u>, it will be safe to conclude that the speaker has not been conducting himself or herself in a manner consistent with the motives, methods, and ends of the academic enterprise.

. . . [T]he academic enterprise, as understood by the Committee presumes that <u>no subjects are inherently taboo or off-limits because they are 'objectively offensive'</u>; and it nurses no phobic aversion to controversial topics or strong emotions.

<u>The content and/or viewpoint of speech by [itself] will very seldom, if ever, disqualify speech from protection by academic freedom</u>. In intramural academic occasions, self-disqualification occurs when a speaker departs from an academic agenda to further personal grievances, animosities, or grudges; to exert power for private gain or satisfaction; to advocate (rather than to analyze) partisan political causes; to stage an emotional catharsis before a captive audience; to browbeat or shame interlocutors into submission, acquiescence, or agreement; in short, to pursue any ulterior purpose likely to thwart the motives, methods, and ends of the academic enterprise. (Emphasis added).

26

78.  The Faculty Manual states the College's "Harassment Policy" and expressly subjects the policy to a balancing test in favor of a faculty member's right to academic freedom:

> Harassment prohibited by this policy includes verbal or physical conduct that, because of its severity and/or persistence, substantially interferes with the mutual respect and collegiality afforded all individuals at Berea College. In particular, harassment may include verbal or physical behavior directed at an individual that is abusive of that individual's distinguishing characteristics, including race, gender, age, religion, sexual orientation, or national origin, to such an extent as to substantially interfere with the individual's work or education or adversely affect one's living conditions.
>
> In prohibiting harassment in all its forms, Berea seeks to preserve and enhance academic freedom for all members of the campus community. Nothing in this policy is intended to limit the freedom of inquiry, teaching, or learning necessary to the College's educational purposes, or to inhibit scholarly, scientific, or artistic treatment of subject matter appropriate to an institution of higher education.
> (Emphasis added).

79.  The Faculty Manual specifies the promised procedures in the formal hearing process in the event a complaint is made against a faculty member for conduct in violation of civil rights, and makes clear that an accused has the right to confront all witnesses under the College's incorporated AAUP standards.  The AAUP burden of proof is set at "clear and convincing evidence" which, as stated in Paragraph 74 above, has been incorporated in the College's Faculty Manual.  *There is no right to confidentiality for any participant in the proceedings* including criticisms of or by Dr. Porter.  Specifically:

Resolving Complaints through the Formal Hearing Process

\*\*\*

> 4.      Except in extraordinary circumstances, the respondent is entitled to confront his or her accuser and any witnesses at the hearing. The right of confrontation may be waived by the absence or gross misconduct of the respondent.

\* \* \*

27

General Guidelines

1.     In the reporting, investigating, and hearing of alleged Violations, every effort shall be made to ensure confidentiality and the privacy of the parties involved, but complete confidentiality cannot be guaranteed, particularly if formal charges are filed. Requests for confidentiality shall be addressed to and decided by the College's Title IX Coordinator. At all stages, investigations, administrative hearings, and formal hearings complaints are to be handled discreetly and expeditiously. Every effort will be made to contain hearsay and to minimize the potential for harmful effects on the individuals involved and the College community.

2.     Both the complainant and the respondent shall be assured of fair treatment throughout the investigation, administrative hearing and formal hearing processes. Retaliation or intimidation by either party is prohibited by law and College policy; neither will be tolerated. Any such retaliation or intimidation is subject to disciplinary action up to and including termination or expulsion.
(Emphasis added).

80.  In the stated procedure in a proceeding for dismissal with cause, the

Faculty Manual provides that the College will provide the accused with the right to

confront any witnesses against him, except where there are "unusual" or "urgent"

reasons to take a witness' written statement:

The faculty member and advisor should have the opportunity to question all persons who testify orally and to confront all who testify adversely. When unusual and urgent reasons move the Committee to deny this opportunity, or when the knowledgeable person cannot appear, the identity of the person, as well as the person's statements, should nevertheless be disclosed to the faculty member. Subject to these safeguards, statements may, when necessary, be taken outside the hearing and reported to it.  (Emphasis added).

In Dr. Porter's case, no findings of "unusual" or "urgent" reasoning were

made for allowing the two (2) most crucial witnesses, Drs. Williams and Wyrick,

to submit written statements.

81.  The Faculty Manual defines "retaliation" for the purposes of the College's

Sexual Harassment Policy" and "Sexual Misconduct Policy" as "[t]he act of seeking

28

revenge upon another person." The FAC specifically found that Dr. Porter *had not* committed this act.

82. The Faculty Manual includes the College's "Nondiscrimination Policy," and its "Community Aspirations Statement" provides that "[h]indrances to dialogue and free expression can very much impede learning. The concept and application of academic freedom at Berea College protect these values and are articulated in the Faculty Manual." The "Community Aspirations Statement" further provides that "[t]his statement does not mandate these values and is not intended to restrict any person's conscience or academic or personal freedoms."

83. The Faculty Manual states the following possible grounds for the termination of a faculty member for "incompetence" in the performance of his duties:

> The following are considered adequate cause for dismissal of tenured faculty, or of faculty under term appointment before the appointment expires:
>
> - Demonstrated incompetence or dishonesty in teaching or research.
> - Substantial, persistent and demonstrated neglect of professional responsibilities or failure to observe the terms of appointment to the faculty.
> - Personal conduct which demonstrably hinders fulfillment of professional responsibilities.
> - Infirmities serious enough to qualify for total disability payments under the College's disability plan and/or social security.

84. These abovestated protections were not accorded Dr. Porter.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## II. CAUSES OF ACTION

COUNT I:
Breach of Contract for Suspension from Employment in Violation
of the Required Due Process, and Dr. Porter's Academic Freedom

85. Paragraphs 1-84 are hereby restated and incorporated by reference.

86. The Faculty Manual, which is part of Dr. Porter's employment contract with the College, states that during proceedings for termination for cause "the faculty

member shall be suspended <u>only if continuance threatens immediate danger to persons or property.</u>" (Emphasis added).

87. In the present case, after Dean Berry initially charged Dr. Porter, President Roelofs summarily suspended Dr. Porter and barred him from campus without any prior notice nor any evidence or reasonable basis to determine that he posed any "immediate danger to persons or property." This was a forbidden "prior restraint." It was forbidden by both clear language in the Faculty Manual and by administrative due process. Neither President Roelofs nor Dean Berry specified to Dr. Porter the nature of any such "immediate danger" he may pose and refused to discuss the Survey with him or to convene any mediation between the parties about the controversy.

88. The College's unfounded suspension and banishment of Dr. Porter from campus needlessly tarnished his reputation, denied him access to materials needed to defend himself, and interfered with his academic work by denying his access to crucial resources such as a library, licensed computer software, and his own office.

89. The College's unfounded suspension and banishment of Dr. Porter from campus, without the opportunity for mediation, created a presumption of his guilt, impeded his ability to defend myself, and strongly prejudiced the case against him prior to the FAC hearing.

90. The College suspended Dr. Porter from employment, banished him from campus, and refused mediation in breach of his employment contract and the terms of the Faculty Manual.

91. Dr. Porter's employment contract and the Faculty Manual guarantee him the right of academic freedom in the classroom and in his research, when such speech and conduct pertains to an academic occasion and is made in a manner consistent with the motives, methods, and ends of the academic enterprise.

92.  Dr. Porter, at all pertinent times, created and distributed the Survey pursuant to legitimate academic inquiry and in a manner consistent with the motives, methods, and ends of the academic enterprise.  Particularly, he tendered the Survey to the required persons for vetting prior to its release, and received no feedback forbidding its release.  Accordingly, all of Dr. Porter's speech and conduct associated with or related to the creation and distribution of the Survey was protected under his right to academic freedom and free speech under his employment contract and the terms of the Faculty Manual.

93. The College denied Dr. Porter his right to academic freedom and free speech by bringing false charges of "incompetence" against him, suspending him, and banishing him from campus in breach of his employment contract and the terms of the Faculty Manual.

94.  Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of the College's breaches of contract, including but not limited to his reputation, loss of income and benefits, physical injury, and emotional distress and mental anguish.


COUNT II:
Breach of Contract for Termination of Dr. Porter's Employment
after the College's Denial of the Required Administrative Due Process.

95. Paragraphs 1-94 are hereby restated and incorporated by reference.

96. The College's unfounded suspension and banishment of Dr. Porter, without proper notice, without the opportunity for mediation, without any reasonable basis or evidence that Dr. Porter was an "immediate danger to persons or property" on campus, and without affording him any due process with a reasonable investigation,

31

specification of charges, discovery of evidence, or opportunity to defend himself, was in breach of his employment contract and the terms of the Faculty Manual.

97. The FAC Chair advised Dr. Porter prior to the hearing that the FAC would give "little weight" to written witness statements. This was not done.

98. The charges brought against Dr. Porter at the FAC hearing involved alleged "incompetence" but also accused him of specific violations of the College's civil rights policies concerning harassment, creation of a hostile work environment, and retaliation.

99. The grouping or conflation of charges seeking Dr. Porter's dismissal for cause based on "incompetence" while also accusing him of violations of the College's civil rights policies on harassment, creation of a hostile work environment, and retaliation accordingly rendered the FAC hearing a proceeding under and subject to the requirements of both the dismissal with cause and the civil liberty hearing procedures set forth in the Faculty Manual.

100. In breach of the Faculty Manual's promise that Dr. Porter would be able to confront all witnesses against him at the FAC hearing, the College terminated Dr. Porter's employment without allowing him to confront or cross examine his main accusers, Dr. Williams or Dr. Wyrick, who instead only submitted written statements to the FAC about the alleged hostile work environment in the psychology department, the alleged sexual harassment and retaliation against them, and the alleged harm and emotional distress they suffered as a result. The grievants did not allege or offer to prove any "unusual" or "urgent" circumstances which would allow them to not testify in person.

101. The FAC Report then frequently referred to Dr. Williams' and Dr. Wyrick's written testimony in concluding that Dr. Porter's Survey had caused them professional

32

and personal harm and emotional distress, contrary to the FAC's stated promise to place little weight on such statements and in breach of Dr. Porter's right under his employment contract and the Faculty Manual to confront and cross examine the witnesses against him.

102.   Dean Berry was a participant in the prior hostile environment proceedings against Dr. Messer and was also an actor in and witness of the events and circumstances involved in the termination proceedings against Dr. Porter.  The Dean served as a witness and the prosecutor at the FAC hearing, while also being the direct supervisor of the FAC members concerning their compensation and the terms of their employment at the College.  This was over Dr. Porter's written objection., and was a blatant violation of the Plaintiff's administrative due process.

103.   The Faculty Manual states that the College's stated procedures in a termination proceeding against a faculty member "are intended to insure fair process." *See* FM, page 129.

104.   However, the College allowed Dean Berry to assume the multi-part role as participant, witness, and prosecutor in the termination proceedings against Dr. Porter in violation of Dr. Porter's right to fundamental fairness in the proceedings under the terms of his employment contract, the Faculty Manual, and the Executive Committee Resolution, at Items (i) - (iv).

105.   Also, at least three members of the FAC displayed a previously undisclosed and unfair prejudgment and bias against Dr. Porter's defense at the hearing.  See paragraphs 36,  and 56-58 above, showing egregious violation of Dr. Porter's right to fundamental fairness proceedings under the terms of the Faculty Manual and the Executive Committee Resolution, at its Items (iii) - (iv).

33

106.   The College denied Dr. Porter his guaranteed administrative due process throughout the termination proceedings against him in breach of his employment contract, the terms of the Faculty Manual, and the Executive Committee Resolution.

107.   Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of the College's breaches of contract, including but not limited to irreparable harm to his reputation, loss of income and benefits, physical injury, and emotional distress and mental anguish.

COUNT III:

Breach of Contract for Termination of Dr. Porter's Employment
in Violation of His Academic Freedom.

108.   Paragraphs 1-107 are hereby restated and incorporated by reference.

109.   Dr. Porter's employment contract and the Faculty Manual offered him continued employment under a guarantee of tenure, absent an "adequate cause" for his termination, and the College breached his employment contract by terminating him without adequate cause.

110.   Dr. Porter's employment contract and the Faculty Manual guarantee him the right of academic freedom in the classroom and in his research, when such speech and conduct pertains to an academic occasion and is made in a manner consistent with the motives, methods, and ends of the academic enterprise.

111.   Dr. Porter, at all pertinent times, created and distributed the Survey pursuant to legitimate academic inquiry and in a manner consistent with the motives, methods, and ends of the academic enterprise.  Accordingly, all of Dr. Porter's speech and conduct associated with or related to the creation and distribution of the Survey was protected under his right to academic freedom under his employment contract, the terms of the Faculty Manual, and the Executive Committee Resolution, at Items (i) – (iv), and his right to free speech.

34

112.   The College denied Dr. Porter his right to academic freedom throughout the termination proceedings against him in breach of his employment contract, the terms of the Faculty Manual, and the Executive Committee Resolution.

113.   Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of the College's breaches of contract, including but not limited to irreparable harm to his reputation, loss of income and benefits, physical injury, and emotional distress and mental anguish.

COUNT IV:

Violations of the KCRA for Employment Discrimination.

114.   Paragraphs 1-113 are hereby restated and incorporated by reference.

115.   The College has participated in and supported a pattern and practice of illegal discrimination based on age, race, and sex against white males over the age of 40 in the College's employment, discipline, and termination of members of the faculty in the psychology department and in the overall faculty of the College.

116.   As part of this pattern and practice and because of the illegal discriminatory animus against Dr. Porter on the part of President Roelofs and Dean Berry, and due to the severe personal and political coercion of other College faculty members and administrators, with the knowing participation of the College, the College intentionally discriminated against Dr. Porter in suspending him, banishing him from campus, and ultimately terminating his employment without adequate cause and based on his age, race, and sex in violation of KRS 344.040(1)(a).

A.  Discrimination Based on Age.

117.   Paragraphs 1-116 are hereby restated and incorporated by reference.

35

118.   Dr. Porter is a 69-year-old, white male.

119.   Under KRS 344.040(1)(a) "[i]t is an unlawful practice for an employer: (a) To fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's [age forty (40) and over]."

120.   The College, in furthering its prior pattern of age discrimination, intentionally discriminated against Dr. Porter because of his age and in violation of KRS 344.040(1)(a) when the College brought false charges of "incompetence" against him, suspended him, and banished him from campus without any evidence of showing that he posed any "immediate danger to persons or property."

121.   The Faculty Manual expressly states that there is no enforceable guarantee of confidentiality in the College's civil rights proceedings. The only circumstance where confidentiality is guaranteed in such proceedings is "[u]pon receipt of a complaint of Sexual Violence." President Roelofs' concluding letter in Dr. Messer's case confirmed the College administration knew this by stating that "I have scanned our policy documents in vain for any requirement of confidentiality and so do not have the latitude to impose it."

122. The College intentionally discriminated against Dr. Porter because of his age and in violation of KRS 344.040(1)(a) when the College brought false charges of "incompetence" against him and terminated him on the pretext that he had allegedly violated a fabricated requirement for all participants in the College's civil rights proceedings to maintain confidentiality, and specifically concerning Dr. Porter's knowledge of and involvement in the prior proceedings against Dr. Messer. The College knowingly and unlawfully treated Dr. Porter differently from and less favorably than other similarly situated, younger employees, and differently and less favorably

36

than person who supported Dr. Messer's punishment, and condoned the unlawful discriminatory treatment of other faculty who participated as grievants against Dr. Messer and, later, against Dr. Porter.

123.   Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of the College's illegal discrimination based on age in violation of KRS 344.040(1)(a), including but not limited to irreparable harm to his reputation, loss of income and benefits, physical injury, embarassment, humiliation, emotional distress, and mental anguish.

### B. Discrimination Based on Race.

124.   Paragraphs 1-123 are hereby restated and incorporated by reference.

125.   Dr. Porter is a 69-year-old, white male.

126.   Under KRS 344.040(1)(a) "[i]t is an unlawful practice for an employer: (a) To fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's [race]"

127.   The College, in furthering its prior pattern of race discrimination, intentionally discriminated against Dr. Porter because of his race and in violation of KRS 344.040(1)(a) when the College brought false charges of "incompetence" against him, suspended him, and banished him from campus without any evidence of showing that he posed any "immediate danger to persons or property."

128.   The Faculty Manual expressly states that there is no enforceable guarantee of confidentiality in the College's civil rights proceedings. The only circumstance where confidentiality is guaranteed in such proceedings is "[u]pon receipt of a complaint of Sexual Violence." President Roelofs' concluding letter in Dr.

Messer's case confirmed the College administration knew this by stating that "I have scanned our policy documents in vain for any requirement of confidentiality and so do not have the latitude to impose it."

129.  The College intentionally discriminated against Dr. Porter because of his race and in violation of KRS 344.040(1)(a) when the College brought false charges of "incompetence" against him and terminated him on the pretext that he had allegedly violated a fabricated requirement for all participants in the College's Civil Rights proceedings to maintain their confidentiality and specifically concerning Dr. Porter's knowledge of and involvement in the prior proceedings against Dr. Messer. The College knowingly and unlawfully treated Dr. Porter differently and less favorably than similarly situated non-white employees, and differently and less favorably from persons who supported Dr. Messer's punishment, and condoned the unlawful discriminatory treatment of other faculty who participated as grievants against Dr. Messer, and, later, against Dr. Porter.

130.  Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of the College's illegal discrimination based on race, in violation of KRS 344.040(1)(a), including, but not limited to, irreparable harm to his reputation, loss of income and benefits, physical injury, injury to his reputation, embarassment, humiliation, emotional distress, and mental anguish.

C. Discrimination Based on Sex

131.  Paragraphs 1-130 are hereby restated and incorporated by reference.

132.  Dr. Porter is a 69-year-old, white male.

133.  Under KRS 344.040(1)(a) "[i]t is an unlawful practice for an employer: (a) To fail or refuse to hire, or to discharge any individual, or otherwise to discriminate

38

against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's [sex]"

134.   The College, in furthering its previous pattern of sex discrimination, intentionally discriminated against Dr. Porter because of his sex and in violation of KRS 344.040(1)(a) when the College brought false charges of "incompetence" against him, suspended him, and banished him from campus without any evidence of showing that he posed any "immediate danger to persons or property."

135.   The Faculty Manual expressly states that there is no enforceable guarantee of confidentiality in the College's civil rights proceedings. The only circumstance where confidentiality is guaranteed in such proceedings is "[u]pon receipt of a complaint of Sexual Violence."  President Roelofs' concluding letter in Dr. Messer's case confirmed the College administration knew this by stating that "I have scanned our policy documents in vain for any requirement of confidentiality and so do not have the latitude to impose it."

136.   The College intentionally discriminated against Dr. Porter because of his sex and in violation of KRS 344.040(1)(a) when the College brought false charges of "incompetence" against him and terminated him on the pretext that he had allegedly violated a fabricated requirement for all participants in the College's civil rights proceedings to maintain their confidentiality and specifically concerning Dr. Porter's knowledge of and involvement in the prior proceedings against Dr. Messer.  The College knowingly and unlawfully treated Dr. Porter differently and less favorably than other similarly situated female faculty, and differently and less favorably from persons who supported Dr. Messer's punishment, and condoned the unlawful discriminatory treatment of other faculty who participated as grievants against Dr. Messer, and, later, against Dr. Porter.

137.   Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of the College's illegal discrimination based on sex in violation of KRS 344.040(1)(a), including but not limited to irreparable harm to his reputation, loss of income and benefits, physical injury, injury to his reputation, embarassment, humiliation, emotional distress, and mental anguish.

COUNT V:
Violation of the KCRA for Illegal Retaliation

138.   Paragraphs 1-137 are hereby restated and incorporated by reference.

139.   Under KRS 344.280(1) "[i]t shall be an unlawful practice for a person, or for two (2) or more persons to conspire: (1) To retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this chapter, or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter . . ."

140.   Dr. Porter acted as Dr. Messer's "adviser" throughout his hostile environment hearing and appeals, as allowed under the Faculty Manual.  Dr. Porter argued that Dr. Messer's alleged infractions were neither severe nor pervasive enough to create a "hostile workplace environment" on the basis of sex or to warrant the punishments levied against him.  Dr. Porter, during the proceedings regarding Dr. Messer before the CCHB and the FAC, and in correspondence with President Roelofs and with Dean Berry and in a letter to administrators at the campus, expressed his disappointment with the unfairness of the College's processes and the result in Dr. Messer's case, thereby antagonizing the College's administration as well as the grievants who had placed the charges against Dr. Messer.  This animus is blatantly expressed in the postings by Dr. Sergent and Dr. Williams, in which the College conspired and enabled.

40

141. The College intentionally retaliated against Dr. Porter because of his participation in Dr. Messer's defense in the proceedings against him and because of Dr. Porter's verbal and written criticism of the College's civil liberties procedures in general, the College's Civil Liberties proceedings against Dr. Messer in particular, and of the roles and actions President Roelofs and Dean Berry took with regard to both and in violation of KRS 344.280(1), when the College brought false charges of "incompetence" against him, suspended him, and banished him from campus without any evidence of showing that he posed any "immediate danger to persons or property." The College, particularly, enabled the retaliation against Dr. Porter by Dr. Williams and Dr. Sergent, generally, and particularly because of his defense of himself and Dr. Messer as older white males.

142. The Faculty Manual expressly states that there is no enforceable guarantee of confidentiality in the College's hostile environment proceedings. The only circumstance where confidentiality is guaranteed in such proceedings is "[u]pon receipt of a complaint of Sexual Violence." President Roelofs' concluding letter in Dr. Messer's case confirmed the College administration knew this by stating that "I have scanned our policy documents in vain for any requirement of such confidentiality and so do not have the latitude to impose it."

143. The College intentionally retaliated against Dr. Porter because of his participation in Dr. Messer's defense in the proceedings against him and because of Dr. Porter's verbal and written criticism of the College's civil rights procedures in general, the College's hostile environment proceedings against Dr. Messer, in particular, and of the roles and actions President Roelofs and Dean Berry took with regard to both and in violation of KRS 344.280(1), when the College brought false charges of "incompetence" against him and terminated him on the pretext that he had

41

allegedly violated a fabricated requirement for all participants in the College's civil rights proceedings to maintain their confidentiality and specifically concerning Dr. Porter's knowledge of and involvement in the prior proceedings against Dr. Messer. The College's treatment of Dr. Porter was directly retaliatory against him because of his defense of Dr. Messer, and, later, himself, as an older white male.

144.   Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of the College's illegal retaliation against him in violation of KRS 344.280(1), including but not limited to irreparable harm to his reputation, loss of income and benefits, physical injury, injury to his reputation, embarrassment, humiliation, emotional distress, and mental anguish.

145.  So far as is known, this Complaint implicates only Kentucky state law, including the KCRA, state contract law, and the Kentucky State Constitution.  No known federal claims are raised herein.

WHEREFORE, Dr. Porter hereby respectfully requests this Court enter Judgment against the Defendant on each and all counts in this Complaint and for the following relief, including, but not limited to:

1. Injunctive relief under KRS 344.450 ordering the College to reinstate Dr. Porter in his position as a tenured professor in the College's psychology department with full reinstatement of his rights under his tenured employment contract, including his salary and benefits, and with full restitution of his lost income and benefits, with interest thereon;

2. Compensatory damages under KRS 344.450, in an amount in excess of the minimum jurisdictional limits of this Court, including but not limited to:

    a.    Back pay.
    b.    Front pay.
    c.    Lost employment benefits.
    d.    Lost future employment benefits.
    e.    Damages for injury to reputation, embarrassment, humiliation, physical and emotional distress and mental anguish, including all damages for any manifestation of physical injury resulting from the above.
    f.    Interest at the legal rate from October 1, 2018.
    g.    Reasonable costs and attorney's fees.
    h.    All other equitable and legal relief which this Court deems just and due.

3. Plaintiff specifically requests trial by jury on all issues so triable.

Respectfully Submitted,

*John F. Lackey*

HON. JOHN F. LACKEY
214 West Main Street
Richmond KY 40475
(859) 575-7206
lackeylaw@att.net

*Debra A. Doss By John Lackey*

HON. DEBRA DOSS
108 Pasadena Dr.
Lexington, Kentucky 40503
(859) 260-1980
debra.doss@qx.net
**Attorneys for the Plaintiff**

43

*********************

CERTIFICATE OF SERVICE

I hereby certify that I have served a true copy of the foregoing FIRST AMENDED
*Exhibits 1 & 2, 2nd C.R. 33 & 34 discovery*
COMPLAINT upon the following by first class mail:

Berea College
c/o Dr. Lyle R. Roelofs, President
Lincoln Hall
CPO 2182
Berea, KY 40404

The defendant is not now being represented by
Counsel of record.

This the _4th_ day of _February_, 2019,

*John F. Lackey*

HON. JOHN F. LACKEY
244 West Main Street
Richmond KY 40475
(859) 575-7206
lackeylaw@att.net

*Debra A Doss by John Lackey*

HON. DEBRA DOSS
108 Pasadena Dr.
Lexington, Kentucky 40503
(859) 260-1980
debra.doss@qx.net

**Attorneys for the Plaintiff**

Exhibit I

Have heard that SGA did vote for Porter to receive SGA 2017-18 Outstanding Service Award but administration decided Porter was ineligible because he had been placed on suspended status by executive action and that when the college policy states "faculty member" it means "faculty member in good standing" (i.e., not suspended).

**From:** Tyler Sergent  **Sent:** Monday, April 9, 2018 12:09 AM
**To:** Yabsira H. Ayele
**Cc:** Osvaldo Flores; Rachel S. Vagts; Sierra N. Turner; Kelley S. Farley; Martin Kameya
**Subject:** Re: Concern about SGA service award

Yabsira,

Until you actually know something about the situation, there is no basis for debate or dialogue. I voiced my advice as part of my role as elected SGA faculty advisor. Again, I am not the only one, and so you need to include Rachel Vagts in your messages.

Clearly you have no interest in my advice or the advice of your other faculty advisor, both of whom know much more than you about a great many things directly related to this situation. So I hope you at least listen to those around you among the SGA leadership who are wiser and better informed.

One last bit of advice: I would caution you against burning bridges this early in your education, particularly for the wrong side of a cause.

Do not email me again regarding this issue.

Dr. Sergent

*F. Tyler Sergent, PhD*
*Assistant Professor*
*General Studies and History*

**From:** Yabsira H. Ayele  **Sent:** Sunday, April 8, 2018 11:51 PM
**To:** Tyler Sergent  **Subject:** Re: Concern about SGA service award

You are entitled your opinions I am entitled to mine.
Out of the 3 nominees, Dave was recognized as the most noteworthy. I urge you to let the students choose who served the students best.
I am disappointed in your objection and I believe they are without merit because I do not believe you have read the nominations. The college body nominated and we chose on behalf of them as elected officials.

I quote you the definition of a Biggot:  "a person who is obstinately or intolerantly devoted to his or her own opinions and prejudices; especially: one who regards or treats the members of a group with hatred and intolerance".

'I am not inviting a debate with you or anyone else who would defend the unethical actions of David Porter--they are indefensible just like racism and any other of form discrimination--or any other faculty member who has caused harm to other members of our community"

If you are willing to disseminate information, when the persons aforementioned, do not have the ability to defend themselves, is wrong, and that is unethical. To threaten me is unethical. I do not know the entire situation and you don't either. My point is with the information available to the general public the nominations were brought forth and democracy prevailed. If next, you say democracy is unethical then I cannot emphasize how problematic that is.

Our job is to bring these candidates forward, the rest is democracy, you have to respect that.

On a side note, I have no allegiance to anyone but truth and the right of equity and fairness, if I receive information that truly draws Professor Porter in a bad light, I am more than willing to change my stance. Hence my invitation to dialogue.

best,

**Yabsira Ayele** *Speaker of the Senate   Program Specialist- Deep Green Residence Hall* Business Admin & Psychology  CPO 32

*The contents of this e-mail message and any attachments are confidential and are intended solely for addressee.*

---

**From:** Tyler Sergent  **Sent:** Sunday, April 8, 2018 11:07:03 PM
**To:** Yabsira H. Ayele; Rachel S. Vagts; Osvaldo Flores
**Cc:** Sierra N. Turner; Kelley S. Farley  **Subject:** Re: Concern about SGA service award

Yabsira,

There are many faculty and staff members who do this and much more for students and do so without bringing harm to other members of our community and without ever being accused of unfairness or unethical actions. That is the reason for my strong objection to the SGA in my capacity as faculty advisor. If you do not think other faculty members have done every good thing you attribute to David Porter plus much more, than you are uninformed about the unending, tireless work and support the rest of us give to students day in and day out.

I am not inviting a debate with you or anyone else who would defend the unethical actions of David Porter--they are indefensible just like racism and any other of form discrimination--or any other faculty member who has caused harm to other members of our community. Rewarding those actions and the harm coming from them is not the Berean way. The administration has good reasons for suspension and the case will be adjudicated.

I gave my advice and detailed my reasons for that advice. I have no doubt that you believe you are doing what is right. But there are people giving you advice who know a great deal more about this situation than you do. You should heed their advice.

To be clear, SGA has two faculty advisors, and we are both in agreement with our objections. We are attempting to keep the SGA from making a mistake today that will not only bring additional harm to those already harmed and hurting but that will be recorded for all time in Berea College history. I'm an historian and Rachel Vagts is an archivist and the head of the college archives--you do not want to be among a group of

student leaders on the wrong side of Berea's history. Therefore, I urge the SGA to heed our advice.

Tyler

_____

**_F. Tyler Sergent, PhD_**
_Assistant Professor_
_General Studies and History_

---

**From:** Yabsira H. Ayele  **Sent:** Sunday, April 8, 2018 10:22 PM
**To:** Rachel S. Vagts; Tyler Sergent; Osvaldo Flores
**Cc:** Sierra N. Turner; Kelley S. Farley
**Subject:** Re: Concern about SGA service award

Dr. Sergent,
The reason why we chose to nominate Professor Porter is because of the excellence in service to students he has exhibited. His service to students towered over the other candidates.

I ask you when was the last time a professor bought groceries for students because they do not make enough money? When was the lasts time a professor provided housing free of charge for multiple students because they did not make enough money? When was the last time a professor got a student a full ride to Cambridge? When was the last time a professor actively helped students publish papers outside of class?

Professor Porter did all of this and then some more.  The choice of nominating Professor Porter was not made lightly, it was made because we believe he deserves this award. For you to bring up something that deals with faculty and an ongoing investigation is not fair, to say the slightest; the senators made their decision cognizant of the available information at hand ( The vote was 7-2-4).  Secondly, your characterization of people who disagree with you is not fair. I am more than willing to have a conversation with you one on one if need be. But I do not believe this should be shared any further. I urge that your personal involvement in Faculty matter does not cloud your judgment on Student matters.

With all respect,


**Yabsira Ayele**  **_Speaker of the Senate_**

---

**From:** Rachel S. Vagts  **Sent:** Sunday, April 8, 2018 7:13:01 PM
**To:** Tyler Sergent; Osvaldo Flores  **Cc:** Sierra N. Turner; Kelley S. Farley; Yabsira H.
Ayele   **Subject:** Re: Concern about SGA service award

I would like to echo Tyler's concerns and include my strong objection as well. I did not have as many of the facts of the situation before, so I was reluctant to assert that objection at the Senate meeting, but now that they have been detailed here, I feel compelled to advise you to  reconsider Dr. Porter's nomination for the SGA Service award.

All my best,  Rachel

**Rachel Vagts** Head of Special Collections & Archives
Hutchins Library - Berea College Berea, KY 40404
859-985-3267  Rachel_Vagts@berea.edu

---

**From:** Tyler Sergent  **Sent:** Sunday, April 8, 2018 6:23:35 PM
**To:** Osvaldo Flores  **Cc:** Rachel S. Vagts; Sierra N. Turner; Kelley S. Farley
**Subject:** Concern about SGA service award

Hi, Osvaldo and SGA Executive Committee,

I just heard that the SGA Senate has voted to give David Porter the SGA Service Award
this year. I am compelled to let you know my issues with and vehement objection to this
decision. I ask that you please share this with everyone else on the executive committee
for tonight's meeting.

I am aware that some of Porter's supporters among students--who have publicly said
they will support him "no matter what to the bitter end"--are also involved in SGA. I'm
surprised how they are able to convince others in SGA that Porter's actions aren't so
bad. That's the first issue I want to address with some background and details.

Porter supported Wayne Messer throughout a Title IX/VII complaint this last year that
was upheld against Messer at every level, including appeals, in which Messer was found
guilty of creating a hostile work environment for racist, sexist, and homophobic
comments. Messer was removed as chair of the Psychology Department and removed
from his office near the other Psychology faculty members as an outcome of his actions.
Porter argued on Messer's behalf that the racist, sexist, homophobic comments were
academic freedom and that Messer had the right to say those things to colleagues and
students. This took place from February 2017 until the present, as Porter has
continued to express this view about the case that was fully adjudicated several months
ago. In the process of this case, Porter also publicly in writing and in testimony made
sexist, disparaging remarks about each of the three female faculty members in
Psychology, including disclosing personal medical records of one, which
he characterized falsely, rising to the level of slander, libel, and defamation.

**The reasons for which Porter has been suspended and is in the process of being
fired for cause center on five major wrongful acts.**

**First is academic dishonesty.** The survey he sent out to the whole community was not
a valid survey, and he was well aware of that, and made it available to the entire
campus community anyway. Even after being told to remove it because of its
invalidation (for reasons explained below), he refused.

**Second is gross ethical violations.** In the survey, Porter included actual cases from
this past year's Title IX/VII case against Messer. That is a serious violation of
professional ethics in itself. To make it even more unethical, Porter falsely stated in the
discloser section of the survey that the scenarios were not based on any actual events.

**Third is incompetence along with manipulation of students.** Porter also sent the
survey out with students' names attached without having gotten those students express
permission, and many among those students had already expressed their own ethical
concerns about the survey. Porter has continued to manipulate students--like those in
SGA supporting this award--to rally for his cause. Hero-worship is not education; this
cultish approach to answering for his unethical acts is yet another level of unethical
behavior and breach of the student-teacher relationship.

**Fourth is refusal to abide by IRB (Institutional Review Board) and college policies for research.** Porter refused to send his survey to the IRB for review as required by college policy (and APA standards for research and ethics). When the IRB did review the survey at the request of the administration, against Porter's objections, the IRB rejected the survey as unethical for the reasons stated above.

**Fifth is harm to human subjects (and the campus community).** The people whose personal and private information was made public in the survey have been seriously harmed by Porter's actions and are having to seek care for both physical and mental health that has been damaged willfully by Porter. Contrary to what some students may have claimed, Porter has not apologized for this harm and has made no effort to repair the harm he has caused. By extension, Porter's continued manipulation of students to support him--no matter how much in the wrong he is--has caused serious (if not permanent) rifts between groups of students, and the animosity has spilled over into other classroom space, other campus spaces, and social media. Porter is actively fueling this animosity, among students and among faculty members.

The second issue at stake, however, regarding the SGA service award, is that the SGA not be reactionary in its decisions. The service award is a serious matter and should not be victim to manipulation by students who themselves are victims of manipulation by an unethical, unrepentant, academically dishonest person who is in process of rightly being fired from Berea College. That students like him is irrelevant; that his colleagues dislike him is irrelevant. Evaluate Porter--and other nominees for the award--as you would evaluate anyone: based on what they do and how they treat others. In this case, giving a service award to David Porter would add additional injury to those who Porter has already injured. This in itself would outweigh the good SGA has accomplished all year long.

Because there are remarkable people at Berea College who are worthy of the SGA service award and whose continuous work is always for the good people at all times (i.e, not unethical, not harmful, not malicious, not getting fired), I'm hoping SGA Senate will reconsider its decision. I know BOR has not yet voted on the matter. As one faculty advisor to SGA and voting member of the Senate and BOR, I will vote against this nomination. I've been so impressed with the work of SGA since my coming to Berea in 2011, and especially over the last two years when I've had the pleasure to work directly and closely with SGA leadership and members. On this particular matter, SGA can and ought to do better.

Sincerely,
Tyler

_____

*F. Tyler Sergent, PhD*



**BEREA COLLEGE**

Office of the Academic Vice President and Dean of the Faculty
Chad Berry
CPO 2204, Berea, KY 40404
Phone: 859.985.3486
chad_berry@berea.edu

June 1, 2018

David Porter
CPO 1995

Exhibit 2

Dear David,

As we approach the end of another academic and fiscal year, I am writing to thank you for your service and to inform you of your salary increase for 2018-19. Berea College benefits from a staff and teaching faculty of extraordinary dedication and commitment, and we are pleased to be able to provide raises this year for all successful employees. The typical increase College-wide for 2018-19 is 2 percent.

Enclosed is a data sheet that shows how the salaries of Berea faculty compare to those in our faculty salary benchmark group for the last academic year (2017-18). The aim of the College in determining faculty salaries has been to have the average Berea College salary in each rank be as near as possible to the median salary among the average salaries in the benchmark group. The sheet also includes new information at the bottom for the upcoming academic year (2018-19).

Your salary effective with the first payroll period following August 1, 2018, will be at the annualized rate of $108,340, subject to taxes and other withholdings.

In addition to employees' salaries and wages, the College's payments for all employee benefits average an additional 26 percent of salaries. The benefits paid by the College for eligible employees include (a) contributions to retirement, health insurance, and dental plans, and (b) providing for payroll taxes (FICA and Medicare), life and disability insurance, the employee assistance program, workers' compensation, vacation and sick leave, as well as most administrative costs of the employee benefits programs.

The terms and conditions of your employment remain subject to the provisions of the Berea College Faculty Manual and the Berea College Employee Handbook. Current versions of the Manual and the Handbook are available online at http://www.berea.edu. The Handbook includes a description of the comprehensive benefits offered through the College.

I look forward to working with you in the coming year as we all seek to advance Berea's extraordinary mission.

Sincerely,

Chad Berry
Academic Vice President and Dean of the Faculty

cc: Steve Lawson
    Sara Clements

1192-2175-6101-400

*Investing in Lives of Great Promise*



MADISON CIRCUIT CLERK
201 W. MAIN STREET
RICHMOND KY 40475

91 7199 9991 7030 2212 2742



TIME ___ FILED ___ A.M./P.M.

FEB 13 2019

MADISON CIRCUIT COURT
DAVID FERNANDEZ CLERK

**Berea College**
Lyle D. Roelofs c/o Berea College
Lincoln Hall
CPO 2182 Berea KY 40404
19-CI-60

RTS
RETURN TO SENDER

OTHER

Return Away

Tennessee

INSUFFICIENT ADDRESS
NOT KNOWN
NOT AS ADDRESSED
AT SUCH NUMBER
NOT DUE TO FORWARD
UNABLE TO FORWARD

**UNITED STATES POSTAL SERVICE**

Berea College
Lyle D. Roelofs c/o Berea College
Lincoln Hall
CPO 2182 Berea KY 40404
19-CI-60

February 15, 2019

TIME_____ FILED _____ A.M./P.M.

FEB 15 2019

Dear allison hemsley:

The following is in response to your request for proof of delivery on your item with the tracking number:
**9171 9999 9170 3022 1227 42**.

## Item Details

| | | |
|---|---|---|
| **Status:** | Delivered, Left with Individual | |
| **Status Date / Time:** | February 11, 2019, 9:57 am | |
| **Location:** | RICHMOND, KY 40475 | |
| **Postal Product:** | First-Class Mail® | |
| **Extra Services:** | Certified Mail™ | |
| | Return Receipt Electronic | |

TIME_____ FILED _____ A.M./P.M.

FEB 15 2019

MADISON CIRCUIT COURT
DAVID FERNANDEZ, CLERK

## Shipment Details

**Weight:**                     18lb, 8.3oz

## Recipient Signature

| | |
|---|---|
| Signature of Recipient: | *Prallahylm* |
| Address of Recipient: | 101 W. Main |

Note: Scanned image may reflect a different destination address due to Intended Recipient's delivery instructions on file.

Thank you for selecting the United States Postal Service® for your mailing needs. If you require additional assistance, please contact your local Post Office™ or a Postal representative at 1-800-222-1811.

Sincerely,
United States Postal Service®
475 L'Enfant Plaza SW
Washington, D.C. 20260-0004

AOC-105    Summons Type:  CI
Rev. 11-95

Commonwealth of Kentucky
Court of Justice

CR 4.02; CR Official Form 1

CASE NO. 19-CI- 060

COURT:  CIRCUIT

COUNTY:  Madison

## CIVIL SUMMONS

Dr. DAVID B. PORTER,

**PLAINTIFF**

**VS.**

BEREA COLLEGE
(With Process Agent:
Lyle D. Roelofs
c/o Berea College
Lincoln Hall
CPO 2182 Berea, KY 40404),

*Original filing*

**DEFENDANT.**

THE COMMONWEALTH OF KENTUCKY
TO THE ABOVE-NAMED DEFENDANT(S):

You are hereby notified that a legal action has been filed against you in this court demanding relief as shown on the document delivered to you with this summons.  Unless a written defense is made by you or by an attorney on your behalf and filed in the clerk's office within 20 days following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding such relief against you or his (their) attorney(s) are shown on the document delivered to you with this summons.

DATE  February 18, 2019          CLERK:  *Kevil M. Kennedy*

By: *Beth Tussey*  D.C.

### PROOF OF SERVICE

This Summons was served by delivering a true copy and the complaint (or other initiating document) to:

*Lyle D. Roelofs*

This the  19th  day of  Feb. , 2019.

Served By: *Bruce Thomas*
*Constable*

AOC-105   Summons Type: CI
Rev. 11-95

TIME _____ FILED _____ A.M./P.M.

FEB 20 2019

MADISON CIRCUIT COURT
DAVID FERNANDEZ, CLERK

Commonwealth of Kentucky
Court of Justice

CR 4.02; CR Official Form 1

CASE NO. 19-CI- _____

COURT:   CIRCUIT

COUNTY:   Madison

## CIVIL SUMMONS

Dr. DAVID B. PORTER,                                      **PLAINTIFF**

TIME _____ FILED _____ A.M./P.M.

FEB 20 2019

MADISON CIRCUIT COURT
DAVID FERNANDEZ, CLERK

**VS.**

BEREA COLLEGE
(With Process Agent:
Lyle D. Roelofs
c/o Berea College
Lincoln Hall
CPO 2182 Berea, KY 40404),

*Original filing*

**DEFENDANT.**

THE COMMONWEALTH OF KENTUCKY
TO THE ABOVE-NAMED DEFENDANT(S):

        You are hereby notified that a legal action has been filed against you in this court demanding relief as shown on the document delivered to you with this summons.  Unless a written defense is made by you or by an attorney on your behalf and filed in the clerk's office within 20 days following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

        The name(s) and address(es) of the party or parties demanding such relief against you or his (their) attorney(s) are shown on the document delivered to you with this summons.

DATE _February 18, 2019_          CLERK: _Paul M. [Sevency]_

                                   By: _Beth [Tusson]_ D.C.

## PROOF OF SERVICE

This Summons was served by delivering a true copy and the complaint (or other initiating document) to:

_____ _Lyle D. Roelofs_ _____

This the _8th_ day of _Feb_, 2019.

                         Served By: _David Thomas_
                                    _Constable_

 **UNITED STATES POSTAL SERVICE**

March 5, 2019

Dear allison hemsley:

FILED
TIME_____ A.M./P.M.
MAR 06 2019
MADISON CIRCUIT COURT
DAVID FERNANDEZ, CLERK

Berea College
Process Agent: Lyle D. Roelofs c/o Berea
College Lincoln Hall
CPO 2182
Berea, KY 40403
19-CI-00060

The following is in response to your request for proof of delivery on your item with the tracking number:
**9489 0090 0027 6096 4187 63** .

## Item Details

| | |
|---|---|
| **Status:** | Delivered, To Agent |
| **Status Date / Time:** | February 21, 2019, 9:16 am |
| **Location:** | BEREA, KY 40404 |
| **Postal Product:** | First-Class Mail® |
| **Extra Services:** | Certified Mail™ |
| | Return Receipt Electronic |

## Shipment Details

| | |
|---|---|
| **Weight:** | 20lb, 4.1oz |

## Recipient Signature

| | |
|---|---|
| Signature of Recipient: | *Bw Cook* |
| Address of Recipient: | *CPO 40404* |

Note: Scanned image may reflect a different destination address due to intended Recipient's delivery instructions on file.

Thank you for selecting the United States Postal Service® for your mailing needs. If you require additional
assistance, please contact your local Post Office™ or a Postal representative at 1-800-222-1811.

Sincerely,
United States Postal Service®
475 L'Enfant Plaza SW
Washington, D.C. 20260-0004

11/15/2019 09:49:44 AM
*ELECTRONICALLY FILED*

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
DIVISION I
CIVIL ACTION NO. 19-CI-00060

Dr. DAVID B. PORTER                                                    PLAINTIFF

v.

BEREA COLLEGE                                                          DEFENDANT

### ANSWER TO FIRST AMENDED COMPLAINT

Comes the Defendant, Berea College (the "College", "Berea" or "Defendant"), by counsel, and states as follows for its Answer to the First Amended Complaint ("Amended Complaint") filed by Plaintiff Dr. David B. Porter ("Porter" or "Plaintiff").

### GENERAL OBJECTION TO FORM OF AMENDED COMPLAINT

Defendant objects to the form of the Amended Complaint. Not only are most of the allegations vague and lack specificity, many paragraphs violate Kentucky Civil Rule 10.02 which requires that averments must be in separate numbered paragraphs, each of which should be limited to a single set of circumstances. Contrary to this rule, the Amended Complaint reads like a rambling brief or memorandum with some paragraphs including nine or more vague assertions.

### FIRST DEFENSE

Plaintiff's Amended Complaint, in whole or in part, fails to state a claim upon which relief can be granted.

### SECOND DEFENSE

All actions of the Defendant were taken, made, or done in good faith for legitimate, non-discriminatory job-related business reasons, and not based on Plaintiff's membership

in any protected class or for any other illegal or wrongful reason.

### THIRD DEFENSE

Plaintiff's claims are barred to the extent Plaintiff unreasonably failed to take advantage of any preventive or corrective opportunity provided by Defendant to avoid harm otherwise.

### FOURTH DEFENSE

Some or all of the claims in the Amended Complaint are barred by applicable statute of limitations and/or the doctrines of estoppel, laches, waiver, res judicata, election of remedies, and administrative exhaustion.

### FIFTH DEFENSE

Defendant has not violated KRS Chapter 344, willfully or otherwise, or any other applicable state or federal law.

### SIXTH DEFENSE

Defendant asserts all affirmative defenses that the facts may establish are available to it under Rules 8 and 12 of the Kentucky Rules of Civil Procedure, as if all such defenses were set forth verbatim in this Answer.

### SEVENTH DEFENSE

Defendant asserts all defenses available to employers under KRS Chapter 344, which the evidence may support, as if all such defenses were set forth verbatim in this Answer.

### EIGHTH DEFENSE

Plaintiff's alleged injuries and damages resulted from his own conduct and/or from intervening or superseding causes over which the Defendant had no control.

### NINTH DEFENSE

Upon information and belief, some or all of Plaintiff's claims are barred due to Plaintiff's failure to mitigate his alleged losses.

### TENTH DEFENSE

To the extent the Amended Complaint asserts a pattern-or-practice discrimination claim, it must be dismissed as such claims may not be maintained by individual plaintiffs like Plaintiff.

### ELEVENTH DEFENSE

Plaintiff's Amended Complaint is barred in whole or in part by his own breaches of contract.

### TWELFTH DEFENSE

Plaintiff's damages, if any, should be offset by any of his subsequent earnings and benefits, or by sums that through the exercise of reasonable diligence he could have earned; and also by any sums that he may owe or damages that he may have caused to Defendant.

### THIRTEENTH DEFENSE

If determined applicable, Defendant relies on the after-acquired evidence doctrine as a bar to Plaintiff's claims or to reduce any damages relating to the claims.

### FOURTEENTH DEFENSE

Defendant acted at all times without malice or intent to harm or cause emotional distress to Plaintiff, and Defendant relies on same as a complete or partial defense to Plaintiff's claims.

Filed          19-CI-00060     03/29/2019          David M. Fernandez, Madison Circuit Clerk

11/15/2019 09:49:44 AM
82451-35

## FIFTEENTH DEFENSE

Defendant reserves the right to add any further defenses as are supported by the facts, pending further investigation and discovery.

## SIXTEENTH DEFENSE

To the extent relevant, Defendant's statements and communications regarding Plaintiff are protected by absolute or qualified privilege defense.

## SEVENTEENTH DEFENSE

Some or all of the Plaintiff's claims for punitive damages are barred by the terms of Kentucky's punitive damage statute.

## EIGHTEENTH DEFENSE

Plaintiff's Amended Complaint fails for want of joining all parties under Rule 19.

## NINETEENTH DEFENSE

With regard to the particular allegations in the Amended Complaint, Defendant states as follows:

## PARTIES

1.      Defendant is without knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 1 regarding Plaintiff's legal residency and, therefore, denies the same.

2.      Defendant admits the allegations in Paragraph 2 except to state that Berea is a non-profit corporation.

## JURISDICTION AND VENUE

3.      In response to Paragraph 3, Defendant reiterates and incorporates by reference its affirmative defenses, and its responses set forth in Paragraphs 1-2 of this

4

Answer.

4.      Paragraph 4 states or calls for a legal conclusion to which no response is required.  To the extent a response is required, Defendant admits that this Court has personal jurisdiction over the College, that Defendant's principal place of business is in Madison County, Kentucky, and that certain relevant facts related to this action occurred in Madison County, Kentucky.

5.      Paragraph 5 states or calls for a legal conclusion to which no response is required.  To the extent a response is required, Defendant admits the same.

6.      Paragraph 6 states or calls for a legal conclusion to which no response is required.  To the extent a response is required, Defendant admits the same.

7.      Paragraph 7 states or calls for a legal conclusion to which no response is required.  To the extent a response is required, Defendant admits that venue is proper in this Court.

## I. STATEMENT OF FACTS

A.      Dr. Porter's Qualifications for Employment at the College.[1]

8.      In response to Paragraph 8, Defendant reiterates and incorporates by reference its affirmative defenses, and its responses set forth in Paragraphs 1-7 of this Answer.

9.      Defendant admits the allegations that Dr. Porter is a 69-year-old white male, that Dr. Porter was a tenured professor and employee of the College for more than

---

[1]  Defendant has restated the various headings contained in Plaintiff's First Amended Complaint for organization and ease of reference only.  The inclusion of the headings in this Answer should not be construed as Defendant's admission or agreement to the language contained in any of the headings.  To the extent any of the headings contain allegations, Defendant denies them.

17 years, and was a member of the Psychology Department. With regard to the remainder of allegations in this Paragraph 9, Defendant states that Dr. Porter was hired effective July 1, 2001, he ceased to be Academic Vice President and Provost on June 30, 2005, and the date of the termination of his employment was September 30, 2018.

10.     Paragraph 10 states or calls for a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 10.

11.     Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegation in Paragraph 11 regarding whether Plaintiff is partially disabled and the extent of his training and leadership in claims of wrongful workplace harassment, and, therefore denies the same. Defendant admits the remainder of the allegations in Paragraph 11 based on the Plaintiff's prior representations to Berea.

12.     Defendant admits that this is what Dr. Porter represented to Defendant. Defendant is without sufficient information to admit or deny the truth of those representations and, therefore, deny same in this Paragraph 12.

13.     Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 13 as to the number of Plaintiff's professional publications and presentations, and, therefore denies the same.

14.     The allegations in Paragraph 14 are vague, non-specific, and ambiguous. Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 14 and, therefore, deny same.

15.     With regard to the first sentence in Paragraph 15, Defendant states that the students associated with Dr. Porter for a Student Service Award from the Berea College

11/15/2019 09:49:44 AM
82451-35

Student Government Association; however, Dr. Porter did not receive the award.  The remainder of the allegations in this Paragraph 15 are vague, unlimited as to time, lack specificity and are ambiguous.  Defendant is without sufficient information to admit or deny the remainder of the allegations and, therefore deny same.

B.  Pattern of Discrimination by Berea College Against Older, White Male Employees at the College, and the Prior Civil Rights Grievance Filed Against Dr. Wayne Messer in Which Dr. Porter Participated as Dr. Messer's "Advisor".

16.  With regard to the allegations in the first sentence of Paragraph 16, the social media post, when identified by Dr. Porter, will speak for itself and to the extent the allegations differ from the post, those allegations are denied.  With regard to the second sentence of Paragraph 16, Defendant admits that there was outrage on campus, but states that the term "appropriately" is undefined, conclusory, ambiguous and, therefore, denies same.  With regard to the third sentence, a mandatory faculty retreat with training on various topics, including, but not limited to professional conduct and professional ethics, was not the only response of the College to the referenced social media post. Defendant denies the second to last sentence in this Paragraph 16.  The remainder of this Paragraph 16 is vague and ambiguous and, therefore, Defendant does not have sufficient information to admit or deny the allegations and, therefore, deny same.

17.  Defendant denies the allegations stated in the last sentence of Paragraph 17.  Defendant has insufficient knowledge to admit or deny the remainder of the allegations in this Paragraph 17 and, therefore, denies same.

18.  With regard to the allegations in Paragraph 18, the words "quite competent" are vague, ambiguous, a matter of opinion and, thus, Defendant is unable to adequately respond to the truth or falsity of this allegation.  With regard to the remainder

Filed            19-CI-00060     03/29/2019          David M. Fernandez, Madison Circuit Clerk

11/15/2019 09:49:44 AM
82451-35

of the allegations in Paragraph 18, Defendant does not have sufficient information to admit or deny the allegations and, thus, denies same.

19. With regard to the allegations in Paragraph 19, the grievance speaks for itself and, to the extent the allegations vary from the grievance, those allegations are denied.

20. With regard to the allegations in Paragraph 20, the decisions referenced in this Paragraph and text of the Faculty Manual speak for themselves and to the extent the allegations in this Paragraph 20 differ from those decisions and the Faculty Manual, those allegations are denied. Defendant denies that Dr. Messer was not allowed to defend or explain his intentions in the CCHB and FAC hearings. Defendant also denies the allegations in the second sentence of Paragraph 20. Further, not all the parties agreed to mediation and without mutual agreement mediation could not be obtained. The remainder of the allegations in this paragraph are denied.

21. With regard to the allegations in Paragraph 21, the charges, the Excel spreadsheet, and whatever testimony was introduced, speaks for itself and, to the extent the aforementioned differs from what is alleged in this Paragraph 21, said allegations are denied. The remaining allegations contained in Paragraph 21 are denied.

22. The Defendant denies the last sentence of this Paragraph 22. Defendant is without sufficient information concerning the remaining allegations in Paragraph 22 and, thus, deny same.

23. The complaints referenced in Paragraph 23 speak for themselves and to the extent those complaints differ, those allegations are denied. Likewise, Defendant states that the Faculty Manual references contained in Paragraph 21 speak for themselves.

8

To the extent that the allegations in Paragraph 23 are inconsistent with the Faculty Manual, they are denied. Defendant denies the remainder of allegations in Paragraph 23.

24.    With regard to the allegations in Paragraph 24 relating to the findings and remedies in Dr. Messer's case, Defendant states that the CCHB and FAC reports in Messer's case speak for themselves. To the extent the allegations in Paragraph 24 are inconsistent with said CCHB and FAC reports, they are denied.

25.    Defendant admits the allegation in Paragraph 25 that Porter acted as an "adviser" to Messer throughout that grievance process. With regard to the allegations in Paragraph 25 relating to language contained in the Faculty Manual, Defendant states that the Faculty Manual speaks for itself. With regard to the allegations in Paragraph 25 relating to Porter's correspondence with President Roelofs and Dean Chad Berry ("Dean Berry"), Defendant states that said correspondence speaks for itself. To the extent the allegations in Paragraph 25 are inconsistent with the Faculty Manual and the correspondence with College administrators, they are denied. With regard to the last sentence, these allegations contain legal conclusions to which no response is required and this Defendant is without sufficient information to admit or deny the same and, thus, those allegations are denied. Defendant denies the remainder of allegations in Paragraph 25.

26.    Defendant denies the allegations in this Paragraph 26.

27.    With regard to the allegations in Paragraph 27 relating to language contained in the Faculty Manual, Defendant states that the Faculty Manual speaks for itself. To the extent the allegations in Paragraph 27 are inconsistent with the Faculty Manual, they are denied. With regard to the allegations in Paragraph 27 relating to

11/15/2019 09:49:44 AM
82451-35

communications between President Roelofs, Dean Berry, and psychology department faculty members, Defendant states that said correspondence speaks for itself. To the extent the allegations are inconsistent with said communications, they are denied. In the absence of an apology or act of contrition, the grievants refused to meet with Dr. Messer. The remainder of the allegations in Paragraph 27 are denied.

28.     Defendant denies the allegations in this Paragraph 28.

29.     Defendant denies the allegations in this Paragraph 29.

30.     Defendant admits that Defendant, through its counsel, hired W. Scott Lewis, as an expert. Mr. Lewis's qualifications speak for themselves. Further, Lewis' report is a written document prepared for counsel that is privileged and that speaks for itself. To the extent the allegations in Paragraph 30 are inconsistent with Lewis's report, they are denied.

31.     Paragraph 31 states or calls for a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the allegations contained in Paragraph 31.

C.     Dr. Porter's Survey for his PSY 210 Industrial/Organizational Psychology Class, and the College's Resulting Suspension, and His Banishment From Campus.

32.     With regard to Paragraph 32, Defendant admits that Porter taught PSY 210 Industrial/Organizational Psychology at various times for Defendant. Defendant is without sufficient knowledge or information to form a belief as to the truth of the remainder of allegations in Paragraph 32 and, therefore, denies the same.

33.     With regard to Paragraph 33, Defendant admits that Porter prepared a survey for his Spring 2018 PSY 2010 Industrial/Organizational Psychology class in

Filed          19-CI-00060     03/29/2019          David M. Fernandez, Madison Circuit Clerk

developing a survey (the "Survey").  The Survey speaks for itself and to the extent the allegations in Paragraph 33 are inconsistent with the Survey, they are denied.  Defendant is without sufficient knowledge or information to form a belief as to the truth of the remainder of allegations in Paragraph 33 and therefore, denies the same.

34.     With regard to the allegations in Paragraph 34 relating to the Survey, Defendant states that the Survey speaks for itself.  To the extent the allegations in Paragraph 34 are inconsistent with the Survey, they are denied.  Defendant is without sufficient knowledge or information to form a belief as to the truth of the remainder of allegations in Paragraph 34 and, therefore, denies the same.

35.     With regard to the allegations in Paragraph 35 relating to the Survey, Defendant states that the Survey speaks for itself.  To the extent the allegations in Paragraph 35 are inconsistent with the Survey, they are denied.

36.     Defendant admits the fifth sentence in Paragraph 36 that Dr. Porter sent the Survey to Dean Berry via email while Dean Berry was out of state with family.  Dr. Porter did not wait for a response from Dean Berry or otherwise attempt to contact him before distributing the Survey to the entire Campus.  The correspondence referenced in this Paragraph 36 speaks for itself, and to the extent that correspondence differs from said allegations, those allegations are denied.  With regard to the last sentence in Paragraph 36, Dr. Porter knew that Dr. Baltisberger had the Survey because he sent the Survey to Dr. Baltisberger and knew that Dr. Baltisberger was the FAC Chair.  Dr. Porter did not object to Dr. Baltisberfer's presence on the FAC and, thus, waived any argument concerning same.  The Defendant is without sufficient knowledge or information to form

a belief as to the truth of the remainder of the allegations in Paragraph 36 and, therefore, denies the same.

37.    Defendant admits the allegation in the first sentence of Paragraph 37. With regard to the remainder of the allegations, Defendant admits that Dr. Porter and Dean Berry had email communications on February 19, 2018 and those communications speak for themselves.   To the extent the communications differ from the allegations stated in this Paragraph 37, they are denied.  Any remaining allegations are denied.

38.    With regard to the allegations in Paragraph 38 relating to Dr. Wendy Williams' ("Williams") Facebook post, Defendant states that Dr. Williams' Facebook post speaks for itself.  To the extent the allegations in Paragraph 38 are incomplete or inconsistent with Dr. Williams' Facebook post, they are denied.

39.    With regard to the allegations in Paragraph 39 relating to Dr. Williams' Facebook post, Defendant states that Williams' Facebook post speaks for itself.  To the extent the allegations in Paragraph 39 are inconsistent with Williams' Facebook post, they are denied.  Furthermore, the allegations in this Paragraph are conclusory, vague and ambiguous and, therefore, are denied.

40.    With regard to the allegations in Paragraph 40 relating to Williams' Facebook post, Defendant states that Williams' Facebook post speaks for itself.  To the extent the allegations in Paragraph 40 are inconsistent with Williams' Facebook post, they are denied.

41.    With regard to Paragraph 41, Defendant admits that several individuals expressed anguish to the College's administration immediately following issuance of

regarding the Plaintiff's Survey. Defendant denies the Plaintiff's characterizations of these individuals or their responses and denies the same.

42.     Defendant admits the first sentence in Paragraph 42. Dean Berry's request for Dr. Porter to take the Survey down was not conditioned upon Dean Berry providing a list of particular problems with the Survey to Dr. Porter. Dr. Porter asked for particulars of problematic scenarios, but since Dr. Porter refused to take the Survey down, there was no purpose in providing a list. Defendant is without sufficient knowledge or information to form a belief as to the truth of the remainder of the allegations in Paragraph 42 and therefore denies the same.

43.     With regard to the allegations in Paragraph 43, Defendant denies that the responses are valid. Defendant states that the responses to the Survey speak for themselves. To the extent the allegations in Paragraph 43 are inconsistent with said responses, they are denied.

44.     Defendant denies that the Survey results could be valid based on how the survey was constructed and distributed along with other concerns. Defendant denies the second sentence of Paragraph 44. Defendant further states that it has not received the responses to the Survey and, therefore, is without sufficient information to admit or deny the allegations in the first sentence of Paragraph 44, and therefore denies the same. Defendant denies the remainder of the allegations of this Paragraph.

45.     Dean Berry, Dr. Porter and Dr. Jackie Burnside met on February 22, 2018 in Dean Berry's office. Dean Berry advised Dr. Porter that charges for dismissal for cause would be brought against him. The parties discussed the matter at this meeting. Dr. Porter again refused to withdraw the Survey or apologize to his colleagues at that

11/15/2019 09:49:44 AM
82451-35

time.  When the meeting ended, Dean Berry stated that the time for further discussion was over.  To the extent the allegations in Paragraph 45 are inconsistent with the Faculty Manual, they are denied.  The remainder of the allegations in this Paragraph are denied.

46.     With regard to the first sentence in Paragraph 46, Defendant is without knowledge as to Dr. Porter's knowledge and, therefore denies same.  With regard to the remainder of the allegations in the first sentence, Dean Berry met with the FSC at a meeting to relay his concerns with Dr. Porter's conduct, as required in the Faculty Manual.  Defendant denies that the FSC meeting was a "hearing" at which Dr. Porter was entitled to be present and states that the Manual does not require a hearing at this point in the process.  With regard to the second sentence, Defendant states that a majority of the FSC concurred with the charges, warranting his dismissal, and requested that the President of the College initiate formal proceedings in accordance with the Faculty Manual seeking dismissal of Plaintiff.  With regard to the third sentence, the allegations are denied and the Survey speaks for itself.  With regard to the fourth sentence, the allegations are denied and the Survey speaks for itself.  Defendant denies the fifth sentence.  Defendant denies the sixth sentence and the remainder of the allegations of this paragraph.

47.     With regard to Paragraph 47, Dr. Porter's suspension was memorialized in a suspension letter that speaks for itself.  To the extent the allegations in this paragraph differ, they are denied.  Defendant denies the remainder of the allegations contained in Paragraph 47.

48.     With regard to the first sentence in Paragraph 48, the allegation does not identify the surveys or the faculty members to whom it refers and, thus, Defendant is

without sufficient information to admit or deny the allegations and, thus, denies same. The same objection applies to the surveys mentioned in the second sentence and, thus, these allegations are denied. In addition, there is not sufficient detail to determine whether the unnamed surveys referenced were comparable and, thus this entire sentence is denied. With regard to the third sentence, Defendant denies that Dr. Porter's survey did not identify particular individuals and states that due to vague allegations, it is without information to admit or deny the remainder of this third sentence and, thus, denies same. With regard to the fourth sentence, the Defendant states that the Carter G. Woodson Center for Interracial Education is led by a female faculty member. Berea's student counseling center is named Berea College Counseling Services. It is not led by a faculty member. The remainder of the allegations in the fourth sentence are denied because they are vague and Defendant is without sufficient information to admit or deny same. Defendant denies the allegations in the fifth and sixth sentence and all remaining allegations.

49.     Defendant denies the allegations in the first sentence. With regard to the second sentence, Dr. Sergeant acted on his own without consulting the administration. With regard to the allegations in Paragraph 49 relating to email communications between Dr. F. Tyler Sergent ("Sergeant") and students, Defendant states that said email communications speak for themselves. To the extent the allegations in Paragraph 49 are inconsistent with said email communications, they are denied. Defendant denies the allegations in the fifth, sixth, and seventh sentences and remainder of allegations in Paragraph 49.

D.     The College's Wrongful Disciplinary Proceedings Against Dr. Porter, Leading to His Termination.

50.     The Charges and the Faculty Manual referenced in Paragraph 50 speak for themselves. To the extent the allegations in Paragraph 50 are inconsistent with said email communications, they are denied.  In addition, Defendant states that Defendant disagrees with Plaintiff's characterization of the charges and the Faculty Manual.

51.     With regard to the allegations in Paragraph 51 relating to Faculty Manual procedure, Defendant states that the Faculty Manual speaks for itself.  To the extent the allegations in Paragraph 51 are inconsistent with the Faculty Manual, they are denied. Furthermore, the Faculty Manual provides for a personal conference, which was provided.  The remainder of the allegations of this Paragraph 51 are denied.

52.     With regard to the first sentence in Paragraph 52, Dean Berry presented a case and was a witness, as contemplated by the Faculty Manual.  Defendant denies any implication in this entire paragraph that Dean Berry's actions were improper.  In addition, Plaintiff's objections, if any, are contained in the record of the hearing or not, which record speaks for itself and to the extent that these allegations differ from the record, they are denied.  With regard to the second sentence, it is too vague to respond, so the allegation is denied.  With regard to the third sentence, the Dean is not the direct supervisor of the members of the FAC in their capacities as professors or in their positions on the FAC, they all have tenure and are elected to the FAC by the faculty. Dean Berry presented a case and was a witness, as contemplated by the Faculty Manual. The terms of the FAC member's employment are dictated by the Faculty Manual. Defendant denies the allegations in the fourth sentence and any remaining allegations in this Paragraph 52.

11/15/2019 09:49:44 AM
82451-35

53.     With regard to the first sentence in Paragraph 53, the term "minimal" and what if, anything, is required by "administrative due process" are conclusory and legal terms that do not require Defendant to admit or deny and, thus, Defendant denies same. In addition, Plaintiff's objections, if any, are contained in the record of the hearing or not, which is a record that speaks for itself and to the extent that these allegations differ from the record, they are denied. Defendant states that the proper standard, preponderance of the evidence was used. With regard to the second sentence of paragraph 53, Plaintiff produced every witness he offered and he rested without objection to wanting more time. In addition, Plaintiff produced additional evidence to the President, after the hearing, that was considered in the President's decision, which was above and beyond what was required by this process. The Defendant denies remaining allegations in this Paragraph 53.

54.     With regard to the first sentence in Paragraph 54, Dr. Williams and Dr. Wyrick were not "grievants." Neither testified at the hearing due to the injury Plaintiff's actions caused. Dr. Wyrick submitted a letter and Dr. Williams refused to participate in any manner owing to her condition. Wyrick's letter and any documents submitted at the hearing speak for themselves and to the extent any statements in this allegation are in conflict with those documents, the allegations are denied. Furthermore, Plaintiff admitted he caused them distress. With regard to the second sentence, the process does not call for Interrogatories and, in addition, Plaintiff could have called Dr. Wyrick and Dr. Williams but he did not. With regard to the remaining allegations in this paragraph, Plaintiff could have called them as witnesses and did not. Defendant is without knowledge of what

Filed          19-CI-00060     03/29/2019          David M. Fernandez, Madison Circuit Clerk

Plaintiff "wished" and, thus, deny same. The remaining allegations are denied in this Paragraph 54.

55.     With regard to the first sentence in Paragraph 55, Plaintiff's comments and statements speak for themselves and, to the extent these allegations differ from the comments and statements at the hearing, which are part of the record of the hearing, these allegations are denied. In addition, the terms "contractual promise" and "guaranteed" are legal conclusions which do not have to be admitted or denied and, thus, are denied. With regard to the second and third sentences, Defendant denies that they were familiar with research the Survey presented, that they were experts and that were national experts. Their testimony is part of the record of the hearing that speaks for itself and, to the extent these allegations differ from the record, these allegations are denied. The remainder of the allegations are denied.

56.     With regard to the allegations in the first sentence of Paragraph 56, Defendant denies preconceived bias. In addition, the statements of the unnamed member of this FAC that Plaintiff alleges in the first two sentences are contained the record of the hearing and speaks for itself. To the extent the allegations differ from same, they are denied. With regard to the allegations in the third sentence, Defendant denies improper motive or conflict of interest. Furthermore, the Faculty Manual is a document that speaks for itself and to the extent these allegations differ from same, the allegations are denied. With regard to the fourth sentence, the FAC report is a document that speaks for itself, to the extent the allegations differ from same, those allegations are denied. Defendant denies the remainder of this Paragraph 56.

NOT ORIGINAL DOCUMENT
11/15/2019 09:49:44 AM
82451-35

57. Defendant denies the allegations in the first sentence. Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations in the second, third, and fourth sentences and, therefore, denies the same. With regard to sentence five, Defendant admits that Dr. McCormack participated on the FAC that heard Dr. Porter's case, but Defendant denies any alleged impropriety with regard to Dr. McCormack's participation on the FAC. With regard to sentence six and any reference to the Faculty Manual in this paragraph, the Faculty Manual is a document that speaks for itself and to the extent Plaintiff's allegations in this paragraph differ from same, those allegations are denied. Defendant denies the allegations in sentence seven and all remaining allegations.

58. With regard to the allegations in Paragraph 58 relating to Dr. Jay Baltisberger, Defendant admits that he was the Chair of the FAC that heard the charges against Plaintiff. Defendant denies the remainder of the allegations in Paragraph 58.

59. With regard to the allegations in Paragraph 59 relating to the FAC Report submitted to President Roelofs, Defendant states that the FAC Report speaks for itself. To the extent the allegations in Paragraph 59 are inconsistent with the FAC Report, they are denied. The remaining allegations are denied.

60. With regard to the allegations in Paragraph 60 relating to the FAC Report and Survey, Defendant states that the FAC Report and Survey speaks for themselves. To the extent the allegations in Paragraph 60 are inconsistent with same, they are denied. Defendant does not understand what is meant by KRS 344 proceeding and, thus, denies same. Defendant is without sufficient knowledge or information to form a belief as to the truth of the remainder of the allegations in Paragraph 60 and, therefore, denies the same.

61.     With regard to the allegations in Paragraph 61 relating to the FAC Report, the record of the hearing speaks for itself. To the extent the allegations in Paragraph 61 are inconsistent with same, they are denied. Defendant denies the remainder of allegations in Paragraph 61.

62.     With regard to the allegations in Paragraph 62 relating to the FAC Report, the record of the hearing speaks for itself. To the extent the allegations in Paragraph 62 are inconsistent with same, they are denied. Defendant denies the remainder of the allegations in Paragraph 62.

63.     With regard to the allegations in Paragraph 63 relating to the FAC Report, Defendant states that the FAC Report speaks for itself. To the extent the allegations in Paragraph 63 are inconsistent with the FAC Report, they are denied. Defendant denies the remainder of the allegations in Paragraph 63.

64.     With regard to the allegations in Paragraph 64 relating to the FAC report, Defendant states that the FAC Report speaks for itself. To the extent the allegations in Paragraph 64 are inconsistent with the FAC Report, they are denied.

65.     Defendant admits the first sentence in Paragraph 65 except to state that it is not an appeal, the matter was submitted to the President for his decision. The fifth sentence in Paragraph 65 constitutes a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the same. Defendant denies the remainder of the allegations in Paragraph 65.

66.     The letter referenced in Paragraph 66 speaks for itself. To the extent these allegations differ from same, the allegations are denied.

11/15/2019 09:49:44 AM
82451-35

67.    With regard to the allegations in Paragraph 67 relating to language contained in the Faculty Manual, Defendant states that the Faculty Manual speaks for itself.    Similarly, with regard to the allegations relating to President Roelofs' "concluding letter" in Messer's case, Defendant states that President Roelofs' letter speaks for itself.  To the extent the allegations in Paragraph 67 are inconsistent with  the Faculty Manual or President Roelofs' "concluding letter", they are denied.    Defendant denies the remainder of the allegations in Paragraph 67.

68.    With regard to the allegations in Paragraph 68, the Faculty Manual speaks for itself and to the extent these allegations differ from same, they are denied.  Defendant admits that Plaintiff sought review of the decision by the Executive Committee. Remaining allegations are denied.

69.    With regard to the allegations in Paragraph 69 relating to language contained in of the July 27, 2018 Resolution of the Berea College Board of Trustees Executive Committee, Defendant states that said Resolution speaks for itself.  To the extent the allegations in Paragraph 69 are inconsistent with said Resolution, they are denied.  Defendant denies the remainder of this Paragraph.

70.    With regard to the allegations in Paragraph 70 relating to Porter's document that he calls an "appeal", Defendant states that Porter's "appeal" speaks for itself.  To the extent the allegations in Paragraph 70 are inconsistent with Porter's "appeal," they are denied.  Defendant denies the last sentence and all remaining allegations.

71.    With regard to the allegations in Paragraph 71, the word "nonetheless" is argument that does not have to be admitted or denied, but nonetheless is denied.  The

Filed          19-CI-90060      03/29/2019           David M. Fernandez, Madison Circuit Clerk

11/15/2019 09:49:44 AM
82451-35

remainder of this Paragraph 71 concerns the Executive Committee decision which is a document that speaks for itself. To the extent these allegations differ from same, the allegations are denied.

72.     Defendant denies the allegation in Paragraph 72 that the College's charges against Plaintiff were false, that he was "banished" from campus and that the Defendant caused any damages or injuries to Plaintiff. Defendant is without sufficient knowledge or information to form a belief as to the truth of the remainder of the allegations in Paragraph 72 and therefore denies the same.

F.     Dr. Porter's Contractual Rights to Continued Employment, Academic Freedom, and Administrative Due Process According to the Faculty Manual.

73.     With regard to the allegations in Paragraph 73, Defendant admits that Plaintiff was a tenured member of the College faculty. This paragraph contains numerous legal conclusions, like whether he had an employment contract with automatic annual renewal in the first sentence that do not have to be admitted or denied and, thus, Defendant denies same. Defendant denies the allegations in the second sentence – this form of letter is issued to all current employees and Dr. Porter received same because his case was still pending internally. His employment was subject to the dismissal proceedings which were ongoing at that time and not completed. The remainder of the allegations are denied.

74.     With regard to the allegations in Paragraph 74 relating to the language contained in the Faculty Manual and the letter, Defendant states that the Faculty Manual and the letter speak for themselves. To the extent the allegations in Paragraph 74 are

11/15/2019 09:49:44 AM
82451-35

inconsistent with same, they are denied.  Furthermore, Defendant states that it was a salary letter, not a contract.

75.     With regard to the allegations in Paragraph 75, Defendant admits that Plaintiff's employment was subject to the Faculty Manual, which speaks for itself.  To the extent the allegations in Paragraph 75 are inconsistent with the Faculty Manual, they are denied.  Defendant denies the remainder of the allegations.

76.     With regard to the allegations in Paragraph 76 relating to the language contained in of the Faculty Manual, Defendant states that the Faculty Manual speaks for itself.  To the extent the allegations in Paragraph 76 are inconsistent with the Faculty Manual, they are denied.

77.     With regard to the allegations in Paragraph 77 relating to the FAC report following Messer's appeal, Defendant states that the report speaks for itself.  To the extent the allegations in Paragraph 77 are inconsistent with the FAC report, they are denied.

78.     With regard to the allegations in Paragraph 78 relating to the language contained in of the Faculty Manual, Defendant states that the Faculty Manual speaks for itself.  To the extent the allegations in Paragraph 78 are inconsistent with the Faculty Manual, they are denied.

79.     With regard to the allegations in Paragraph 79 relating to the language contained in of the Faculty Manual, Defendant states that the Faculty Manual speaks for itself.  To the extent the allegations in Paragraph 79 are inconsistent with the Faculty Manual, they are denied.  Defendant denies the second, third, and the remainder of the sentences in Paragraph 79.

Filed          19-CI-00000   03/29/2019        David M. Fernandez, Madison Circuit Clerk

80.    With regard to the allegations in Paragraph 80 relating to the language contained in of the Faculty Manual and the findings at the hearing, Defendant states that the Faculty Manual and the record of the hearing speak for themselves.  To the extent the allegations in Paragraph 80 are inconsistent with same, they are denied.  Defendant states that Plaintiff could have called Williams and Wyrick but chose not to.  Defendant denies the remainder of this Paragraph 80.

81.    With regard to the allegations in Paragraph 81 relating to the Faculty Manual and FAC report, Defendant states that the Faculty Manual and FAC Report speak for themselves.  To the extent the allegations in Paragraph 81 are inconsistent with the same, they are denied.

82.    With regard to the allegations in Paragraph 82 relating to the Faculty Manual, Defendant states that the Faculty Manual speaks for itself.  To the extent the allegations in Paragraph 82 are inconsistent with the Faculty Manual, they are denied.

83.    With regard to the allegations in Paragraph 83 relating to the language contained in of the Faculty Manual, Defendant states that the Faculty Manual speaks for itself.  To the extent the allegations in Paragraph 83 are inconsistent with the Faculty Manual, they are denied.

84.    Defendant denies the allegations in Paragraph 84.

****************

## CAUSES OF ACTION

### COUNT I:
Breach of Contract for Suspension from Employment in Violation
of the Required Due Process, and Dr. Porter's Academic Freedom

11/15/2019 09:49:44 AM
82451-35

85.     In response to Paragraph 85, Defendant reiterates and incorporates by reference its affirmative defenses, and its responses set forth in Paragraphs 1-84 of this Answer.

86.     With regard to the allegations in Paragraph 86 relating to the language quoted from the Faculty Manual, Defendant states that the Faculty Manual speaks for itself.  To the extent the allegations in Paragraph 86 are inconsistent with the Faculty Manual, they are denied.  In addition, Paragraph 86 contains legal conclusions for which no response is required, but nevertheless denied.  The remainder of the allegations in Paragraph 86 are denied.

87.     Defendant denies the allegations in Paragraph 87.

88.     Defendant denies the allegations in Paragraph 88.

89.     Defendant denies the allegations in Paragraph 89.

90.     Defendant denies the allegations in Paragraph 90.

91.     Paragraph 91 contains legal conclusions ("guarantee" and "employment contract") that require no response, but to the extent they do, same are denied.  With regard to the allegations in Paragraph 91 relating to the language contained in the Faculty Manual, Defendant states that the Faculty Manual speaks for itself.  To the extent the allegations in Paragraph 91 are inconsistent with the Faculty Manual and interpretations of the Faculty Appeals Committee, they are denied.

92.     Defendant denies the allegations in Paragraph 92.

93.     Defendant denies the allegations in Paragraph 93.

94.     Defendant denies the allegations in Paragraph 94.

COUNT II:
Breach of Contract for Termination of Dr. Porter's Employment

11/15/2019 09:49:44 AM
82451-35

<u>after the College's Denial of the Required Administrative Due Process</u>

95.     In response to Paragraph 95, Defendant reiterates and incorporates by reference its affirmative defenses, and its responses set forth in Paragraphs 1-94 of this Answer.

96.     Defendant denies the allegations in Paragraph 96.

97.     The statements of the FAC Chair and the FAC Report are documents that speak for themselves.  To the extent these allegations in Paragraph 97 differ from same, these allegations are denied.

98.     Plaintiff mischaracterizes the charges.   In any event, the charges are contained in a document that speaks for itself and, to the extent these allegations in Paragraph 98 differ from same, those allegations are denied.

99.     Paragraph 99 contains legal conclusions to which no response is required. To the extent a response is required, Defendant denies the same.    In addition, this paragraph is vague.  Defendant denies the remainder of the allegations in Paragraph 99.

100.    Defendant denies the allegations in Paragraph 100.

101.    Defendant denies the allegations in Paragraph 101.

102.    With regard to the first sentence of Paragraph 102, Plaintiff mischaracterizes Dean Berry's involvement in the proceedings against Dr. Messer. Defendant states that Dean Berry did not charge Dr. Messer and was not a witness in the Title VII case involving Dr. Messer before the Campus Conduct Hearing Board.  His only participation was, at an early stage, to determine whether the parties would agree to an informal dispute resolution process.  They did not and the matter proceeded to a formal hearing process administered under the College's policies and procedures for

11/15/2019 09:49:44 AM
82451-35

sexual harassment and misconduct cases.  Dr. Berry did not decide the case, the CCHB panel did and rendered its report to President Roelofs, who made the final decision on behalf of the College.  With regard to the second sentence of Paragraph 102, the Dean is not the direct supervisor of the members of the FAC in their capacities as professors or in their positions on the FAC, they all have tenure and are elected to the FAC by the faculty. Dean Berry presented a case and was a witness, as contemplated by the Faculty Manual. The terms of the FAC member's employment are dictated by the Faculty Manual.   With regard to the third sentence, Dr. Porter's written objection speaks for itself and to the extent that the allegations differ from same, the allegations are denied.   Defendant reiterates that the Dean's participation was proper and consistent with the Faculty Manual.  Finally, Defendant denies that Dean Berry's involvement in the FAC hearing violated the concept of administrative due process.    Any remaining allegations in Paragraph 102 are denied.

103.    With regard to the allegations in Paragraph 103 relating to the procedures in the Faculty Manual, Defendant states that the Faculty Manual speaks for itself.  To the extent the allegations in Paragraph 103 are inconsistent with the Faculty Manual, they are denied.

104.    Defendant denies the allegations in Paragraph 104.

105.    Defendant denies the allegations in Paragraph 105.   Defendant also incorporates by reference its affirmative defenses, and its responses set forth in Paragraphs 36, 56-58 of this Answer.

106.    Defendant denies the allegations in Paragraph 106.

107.    Defendant denies the allegations in Paragraph 107.

Filed          19-CI-00060    03/29/2019          David M. Fernandez, Madison Circuit Clerk

11/15/2019 09:49:44 AM
82451-35

## COUNT III:
### Breach of Contract for Termination of Dr. Porter's Employment in Violation of His Academic Freedom.

108.    In response to Paragraph 108, Defendant reiterates and incorporates by reference its affirmative defenses, and its responses set forth in Paragraphs 1-107 of this Answer.

109.    With regard to the allegations in Paragraph 109 relating to the language contained in the Faculty Manual, Defendant states that the Faculty Manual speak for itself.  To the extent the allegations in Paragraph 109 are inconsistent with the Faculty Manual, they are denied.  Furthermore, this Paragraph 109 contains legal conclusions that do not require a response. Defendant denies the remainder of the allegations in Paragraph 109.

110.    With regard to the allegations in Paragraph 110 relating to the language contained in the Faculty Manual, Defendant states that the Faculty Manual speaks for itself.  To the extent the allegations in Paragraph 110 are inconsistent with the Faculty Manual, they are denied. Furthermore, this Paragraph 110 contains legal conclusions that do not require a response. Defendant denies the remainder of the allegations in Paragraph 110.

111.    Defendant denies the allegations in Paragraph 111.

112.    Defendant denies the allegations in Paragraph 112.

113.    Defendant denies the allegations in Paragraph 113.

## COUNT IV:

### Violations of the KCRA for Employment Discrimination.

FILED 11/15/2019 09:49:44 AM
02451-35

114.    In response to Paragraph 114, Defendant reiterates and incorporates by reference its affirmative defenses, and its responses set forth in Paragraphs 1-113 of this Answer.

115.    Defendant denies the allegations in Paragraph 115.

116.    Defendant denies the allegations in Paragraph 116.

A.    Discrimination Based on Age.

117.    In response to Paragraph 117, Defendant reiterates and incorporates by reference its affirmative defenses, and its responses set forth in Paragraphs 1-116 of this Answer.

118.    Defendant admits the allegations in Paragraph 118.

119.    With regard to the allegations in Paragraph 119 relating to the language of KRS 344.040(1)(a), Defendant states that said statute speaks for itself.  To the extent the allegations in Paragraph 119 are inconsistent with said statute, Defendant denies them.

120.    Defendant denies the allegations in Paragraph 120.

121.    With regard to the allegations in Paragraph 121 relating to the language contained in of the Faculty Manual and President Roelofs' concluding letter in Messer's case, Defendant states that the Faculty Manual and President Roelofs' letter speak for themselves.  To the extent the allegations in Paragraph 121 are inconsistent with the Faculty Manual and President Roelofs' letter, they are denied.  Defendant denies the remainder of the allegations of this Paragraph 121.

122.    Defendant denies the allegations in Paragraph 122.

123.    Defendant denies the allegations in Paragraph 123.

B.    Discrimination Based on Race.

Filed          19-CI-00060    03/29/2019        David M. Fernandez, Madison Circuit Clerk

124.     In response to Paragraph 124, Defendant reiterates and incorporates by reference its affirmative defenses, and its responses set forth in Paragraphs 1-123 of this Answer.

125.     Defendant admits the allegations in Paragraph 125.

126.     With regard to the allegations in Paragraph 126 relating to the language of KRS 344.040(1)(a), Defendant states that said statute speaks for itself.  To the extent the allegations in Paragraph 126 are inconsistent with said statute, Defendant denies them.

127.     Defendant denies the allegations in Paragraph 127.

128.     With regard to the allegations in Paragraph 128 relating to the language contained in of the Faculty Manual and President Roelofs' concluding letter in Messer's case, Defendant states that the Faculty Manual and President Roelofs' letter speak for themselves.  To the extent the allegations in Paragraph 128 are inconsistent with the Faculty Manual and President Roelofs' letter, they are denied.  Defendant denies the remainder of this Paragraph 128.

129.     Defendant denies the allegations in Paragraph 129.

130.     Defendant denies the allegations in Paragraph 130.

C.     Discrimination Based on Sex

131.     In response to Paragraph 131, Defendant reiterates and incorporates by reference its affirmative defenses, and its responses set forth in Paragraphs 1-130 of this Answer.

132.     Defendant admits the allegations in Paragraph 132.

133.    With regard to the allegations in Paragraph 133 relating to the language of KRS 344.040(1)(a), Defendant states that said statute speaks for itself.  To the extent the allegations in Paragraph 133 are inconsistent with said statute, Defendant denies them.

134.    Defendant denies the allegations in Paragraph 134.

135.    With regard to the allegations in Paragraph 135 relating to the language contained in of the Faculty Manual and President Roelofs' concluding letter in Messer's case, Defendant states that the Faculty Manual and President Roelofs' letter speak for themselves.  To the extent the allegations in Paragraph 135 are inconsistent with the Faculty Manual and President Roelofs' letter, they are denied.  Defendant denies the remainder of this Paragraph 135.

136.    Defendant denies the allegations in Paragraph 136.

137.    Defendant denies the allegations in Paragraph 137.

COUNT V:
Violation of the KCRA for Illegal Retaliation

138.    In response to Paragraph 138, Defendant reiterates and incorporates by reference its affirmative defenses, and its responses set forth in Paragraphs 1-137 of this Answer.

139.    With regard to the allegations in Paragraph 139 relating to the language of KRS 344.280(1), Defendant states that said statute speaks for itself.  To the extent the allegations in Paragraph 139 are inconsistent with said statute, Defendant denies them.

140.    With regard to the allegations in the first sentence of Paragraph 140, Defendant admits that Plaintiff acted as Dr. Messer's "adviser" through the latter's hearing and appeals, and that he advocated on behalf of Dr. Messer in this role. Defendant is without sufficient information to admit or deny the allegations in sentences

11/18/2019 09:49:44 AM
82451-35

2 and 3 and, further, to the extent recordings or documents are discussed herein, they are documents that speak for themselves and Defendant denies any allegations that are contrary to same. With regard to the fourth sentence, the postings referenced therein speak for themselves and to the extent the allegations differ from the postings, those allegations are denied. Defendant specifically denies that the College conspired with or enabled postings by Sergent and Williams. The remainder of the allegations are denied.

141.    Defendant denies the allegations in Paragraph 141.

142.    With regard to the allegations in Paragraph 142 relating to the language contained in the Faculty Manual and President Roelofs' concluding letter in Messer's case, Defendant states that the Faculty Manual and President Roelofs' letter speak for themselves. To the extent the allegations in Paragraph 142 are inconsistent with the Faculty Manual and President Roelofs' letter, they are denied. The remaining allegations in this Paragraph 142 are denied.

143.    Defendant denies the allegations in Paragraph 143.

144.    Defendant denies the allegations in Paragraph 144.

145.    Paragraph 145 states or calls for a legal conclusion to which no response is required. To the extent a response is required, Defendant denies any violation of state or federal law.

146.    Insofar as the Complaint's prayer for relief contains allegations that must be admitted or denied, Defendant denes them.

147.    All allegations not specifically admitted are denied.

148.    Defendant reserves the right to amend this Answer in accordance with the Civil Rules and orders of the Court.

WHEREFORE, Defendant respectfully requests that the Court deny all claims for relief by Plaintiff, dismiss Plaintiff's First Amended Complaint with prejudice, award Defendant its costs and attorneys' fees incurred in defending this action, and provide Defendant with any and all other relief to which it may be entitled.

Respectfully submitted,

*/s/ Sharon L. Gold*

W. Craig Robertson III
Sharon L. Gold
Courtney R. Samford
WYATT, TARRANT & COMBS, LLP
250 West Main Street, Suite 1600
Lexington, KY  40507-1746
859.233.2012
*Counsel for Defendant*

11/15/2019 09:49:44 AM
62451-35

## CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2019, I electronically filed the foregoing with the Clerk of Court via the e-filing system. I further certify that I mailed the foregoing document by first class mail to all non-eFiling participants.

John F. Lackey
214 West Main Street
Richmond, KY 40475

Debra Ann Doss
108 Pasadena Drive
Lexington, KY 40503
*Counsel for Plaintiff*

/s/ *Sharon L. Gold*
_____
Sharon L. Gold

61810266.8

34

NOT ORIGINAL DOCUMENT
11/15/2019 09:50:00 AM
*ELECTRONICALLY FILED*

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
DIVISION I
CIVIL ACTION NO. 19-CI-00060

Dr. DAVID B. PORTER                                          PLAINTIFF

v.

BEREA COLLEGE                                               DEFENDANT

## NOTICE OF SERVICE

Defendant, Berea College ("Defendant"), hereby gives notice that its First Set of

Interrogatories and Requests for Production of Documents to Plaintiff were served on

counsel for Plaintiff via U.S. Mail on the 29th day of March, 2019.

Respectfully submitted,

*/s/ Sharon L. Gold*

W. Craig Robertson III
Sharon L. Gold
Courtney R. Samford
WYATT, TARRANT & COMBS, LLP
250 West Main Street, Suite 1600
Lexington, KY 40507-1746
859.233.2012

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2019, I electronically filed the foregoing with the Clerk of Court via the e-filing system. I further certify that I mailed the foregoing document by first class mail to all non-eFiling participants.

John F. Lackey
214 West Main Street
Richmond, KY 40475

Debra Ann Doss
108 Pasadena Drive
Lexington, KY 40503
*Counsel for Plaintiff*

/s/ Sharon L. Gold

Sharon L. Gold

61812143.1

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
DIVISION I
CIVIL ACTION NO. 19-CI-00060

Dr. DAVID B. PORTER                                                    PLAINTIFF

v.

BEREA COLLEGE                                                         DEFENDANT


**MOTION FOR PROTECTIVE ORDER TO STAY**
**YABSIRA AYELE'S DEPOSITION**

Comes the Defendant, Berea College ("Berea"), by counsel, and hereby moves the Court for a protective order prohibiting the Plaintiff Dr. David B. Porter ("Porter" or "Plaintiff") from deposing Yabsira Ayele ("Ayele") on May 22, 2019. In support of said Motion, Berea states as follows:

This matter concerns an employment dispute between Berea and Porter, a former professor. Porter filed an expansive complaint against Berea alleging numerous employment claims concerning his termination. Porter was terminated after a lengthy internal review process for personal conduct which demonstrably hindered fulfillment of professional responsibilities. Porter disseminated a survey across the entire campus that utilized information from Title VII/IX complaints regarding his colleagues, causing outrage on campus and harm to the complainants and others.

One of the exhibits to the First Amended Complaint in this case is an email exchange between Ayele and Porter's former colleague, Tyler Sergent. **(See Exhibit 1 to First Amended Complaint, which is attached as Exhibit A hereto)**. Ayele is a referenced in the First Amended Complaint as a Berea student. According to Plaintiff's

attorney, he will be moving out of Kentucky at the end of the month after graduating. **(See Debra Doss Email, Exhibit B hereto).**

The case has been pending for less than four months and the parties are still in the very early stages of discovery.  Porter has also just recently brought a companion case involving some of the same subject matter, but against his former colleague Sergent who is the husband of one of the Title VII complainants.  **(See Exhibit C hereto, Sergent Complaint, 19-CI-200).**  Sergent is represented by separate counsel in that case.  The parties in the Sergent case are not even finished with the initial pleadings.  Porter references the same Ayele and Sergent discussion in that complaint.  **(See Porter's Exhibit 1 to the Sergent Complaint).**

In this case, by agreement of the parties, Berea's responses to Plaintiff's First Set of Interrogatories and Requests for Production of Documents are not due until June 4, 2019, and Plaintiff's responses to Berea's First Set of Interrogatories and Requests for Production of Documents are not due until June 14, 2019.  The parties will need to work out a confidentiality agreement due to the nature of some of the documents that are requested.  In addition, there will need to be time to review documents produced.  This case will involve the exchange of <u>thousands of documents</u>.  There will be multiple witnesses that are out of state, potentially including Porter's and Berea's expert witnesses.

Notwithstanding the foregoing, on May 7, 2019, Plaintiff's counsel sent an email to the undersigned requesting to take the deposition of Ayele on May 22, 2019, with the sole reason for taking this deposition before the completion of written discovery being that Ayele recently graduated and, according to Plaintiff, will be leaving Kentucky at the

2

end of May. **(See Exhibit B).** Plaintiff's counsel did not indicate that Mr. Ayele will be moving out of the country or otherwise unavailable. Merely moving out of state is not a sufficient reason to take a deposition before counsel for the Defendant (and, likewise, counsel for Sergent in the companion case) can prepare sufficiently for his deposition.

Ayele was in Porter's class that disseminated the survey and may have knowledge of other matters referenced in the complaint. Ayele had what we surmise to be numerous conversations with Porter, many of which are likely in emails and other documents that will be provided by Plaintiff. There is no way that Berea can adequately prepare for Ayele's deposition before the exchange of documents. Furthermore, neither Defendant's lead counsel is available on May 22, and two weeks' notice is simply insufficient for scheduling a deposition in a case of this magnitude.

The undersigned sent a letter to Plaintiff's counsel on May 9, 2019, objecting to Ayele's deposition being scheduled for May 22, 2019, for the following reasons: (1) Berea cannot adequately prepare for Ayele's deposition without Plaintiff's responses to Berea's first set of discovery requests; (2) Berea has repeatedly requested that the Plaintiff's deposition be conducted prior to the deposition of any other witness in accordance with local practice; and (3) neither of this Defendant's lead attorneys are available on May 22, 2019. **(See Gold letter, Exhibit D).**

Plaintiff's counsel responded by email on May 10, 2019, stating that Berea's objection to the date of Ayele's deposition is "untenable" and indicating his intention to "move forward with our planned discovery." **(Lackey letter, Exhibit E).** Due to the timing of the deposition being next week, and the parties obvious impasse on this issue, the undersigned certifies that the motion is necessary to resolve this dispute.

To be clear, Berea has no objection to the deposition of Yabsira Ayele after written discovery has concluded, the Plaintiff's deposition has been taken, and the parties have had time to digest the thousands of documents that will be produced in this case. However, noticing Mr. Ayele's deposition, who is likely to be a trial witness, at such late notice, on a date that defense counsel is not available, and, more importantly, prior to Plaintiff's deposition and the production of written discovery and documents that are necessary to enable Berea to fully prepare for Ayele's deposition is premature and simply improper. Just as in any case where parties have witnesses that reside out of state, Mr. Ayele will either travel here for the deposition or counsel for the parties will travel to where the witness is located.

Accordingly, and for the foregoing reasons, Berea respectfully requests that this Court enter a protective order prohibiting Plaintiff from taking the deposition of Ayele prior to the conclusion of written discovery or Plaintiff's deposition.

## NOTICE

Please take notice that the foregoing Motion will come on for hearing on Thursday, May 16, 2019, at the hour of 9:30 a.m., or as soon thereafter as Counsel may be heard.

Respectfully submitted,

*/s/ Sharon L. Gold*

W. Craig Robertson III
Sharon L. Gold
WYATT, TARRANT & COMBS, LLP
250 West Main Street, Suite 1600
Lexington, KY 40507-1746
859.233.2012
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2019, I electronically filed the foregoing with the Clerk of Court via the e-filing system. I further certify that I mailed the foregoing document by first class mail to all non-eFiling participants.

John F. Lackey
214 West Main Street
Richmond, KY 40475

Debra Ann Doss
108 Pasadena Drive
Lexington, KY 40503
*Counsel for Plaintiff*

*/s/ Sharon L. Gold*

Sharon L. Gold

61837170.1

5

TIME ____ FILED A.M./P.M.
FEB 04 2019
MADISON CIRCUIT COURT
DAVID FERNANDEZ, CLERK

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
CIVIL ACTION, FILE NO. 19-CI-60
DIVISION I

Dr. DAVID B. PORTER,

PLAINTIFF,

VS.

BEREA COLLEGE (With Process Agent:
Lyle D. Roelofs c/o Berea College
Lincoln Hall, CPO 2182 Berea, KY 40404),

DEFENDANT.

*************************
FIRST AMENDED COMPLAINT
*************************

COMES NOW the Plaintiff Dr. David B. Porter ("Dr. Porter"), by and through his

counsel, who hereby files this, his First Amended Complaint as "a matter of course,"

pursuant to C.R. 15.01, before any responsive pleading has been filed herein by the

defendant, against the Defendant Berea College ("the College") for breach of contract,

and for employment discrimination resulting in his wrongful termination, and

retaliation, all in violation of the Kentucky Civil Rights Act, KRS 344.010, et seq., and

who further states as follows:

**PARTIES**

1.    Dr. Porter is a resident of the City of Berea, Madison County, Kentucky.

2.    The College is a private liberal arts college and a Kentucky corporation

situated in the City of Berea, Madison County, Kentucky.

**JURISDICTION AND VENUE**

3.    Paragraphs 1-2 are hereby restated and incorporated by reference.

4.    This Court has personal jurisdiction over the College as it is a

corporation situated in and with its principal place of business in Madison County,

Kentucky, and the relevant facts hereof occurred in said county.

5.    This Court has subject matter jurisdiction over a claim for breach of

contract under KY Const. § 112(5) and KRS 23A.010.

1

EXHIBIT
A

6.      This Court has subject matter jurisdiction over a claim for employment discrimination in violation of the Kentucky Civil Rights Act, KRS 344.010, et seq., under KRS 344.450, and under KY Const. § 112(5) and KRS 23A.010.

7.      This Court is the proper venue for this Complaint under KRS 452.450.

## I. STATEMENT OF FACTS

A. Dr. Porter's Qualifications for Employment at the College.

8.      Paragraphs 1-7 are hereby restated and incorporated by reference.

9.      Dr. Porter is a 69-year-old, white male and was a tenured professor and employee of the College for more than 17 years, serving as academic vice president and provost from 2001 – 2005 and as a member of the Psychology Department thereafter until the termination of his employment on Oct 1, 2018.

10.     At all pertinent times, Dr. Porter was qualified for his position at the College as a tenured professor of psychology.

11.     Dr. Porter is a partially disabled United States Air Force veteran who holds a Doctorate of Philosophy from Oxford University, United Kingdom, a Master of Science from the University of California at Los Angeles, and a Bachelor of Science from the United States Air Force Academy.  He has extensive training and leadership in claims of wrongful workplace harassment.

12.     Prior to joining the College, Dr. Porter taught for the United States Air Force as Permanent Professor and Head of the Air Force Academy Department of Behavioral Sciences and Leadership.

13.     Dr. Porter is the author of some sixty (60) professional publications, and has given roughly an equal number of professional presentations.

2

FILED DOCUMENT
11/15/2019 09:50:32 AM
62451-35

14.    In his position at the College, as a part of his employment duties, Dr. Porter advocated using peer-reviewed, scientifically approved analysis rather than subjective opinions to assess administrative policies and programs.  His observations and advocacy, at times, annoyed and rankled members of the College administration and faculty and student factions in campus workplace matters.  Dr. Porter's advocacy of science and skepticism was incorporated in many of the courses he taught, including GSTR 110 (*Questioning Authority; Skepticism and Science and Antidotes for Oppression*), GST 232 (*Introduction to the Behavioral Sciences*); PSY 208 (*Cognitive Psychology*), PSY 210 (*Industrial/Organizational Psychology*), and PSY 424 (*Senior Research*).

15.    In 2018 the Berea College Student Government Association chose Dr. Porter for its Student Service Award.  Dr. Porter received other distinguished teaching and service awards from the College during his tenure.  His students consistently placed him in the highest professional ranking at the College, and his students consistently scored in the highest academic ranking.

B. Pattern of Discrimination by Berea College Against Older, White Male Employees at the College, Including, Without Limitation, the Prior Civil Rights Grievance Filed Against Dr. Wayne Messer in Which Dr. Porter Participated as Dr. Messer's "Adviser".

16.    In 2013 a Caucasian male faculty member made an inappropriate post on social media sarcastically suggesting that little should be expected from one of his African American students named "Tequila".  The response to the tweet from the campus community was, appropriately, immediate outrage.  The College's response was to declare a mandatory "Diversity Day" training for all faculty members.  Most, but not all, faculty members attended, but two senior white male professors who had nothing to do with the post did not attend and criticized the endeavor as demeaning to

3

11/15/2019 09:50:32 AM
82451-35

them and counterproductive.  The College harshly punished the two men for their

criticism and noncompliance, including imposing restrictions on pay, benefits, and

academic promotion.  The names of these men are known to the Plaintiff and

Defendant, but will not be identified in this Complaint.

17.    In 2015 during a faculty meeting discussion of institutionally provided

health insurance, a young, female African American faculty member related her

difficulties and traumas related to several unsuccessful pregnancies.  Shortly

thereafter at a Walmart, a senior, white male faculty member in the same department

as the female faculty member expressed his sympathy and condolences for her

traumas.  The College charged him with a breach of confidentiality and forced him to

resign.

18.  At the close of the 2017 school year, a quite competent and approximately

ten-year employed administrator at Berea College chose to leave the College because

he was told by another senior administrator that he would not be further promoted

because he was a Caucasian male.  The name of this individual is known to both the

Plaintiff and Defendant, but will not be identified in this Complaint.

19. In March of 2017 the chairman of the psychology department, Dr. Wayne

Messer, was subject to a civil rights grievance brought by fellow psychology professors

Dr. Wendy R. Williams, Dr. Amanda Wyrick, and Dr. Sarah Jones, alleging his

discrimination in hiring and promotion, retaliation, and creation of a hostile workplace

environment.

20.  In the proceedings against Dr. Messer, before the Campus College Hearing

Board (CCHB) and the Faculty Appeals Committee (FAC), concerning the civil rights

Complaint, the College deemed his (appropriate) motives to be irrelevant, and he was

not allowed to defend or explain his intentions.  The focus of the investigation was

4

entirely on the claimed subjective emotional impact on the three grievants. One of the grievants incorrectly, but successfully, asserted that the Faculty Manual states that mediation is inappropriate for cases of "sexual discrimination," and the College accepted this position in its investigation. The Faculty Manual, however (at its page 19, "Resolving Complaints Informally"), provides that mediation is inappropriate only for charges of sexual assault, for which Dr. Messer was not charged. The campus investigative committees, the CCHB and the FAC, recommended punishment for Dr. Messer, rather than mediation between the parties, confirming that the grievant's false claim was adopted. President Lyle Roelofs summarily dismissed, without explanation, Dr. Messer's appeal alleging violations of Dr. Messer's rights to administrative due process under the terms of the Faculty Manual.

21. One of the charges against Dr. Messer was that he had demonstrated a bias against women in hiring. This charge was demonstrably false in every way. A contemporaneous Excel spreadsheet introduced by Dr. Messer showed the ratings each of the five psychology department selection committee members had given to approximately 100 applicants. The sheet showed that the top six ratings Dr. Messer gave were all assigned to women. Testimony of other selection panel participants supported the absence of Dr. Messer's bias.

22. In contrast, the grievant, Dr. Williams, had proclaimed during a selection panel meeting that, *"The last thing we need in this department is any more old white guys!"* A closer examination of Dr. Williams' own ratings of applicants revealed other incidents of her discrimination against white males. Although white males made up about 25% of the applicant pool, none appeared in Dr. Williams' top-ten rated applicants. Unlike the other four professors in the department making ratings, she had used a scale of 0-5 to rate the applicants rather than the 1-5 scale to which all of

5

11/15/2019 09:50:32 AM
82454-35

the selection panel members had agreed prior to rating. White males received a disproportionately high number of Dr. Williams' "0" ratings. Similarly, she awarded disproportionately more below-average ratings to white males whom the other professors had rated in the top third of applicants. Dr. Williams also withheld her ratings until after she had seen all the other ratings of applicants. Her anomalous rating scale served to discriminate in hiring against all white males. Nonetheless, the College took no action against her, despite having knowledge of her unlawful racial, age, and gender discrimination.

23. The grievants in Dr. Messer's case also asserted that due to the hostility in the department, they had been forced to use the copier on a different floor rather than the copier next to the department chair's office. This, too, was a demonstrably false charge. Dr. Williams had, in fact, used this alternative copier only about 6% of the time during the semester. The copier records also revealed that the grievant, Dr. Wyrick, had used the alternative copier less than 2% of the time, and nearly all these uses had been during the week in which her grievance had been filed. The College was aware of this false claim, but took no action despite the Faculty Manual's warning that false testimony in such proceedings could result in serious sanctions, up to and including dismissal. *See* page 92, "General Guidelines," of the Faculty Manual: "Fabricated charges of alleged violations or false testimony are serious offenses. Persons found to have fabricated charges or testified falsely will be subject to disciplinary action up to and including termination or expulsion."

24. After the civil rights investigation and hearing, many of the charges against Dr. Messer were dismissed, but the College found that Dr. Messer had created a "hostile workplace environment" based on sex. The College found Dr. Messer guilty based on three incidents over a two-year period: telling an inappropriate joke about a

6

"Jewish American Princess" prior to a department meeting; attempting to engage his psychology department colleagues in conversations about the public backlash to rock singer Chrissy Hynde's recent NPR interview about her rape; and his use of the phrase "militant lesbian" during an animated faculty discussion regarding one of his student's disciplinary problems. These findings led to the College removing Dr. Messer as psychology department chair and revoking his then office space and banishing him to an office in the basement of the psychology department building.

25. Dr. Porter acted as Dr. Messer's "adviser" throughout his grievance hearing and appeals, as allowed under the Faculty Manual. See page 92 of the Faculty Manual. Dr. Porter argued that Dr. Messer's alleged infractions were neither severe nor pervasive enough to create a "hostile workplace environment" on the basis of sex or to warrant the punishments levied against him. Dr. Porter, during the proceedings before the CCHB and the FAC, and in correspondence with President Roelofs and Dean Chad Berry, and in a letter, expressed his disappointment with the unfairness of the College's civil rights process, and the result in Dr. Messer's case. This advocacy subjected Dr. Porter to unlawful workplace hostility from members of the College's senior faculty and administration, and from the grievants who had placed the charges against Dr. Messer. These grievants later unlawfully retaliated against Dr. Porter as hereafter described.

26. College administrators rebuffed Dr. Porter's attempts to have them address his concerns about the College's unfair lack of administrative due process and its misapplications of workplace policies and procedures in Dr. Messer's case. While many senior faculty members and mid-level administrators unofficially acknowledged problems with the Hostile Work Environment Program disciplinary process at the

11/15/2019 09:50:32 AM
82451-35

College, President Roelofs and Dean Berry refused to discuss Dr. Porter's specific concerns.

27. In accordance with Faculty Manual procedure, President Roelofs and Dean Berry decided to order the psychology department faculty members to meet face-to-face in the aftermath of Dr. Messer's contentious defense, in order to broker some sort of a peace. However, the three female grievants refused to meet or interact directly with the male department members, claiming that the acting department chair Dr. Jackie Burnside, an African-American female, had treated them with "contempt.". In response, Dean Berry acquiesced and rescinded the requirement for face-to-face department meetings, even though the Faculty Manual states that attendance at "faculty meetings" is a job requirement. See its page 34. This same provision had been the College's exact justification for severely punishing the two senior, white male faculty members for not attending "Diversity Day" training. *See* Paragraph 16, *supra.*

28. During several meetings of the College's Strategic Planning Council, Dean Berry and the College's Vice President for Diversity, stated that only those who share a "minority identity" should have significant input on policies of the College involving inclusivity and diversity.

29. Later, during the 2018 fall semester, the College, through Dean Berry, advised faculty members that all faculty hires would be "either black or brown".

30. Following the unpleasant proceedings against Dr. Messer, in the late fall semester of 2017, Berea College employed a quite distinguished expert by the name of W. Scott Lewis to advise it about its policies and procedures regarding wrongful workplace hostility in the College's psychology department. Dr. Lewis has trained thousands of faculty and staff members on how to prevent, address and properly

report wrongful workplace issues.  He is also a law enforcement trainer on how to investigate sensitive matters, such as abuse and assault.

Dr. Lewis did a thorough investigation of workplace issues in the College's psychology department.  His report supported the prior criticisms made by Dr. Porter. As part of its pattern of wrongful workplace discrimination, and in support thereof, the College refused to release Dr. Lewis' report, embargoed it, kept it confidential, and took no responsible actions to implement its recommendations, or to address Dr. Porter's prior recommendations supported by Dr. Lewis' report.

31.  The abovementioned instances of unlawful discrimination based on age, sex, and race are not intended to be exhaustive.  Plaintiff states that other instances known to the defendant will be presented as they become known to Plaintiff.

C.  Dr. Porter's Survey for his PSY 210 Industrial/Organizational Psychology Class, and the College's Resulting Suspension, and His Banishment From Campus.

32.  For over a decade Dr. Porter had taught the PSY 210 Industrial /Organizational Psychology course at the College.  A regular feature of this course was large, integrative student projects that apply the scientific method through the examination of archival and survey data to assess college policies, practices, and programs and to identify areas where there are opportunities for improvement.  These studies had included, for example, reviews of the effects of characteristics of first year general studies courses on student retention and academic success and the relation between the first-year student labor positions, and other measures of student satisfaction and motivation.  These projects were integral to the academic content of the course and often received praise from students and officials of the College.

To Dr. Porter's knowledge, there had been no objection to Porter's methodology or subject matter prior to February, 2018.

9

11/15/2019 09:50:32 AM
82451-35

33. After the contentious proceedings against Dr. Messer, it appeared to Dr. Porter that the College's Civil Rights Program enforcement relied almost entirely on asserting and re-asserting the charged assumptions of the College administration, with little attention to actual evidence of the program's effectiveness or consequences. As an academic researcher having authored over fifty published articles and several book chapters concerning psychology, Dr. Porter decided to engage his Spring 2018 PSY 210 Industrial/Organizational Psychology class in developing a survey of community perceptions and attitudes about academic freedom, freedom of speech, and hostile work environments under KRS Chapter 344 ("the Survey"). This research employed survey methods similar to those Dr. Porter had used in the past in his classes.

34. The heart of the Survey was a set of some 20 posed scenarios. Respondents were asked to read the scenarios and decide whether each situation reflected a "hostile environment," and if academic freedom should protect the action taken in the scenario. The use of such scenarios (i.e., situational judgement tasks) is common in industrial/organizational psychology studies and often provides reliable information about implicit attitudes which may differ from explicit beliefs. In no respect did the scenarios suggest (push) a preferred, or "right," response.

35. Dr. Porter drew about one half of the Survey's scenarios from issues, arguments, and events he had observed as faculty adviser for Dr. Messer in the prior civil rights case. The Survey carefully concealed participant identity by obscuring dates and altering the identification of gender, race, and other personal characteristics. No names or other information identifying the participants were presented in any of the scenarios. The Survey instructions carefully stated that "[n]o

10

11/15/2019 09:50:32 AM
82451-35

claims are made about the relationship between these hypothetical situations and actual occurrences here at Berea College or elsewhere."

36.  Before publicly releasing the Survey, Dr. Porter shared drafts of it with many other faculty members, and requested and received feedback from six (6) of them.  These six included the Chair of the College's Institutional Review Board (IRB) and its Director of Academic Assessment, Dr. Robert Smith, Dr. Porter's academic and departmental division chair, Dr. Jackie Burnisde, and other tenured faculty members with applicable experience in the social sciences, including Dr. Wayne Messer, Dr. Jose Bey, and Dr. Ian Norris.  No person who was asked to vet the Survey flagged any potential breaches of confidentiality, ethical concerns, or harm to the former grievants.

Two reviewers did express concern about controversy the survey might elicit by presenting issues the College administration did not want to have debated.

Dr. Porter sent a copy of the Survey to Dean Chad Berry three days before it was posted.

Dr. Jay Baltisberger, later Chair of the Faculty Affairs Committee (FAC), which heard the claims against Dr. Porter, was one of the six persons who both received an early vetting copy of the Survey, and who responded to Dr. Porter's pre-published inquiry.  Dr. Baltisberger did not offer a critique, but by email, responded to Dr. Porter by observing that since the Survey was for class use, he would not comment.  Dr. Porter took Dr. Baltisberger's silence to mean that he had no ethical or professional objection to the Survey. Dr. Baltisberger, while serving as FAC Chair, did not acknowledge his review of the Survey prior to its release..

37.  The survey was launched on Monday, February 19, 2018.  That day Dr. Porter received a polite e-mail request from Dean Berry that they meet to discuss it, to which Dr. Porter quickly replied affirmatively.

Filed         19-CI-00060   05/13/2019        David M. Fernandez, Madison Circuit Clerk

11/15/2019 09:50:32 AM
82451-35

38.  Meanwhile, that same day, Dr. Williams published a Facebook post incorrectly claiming that nearly all the fact patterns in the Survey's scenarios were expressly about her and the other grievants in Dr. Messer's disciplinary proceedings, that the Survey improperly repeated allegations of cognitive impairment against her, and that the Survey targeted them and was intended to punish and silence them.  Dr. Williams posted:

> I've said this elsewhere, so I'll post it here, too. <u>As one of the not anonymous targets of this survey</u> I can tell you that I, and the other women who filed (and won-at every level of the process) the [civil rights] hostile work environment complaint on which this survey is based, <u>would be thrilled with some support on this</u>. <u>Every scenario in the survey</u> is either a biased portrayal of what we claimed in our complaint, or it was given by the defense to show that we were the biased ones <u>or that we were cognitively compromised in our judgment</u>, or it was given as examples of how other people had done much worse so the behavior we objected to isn't *that bad* in comparison to "real" hostile environments. Let me repeat again-we won at every stage of the process. Yet despite the conclusion of that process three months ago (after 9 months of the process) <u>this is another attempt to silence us (and those like us)</u>. That said, <u>if this kind of behavior by a colleague in response to losing a Title IX complaint is tolerated by the community</u>, <u>then this is certainly one way to make sure no one ever brings another [civil rights] complaint on this campus</u>. If you feel upset by this unethical use of students under the guise of "research" or the not subtle attack on your female colleagues/faculty, <u>please do more than write it here. If you want to know more ways to help, let me know</u>.  (Emphasis added).

Dr. Williams made other hostile postings on other dates.

39.  Dr. Williams' Facebook post falsely claimed that nearly every scenario was about her and the other grievants in Dr. Messer's case, and, importantly, *improperly revealed identities of persons she believed were involved to the entire campus community*, who were not familiar with the particular fact patterns posed.

40.  In her Facebook post Dr. Williams specifically exhorted campus activists to take action to "support" her and to do "more" than just write about their anger.

Filed          19-CI-00060     05/13/2019          David M. Fernandez, Madison Circuit Clerk

41. Dr. Williams's Facebook post predictably aroused a small group of campus activists who made their anger known to Dr. Porter's students, the College civil rights coordinator, Dean Berry, and President Roelofs.

42. On Tuesday, February 20, 2018, in a message sent to the entire College campus, Dean Berry publicly requested that Dr. Porter remove the Survey and apologize to the campus community. However, two hours later in a phone call, Dean Berry promised to forward some of the grievances to Dr. Porter directly and to provide him with a list of the most "problematic" Survey scenarios, so they could be deleted or amended. The Dean never sent this information to Dr. Porter. Dr. Porter awaited this response from Dean Berry before withdrawing the survey.

43. Data from the Survey's 160 valid responses yielded a surfeit of psychologically and scientifically valid results:

- The respondents' biographic characteristics predicted their political beliefs, and these beliefs predicted most of the variance in the perceptions and judgments people make about hostile environments and academic freedom.
- A large majority of the respondents stated that they did not express their beliefs on campus because of fear of judgment and retaliation.
- The Survey results revealed that most of the College's current "diversity training" programs did little to affect awareness, attitudes, or perceptions, and one such program appeared to be having a polarizing effect on its participants.
- Over half of the respondents did not see the survey as contributing to a hostile environment, and nearly three-quarters of them believed academic freedom protected the dissemination of the Survey.
- The Survey also uncovered evidence that at the College that race was unrelated to the respondents' attitudes and perceptions about civil rights or academic freedom.

13

- About a quarter of the Survey's respondents expressed support for denying others the opportunity to express beliefs that could be considered potentially harmful or hurtful.
- Women rather than men at the College were more likely to express strong activist views.  Respondents who endorsed the need for hostile environment protection were also more likely to express support for academic freedom.
- Judgments about hostile environments and academic freedom protection were significantly negatively correlated.  What respondents claimed to be true was just the opposite of the pattern of what their responses to the scenarios showed to be true.

44.    Therefore, the Survey provided valid psychological evidence that because beliefs or viewpoints determine one's perception of hostility, relying primarily on subjective reports of offense can be very problematic.  The College administration's interest in suppressing these results was clear, given past disciplinary and KRS Chapter 344 controversies.

45.  On Thursday, February 22, 2018 Dean Berry summoned Dr. Porter and his academic division chair to the Dean's office, where Dean Berry advised Dr. Porter that charges of "incompetence" would be brought against him.  Pursuant to Faculty Manual procedure at its page 121, Dr. Porter asked to discuss the matter.  Dean Berry stated that the time for discussion had ended two days earlier when Dr. Porter had not immediately withdrawn the Survey and apologized to the campus.

46.  Dean Berry presented the charges against Dr. Porter to the Faculty Status Committee (FSC) at a hearing that afternoon, that Dr. Porter did not know was taking place. A majority concurred with the Dean and recommended termination.  Dean Berry claimed that the Survey was only an instrument of malicious retaliation against Dr. Messer's grievants.  He did not inform the Committee of the survey's academic

14

value. The FSC hearing took place without notice to, or an appearance by, Dr. Porter. The College engaged in no investigation of the charges against him before a majority of the FSC voted to support termination.

47. Shortly thereafter, President Roelofs summarily suspended Dr. Porter, and the College reassigned his classes to other faculty members. It prohibited him from communicating with students, labeled him as "dangerous" to the students, and banished him from campus. During the ten weeks between the distribution of the Survey and the eventual FAC hearing, President Roelofs and Dean Berry repeatedly refused Dr. Porter's requests that they specify the nature of the "danger" Dr. Porter supposedly posed to others that justified his continuing suspension. The College refused any conversation aimed at informally resolving the issues involved. It also rebuffed Dr. Porter's attempts to understand the nature of the charges against him.

48. The College administrators treated other faculty who posted surveys completely differently from their treatment of Dr. Porter. In the spring semester of 2018, several other surveys, completed by the College campus community, similarly studied campus attitudes and opinions. The College's Institutional Review Board (IRB) was not involved, because the College interpreted that since the surveys did not identify particular individuals (as Dr. Porter's had not), they did not meet the definition of "human subjects research". The IRB did not review these surveys from the Student Counseling Center and the Interracial Education Center, both led by female faculty members. In Dr. Porter's case, however, the College used an arbitrary and contradictory standard from other IRB procedures in the Faculty Manual to justify President Roelofs' decision to embargo the Survey data. Without allowing Dr. Porter any opportunity to defend his work, the College prohibited him from using the Survey data.

15

49.  In the midst of the controversy, the Berea College Student Government Association ("SGA") voted to award Dr. Porter its 2018 Student Service Award.  While notifying the College's administration of his actions, Dr. F. Tyler Sergent, the husband of Dr. Wendy Williams, a primary Porter grievant, and a junior faculty member, acting in his role as faculty advisor to the SGA, emailed SGA members as "Faculty Advisor to the SGA" attacking the award, and making false claims linking Dr. Messer, Dr. Porter's advocacy of Dr. Messer, and the Survey.   Dr. Sergent's emails threatened the SGA board members with reprisal and retaliation by negative educational repercussions if they went through with the award to Dr. Porter.  See exhibited emails between Dr. Sergent and student Yabsira Ayele (Exhibit 1). Though aware of Dr. Sergent's unlawful retaliation against the SGA, Dr. Porter, and Dr. Messer, the College administration did nothing to investigate or repudiate Dr. Sergent's unlawful retaliation against Dr. Porter, or the unlawful retaliation against Mr. Ayele, or the unlawful threats to SGA members.  On the contrary, the College unlawfully enabled Dr. Sergent's retaliation by interpreting, without precedent or authority, that the SGA award could not be given to a person charged with an offence.  The College's support of Dr. Sergent's behavior constituted specifically unlawful conspired retaliation prohibited by KRS 344.280, and other applicable law.

   D.  The College's Wrongful Disciplinary Proceedings Against Dr. Porter,
       Leading to His Termination.

50.  Dean Berry and the Faculty Status Council on behalf of the College ostensibly sought the termination of Dr. Porter under a section of the Faculty Manual entitled "Professional Competence and Dismissal for Cause."  The College specified charges against Dr. Porter for trial before the FAC, accusing him of "incompetence" and also of (i) disclosing personal information of Dr. Williams, and harassing her, Dr.

16

DRAFT ORIGINAL DOCUMENT
11/15/2019 09:50:32 AM
82451-35

Wyrick, and Dr. Jones, (ii) retaliating against them for their participation in the prior proceedings against Dr. Messer, (iii) causing them emotional distress, (iv) jeopardizing trust in the process, and (v) perpetuating a hostile environment in the psychology department.

51.  The Faculty Manual states: "Once the question of competence or effectiveness has [a]risen, the Division Chair, the Academic Vice President and Dean of the Faculty, and the faculty member shall discuss the matter in personal conference." *See* Faculty Manual, page 121.  However, Dean Berry refused to allow any such mediation of these issues.

52.  At the FAC hearing, Dean Berry both prosecuted and acted as a witness in the case against Dr. Porter, over Porter's objection.  Dean Berry had been involved in, and had been criticized by Dr. Porter, about the proceedings against Dr. Messer, and the Dean also headed the College's response to the Survey and its aftermath.  The Dean acted as a witness and the prosecutor at the FAC hearing, while also being the direct supervisor of the FAC members concerning their compensation and the terms of their employment at the College.  This behavior was in clear conflict with administrative due process.

53.  At Dean Berry's insistence and over Dr. Porter's objections that the Faculty Manual and administrative due process required a standard of "clear and convincing evidence," the FAC adopted the minimal "preponderance of the evidence" standard in the proceedings.  The FAC allowed Dr. Porter only a single day to present his defense rather than the two days he had requested, precluding Dr. Porter from presenting all of his witnesses and evidence.

54.  The grievants, Dr. Williams and Dr. Wyrick, did not testify at the FAC hearing, but submitted written witness statements concerning the events at issue and

17

11/15/2019 09:50:32 AM
82451-35

their alleged emotional distress resulting from the Survey and Dr. Porter's acts and statements in defense of Dr. Messer. Dr. Porter did not have opportunity to cross examine Dr. Williams or Dr. Wyrick, or to serve any interrogatories on them. He wished to inquire how each learned of the contents of the Survey, and what alleged objections they had to its academic rigor and its appropriateness. Dr. Porter was unable even to ask Dr. Williams as to why she publicized the Survey on Facebook. Dr. Porter could not question Dr. Williams and Dr. Wyrick about the authenticity of their emotional distress, or the nature of their alleged personal or professional harm. He was not allowed to confront Dr. Williams about her wrongful identification of individuals in her email post.

55. Dr. Porter defended his use and distribution of the Survey on the basis of the College's contractual promise of academic freedom as defined and guaranteed in the Faculty Manual. Dr. Porter submitted written and telephonic testimony from national experts familiar with the research the Survey represented. These experts supported the use of situational judgment indexes (i.e., scenarios) composed of incidents drawn from real life events.

56. At the hearing, one member of the FAC showed his preconceived bias by likening Dr. Porter's Survey to pouring gasoline in a dry forest, and then argued that the inflammatory Facebook posting was the equivalent of someone dropping a match. Later, that same FAC member compared the Survey and the grievants' alleged harm to that done to the Tuskegee inmates being infected with syphilis. Contrary to the College's policies, this FAC member failed to disclose his motives or conflict prior to the proceedings. His metaphor, however, was commended in the FAC report.

57. Following the FAC report, Dr. Porter learned that two members of the FAC committee had, contrary to Faculty Manual procedures and administrative due

18

11/15/2019 09:50:32 AM
62451-35

process, blatantly participated in biased and preconceived actions which disqualified them from participating in adjudication of Dr. Porter's case. In the first of such instances, Dr. Ed McCormack, on February 20, 2018, along with Dr. Ian Norris, and Dr. Caryn Vazzana, who had been a Chair of the FSC committee that had recommended Dr. Porter's termination to the FAC, discussed together the charges against Dr. Porter. Dr. Vazzana adamantly claimed that Dr. Porter's survey was wrong. Dr. McCormack asked: "is this the consensus....all right."

Dr. McCormack afterwards participated on the FAC that heard Dr. Porter's case. As a member of the FAC, the Faculty Manual requires his lack of bias and preconceived opinion. He wrongfully failed to reveal his preconceptions, bias or ex parte influence.

58. The second instance of blatant action contrary to the Faculty Manual and administrative due process involved Dr. Jay Baltisberger, Chair of the FAC that heard Dr. Porter's charges. On or about February 19, 2018, Dr. Baltisberger expressed his clear bias and preconceived opinion that Dr. Porter had violated provisions of the conduct code of the College by the publishing of the Psychology 210 class survey. He advised the College administration, including President Roelofs, of his preconceptions. Despite Dr. Baltisberger's admitted bias, President Roelofs selected Dr. Baltisberger to chair the FAC hearing panel that heard Dr. Porter's charges.

This, along with the inaction of Dr. Baltisberger, described in Paragraph 36, above, were blatant violations of Faculty Manual procedures and administrative due process.

59. The FAC Report submitted to President Roelofs found that academic freedom did not protect the Survey. The FAC Report states that two conditions are necessary for academic freedom protection at the College: (i) the speech must be made in an academic occasion, and (ii) the participants must speak and conduct themselves

19

FILED: HARRISON CIRCUIT COURT EXHIBIT B — ORIGINAL DOCUMENT
11/15/2019 09:50:32 AM
62451-35

in a manner consistent with the motives, methods, and ends of the academic

enterprise. The FAC found only that the survey was inconsistent with the "methods"

of the academic enterprise. This was contrary to both the procedures in the Faculty

Manual, and to administrative due process.

60.  The FAC Report relied on a factual error claiming that the Survey identified

Dr. Williams as having a "documented disability" pertaining to an alleged post-

chemotherapy cognitive impairment. The Survey's reference to a "documented

disability" actually referred to Dr. Messer's post-hearing diagnosis of having Attention

Deficit Hyperactivity Disorder, which manifested itself in the "impulsive", "aggressively

oblivious", and "erratic" behaviors about which the College accused Dr. Messer during

his KRS Chapter 344 proceedings as having exhibited in creating a hostile work

environment. Dr. Messer had no objection to this characterization by his "adviser."

61.  The FAC had cautioned the parties that written witness statements would

be given little weight, but the FAC Report relied frequently on the un-cross-examined

written statements of Dr. Williams and of Dr. Wyrick describing their knowledge of and

reactions to the Survey, including the harm they allegedly suffered in response to it.

62.  Despite Dean Berry's arguments that Dr. Porter's intentions did not matter

(as the Dean had also argued with respect to Dr. Messer), the FAC Report specifically

found that in creating and distributing the Survey Dr. Porter had *not* intended to

retaliate against the grievants in Dr. Messer's proceedings. The FAC Report found that

it was Dr. Williams' publicizing of the existence of the Survey to the campus

community which ignited the campus conflict. It excused Dr. Williams' unlawful

retaliation by finding that the Survey was like a "match thrown into a dry forest." The

FAC Report stated that "[t]hough social media surely played a part in escalating the

backlash on the PSY 210 students, social media could only have done so after and in

11/15/2019 09:50:32 AM
82451-35

light of the [S]urvey's dissemination." This finding constitutes an unlawful "heckler's veto" of protected speech.

63.    The FAC Report specifically found that Dr. Porter's actions in pursuing the Survey were properly based on academic principle.  The FAC found that Dr. Porter created and used the Survey in an academic setting for "a reasonable and proper (albeit controversial) purpose".  The FAC acknowledged that criticism of the College's hostile environment procedures is a permissible topic of academic discussion and inquiry, relevant to Dr. Porter's PSY 210 Industrial / Organizational Psychology class.

64.  The FAC Report faulted Dr. Porter for not "disclosing" to his PSY 210 students the factual events which served as the basis of the scenarios in the Survey. In contradiction, the FAC Report criticized the Survey's alleged disclosure of "confidential information" to the campus community concerning the prior Dr. Messer proceedings, and the alleged resulting harm to Dr. Porter's colleagues.  Accordingly, while the FAC Report claimed that Dr. Porter's "methods" precluded an academic freedom defense, the stated basis for the FAC Report's conclusion that Dr. Porter should be terminated was that he "cannot be trusted" to handle "confidential" information in the future and that "the personal conduct of Dr. Porter has hindered his professional responsibilities to an extent" that he should be dismissed. No criticism of Dr. Williams' identification of individuals was mentioned.

65. Following the recommended action by the FAC, Dr. Porter appealed its action to the President of Berea College, Dr. Lyle D. Roelofs. Prior to Dr. Roelofs' decision to terminate Dr. Porter from the faculty, the College's "Title IX Coordinator" (i.e., civil rights coordinator) contacted selected members of the campus community and asked them to communicate directly with the College Administration, including Dr. Roelofs, to express their wishes that Dr. Porter be terminated.  At least eleven (11) persons,

21

FILED 11/15/2019 09:50:32 AM
82451-35

overwhelmingly female, responded to the Diversity Chair's orchestrated effort to wrongfully pressure Dr. Roelofs to terminate Dr. Porter.

The College intentionally hid from Dr. Porter the actions of the Diversity Chair, and the letters written in response to those actions. The actions of these persons, and the College's response, constitute a wrongful conspiracy in violation of KRS 344.280, and was wrongful retaliation in violation of KRS 344.280 (1), and other applicable law.

The action by the diversity administrator and the communicants was in stark contrast to Dr. Roelofs' prohibition of Dr. Porter from having similar contact with members of the campus community during the period of his adjudication.

66. President Roelofs in a letter dated June 13, 2018 affirmed the FAC Report's recommendation and ordered Dr. Porter's termination.

67. The Faculty Manual expressly states that there is no enforceable guarantee of confidentiality in the College's civil rights proceedings. *See* FM, page 92. The only circumstance where confidentiality is guaranteed in such proceedings is "[u]pon receipt of a complaint of Sexual Violence." President Roelofs' concluding letter in Dr. Messer's case confirmed that the College administration knew this, by stating that "I have scanned our policy documents in vain for any requirement of confidentiality and so do not have the latitude to impose it." This finding was blatantly ignored in Dr. Porter's case.

68. Under the terms of the Faculty Manual, Dr. Porter had a right to appeal the President's decision to the Berea College Board of Trustees Executive Committee. He made such appeal.

69. On July 27, 2018 the College Executive Committee issued a Resolution describing the possible grounds for reversal of Dr. Porter's termination on appeal, pursuant to the Committee's duty to hear any such appeal as provided in the Faculty

Filed          19-CI-00060   05/13/2019          David M. Fernandez, Madison Circuit Clerk

Manual and, as such, part of Dr. Porter's employment contract. In pertinent part, these grounds concluded that President Roelofs' decision was not:

(i)  In violation of Faculty Manual provisions;

(ii)  In excess of the authority granted to the Faculty Appeals Committee or the President in the Faculty Manual;

(iii)  Without support of substantial evidence on the whole record;

(iv)  Arbitrary, capricious, or characterized by abuse of discretion;

* * *

(vi)  Prejudiced by a failure of

[a]  any member of the Faculty Appeals Committee, prior to the evidentiary hearing, or

[b]  the President, prior to any involvement in the faculty disciplinary process, to disclose any conflict of interest or bias which would prevent the faculty member or Berea College from receiving an impartial evidentiary hearing or decision; or

(vii)  Deficient as otherwise provided by the Faculty Manual or Berea College policies.

70. In his appeal, Dr. Porter pointed out the obvious contradiction between the stated basis for his termination and the lack of any confidentiality requirements. He also argued, in pertinent part, that: (i) his termination violated his right to academic freedom, (ii) the Dean's failure to allow mediation prior to bring charges against Dr. Porter was contrary to the terms of the Faculty Manual, (iii) the Dean's multi-part role as participant, witness, and prosecutor violated Dr. Porter's right under the Faculty Manual to fundamental fairness in the termination proceedings, (iv) the FAC's denial of Dr. Porter's right to confront all of the witnesses against him was contrary to the terms of the Faculty Manual and administrative due process; and (v) that the Committee use of the preponderance of the evidence standard violated his rights

23

11/15/2019 09:50:32 AM
82451-35

under the Faculty Manual and administrative due process.  In summation, the
proceedings against Dr. Porter were a sham, a show trial.

71.  Nonetheless, the Executive Committee affirmed President Roelofs' decision,
and Dr. Porter's employment at Berea College officially ended on September 30, 2018.

72.  As a result of the College's false charges against him, his suspension and
banishment from campus, and his ultimate termination, Dr. Porter has suffered severe
humiliation, embarassment, stress and mental anguish, manifesting in a stroke
(cerebral vascular accident) he suffered on November 12, 2018, when he was treated
in the emergency room of St. Joseph Berea Hospital, transferred via ambulance to the
Neurological Intensive Care Unit and St Joseph Lexington Hospital, and released on
November 14th, 2018.  Dr. Porter's consequent prolonged stress and mental anguish
has also contributed to his high blood pressure and greatly disturbed sleep patterns.

F.  Dr. Porter's Contractual Rights to Continued Employment,
     Academic  Freedom, and Administrative Due Process According to
     the Faculty Manual.

73.  As a tenured member of the College faculty, Dr. Porter had an employment
contract with the College which was subject to automatic annual renewal.  The last
executed annual employment contract the College provided to Dr. Porter was dated
June 1, 2018, which stated in part that he was re-hired for the school year 2018-2019
at a small increase in salary.  This letter made no reference to, or qualification about,
Dr. Porter termination.  It creates an estoppel on actions to terminate Dr. Porter (See
Exhibit 2).

74.  Dr. Porter's employment contract expressly stated that it was subject to the
terms of the Berea College Faculty Manual ("the Faculty Manual"), which sets forth the
College's policies on appointment, promotion, tenure, academic freedom, non-

24

FILED   NON-ORIGINAL DOCUMENT
11/15/2019 09:50:32 AM
82454-35

discrimination, harassment, retaliation, sexual misconduct, and KRS Chapter 344

proceedings, as published on the College's website at http://catalog.berea.edu

/en/Current/Faculty-Manual.

75. As a tenured member of the faculty, Dr. Porter was entitled to continued

employment and the protection of academic freedom at the College according to the

Faculty Manual, except for a showing of "adequate cause" for his termination:

> A tenured appointment represents Berea College's commitment to
> academic freedom, and its trust in the appointee's promise as teacher
> and scholar. The granting of tenure is not automatic; it is the result of a
> considered judgment that the faculty member will make a significant,
> long-term contribution to the fulfillment of the College's purposes.
> Tenure is a continuous appointment. It continues until (1) the appointee
> resigns or retires, or chooses to reduce teaching responsibilities below
> one-half of a normal teaching load, or (2) a situation develops that is
> demonstrably adequate cause for discontinuation of the appointment.
> Academic freedom is essential to the College's success in meeting its
> educational obligations to its students and the larger society. A well-
> conceived and soundly administered tenure system is considered the
> best means to assure such freedom. (Emphasis added).

76. The Faculty Manual states that the specific principles of academic freedom

are substantially based on "[t]he substance and the wording of this statement are

drawn in part from the 1940 Statement of Principles on Academic Freedom and

Tenure, developed by the Association of American Colleges and the American

Association of University Professors" (AAUP), and that each faculty member is entitled

to academic freedom in the classroom and in his or her research:

> This statement summarizes the understanding between the faculty and
> administration of Berea College on the principles and practices of
> academic freedom at this institution . . .
>
> * * *
>
> Freedom in the Classroom
>
> The faculty member is entitled to freedom in the classroom and should
> be supported by the College administration and colleagues in its exercise.
> Academic freedom, however, carries with it duties correlative with rights.
> In exercising freedom in discussion of the subject matter, the faculty

member should be careful not to introduce controversial matter <u>which has no relation to the subject</u>. This should not be narrowly construed, but the faculty member has a responsibility to the entire College community <u>to refrain from habitually substituting extraneous materials for the proper subject matter of the course</u>.

Freedom of Research

Freedom of research is fundamental to the advancement of truth. The faculty member is entitled <u>to full freedom in ordering and recommending library materials, presenting a variety of perspectives, and in research and in the publication of the results</u>. . .

\* \* \*

(Emphasis added).

77. In its report upon Dr. Messer's appeal in the prior disciplinary proceedings, the FAC outlined the College's interpretation of its academic freedom policy which it applied in its Report on Dr. Porter's case:

Two conditions must be met . . . to create an "environment that is protected by academic freedom": (1) it must be an academic occasion, and (2) the participants must speak and conduct themselves in a manner consistent with the motives, methods, and ends of the academic enterprise.

. . . <u>Where the academic purpose is not apparent or where the academic purpose is plainly not significant enough to warrant the offense</u>, it will be safe to conclude that the speaker has not been conducting himself or herself in a manner consistent with the motives, methods, and ends of the academic enterprise.

. . . [T]he academic enterprise, as understood by the Committee presumes that <u>no subjects are inherently taboo or off-limits because they are 'objectively offensive'</u>; and it nurses no phobic aversion to controversial topics or strong emotions.

<u>The content and/or viewpoint of speech by [itself] will very seldom, if ever, disqualify speech from protection by academic freedom</u>. In intramural academic occasions, self-disqualification occurs when a speaker departs from an academic agenda to further personal grievances, animosities, or grudges; to exert power for private gain or satisfaction; to advocate (rather than to analyze) partisan political causes; to stage an emotional catharsis before a captive audience; to browbeat or shame interlocutors into submission, acquiescence, or agreement; in short, to pursue any ulterior purpose likely to thwart the motives, methods, and ends of the academic enterprise. (Emphasis added).

26

11/15/2019 09:50:32 AM
82451-35

78.  The Faculty Manual states the College's "Harassment Policy" and expressly subjects the policy to a balancing test in favor of a faculty member's right to academic freedom:

> Harassment prohibited by this policy includes verbal or physical conduct that, <u>because of its severity and/or persistence</u>, substantially interferes with the mutual respect and collegiality afforded all individuals at Berea College. In particular, harassment may include verbal or physical behavior directed at an individual that is abusive of that individual's distinguishing characteristics, including race, gender, age, religion, sexual orientation, or national origin, <u>to such an extent as to substantially interfere with the individual's work or education or adversely affect one's living conditions</u>.
>
> In prohibiting harassment in all its forms, Berea seeks to preserve and enhance academic freedom for all members of the campus community. <u>Nothing in this policy is intended to limit the freedom of inquiry, teaching, or learning necessary to the College's educational purposes, or to inhibit scholarly, scientific, or artistic treatment of subject matter appropriate to an institution of higher education.</u>
> (Emphasis added).

79.  The Faculty Manual specifies the promised procedures in the formal hearing process in the event a complaint is made against a faculty member for conduct in violation of civil rights, and makes clear that an accused has the right to confront all witnesses under the College's incorporated AAUP standards.  The AAUP burden of proof is set at "clear and convincing evidence" which, as stated in Paragraph 74 above, has been incorporated in the College's Faculty Manual.  *There is no right to confidentiality for any participant in the proceedings* including criticisms of or by Dr. Porter.  Specifically:

<u>Resolving Complaints through the Formal Hearing Process</u>

\*\*\*

4.    <u>Except in extraordinary circumstances, the respondent is entitled to confront his or her accuser and any witnesses at the hearing.</u> The right of confrontation may be waived by the absence or gross misconduct of the respondent.

\* \* \*

Filed          19-CI-00060     05/13/2019          David M. Fernandez, Madison Circuit Clerk

General Guidelines

1.      In the reporting, investigating, and hearing of alleged Violations, every effort shall be made to ensure confidentiality and the privacy of the parties involved, but complete confidentiality cannot be guaranteed, particularly if formal charges are filed. Requests for confidentiality shall be addressed to and decided by the College's Title IX Coordinator. At all stages, investigations, administrative hearings, and formal hearings complaints are to be handled discreetly and expeditiously. Every effort will be made to contain hearsay and to minimize the potential for harmful effects on the individuals involved and the College community.

2.      Both the complainant and the respondent shall be assured of fair treatment throughout the investigation, administrative hearing and formal hearing processes. Retaliation or intimidation by either party is prohibited by law and College policy; neither will be tolerated. Any such retaliation or intimidation is subject to disciplinary action up to and including termination or expulsion.
(Emphasis added).

80.  In the stated procedure in a proceeding for dismissal with cause, the

Faculty Manual provides that the College will provide the accused with the right to

confront any witnesses against him, except where there are "unusual" or "urgent"

reasons to take a witness' written statement:

> The faculty member and advisor should have the opportunity to question all persons who testify orally and to confront all who testify adversely. When unusual and urgent reasons move the Committee to deny this opportunity, or when the knowledgeable person cannot appear, the identity of the person, as well as the person's statements, should nevertheless be disclosed to the faculty member. Subject to these safeguards, statements may, when necessary, be taken outside the hearing and reported to it. (Emphasis added).

In Dr. Porter's case, no findings of "unusual" or "urgent" reasoning were

made for allowing the two (2) most crucial witnesses, Drs. Williams and Wyrick,

to submit written statements.

81.  The Faculty Manual defines "retaliation" for the purposes of the College's

Sexual Harassment Policy" and "Sexual Misconduct Policy" as "[t]he act of seeking

11/15/2019 09:50:32 AM
82451-35

revenge upon another person." The FAC specifically found that Dr. Porter *had not* committed this act.

82. The Faculty Manual includes the College's "Nondiscrimination Policy," and its "Community Aspirations Statement" provides that "[h]indrances to dialogue and free expression can very much impede learning. The concept and application of academic freedom at Berea College protect these values and are articulated in the Faculty Manual." The "Community Aspirations Statement" further provides that "[t]his statement does not mandate these values and is not intended to restrict any person's conscience or academic or personal freedoms."

83. The Faculty Manual states the following possible grounds for the termination of a faculty member for "incompetence" in the performance of his duties:

> The following are considered adequate cause for dismissal of tenured faculty, or of faculty under term appointment before the appointment expires:
>
> - Demonstrated incompetence or dishonesty in teaching or research.
> - Substantial, persistent and demonstrated neglect of professional responsibilities or failure to observe the terms of appointment to the faculty.
> - Personal conduct which demonstrably hinders fulfillment of professional responsibilities.
> - Infirmities serious enough to qualify for total disability payments under the College's disability plan and/or social security.

84. These abovestated protections were not accorded Dr. Porter.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## II. CAUSES OF ACTION

### COUNT I:
Breach of Contract for Suspension from Employment in Violation of the Required Due Process, and Dr. Porter's Academic Freedom

85. Paragraphs 1-84 are hereby restated and incorporated by reference.

86. The Faculty Manual, which is part of Dr. Porter's employment contract with the College, states that during proceedings for termination for cause "the faculty

29

11/15/2019 09:50:32 AM
82451-35

member shall be suspended <u>only if continuance threatens immediate danger to persons or property</u>." (Emphasis added).

87. In the present case, after Dean Berry initially charged Dr. Porter, President Roelofs summarily suspended Dr. Porter and barred him from campus without any prior notice nor any evidence or reasonable basis to determine that he posed any "immediate danger to persons or property." This was a forbidden "prior restraint." It was forbidden by both clear language in the Faculty Manual and by administrative due process. Neither President Roelofs nor Dean Berry specified to Dr. Porter the nature of any such "immediate danger" he may pose and refused to discuss the Survey with him or to convene any mediation between the parties about the controversy.

88. The College's unfounded suspension and banishment of Dr. Porter from campus needlessly tarnished his reputation, denied him access to materials needed to defend himself, and interfered with his academic work by denying his access to crucial resources such as a library, licensed computer software, and his own office.

89. The College's unfounded suspension and banishment of Dr. Porter from campus, without the opportunity for mediation, created a presumption of his guilt, impeded his ability to defend myself, and strongly prejudiced the case against him prior to the FAC hearing.

90. The College suspended Dr. Porter from employment, banished him from campus, and refused mediation in breach of his employment contract and the terms of the Faculty Manual.

91. Dr. Porter's employment contract and the Faculty Manual guarantee him the right of academic freedom in the classroom and in his research, when such speech and conduct pertains to an academic occasion and is made in a manner consistent with the motives, methods, and ends of the academic enterprise.

30

11/15/2019 09:50:32 AM
82451-35

92. Dr. Porter, at all pertinent times, created and distributed the Survey pursuant to legitimate academic inquiry and in a manner consistent with the motives, methods, and ends of the academic enterprise. Particularly, he tendered the Survey to the required persons for vetting prior to its release, and received no feedback forbidding its release. Accordingly, all of Dr. Porter's speech and conduct associated with or related to the creation and distribution of the Survey was protected under his right to academic freedom and free speech under his employment contract and the terms of the Faculty Manual.

93. The College denied Dr. Porter his right to academic freedom and free speech by bringing false charges of "incompetence" against him, suspending him, and banishing him from campus in breach of his employment contract and the terms of the Faculty Manual.

94. Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of the College's breaches of contract, including but not limited to his reputation, loss of income and benefits, physical injury, and emotional distress and mental anguish.

COUNT II:
Breach of Contract for Termination of Dr. Porter's Employment
after the College's Denial of the Required Administrative Due Process.

95. Paragraphs 1-94 are hereby restated and incorporated by reference.

96. The College's unfounded suspension and banishment of Dr. Porter, without proper notice, without the opportunity for mediation, without any reasonable basis or evidence that Dr. Porter was an "immediate danger to persons or property" on campus, and without affording him any due process with a reasonable investigation,

31

11/15/2019 09:50:32 AM
82451-35

specification of charges, discovery of evidence, or opportunity to defend himself, was in breach of his employment contract and the terms of the Faculty Manual.

97. The FAC Chair advised Dr. Porter prior to the hearing that the FAC would give "little weight" to written witness statements. This was not done.

98. The charges brought against Dr. Porter at the FAC hearing involved alleged "incompetence" but also accused him of specific violations of the College's civil rights policies concerning harassment, creation of a hostile work environment, and retaliation.

99. The grouping or conflation of charges seeking Dr. Porter's dismissal for cause based on "incompetence" while also accusing him of violations of the College's civil rights policies on harassment, creation of a hostile work environment, and retaliation accordingly rendered the FAC hearing a proceeding under and subject to the requirements of both the dismissal with cause and the civil liberty hearing procedures set forth in the Faculty Manual.

100. In breach of the Faculty Manual's promise that Dr. Porter would be able to confront all witnesses against him at the FAC hearing, the College terminated Dr. Porter's employment without allowing him to confront or cross examine his main accusers, Dr. Williams or Dr. Wyrick, who instead only submitted written statements to the FAC about the alleged hostile work environment in the psychology department, the alleged sexual harassment and retaliation against them, and the alleged harm and emotional distress they suffered as a result. The grievants did not allege or offer to prove any "unusual" or "urgent" circumstances which would allow them to not testify in person.

101. The FAC Report then frequently referred to Dr. Williams' and Dr. Wyrick's written testimony in concluding that Dr. Porter's Survey had caused them professional

11/15/2019 09:50:32 AM
82451-35

and personal harm and emotional distress, contrary to the FAC's stated promise to place little weight on such statements and in breach of Dr. Porter's right under his employment contract and the Faculty Manual to confront and cross examine the witnesses against him.

102.   Dean Berry was a participant in the prior hostile environment proceedings against Dr. Messer and was also an actor in and witness of the events and circumstances involved in the termination proceedings against Dr. Porter.  The Dean served as a witness and the prosecutor at the FAC hearing, while also being the direct supervisor of the FAC members concerning their compensation and the terms of their employment at the College.  This was over Dr. Porter's written objection., and was a blatant violation of the Plaintiff's administrative due process.

103.   The Faculty Manual states that the College's stated procedures in a termination proceeding against a faculty member "are intended to insure fair process." *See* FM, page 129.

104.   However, the College allowed Dean Berry to assume the multi-part role as participant, witness, and prosecutor in the termination proceedings against Dr. Porter in violation of Dr. Porter's right to fundamental fairness in the proceedings under the terms of his employment contract, the Faculty Manual, and the Executive Committee Resolution, at Items (i) - (iv).

105.   Also, at least three members of the FAC displayed a previously undisclosed and unfair prejudgment and bias against Dr. Porter's defense at the hearing.  See paragraphs 36,  and 56-58 above, showing egregious violation of Dr. Porter's right to fundamental fairness proceedings under the terms of the Faculty Manual and the Executive Committee Resolution, at its Items (iii) - (iv).

33

106.   The College denied Dr. Porter his guaranteed administrative due process throughout the termination proceedings against him in breach of his employment contract, the terms of the Faculty Manual, and the Executive Committee Resolution.

107.   Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of the College's breaches of contract, including but not limited to irreparable harm to his reputation, loss of income and benefits, physical injury, and emotional distress and mental anguish.

### COUNT III:

### Breach of Contract for Termination of Dr. Porter's Employment in Violation of His Academic Freedom.

108.   Paragraphs 1-107 are hereby restated and incorporated by reference.

109.   Dr. Porter's employment contract and the Faculty Manual offered him continued employment under a guarantee of tenure, absent an "adequate cause" for his termination, and the College breached his employment contract by terminating him without adequate cause.

110.   Dr. Porter's employment contract and the Faculty Manual guarantee him the right of academic freedom in the classroom and in his research, when such speech and conduct pertains to an academic occasion and is made in a manner consistent with the motives, methods, and ends of the academic enterprise.

111.   Dr. Porter, at all pertinent times, created and distributed the Survey pursuant to legitimate academic inquiry and in a manner consistent with the motives, methods, and ends of the academic enterprise.  Accordingly, all of Dr. Porter's speech and conduct associated with or related to the creation and distribution of the Survey was protected under his right to academic freedom under his employment contract, the terms of the Faculty Manual, and the Executive Committee Resolution, at Items (i) – (iv), and his right to free speech.

34

11/15/2019 09:50:32 AM
82451-35

112.   The College denied Dr. Porter his right to academic freedom throughout the termination proceedings against him in breach of his employment contract, the terms of the Faculty Manual, and the Executive Committee Resolution.

113.   Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of the College's breaches of contract, including but not limited to irreparable harm to his reputation, loss of income and benefits, physical injury, and emotional distress and mental anguish.

## COUNT IV:

### Violations of the KCRA for Employment Discrimination.

114.   Paragraphs 1-113 are hereby restated and incorporated by reference.

115.   The College has participated in and supported a pattern and practice of illegal discrimination based on age, race, and sex against white males over the age of 40 in the College's employment, discipline, and termination of members of the faculty in the psychology department and in the overall faculty of the College.

116.   As part of this pattern and practice and because of the illegal discriminatory animus against Dr. Porter on the part of President Roelofs and Dean Berry, and due to the severe personal and political coercion of other College faculty members and administrators, with the knowing participation of the College, the College intentionally discriminated against Dr. Porter in suspending him, banishing him from campus, and ultimately terminating his employment without adequate cause and based on his age, race, and sex in violation of KRS 344.040(1)(a).

### A. Discrimination Based on Age.

117.   Paragraphs 1-116 are hereby restated and incorporated by reference.

118.   Dr. Porter is a 69-year-old, white male.

119.   Under KRS 344.040(1)(a) "[i]t is an unlawful practice for an employer: (a) To fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's [age forty (40) and over]."

120.   The College, in furthering its prior pattern of age discrimination, intentionally discriminated against Dr. Porter because of his age and in violation of KRS 344.040(1)(a) when the College brought false charges of "incompetence" against him, suspended him, and banished him from campus without any evidence of showing that he posed any "immediate danger to persons or property."

121.   The Faculty Manual expressly states that there is no enforceable guarantee of confidentiality in the College's civil rights proceedings. The only circumstance where confidentiality is guaranteed in such proceedings is "[u]pon receipt of a complaint of Sexual Violence."  President Roelofs' concluding letter in Dr. Messer's case confirmed the College administration knew this by stating that "I have scanned our policy documents in vain for any requirement of confidentiality and so do not have the latitude to impose it."

122. The College intentionally discriminated against Dr. Porter because of his age and in violation of KRS 344.040(1)(a) when the College brought false charges of "incompetence" against him and terminated him on the pretext that he had allegedly violated a fabricated requirement for all participants in the College's civil rights proceedings to maintain confidentiality, and specifically concerning Dr. Porter's knowledge of and involvement in the prior proceedings against Dr. Messer.  The College knowingly and unlawfully treated Dr. Porter differently from and less favorably than other similarly situated, younger employees, and differently and less favorably

36

than person who supported Dr. Messer's punishment, and condoned the unlawful

discriminatory treatment of other faculty who participated as grievants against Dr.

Messer and, later, against Dr. Porter.

123.   Dr. Porter has suffered and will continue to suffer substantial harm as a

direct result of the College's illegal discrimination based on age in violation of KRS

344.040(1)(a), including but not limited to irreparable harm to his reputation, loss of

income and benefits, physical injury, embarassment, humiliation, emotional distress,

and mental anguish.

### B. Discrimination Based on Race.

124.  Paragraphs 1-123 are hereby restated and incorporated by reference.

125.   Dr. Porter is a 69-year-old, white male.

126.   Under KRS 344.040(1)(a) "[i]t is an unlawful practice for an employer: (a)

To fail or refuse to hire, or to discharge any individual, or otherwise to discriminate

against an individual with respect to compensation, terms, conditions, or privileges of

employment, because of the individual's [race]"

127.   The College, in furthering its prior pattern of race discrimination,

intentionally discriminated against Dr. Porter because of his race and in violation of

KRS 344.040(1)(a) when the College brought false charges of "incompetence" against

him, suspended him, and banished him from campus without any evidence of showing

that he posed any "immediate danger to persons or property."

128.   The Faculty Manual expressly states that there is no enforceable

guarantee of confidentiality in the College's civil rights proceedings. The only

circumstance where confidentiality is guaranteed in such proceedings is "[u]pon

receipt of a complaint of Sexual Violence."  President Roelofs' concluding letter in Dr.

37

Messer's case confirmed the College administration knew this by stating that "I have scanned our policy documents in vain for any requirement of confidentiality and so do not have the latitude to impose it."

129.   The College intentionally discriminated against Dr. Porter because of his race and in violation of KRS 344.040(1)(a) when the College brought false charges of "incompetence" against him and terminated him on the pretext that he had allegedly violated a fabricated requirement for all participants in the College's Civil Rights proceedings to maintain their confidentiality and specifically concerning Dr. Porter's knowledge of and involvement in the prior proceedings against Dr. Messer. The College knowingly and unlawfully treated Dr. Porter differently and less favorably than similarly situated non-white employees, and differently and less favorably from persons who supported Dr. Messer's punishment, and condoned the unlawful discriminatory treatment of other faculty who participated as grievants against Dr. Messer, and, later, against Dr. Porter.

130.   Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of the College's illegal discrimination based on race, in violation of KRS 344.040(1)(a), including, but not limited to, irreparable harm to his reputation, loss of income and benefits, physical injury, injury to his reputation, embarassment, humiliation, emotional distress, and mental anguish.

C. Discrimination Based on Sex

131.   Paragraphs 1-130 are hereby restated and incorporated by reference.

132.   Dr. Porter is a 69-year-old, white male.

133.   Under KRS 344.040(1)(a) "[i]t is an unlawful practice for an employer: (a) To fail or refuse to hire, or to discharge any individual, or otherwise to discriminate

11/15/2019 09:50:32 AM
82451-35

against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's [sex]"

134.   The College, in furthering its previous pattern of sex discrimination, intentionally discriminated against Dr. Porter because of his sex and in violation of KRS 344.040(1)(a) when the College brought false charges of "incompetence" against him, suspended him, and banished him from campus without any evidence of showing that he posed any "immediate danger to persons or property."

135.   The Faculty Manual expressly states that there is no enforceable guarantee of confidentiality in the College's civil rights proceedings. The only circumstance where confidentiality is guaranteed in such proceedings is "[u]pon receipt of a complaint of Sexual Violence." President Roelofs' concluding letter in Dr. Messer's case confirmed the College administration knew this by stating that "I have scanned our policy documents in vain for any requirement of confidentiality and so do not have the latitude to impose it."

136.   The College intentionally discriminated against Dr. Porter because of his sex and in violation of KRS 344.040(1)(a) when the College brought false charges of "incompetence" against him and terminated him on the pretext that he had allegedly violated a fabricated requirement for all participants in the College's civil rights proceedings to maintain their confidentiality and specifically concerning Dr. Porter's knowledge of and involvement in the prior proceedings against Dr. Messer. The College knowingly and unlawfully treated Dr. Porter differently and less favorably than other similarly situated female faculty, and differently and less favorably from persons who supported Dr. Messer's punishment, and condoned the unlawful discriminatory treatment of other faculty who participated as grievants against Dr. Messer, and, later, against Dr. Porter.

11/15/2019 09:50:32 AM
82461-35

137.   Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of the College's illegal discrimination based on sex in violation of KRS 344.040(1)(a), including but not limited to irreparable harm to his reputation, loss of income and benefits, physical injury, injury to his reputation, embarrassment, humiliation, emotional distress, and mental anguish.

## COUNT V:
### Violation of the KCRA for Illegal Retaliation

138.   Paragraphs 1-137 are hereby restated and incorporated by reference.

139.   Under KRS 344.280(1) "[i]t shall be an unlawful practice for a person, or for two (2) or more persons to conspire: (1) To retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this chapter, or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter . . ."

140.   Dr. Porter acted as Dr. Messer's "adviser" throughout his hostile environment hearing and appeals, as allowed under the Faculty Manual. Dr. Porter argued that Dr. Messer's alleged infractions were neither severe nor pervasive enough to create a "hostile workplace environment" on the basis of sex or to warrant the punishments levied against him. Dr. Porter, during the proceedings regarding Dr. Messer before the CCHB and the FAC, and in correspondence with President Roelofs and with Dean Berry and in a letter to administrators at the campus, expressed his disappointment with the unfairness of the College's processes and the result in Dr. Messer's case, thereby antagonizing the College's administration as well as the grievants who had placed the charges against Dr. Messer. This animus is blatantly expressed in the postings by Dr. Sergent and Dr. Williams, in which the College conspired and enabled.

40

11/15/2019 09:50:32 AM
82451-35

141.   The College intentionally retaliated against Dr. Porter because of his participation in Dr. Messer's defense in the proceedings against him and because of Dr. Porter's verbal and written criticism of the College's civil liberties procedures in general, the College's Civil Liberties proceedings against Dr. Messer in particular, and of the roles and actions President Roelofs and Dean Berry took with regard to both and in violation of KRS 344.280(1), when the College brought false charges of "incompetence" against him, suspended him, and banished him from campus without any evidence of showing that he posed any "immediate danger to persons or property." The College, particularly, enabled the retaliation against Dr. Porter by Dr. Williams and Dr. Sergent, generally, and particularly because of his defense of himself and Dr. Messer as older white males.

142.   The Faculty Manual expressly states that there is no enforceable guarantee of confidentiality in the College's hostile environment proceedings. The only circumstance where confidentiality is guaranteed in such proceedings is "[u]pon receipt of a complaint of Sexual Violence." President Roelofs' concluding letter in Dr. Messer's case confirmed the College administration knew this by stating that "I have scanned our policy documents in vain for any requirement of such confidentiality and so do not have the latitude to impose it."

143.   The College intentionally retaliated against Dr. Porter because of his participation in Dr. Messer's defense in the proceedings against him and because of Dr. Porter's verbal and written criticism of the College's civil rights procedures in general, the College's hostile environment proceedings against Dr. Messer, in particular, and of the roles and actions President Roelofs and Dean Berry took with regard to both and in violation of KRS 344.280(1), when the College brought false charges of "incompetence" against him and terminated him on the pretext that he had

41

11/15/2019 09:50:32 AM
62451-35

allegedly violated a fabricated requirement for all participants in the College's civil rights proceedings to maintain their confidentiality and specifically concerning Dr. Porter's knowledge of and involvement in the prior proceedings against Dr. Messer. The College's treatment of Dr. Porter was directly retaliatory against him because of his defense of Dr. Messer, and, later, himself, as an older white male.

144. Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of the College's illegal retaliation against him in violation of KRS 344.280(1), including but not limited to irreparable harm to his reputation, loss of income and benefits, physical injury, injury to his reputation, embarassment, humiliation, emotional distress, and mental anguish.

145. So far as is known, this Complaint implicates only Kentucky state law, including the KCRA, state contract law, and the Kentucky State Constitution.  No known federal claims are raised herein.

WHEREFORE, Dr. Porter hereby respectfully requests this Court enter

Judgment against the Defendant on each and all counts in this Complaint and for the

following relief, including, but not limited to:

1. Injunctive relief under KRS 344.450 ordering the College to reinstate Dr. Porter in his position as a tenured professor in the College's psychology department with full reinstatement of his rights under his tenured employment contract, including his salary and benefits, and with full restitution of his lost income and benefits, with interest thereon;

2. Compensatory damages under KRS 344.450, in an amount in excess of the minimum jurisdictional limits of this Court, including but not limited to:

    a.   Back pay.
    b.   Front pay.
    c.   Lost employment benefits.
    d.   Lost future employment benefits.
    e.   Damages for injury to reputation, embarrassment, humiliation, physical and emotional distress and mental anguish, including all damages for any manifestation of physical injury resulting from the above.
    f.   Interest at the legal rate from October 1, 2018.
    g.   Reasonable costs and attorney's fees.
    h.   All other equitable and legal relief which this Court deems just and due.

3. Plaintiff specifically requests trial by jury on all issues so triable.

Respectfully Submitted,

HON. JOHN F. LACKEY
214 West Main Street
Richmond KY 40475
(859) 575-7206
lackeylaw@att.net

HON. DEBRA DOSS
108 Pasadena Dr.
Lexington, Kentucky 40503
(859) 260-1980
debra.doss@qx.net
**Attorneys for the Plaintiff**

43

11/15/2019 09:50:32 AM
62451-35

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true copy of the foregoing FIRST AMENDED *Exhibits 1+2, 2nd C.R. 33+34 discovery* COMPLAINT upon the following by first class mail:

Berea College
c/o Dr. Lyle R. Roelofs, President
Lincoln Hall
CPO 2182
Berea, KY 40404

The defendant is not now being represented by
Counsel of record.

This the 4th day of February, 2019.

HON. JOHN F. LACKEY
214 West Main Street
Richmond KY 40475
(859) 575-7206
lackeylaw@att.net

HON. DEBRA DOSS
108 Pasadena Dr.
Lexington, Kentucky 40503
(859) 260-1980
debra.doss@qx.net

**Attorneys for the Plaintiff**

Exhibit I

**Have heard that SGA did vote for Porter to receive SGA 2017-18 Outstanding
Service Award but administration decided Porter was ineligible because he had
been placed on suspended status by executive action and that when the college
policy states "faculty member" it means "faculty member in good standing" (i.e.,
not suspended).**

**From:** Tyler Sergent  **Sent:** Monday, April 9, 2018 12:09 AM
**To:** Yabsira H. Ayele
**Cc:** Osvaldo Flores; Rachel S. Vagts; Sierra N. Turner; Kelley S. Farley; Martin Kameya
**Subject:** Re: Concern about SGA service award

Yabsira,

Until you actually know something about the situation, there is no basis for debate or
dialogue. I voiced my advice as part of my role as elected SGA faculty advisor. Again, I
am not the only one, and so you need to include Rachel Vagts in your messages.

Clearly you have no interest in my advice or the advice of your other faculty advisor,
both of whom know much more than you about a great many things directly related to
this situation. So I hope you at least listen to those around you among the SGA
leadership who are wiser and better informed.

One last bit of advice: I would caution you against burning bridges this early in your
education, particularly for the wrong side of a cause.

Do not email me again regarding this issue.

Dr. Sergent

_____
***F. Tyler Sergent, PhD***
*Assistant Professor*
*General Studies and History*

_____
**From:** Yabsira H. Ayele  **Sent:** Sunday, April 8, 2018 11:51 PM
**To:** Tyler Sergent  **Subject:** Re: Concern about SGA service award

You are entitled your opinions I am entitled to mine.
Out of the 3 nominees, Dave was recognized as the most noteworthy. I urge you to let
the students choose who served the students best.
I am disappointed in your objection and I believe they are without merit because I do
not believe you have read the nominations. The college body nominated and we chose
on behalf of them as elected officials.

I quote you the definition of a Biggot: "a person who is obstinately or intolerantly
devoted to his or her own opinions and prejudices; especially: one who regards or treats
the members of a group with hatred and intolerance".

'I am not inviting a debate with you or anyone else who would defend the unethical
actions of David Porter--they are indefensible just like racism and any other of form
discrimination--or any other faculty member who has caused harm to other members of
our community"

If you are willing to disseminate information, when the persons aforementioned, do not have the ability to defend themselves, is wrong, and that is unethical. To threaten me is unethical. I do not know the entire situation and you don't either. My point is with the information available to the general public the nominations were brought forth and democracy prevailed. If next, you say democracy is unethical then I cannot emphasize how problematic that is.

Our job is to bring these candidates forward, the rest is democracy, you have to respect that.

On a side note, I have no allegiance to anyone but truth and the right of equity and fairness, if I receive information that truly draws Professor Porter in a bad light, I am more than willing to change my stance. Hence my invitation to dialogue.

best,

**Yabsira Ayele** *Speaker of the Senate*  *Program Specialist- Deep Green Residence Hall* Business Admin & Psychology  CPO 32

*The contents of this e-mail message and any attachments are confidential and are intended solely for addressee.*

------------------------------------------------

**From:** Tyler Sergent **Sent:** Sunday, April 8, 2018 11:07:03 PM
**To:** Yabsira H. Ayele; Rachel S. Vagts; Osvaldo Flores
**Cc:** Sierra N. Turner; Kelley S. Farley **Subject:** Re: Concern about SGA service award

Yabsira,

There are many faculty and staff members who do this and much more for students and do so without bringing harm to other members of our community and without ever being accused of unfairness or unethical actions. That is the reason for my strong objection to the SGA in my capacity as faculty advisor. If you do not think other faculty members have done every good thing you attribute to David Porter plus much more, than you are uninformed about the unending, tireless work and support the rest of us give to students day in and day out.

I am not inviting a debate with you or anyone else who would defend the unethical actions of David Porter--they are indefensible just like racism and any other of form discrimination--or any other faculty member who has caused harm to other members of our community. Rewarding those actions and the harm coming from them is not the Berean way. The administration has good reasons for suspension and the case will be adjudicated.

I gave my advice and detailed my reasons for that advice. I have no doubt that you believe you are doing what is right. But there are people giving you advice who know a great deal more about this situation than you do. You should heed their advice.

To be clear, SGA has two faculty advisors, and we are both in agreement with our objections. We are attempting to keep the SGA from making a mistake today that will not only bring additional harm to those already harmed and hurting but that will be recorded for all time in Berea College history. I'm an historian and Rachel Vagts is an archivist and the head of the college archives--you do not want to be among a group of

11/15/2019 09:50:32 AM
82451-35

student leaders on the wrong side of Berea's history. Therefore, I urge the SGA to heed our advice.

Tyler

*F. Tyler Sergent, PhD*
*Assistant Professor*
*General Studies and History*

---

**From:** Yabsira H. Ayele **Sent:** Sunday, April 8, 2018 10:22 PM
**To:** Rachel S. Vagts; Tyler Sergent; Osvaldo Flores
**Cc:** Sierra N. Turner; Kelley S. Farley
**Subject:** Re: Concern about SGA service award

Dr. Sergent,
The reason why we chose to nominate Professor Porter is because of the excellence in service to students he has exhibited. His service to students towered over the other candidates.

I ask you when was the last time a professor bought groceries for students because they do not make enough money? When was the lasts time a professor provided housing free of charge for multiple students because they did not make enough money? When was the last time a professor got a student a full ride to Cambridge? When was the last time a professor actively helped students publish papers outside of class?

Professor Porter did all of this and then some more. The choice of nominating Professor Porter was not made lightly, it was made because we believe he deserves this award. For you to bring up something that deals with faculty and an ongoing investigation is not fair, to say the slightest; the senators made their decision cognizant of the available information at hand (The vote was 7-2-4). Secondly, your characterization of people who disagree with you is not fair. I am more than willing to have a conversation with you one on one if need be. But I do not believe this should be shared any further. I urge that your personal involvement in Faculty matter does not cloud your judgment on Student matters.

With all respect,

**Yabsira Ayele** *Speaker of the Senate*

---

**From:** Rachel S. Vagts **Sent:** Sunday, April 8, 2018 7:13:01 PM
**To:** Tyler Sergent; Osvaldo Flores **Cc:** Sierra N. Turner; Kelley S. Farley; Yabsira H. Ayele **Subject:** Re: Concern about SGA service award

I would like to echo Tyler's concerns and include my strong objection as well. I did not have as many of the facts of the situation before, so I was reluctant to assert that objection at the Senate meeting, but now that they have been detailed here, I feel compelled to advise you to reconsider Dr. Porter's nomination for the SGA Service award.

All my best, Rachel

11/15/2019 09:50:32 AM
82451-35

**Rachel Vagts** Head of Special Collections & Archives
Hutchins Library - Berea College  Berea, KY 40404
859-985-3267  Rachel_Vagts@berea.edu

**From:** Tyler Sergent  **Sent:** Sunday, April 8, 2018 6:23:35 PM
**To:** Osvaldo Flores  **Cc:** Rachel S. Vagts; Sierra N. Turner; Kelley S. Farley
**Subject:** Concern about SGA service award

Hi, Osvaldo and SGA Executive Committee,

I just heard that the SGA Senate has voted to give David Porter the SGA Service Award this year. I am compelled to let you know my issues with and vehement objection to this decision. I ask that you please share this with everyone else on the executive committee for tonight's meeting.

I am aware that some of Porter's supporters among students--who have publicly said they will support him "no matter what to the bitter end"--are also involved in SGA. I'm surprised how they are able to convince others in SGA that Porter's actions aren't so bad. That's the first issue I want to address with some background and details.

Porter supported Wayne Messer throughout a Title IX/VII complaint this last year that was upheld against Messer at every level, including appeals, in which Messer was found guilty of creating a hostile work environment for racist, sexist, and homophobic comments. Messer was removed as chair of the Psychology Department and removed from his office near the other Psychology faculty members as an outcome of his actions. Porter argued on Messer's behalf that the racist, sexist, homophobic comments were academic freedom and that Messer had the right to say those things to colleagues and students. This took place from February 2017 until the present, as Porter has continued to express this view about the case that was fully adjudicated several months ago. In the process of this case, Porter also publicly in writing and in testimony made sexist, disparaging remarks about each of the three female faculty members in Psychology, including disclosing personal medical records of one, which he characterized falsely, rising to the level of slander, libel, and defamation.

**The reasons for which Porter has been suspended and is in the process of being fired for cause center on five major wrongful acts.**

**First is academic dishonesty.** The survey he sent out to the whole community was not a valid survey, and he was well aware of that, and made it available to the entire campus community anyway. Even after being told to remove it because of its invalidation (for reasons explained below), he refused.

**Second is gross ethical violations.** In the survey, Porter included actual cases from this past year's Title IX/VII case against Messer. That is a serious violation of professional ethics in itself. To make it even more unethical, Porter falsely stated in the discloser section of the survey that the scenarios were not based on any actual events.

**Third is incompetence along with manipulation of students.** Porter also sent the survey out with students' names attached without having gotten those students express permission, and many among those students had already expressed their own ethical concerns about the survey. Porter has continued to manipulate students--like those in SGA supporting this award--to rally for his cause. Hero-worship is not education; this cultish approach to answering for his unethical acts is yet another level of unethical behavior and breach of the student-teacher relationship.

11/15/2019 09:50:32 AM
82451-35

**Fourth is refusal to abide by IRB (Institutional Review Board) and college policies for research.** Porter refused to send his survey to the IRB for review as required by college policy (and APA standards for research and ethics). When the IRB did review the survey at the request of the administration, against Porter's objections, the IRB rejected the survey as unethical for the reasons stated above.

**Fifth is harm to human subjects (and the campus community).** The people whose personal and private information was made public in the survey have been seriously harmed by Porter's actions and are having to seek care for both physical and mental health that has been damaged willfully by Porter. Contrary to what some students may have claimed, Porter has not apologized for this harm and has made no effort to repair the harm he has caused. By extension, Porter's continued manipulation of students to support him--no matter how much in the wrong he is--has caused serious (if not permanent) rifts between groups of students, and the animosity has spilled over into other classroom spaces, other campus spaces, and social media. Porter is actively fueling this animosity, among students and among faculty members.

The second issue at stake, however, regarding the SGA service award, is that the SGA not be reactionary in its decisions. The service award is a serious matter and should not be victim to manipulation by students who themselves are victims of manipulation by an unethical, unrepentant, academically dishonest person who is in process of rightly being fired from Berea College. That students like him is irrelevant; that his colleagues dislike him is irrelevant. Evaluate Porter--and other nominees for the award--as you would evaluate anyone: based on what they do and how they treat others. In this case, giving a service award to David Porter would add additional injury to those who Porter has already injured. This in itself would outweigh the good SGA has accomplished all year long.

Because there are remarkable people at Berea College who are worthy of the SGA service award and whose continuous work is always for the good people at all times (i.e, not unethical, not harmful, not malicious, not getting fired), I'm hoping SGA Senate will reconsider its decision. I know BOR has not yet voted on the matter. As one faculty advisor to SGA and voting member of the Senate and BOR, I will vote against this nomination. I've been so impressed with the work of SGA since my coming to Berea in 2011, and especially over the last two years when I've had the pleasure to work directly and closely with SGA leadership and members. On this particular matter, SGA can and ought to do better.

Sincerely,
Tyler

*F. Tyler Sergent, PhD*



**BEREA COLLEGE**

GOD HAS MADE OF ONE BLOOD ALL PEOPLES OF THE EARTH

Office of the Academic Vice President and Dean of the Faculty
Chad Berry
CPO 2204, Berea, KY 40404
Phone: 859.985.3486
chad_berry@berea.edu

June 1, 2018

David Porter
CPO 1995

Exhibit 2

Dear David,

As we approach the end of another academic and fiscal year, I am writing to thank you for your service and to inform you of your salary increase for 2018-19. Berea College benefits from a staff and teaching faculty of extraordinary dedication and commitment, and we are pleased to be able to provide raises this year for all successful employees. The typical increase College-wide for 2018-19 is 2 percent.

Enclosed is a data sheet that shows how the salaries of Berea faculty compare to those in our faculty salary benchmark group for the last academic year (2017-18). The aim of the College in determining faculty salaries has been to have the average Berea College salary in each rank be as near as possible to the median salary among the average salaries in the benchmark group. The sheet also includes new information at the bottom for the upcoming academic year (2018-19).

Your salary effective with the first payroll period following August 1, 2018, will be at the annualized rate of $108,340, subject to taxes and other withholdings.

In addition to employees' salaries and wages, the College's payments for all employee benefits average an additional 26 percent of salaries. The benefits paid by the College for eligible employees include (a) contributions to retirement, health insurance, and dental plans, and (b) providing for payroll taxes (FICA and Medicare), life and disability insurance, the employee assistance program, workers' compensation, vacation and sick leave, as well as most administrative costs of the employee benefits programs.

The terms and conditions of your employment remain subject to the provisions of the Berea College Faculty Manual and the Berea College Employee Handbook. Current versions of the Manual and the Handbook are available online at http://www.berea.edu. The Handbook includes a description of the comprehensive benefits offered through the College.

I look forward to working with you in the coming year as we all seek to advance Berea's extraordinary mission.

Sincerely,

Chad Berry
Academic Vice President and Dean of the Faculty

cc: Steve Lawson
    Sara Clements

1192-2175-6101-400

*Investing In Lives of Great Promise*

**Gold, Sharon**

| | |
|---|---|
| **From:** | Debra Doss <debra.doss@qx.net> |
| **Sent:** | Tuesday, May 07, 2019 4:05 PM |
| **To:** | Gold, Sharon |
| **Cc:** | John Lackey |
| **Subject:** | Dr. David Porter v. Berea College |

Hello Sharon,

It is my understanding from your office that you are in Arizona the rest of this week. However, your assistant Susan advised that if I sent you an email you would be able to respond.

The Plaintiff would like to schedule the deposition of Yabsira Ayele on May 22, 2019, sometime in the morning. This witness recently graduated and is leaving Kentucky at the end of the month. Accordingly, we need to take his deposition before he leaves. Please advise if this date is available.

Thank you,

Debra


EXHIBIT
B

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
CIVIL ACTION FILE NO. 19-CI-200
DIVISION 1

FILED
TIME_____ A.M./P.M.
APR - 2 2019
MADISON CIRCUIT COURT
DAVID FERNANDEZ, CLERK

Dr. DAVID B. PORTER,                                         PLAINTIFF,

v.

DR. F. TYLER SERGENT
c/o Berea College, Frost Bldg., 102
CPO 1973
Berea, KY 40404

DR. F. TYLER SERGENT
143 Kenneth Rose Rd.
Berea, KY 40403-9672                                         DEFENDANT.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
**COMPLAINT**
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

COMES NOW the Plaintiff Dr. David B. Porter ("Dr. Porter"), by and through his counsel, who hereby brings this Complaint against the Defendant Dr. F. Tyler Sergent ("Dr. Sergent") for defamation of Dr. Porter, for portrayal of Dr. Porter in a false light, and for illegal retaliation against Dr. Porter in violation of KRS 344.280(1) of the Kentucky Civil Rights Act. Dr. Porter further states in support of this Complaint as follows:

**PARTIES**

1.     Dr. Porter is a resident of the City of Berea, Madison County, Kentucky.

2.     Dr. Sergent is a resident of the City of Berea, Madison County, Kentucky.

**JURISDICTION AND VENUE**

3.  Paragraphs 1-2 are hereby restated and incorporated by reference.

4.  This Court has personal jurisdiction over Dr. Sergent as a Defendant as he is a resident of the City of Berea, Madison County, Kentucky.

5. This Court has subject matter jurisdiction over the defamation, false light, and negligence claims under KY Const. § 112(5) and KRS 23A.010.

1

**EXHIBIT**
C

11/15/2019 09:51:02 AM
82451-35

6. This Court has subject matter jurisdiction under KRS 344.450 for a claim for illegal retaliation in violation of KRS 344.280(1), and under KY Const. § 112(5) and KRS 23A.010.

7. This Court is the proper venue for this Complaint under KRS 452.450.

## STATEMENT OF FACTS

### A.   Dr. Porter's Successful Educational Career

8. Paragraphs 1-7 are hereby restated and incorporated by reference.

9. Dr. Porter is a 69-year-old, white male who was a tenured professor and employee of the College for more than 17 years. Dr. Porter served as academic vice president and provost from 2001 – 2005 and as a member of the Psychology Department thereafter until the termination of his employment on Oct 1, 2018.

10. Dr. Porter is a partially disabled United States Air Force veteran who holds a Doctorate of Philosophy from Oxford University, United Kingdom, a Master of Science from the University of California at Los Angeles, and a Bachelor of Science from the United States Air Force Academy.  He has extensive training and leadership in claims of wrongful workplace harassment.

11. Prior to joining the College, Dr. Porter taught for the United States Air Force as Permanent Professor and Head of the Air Force Academy Department of Behavioral Sciences and Leadership.

12. Dr. Porter is the author of some sixty (60) professional publications, and has given roughly an equal number of professional presentations.  His students have received approximately 20 awards for excellence in research from state and regional professional bodies in the last 10 years.

2

DOCUMENT
11/15/2019 09:51:02 AM
82451-35

13. In 2018, the Berea College Student Government Association initially chose Dr. Porter for its Student Service Award. Dr. Porter had received other distinguished teaching and service awards from the College during his tenure. His students consistently placed him in the highest professional ranking at the College, and his students consistently scored in the highest academic ranking on nationally-normed measures of psychology knowledge and skills.

14. At all pertinent times, Dr. Porter was qualified for his position at the College as a tenured professor of psychology and, in the course of his academic research and teaching, he was in total compliance with all relevant and applicable rules and standards for professional conduct and ethics.

15. In his position at the College and as a part of his employment duties, Dr. Porter advocated using peer-reviewed, scientifically apprpriate analysis rather than subjective opinions to assess administrative policies and programs. His observations and advocacy, at times, annoyed and rankled members of the College administration and faculty and student factions in campus workplace matters. Dr. Porter's advocacy of science and skepticism was incorporated in many of the courses he taught, including GSTR 110 (*Questioning Authority; Skepticism and Science and Antidotes for Oppression*), GST 232 (*Introduction to the Behavioral Sciences*); PSY 208 (*Cognitive Psychology*), PSY 210 (*Industrial/Organizational Psychology*), and PSY 424 (*Senior Research*).

## B.  The Background and College Community Events Motivating Dr. Sergent's Acts of Malice Toward Dr. Porter.

16. In 2013 a Caucasian male faculty member made an inappropriate post on social media sarcastically suggesting that little should be expected from one of his

3

FILED DOCUMENT
11/15/2019 09:51:02 AM
82451-35

African American students named "Tequila". The campus community, appropriately in this instance, immediately condemned the faculty member's conduct. The College's response, though, was to declare a mandatory "Diversity Day" training for all faculty members. Most, but not all, faculty members attended, but two senior white male professors who had nothing to do with the post did not attend and criticized the endeavor as demeaning to them and counterproductive. The College harshly punished the two men for their criticism and noncompliance, including imposing restrictions on pay, benefits, and academic promotion. The names of these men are known to the Plaintiff and Defendant, but will not be identified in this Complaint.

17. In 2015, during a faculty meeting discussion of institutionally provided health insurance, a young, female African American faculty member related her difficulties and traumas related to several unsuccessful pregnancies. Shortly thereafter in a chance meeting at a Walmart, a senior, white male faculty member in the same department as the female faculty member merely expressed his sympathy and condolences for her traumas. The College charged him with a breach of confidentiality and forced him to resign.

18. At the close of the 2017 school year, a quite competent and approximately ten-year employed administrator at Berea College retired after being told by another senior administrator that he would not be further promoted because he was a Caucasian male. The name of this individual is known to both the Plaintiff and Defendant, but will not be identified in this Complaint.

19. In March of 2017 the chairman of the psychology department, Dr. Wayne Messer, was subject to a civil rights grievance brought by fellow psychology professors Dr. Wendy R. Williams, the wife of defendant, Dr. Sergent, Dr. Amanda Wyrick, and

4

Dr. Sarah Jones, alleging discrimination in hiring and promotion, retaliation, and the creation of a hostile workplace environment.

20.   One of the charges was that Dr. Messer had demonstrated a bias against women in hiring, which was demonstrably false.  Dr. Messer introduced an Excel spreadsheet showing the contemporaneous ratings each of the five psychology department selection committee members had given to approximately 100 prior applicants.  The spreadsheet showed that the top six ratings Dr. Messer gave were all assigned to women.  Testimony of other selection panel participants supported the absence of Dr. Messer's bias.

21.   In contrast, the grievant, Dr. Williams, had exclaimed during one selection panel meeting that, "The last thing we need in this department is any more old white guys!"  A closer examination of Dr. Williams' own ratings of applicants revealed other evidence of her discrimination against white males.  Although white males made up about 25% of the applicant pool, none appeared in Dr. Williams' top-twelve rated applicants.  Unlike the other four professors in the department making ratings, she had used a scale of 0-5 to rate the applicants rather than the 1-5 scale to which all of the selection panel members had agreed prior to rating.  White males received a disproportionately high number of Dr. Williams' "0" ratings.  Similarly, she awarded disproportionately more below-average ratings to white males whom the other professors had rated in the top third of applicants.  Dr. Williams also withheld her ratings until after she had seen all the other ratings of applicants.  Her anomalous rating scale served to discriminate in hiring against all white males.  Nonetheless, the College took no action against her despite having knowledge and objective evidence of her unlawful racial, age, and gender discrimination.

5

11/15/2019 09:51:02 AM
82451-35

22.  The grievants in Dr. Messer's case also made the false assertion that due to the hostility in the department they had been forced to use the copier on a different floor rather than the copier next to the department chair's office. Copier usage statistics quickly disproved this fabricated charge. The College was aware of this false claim but took no action against the grievants despite the Faculty Manual's warning at page 92 of the "General Guidelines" section stating: "Fabricated charges of alleged violations or false testimony are serious offenses. Persons found to have fabricated charges or testified falsely will be subject to disciplinary action up to and including termination or expulsion."

23.  After the investigation and hearing, the College dismissed many of the charges against Dr. Messer, but the College found that Dr. Messer had created a "hostile workplace environment" based on sex. The College found Dr. Messer "guilty" based on three incidents over a two-year period: telling an inappropriate joke about a "Jewish American Princess" prior to a department meeting; attempting to engage his psychology department colleagues in conversations about the public backlash to rock singer Chrissy Hynde's recent NPR interview about her rape; and his use of the phrase "militant lesbian" during an animated faculty discussion regarding one of his student's disciplinary problems. In Closing at the hearing, Dr. Williams falsely claimed that mediation was inappropriate in cases of sexual harassment. This false claim appeared to have been accepted by the hearing panel. These findings led to the College removing Dr. Messer as psychology department chair and revoking his then office space and banishing him to an office in the basement of the psychology department building with no effort to resolve the matter through mediation.

24.  Dr. Porter acted as Dr. Messer's "adviser" throughout the grievance hearing and appeals, as allowed under page 92 of the Faculty Manual. Dr. Porter argued that

Dr. Messer's alleged infractions were neither severe nor pervasive enough to create a
"hostile workplace environment" on the basis of sex or to warrant the punishments
levied against him. Dr. Porter, during the proceedings before the Campus Conduct
Hearing Board (CCHB) and the Faculty Appeals Committee (FAC), in correspondence
with President Lyle Roelofs and Dean Chad Berry, and in an open letter to campus,
expressed his disappointment with the unfairness of the College's disciplinary process,
and of the result in Dr. Messer's case. Dr. Porter's advocacy of these positions
subjected him to unlawful workplace hostility from members of the College's senior
faculty and administration, and from the grievants who had initiated the charges
against Dr. Messer.

25. College administrators rebuffed Dr. Porter's attempts to have them address
his concerns about the College's unfair lack of administrative due process and its
misapplications of workplace policies and procedures in Dr. Messer's case. While
many senior faculty members and mid-level administrators unofficially acknowledged
problems with the hostile work environment disciplinary process at the College,
President Roelofs and Dean Berry refused to discuss Dr. Porter's specific concerns.

26. In accordance with Faculty Manual procedure, President Roelofs and Dean
Berry directed the psychology department faculty members to meet face-to-face in the
aftermath of Dr. Messer's contentious disciplinary proceedings to attempt to broker
some sort of a peace. However, the three female grievants refused to meet or interact
directly with the male department members. In response, Dean Berry acquiesced and
rescinded the requirement for face-to-face department meetings, even though the
Faculty Manual at page 34 states that attendance at "faculty meetings" is a job
requirement. This exact provision had been the College's exact justification for

7

severely punishing the two senior, white male faculty members for not attending "Diversity Day" training. *See* ¶16, *supra*.

27. During several meetings of the College's Strategic Planning Council, Dean Berry and the College's Vice President for Diversity, stated that only those who share a "minority identity" should have significant input on policies of the College involving inclusivity and diversity.

28. Later, during the 2018 fall semester, the College, through Dean Berry, advised faculty members that all faculty hires would be "either black or brown".

29. Following the unpleasant proceedings against Dr. Messer, in the late fall semester of 2017 Berea College employed W. Scott Lewis, a distinguished expert in collegiate workplace administration, to advise it about its policies and procedures regarding wrongful workplace hostility in the College's psychology department. Dr. Lewis has trained thousands of faculty and staff members on how to prevent, address and properly report wrongful workplace issues. He is also a law enforcement trainer on how to investigate sensitive matters, such as abuse and assault.

30. Dr. Lewis did a thorough investigation of workplace issues in the College's psychology department. As part of its pattern of extreme "political correctness" and in another failure to defend the protected academic freedom of its faculty, the College refused to release Dr. Lewis' report, embargoed it, kept it confidential, and took no responsible actions to implement its recommendations or to address Dr. Porter's prior criticisms of the College.

31. In all of the above events and particulars, the College demonstrated a longstanding pattern and practice of favor toward and support of some of its students' and employees' extreme "politically correct" activism and their factually and legally unsound grievances, to the gross detriment of the College's obligations to conduct

8

academically honest, fair and even-handed hiring, retention, and supervision of its faculty and staff.

### C. <u>Dr. Porter's Survey for his PSY 210 Industrial/Organizational Psychology Class, and the College's Resulting Suspension and Banishment of Him From Campus.</u>

32.   Dr. Porter taught the PSY 210 Industrial /Organizational Psychology course at the College for more than a decade.  Regularly featured in this course were large, integrative student projects applying the scientific method through the examination of archival and survey data to assess college policies, practices, and programs and to identify areas where there were opportunities for improvement. These studies had included, for example, reviews of the effects of characteristics of first year general studies courses on student retention and academic success, and the relation between first-year student labor positions and other measures of student satisfaction and motivation.  These projects were integral to the academic content of the course and often received public praise from students and officials of the College, including members of the College's Board of Trustees and vice presidents for academics and student life.  The research also earned recognition when presented at the Kentucky Academy of Science.  There had been no objection to Dr. Porter's academic methodology or subject matter prior to February, 2018.

33.   After the contentious proceedings against Dr. Messer, it appeared to Dr. Porter that the College's workplace disciplinary procedure relied almost entirely on asserting and re-asserting the preconceived notions of the College administration, with little attention to actual evidence of the program's effectiveness or consequences.  As an academic researcher having published many articles and several book chapters concerning psychology, Dr. Porter decided to engage his Spring 2018 PSY 210 class in

9

developing a survey of community perceptions and attitudes about academic freedom, freedom of speech, and hostile work environments under civil rights law. ("the Survey"). The Survey employed methods similar to those Dr. Porter had repeatedly used in the past in his classes.

34. The heart of the Survey was a set of some 20 posed scenarios. Respondents were asked to read the scenarios and decide whether each situation reflected a "hostile environment," and if academic freedom should protect the action taken in the scenario. The use of such scenarios (i.e., situational judgement tasks) is common in Cognitive Psychology, as well as Industrial/Organizational Psychology studies, and often provides reliable information about implicit attitudes which may differ from explicit beliefs. In no respect did the scenarios suggest (push) a preferred, or "right," response.

35. Dr. Porter drew about one half of the Survey's scenarios from issues, arguments, and events he had observed as faculty adviser for Dr. Messer in the prior civil rights case. The Survey carefully concealed participant identity by obscuring dates and altering the identification of gender, race, and other personal characteristics. No names or other information identifying the participants were presented in any of the scenarios. The Survey instructions carefully stated that "[n]o claims are made about the relationship between these hypothetical situations and actual occurrences here at Berea College or elsewhere."

36. Before disseminating the Survey, Dr. Porter shared drafts of it with many other faculty members and received feedback from six of them, including the academic division chair, the chair of the College's Institutional Review Board (IRB), the Director of Academic Assessment, and other tenured faculty members with applicable research experience in the social sciences. None of the faculty or administrative reviews flagged

10

11/15/2019 09:57:02 AM
82451-35

any potential breaches of confidentiality, ethical concerns, or harm to others, as possible problems.  Two reviewers did express concern about controversy the Survey might elicit by presenting issues that the College administration did not want to have debated.  Dr. Porter sent a copy of the Survey to Dean Berry three days before it was to be posted.  Dr. Baltisberger had stated that since the survey was for Dr. Porter's class, he would not comment upon it.

37.  The Survey was launched on Monday, February 19, 2018.  That day Dr. Porter received a polite e-mail request from Dean Berry to meet to discuss it, to which Dr. Porter quickly accepted.

38.  Meanwhile, that same day, Dr. Williams, wife of defendant Dr. Sergent, published a Facebook post incorrectly claiming that all of the fact patterns in the Survey's scenarios were expressly about her and the other grievants in Dr. Messer's proceedings, that the Survey improperly repeated allegations of cognitive impairment against her, and that the Survey intended to punish and silence them.  Dr. Williams posted:

> I've said this elsewhere, so I'll post it here, too. As one of the not anonymous targets of this survey I can tell you that I, and the other women who filed (and won-at every level of the process) the [civil rights] hostile work environment complaint on which this survey is based, would be thrilled with some support on this. Every scenario in the survey is either a biased portrayal of what we claimed in our complaint, or it was given by the defense to show that we were the biased ones or that we were cognitively compromised in our judgment, or it was given as examples of how other people had done much worse so the behavior we objected to isn't *that bad* in comparison to "real" hostile environments. Let me repeat again-we won at every stage of the process. Yet despite the conclusion of that process three months ago (after 9 months of the process) this is another attempt to silence us (and those like us). That said, if this kind of behavior by a colleague in response to losing a Title IX complaint is tolerated by the community, then this is certainly one way to make sure no one ever brings another [civil rights] complaint on this campus. If you feel upset by this unethical use of students under the guise of "research' or the not subtle attack on your female colleagues/faculty, please do more than write it here. If you want to know more ways to help, let me know.  (Emphasis added).

11

11/15/2019 09:51:02 AM
82451-35

39. Dr. Williams' Facebook post falsely claimed that nearly every scenario was about her and the other grievants in Dr. Messer's case, and improperly revealed identities of persons she believed were involved to the entire campus community, who were otherwise not familiar with the particular fact patterns posed.

40. In her Facebook post Dr. Williams specifically exhorted campus activists to take action to "support" her and to do "more" than just write about their anger.

41. With the full knowledge of all pertinent members of the College's administration, including but not limited to President Roelofs, Dean Berry, and the Title IX Coordinator, Dr. Williams' complaints about the Survey in public and private and in her Facebook post predictably incited her husband Dr. Sergent, a then-untenured assistant professor of history at the College, and a group of campus activists to make  their anger about Dr. Porter and about the Survey known to Dr. Porter's students and to the College's administration.

42. On Tuesday, February 20, 2018, in a message sent to the entire College campus, Dean Berry publicly requested that Dr. Porter remove the Survey and apologize to the campus community.  However, two hours later in a phone call, Dean Berry promised to forward some of the complaints to Dr. Porter directly and to provide him with a list of the most "problematic" Survey scenarios, so they could be deleted or amended.  The Dean never sent this information to Dr. Porter.  Dr. Porter awaited this list to no avail before withdrawing the Survey.

43. Data from the Survey's 120 valid responses yielded a surfeit of scientifically valid results:

- The respondents' biographic characteristics predicted their political beliefs, and these beliefs predicted much of the variance in the

12

FILED 11/15/2019 09:51:02 AM
82451-35

perceptions and judgments people make about hostile environments and academic freedom protection.

- A large majority of the respondents stated that they did not express their beliefs on campus because of fear of judgment and retaliation.

- The Survey results revealed that most of the College's current "diversity training" programs did little to affect awareness, attitudes, or perceptions, and one such program appeared to be having a polarizing effect on its participants.

- Respondents did not see the Survey as contributing to a hostile environment, and eighty (80%) percent of them believed academic freedom protected the dissemination of the Survey.

- The Survey results also suggested that at Berea College, race was unrelated to the respondents' attitudes and perceptions about civil rights or academic freedom.

- About a quarter of the Survey's respondents expressed support for denying others (through the use of vocal disruption, physical restraint, vandalism, or violence) the opportunity to express beliefs that they could be considered potentially harmful or hurtful.

- Women rather than men at the College were more likely to express strong activist views. Respondents who endorsed the need for hostile environment protection were also more likely to express support for academic freedom.

- However, judgments about hostile environments and academic freedom protection garnered from scenario responses were significantly negatively correlated. What respondents claimed to be true was just the opposite of the pattern of what their responses to the scenarios showed to be true.

44. Therefore, the Survey provided valid psychological evidence that because beliefs or viewpoints determine one's perception of hostility, relying primarily on subjective reports of offense can be misleading. The College administration's interest

Filed          19-CI-00060    05/13/2019          David M. Fernandez, Madison Circuit Clerk

in suppressing this result was clear, given the past disciplinary and civil rights controversies.

45. On Wednesday, February 21, 2018, Dean Berry summoned Dr. Porter and his academic division chair to the Dean's office, where Dean Berry advised Dr. Porter that charges of "incompetence" would be brought against him. Pursuant to page 121 of the Faculty Manual concerning procedure in such an instance, Dr. Porter asked to discuss the matter. Dean Berry stated that the time for discussion had ended two days earlier when Dr. Porter had not immediately withdrawn the Survey and apologized to the campus.

46. Dean Berry presented the charges against Dr. Porter to the FSC at a hearing the next day, without notice to, or an appearance by, Dr. Porter. A majority of the FSC concurred with Dean Berry and recommended termination. Dean Berry claimed that the Survey was only an instrument of malicious retaliation against Dr. Messer's grievants. Dean Berry did not inform the Committee of the Survey's academic and scientific purpose or value. The College engaged in no investigation of the charges against Dr. Porter before the majority of the FSC voted to support termination.

47. Shortly thereafter, President Roelofs summarily suspended Dr. Porter without providing any opportunity for Dr. Porter to defend his actions. The College reassigned his classes to other faculty members. It prohibited him from communicating with students, labeled him as "dangerous" to the students, and banished him from campus. During the ten weeks between the publication of the Survey and the eventual FAC hearing, President Roelofs and Dean Berry repeatedly refused Dr. Porter's requests to specify the "danger" Dr. Porter supposedly posed to others which justified his suspension. The College refused any conversation aimed at

14

informally mediating the issues involved. The College also rebuffed Dr. Porter's requests for clarification of the nature of the charges against him.

48. The College's administrators, however, treated other faculty who had posted surveys differently than they treated Dr. Porter. In the spring semester of 2018, female faculty in the Student Counseling Center and in the Interracial Education posted surveys about campus attitudes and opinions. The Institutional Review Board (IRB) did not involve itself then, per the College's rules, as those surveys also did not identify particular individuals and did not meet the definition of "human subject research". In Dr. Porter's case, however, the College used an arbitrary and contradictory standard from other inapplicable IRB procedures in the Faculty Manual as a post hoc pretext for President Roelofs' decision to embargo the Survey data. Without allowing Dr. Porter any opportunity to defend his work, the College prohibited him from using the Survey data.

49. In a personal and professional accommodation and in an interest and attempt to calm the turmoil in the Psychology department, on March 11, 2018 Dr. Porter authored and sent an e-mail to each of the grievants in which he offered his sincere apology for any hurt that Dr. Porter may have unintentionally caused or that they may have perceived or suffered as a result of Dr. Porter's preparing and disseminating the Survey. One grievant, Dr. Sarah Jones, acknowledged and accepted this apology; Dr. Williams and Dr. Wyrick did not.

D.  **The SGA's Decision to Give Dr. Porter a Teaching Award, and Dr. Sergent's False Statements and His Retaliatory Efforts Made to Have the Award Overturned.**

50. In the midst of the Survey controversy, the student-members of the Berea College Student Government Association ("SGA") courageously voted to award Dr.

15

Porter its 2018 Student Service Award despite the prevailing politically-motivated agitation against Dr. Porter personally and against his continued tenured employment at the College.

51.   Upon hearing of the SGA's vote to give Dr. Porter the award, defendant Dr. Sergent was angered toward the Association and Dr. Porter, and sought to derail the SGA's decision.  Dr. Sergent's motivation was to punish Dr. Porter and to retaliate against him for his past support of Dr. Messer and for his dissemination of the Survey, which Dr. Sergent falsely referred to as a "personal attack" on his wife for her prior grievances against Dr. Messer.

52.   Accordingly, on April 8, 2018 at 6:23 p.m. through April 9, 2018 at 12:09 a.m., Dr. Sergent, purportedly acting as a "Faculty Advisor to the SGA," used his College e-mail address and the College's computer network to send a series of e-mails to SGA board members, and particularly one student, Yabsira Ayele (who was enrolled in Dr Porter's PSY 210 class and had participated in the development and distribution of the Survey),vehemently attacking their decision to give Dr. Porter the award and making false statements linking Dr. Messer, Dr. Porter's advocacy for Dr. Messer, and the Survey.   Dr. Sergent's emails also threatened the SGA board members with negative educational and career repercussions if they gave the award to Dr. Porter (*See* Exhibit 1).

53.   Specifically, Dr. Sergent, in a retaliatory attempt to discredit Dr. Porter in front of the students and to injure Dr. Porter's academic career at the College, falsely stated in these e-mails that Dr. Porter had fraudulently defended the alleged unlawful and discriminatory remarks of Dr. Messer under the guise of academic freedom:

> Porter supported Wayne Messer throughout a Title IX/VII complaint this last year that was upheld against Messer at every level, including appeals, in which Messer was found guilty of creating a hostile work environment for racist, sexist, and homophobic comments. Messer was

16

removed as chair of the Psychology Department and removed from his office near the other Psychology faculty members as an outcome of his actions. Porter argued on Messer's behalf that the racist, sexist, homophobic comments were academic freedom and that Messer had the right to say those things to colleagues and students. This took place from February 2017 until the present, as Porter has continued to express this view about the case that was fully adjudicated several months ago. In the process of this case, Porter also publicly in writing and in testimony made sexist, disparaging remarks about each of the three female faculty members in Psychology[.]

54. Dr. Sergent, in a retaliatory attempt to discredit Dr. Porter in front of the students and to injure the Dr. Porter's academic career at the College, falsely stated in these e-mails that Dr. Porter in his defense of Dr. Messer had improperly disclosed and purposely mischaracterized Dr. Williams' personal medical information in an attempt to defame her:

> Porter also publicly in writing and in testimony made sexist, disparaging remarks about each of the three female faculty members in Psychology, including disclosing personal medical records of one, which he characterized falsely, rising to the level of slander, libel, and defamation.

55. Dr. Sergent, in a retaliatory attempt to discredit Dr. Porter in front of the students and to injure the Dr. Porter's academic career at the College, falsely stated in these e-mails that Dr. Porter had committed academic fraud and gross violations of professional ethics:

> **The reasons for which Porter has been suspended and is in the process of being fired for cause center on five major wrongful acts.**
>
> **First is academic dishonesty.** The survey he sent out to the whole community was not a valid survey, and he was well aware of that, and made it available to the entire campus community anyway. Even after being told to remove it because of its invalidation (for reasons explained below), he refused.
>
> **Second is gross ethical violations** [sic]. In the survey, Porter included actual cases from this past year's Title IX/VII case against Messer. That is a serious violation of professional ethics in itself. To make it even more unethical, Porter falsely stated in the discloser [sic] section of the survey that the scenarios were not based on any actual events. (**Bold** in original).

17

11/15/2019 09:51:02 AM
82451-35

56.  Dr. Sergent, in a retaliatory attempt to discredit Dr. Porter in front of the students and to injure the Dr. Porter's academic career at the College, falsely stated in these e-mails that Dr. Porter had committed academic fraud and gross violations of professional ethics and was an incompetent psychology professor who had improperly and unprofessionally "manipulated" his students for his own purposes:

> **Third is incompetence along with manipulation of students.** Porter also sent the survey out with students' names attached without having gotten those students express permission, and many among those students had already expressed their own ethical concerns about the survey. Porter has continued to manipulate students--like those in SGA supporting this award--to rally for his cause. Hero-worship is not education; this cultish approach to answering for his unethical acts is yet another level of unethical behavior and breach of the student-teacher relationship. (**Bold** in original).

57.  Dr. Sergent, in a retaliatory attempt to discredit Dr. Porter in front of the students and to injure the Dr. Porter's academic career at the College, falsely stated in these e-mails that Dr. Porter had committed academic fraud and gross violations of professional ethics by violating the College's IRB academic research requirements:

> Fourth is refusal to abide by IRB (Institutional Review Board) and college policies for research. Porter refused to send his survey to the IRB for review as required by college policy (and APA standards for research and ethics). When the IRB did review the survey at the request of the administration, against Porter's objections, the IRB rejected the survey as unethical for the reasons stated above. (**Bold** in original).

58.  Dr. Sergent, in a retaliatory attempt to discredit Dr. Porter in front of the students and to injure the Dr. Porter's academic career at the College, falsely stated in these e-mails that Dr. Porter had committed academic fraud and gross violations of professional ethics and had willfully caused mental and emotional harm to his students and to his colleagues in an effort to divide the College campus for his own political reasons, without apology:

> **Fifth is harm to human subjects (and the campus community).** The people whose personal and private information was made public in the survey have been seriously harmed by Porter's actions and are having to

18

seek care for both physical and mental health that has been damaged willfully by Porter. Contrary to what some students may have claimed, Porter has not apologized for this harm and has made no effort to repair the harm he has caused. By extension, Porter's continued manipulation of students to support him--no matter how much in the wrong he is--has caused serious (if not permanent) rifts between groups of students, and the animosity has spilled over into other classroom space, other campus spaces, and social media. Porter is actively fueling this animosity, among students and among faculty members. (**Bold** in original).

59.  Dr. Sergent, in a retaliatory attempt to discredit Dr. Porter in front of the students and to injure the Dr. Porter's academic career at the College, then reiterated in these e-mails his false statements that Dr. Porter had committed academic fraud and gross violations of professional ethics and that the SGA should rescind the award:

> The second issue at stake, however, regarding the SGA service award, is that the SGA not be reactionary in its decisions. The service award is a serious matter and should not be victim to manipulation by students who themselves are victims of manipulation by an unethical, unrepentant, academically dishonest person who is in process of rightly being fired from Berea College.

60.  After receiving some pushback in a reply e-mail from SGA member Yabsira Ayele, Dr. Sergent sent an e-mail response in which he repeated his false statements that Dr. Porter had committed academic fraud and gross violations of professional ethics and had willfully caused harm to students and faculty at the College, and Dr. Sergent also added an implicit threat of negative academic repercussions for Ayele if the SGA did not rescind the award to Dr. Porter:

> I am not inviting a debate with you or anyone else who would defend the unethical actions of David Porter--they are indefensible just like racism and any other of form discrimination--or any other faculty member who has caused harm to other members of our community. Rewarding those actions and the harm coming from them is not the Berean way. The administration has good reasons for suspension and the case will be adjudicated. I gave my advice and detailed my reasons for that advice. I have no doubt that you believe you are doing what is right. But there are people giving you advice who know a great deal more about this situation than you do. You should heed their advice.

19

61.  After another reply e-mail from Ayele, Dr. Sergent in his next e-mail expressly threatened Ayele with negative academic and career repercussions if the SGA did not rescind the award to Dr. Porter:

> Clearly you have no interest in my advice or the advice of your other faculty advisor, both of whom know much more than you about a great many things directly related to this situation. So I hope you at least listen to those around you among the SGA leadership who are wiser and better informed. One last bit of advice: I would caution you against burning bridges this early in your education, particularly for the wrong side of a cause.

> Do not email me again regarding this issue.

62.  As a proximate result of Dr. Sergent's false statements against him, Dr. Porter has suffered irreparable harm to his reputation, embarrassment, humiliation, severe emotional distress, mental anguish, and physical injury, manifesting in a stroke (cerebral vascular accident) he suffered on November 12, 2018, when he was treated in the emergency room of St. Joseph Berea Hospital, transferred via ambulance to the Neurological Intensive Care Unit and St Joseph Lexington Hospital, and released on November 14th, 2018.  Dr. Porter's consequent prolonged stress and mental anguish has also contributed to his high blood pressure and greatly disturbed sleep patterns.

## CAUSES OF ACTION

### COUNT I vs. Dr. Sergent:

### Defamation Per Se and Defamation Per Quod

63.  Paragraphs 1-62 are hereby restated and incorporated by reference.

64.  Dr. Sergent, in his April 8-9, 2018 emails, made false and defamatory statements, as specified in ¶¶ 52-61 above, falsely accusing Dr. Porter of racist, sexist, homophobic comments and conduct as a professor at the school.

20

65. Dr. Sergent, in his April 8-9, 2018 emails, made false and defamatory statements, as specified in ¶¶ 52-61 above, falsely accusing Dr. Porter of improperly disclosing to the public the personal medical information of Dr. Williams in an attempt to defame her in order to disparage and discredit her personally and professionally.

66. Dr. Sergent, in his April 8-9, 2018 emails, made false and defamatory statements, as specified in ¶¶ 52-61 above, falsely accusing Dr. Porter of committing academic fraud and gross violations of professional ethics in preparing and disseminating a scientifically invalid survey and in including in the Survey actual cases from the proceedings against Dr. Messer, after purposely misstating in the disclosure section that the scenarios were not based on any actual events.

67. Dr. Sergent, in his April 8-9, 2018 emails, made false and defamatory statements, as specified in ¶¶ 52-61 above, falsely accusing Dr. Porter of being an "incompetent" psychology professor who had improperly and unprofessionally "manipulated" his students for his own political purposes.

68. Dr. Sergent, in his April 8-9, 2018 emails, made false and defamatory statements, as specified in ¶¶ 52-61 above, falsely accusing Dr. Porter of violating the College's IRB academic research requirements by refusing to submit the Survey to the IRB for review prior to its dissemination.

69. Dr. Sergent, in his April 8-9, 2018 emails, made false and defamatory statements, as specified in ¶¶ 52-61 above, falsely accusing Dr. Porter of committing academic fraud and gross violations of professional ethics by willfully causing mental and emotional harm to his students and to his colleagues in an effort to divide the College campus for his own political reasons, without apology.

70. Dr. Sergent, in his April 8-9, 2018 emails, made false and defamatory statements, as specified in ¶¶ 52-61 above, falsely accusing Dr. Porter of being "an

21

11/15/2019 09:51:02 AM
62451-35

unethical, unrepentant, academically dishonest person who is in process of rightly being fired from Berea College."

71. Dr. Sergent published these false and defamatory statements in his April 8-9, 2018 emails to multiple persons whom he knew, or should have known, would publish them to many other persons. On information and belief, plaintiff states that this was done. The College community became aware of Dr. Sergent's false narrative.

72. Dr. Sergent published these false and defamatory statements in his April 8-9, 2018 emails with knowledge of their falsity and with actual malice toward Dr. Porter due to Dr. Sergent's sinister or corrupt motives, hatred, revenge, personal ill will, spite and desire to injure and retaliate against Dr. Porter.

73. In the alternative, Dr. Sergent published these false and defamatory statements in his April 8-9, 2018 emails due to Dr. Sergent's gross indifference and recklessness and wanton or wilful disregard of Dr. Porter's right to personal security including in his uninterrupted entitlement to enjoyment of his good reputation in the community.

74. Dr. Sergent's false and defamatory statements in his April 8-9, 2018 emails were defamatory per se as they falsely charged Dr. Porter or imputed to him dishonesty or engagement in fraudulent enterprises and detrimentally reflected upon his character and integrity of a person and subjected him to the loss of public confidence and respect.

75. Dr. Sergent's false and defamatory statements in his April 8-9, 2018 emails were defamatory per se as they imputed to Dr. Porter unfitness to perform the duties of his office or employment or directly tended to prejudice or injure him in his profession, trade, or business.

22

76.  As a result of Dr. Sergent making and publishing the false and defamatory per se statements in his April 8-9, 2018 emails, Dr. Porter is presumed to have suffered general damages to her reputation.

77.  Furthermore, as a result of Dr. Sergent making and publishing the false and defamatory per se statements in his April 8-9, 2018 emails, Dr. Porter has suffered special damages in that Dr. Sergent's e-mails led to the rescission of the SGA teaching award, and Dr. Porter has suffered continuous and irreparable harm to his reputation, embarrassment, humiliation, severe emotional distress, mental anguish, and physical injury, manifesting in his cerebral vascular stroke on November 12, 2018.  Dr. Porter's consequent prolonged stress and mental anguish has also contributed to his high blood pressure, cardiac arrhythmias, and greatly disturbed sleep patterns.

## COUNT II vs. Dr. Sergent:

### Portrayal of Dr. Porter in a False Light

78.  Paragraphs 1-77 are hereby restated and incorporated by reference.

79.  To any extent that Dr. Sergent false statements about Dr. Porter in his April 8-9, 2018 emails are not defamatory per se or defamatory per quod, Dr. Sergent, nonetheless, made the false statements as specified in ¶¶ 52-61 above and published them publically, in order to portray Dr. Porter in a false light and to attribute to him characteristics, conduct or beliefs that are false and which placed him before the public in a false position that is highly offensive to a reasonable person of this Commonwealth.

80.  Dr. Sergent published these false statements in his April 8-9, 2018 emails portraying Dr. Porter in a false light with knowledge of their falsity and with actual

23

DOCUMENT
11/15/2019 09:51:02 AM
82451-35

malice toward Dr. Porter due to Dr. Sergent's sinister or corrupt motives, hatred, revenge, personal ill will, spite and desire to injure and retaliate against Dr. Porter.

81.  In the alternative, Dr. Sergent published these false statements in his April 8-9, 2018 emails portraying Dr. Porter in a false light due to Dr. Sergent's gross indifference and recklessness and wanton or wilful disregard as to the falsity of the statements and as to the false light in which Dr. Porter was placed.

82. Furthermore, as a result of Dr. Sergent making and publishing the false statements in his April 8-9, 2018 emails portraying Dr. Porter in a false light, Dr. Porter has suffered damages in that Dr. Sergent's e-mails led to the rescission of the SGA teaching award, and Dr. Porter has suffered continuous and irreparable harm to his reputation, embarassment, humiliation, severe emotional distress, mental anguish, and physical injury, manifesting in his cerebral vascular stroke on November 12, 2018.  Dr. Porter's consequent prolonged stress and mental anguish has also contributed to his high blood pressure, cardiac arrhythmias, and greatly disturbed sleep patterns.

### **COUNT III vs. Dr. Sergent:**

### **Illegal Retaliation under KRS 344.280(1)**

83.  Paragraphs 1-82 are hereby restated and incorporated by reference.

84.  Under KRS 344.280(1) "[i]t shall be an unlawful practice for a person, or for two (2) or more persons to conspire: (1) To retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this chapter, or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter . . ."

Filed          19-CI-00060     05/13/2019     David M. Fernandez, Madison Circuit Clerk

11/15/2019 09:51:02 AM
82451-35

85.  Dr. Porter acted as Dr. Messer's "adviser" throughout his hostile environment hearing and appeals, as allowed under the Faculty Manual.  Dr. Porter argued that Dr. Messer's alleged infractions were neither severe nor pervasive enough to create a "hostile workplace environment" on the basis of sex or to warrant the punishments levied against him.  Dr. Porter, during the proceedings before the CCHB and the FAC and in correspondence with President Roelofs and with Dean Berry and in an open letter to the campus, expressed his disappointment with the unfairness of the College's processes and the result in Dr. Messer's case, thereby antagonizing the College's administration as well as Dr. Sergent and the grievants who had placed the charges against Dr. Messer.

86.  Upon hearing of the SGA's vote to give Dr. Porter the award, Dr. Sergent was again very angry and spiteful toward him and wanted to derail the SGA's decision. Dr. Sergent wanted to punish Dr. Porter and to retaliate against him for his past support of Dr. Messer and for his dissemination of the Survey, which Dr. Sergent hastily and incorrectly inferred to be an "attack" on his wife for her prior grievances against Dr. Messer.  Dr. Porter's written and spoken opinions did not target or retaliate against any of the grievants.  The concerns he focused on were issues of legitimate public concern about the administrative program and its processes.

87.  In violation of KRS 344.280(1) and in retaliation for Dr. Porter's participation in and defense of Dr. Messer in the prior hostile workplace proceedings, and in an attempt to discredit Dr. Porter in front of the students and to injure Dr. Porter's academic career at the College, Dr. Sergent made the false and defamatory statements against Dr. Porter, in his April 8-9, 2018 emails, as specified in ¶¶ 52-61 above.

88. Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of Dr. Sergent's illegal retaliation against him in violation of KRS 344.280(1), including but not limited to irreparable harm to his reputation, embarassment, humiliation, emotional distress, mental anguish and physical injury, manifesting in his cerebral vascular stroke on November 12, 2018. Dr. Porter's consequent prolonged stress and mental anguish has also contributed to his high blood pressure, cardiac arrhythmias, and greatly disturbed sleep patterns.

WHEREFORE, Dr. Porter hereby respectfully requests this Court enter Judgment against the Defendants on each and all counts in this Complaint and for the following relief, including but not limited to:

1. Compensatory damages in an amount in excess of the minimum jurisdictional limits of this Court;

2. Punitive damages;

3. Interest;

4. Reasonable costs and attorney's fees;

5. All other equitable and legal relief which this Court deems just and due.

6. Plaintiff specifically requests trial by jury on all issues so triable.

Respectfully Submitted,

HON. JOHN F. LACKEY
214 West Main Street
Richmond KY 40475
(859) 575-7206
lackeylaw@att.net

**Attorney for the Plaintiff**

26

11/15/2019 09:51:02 AM
01454-99

*Exhibit 1*

Have heard that SGA did vote for Porter to receive SGA 2017-18 Outstanding Service Award but administration decided Porter was ineligible because he had been placed on suspended status by executive action and that when the college policy states "faculty member" it means "faculty member in good standing" (i.e., not suspended).

**From:** Tyler Sergent **Sent:** Monday, April 9, 2018 12:09 AM
**To:** Yabsira H. Ayele
**Cc:** Osvaldo Flores; Rachel S. Vagts; Sierra N. Turner; Kelley S. Farley; Martin Kameya
**Subject:** Re: Concern about SGA service award

Yabsira,

Until you actually know something about the situation, there is no basis for debate or dialogue. I voiced my advice as part of my role as elected SGA faculty advisor. Again, I am not the only one, and so you need to include Rachel Vagts in your messages.

Clearly you have no interest in my advice or the advice of your other faculty advisor, both of whom know much more than you about a great many things directly related to this situation. So I hope you at least listen to those around you among the SGA leadership who are wiser and better informed.

One last bit of advice: I would caution you against burning bridges this early in your education, particularly for the wrong side of a cause.

Do not email me again regarding this issue.

Dr. Sergent

_____

***F. Tyler Sergent, PhD***
*Assistant Professor*
*General Studies and History*

_____

**From:** Yabsira H. Ayele **Sent:** Sunday, April 8, 2018 11:51 PM
**To:** Tyler Sergent **Subject:** Re: Concern about SGA service award

You are entitled your opinions I am entitled to mine.
Out of the 3 nominees, Dave was recognized as the most noteworthy. I urge you to let the students choose who served the students best.
I am disappointed in your objection and I believe they are without merit because I do not believe you have read the nominations. The college body nominated and we chose on behalf of them as elected officials.

I quote you the definition of a Biggot: "a person who is obstinately or intolerantly devoted to his or her own opinions and prejudices; especially: one who regards or treats the members of a group with hatred and intolerance".

'I am not inviting a debate with you or anyone else who would defend the unethical actions of David Porter—they are indefensible just like racism and any other of form discrimination—or any other faculty member who has caused harm to other members of our community"

If you are willing to disseminate information, when the persons aforementioned, do not have the ability to defend themselves, is wrong, and that is unethical. To threaten me is unethical. I do not know the entire situation and you don't either. My point is with the information available to the general public the nominations were brought forth and democracy prevailed. If next, you say democracy is unethical then I cannot emphasize how problematic that is.

Our job is to bring these candidates forward, the rest is democracy, you have to respect that.

On a side note, I have no allegiance to anyone but truth and the right of equity and fairness, if I receive information that truly draws Professor Porter in a bad light, I am more than willing to change my stance. Hence my invitation to dialogue.

best,

**Yabsira Ayele** *Speaker of the Senate   Program Specialist- Deep Green Residence Hall* Business Admin & Psychology  CPO 32

*The contents of this e-mail message and any attachments are confidential and are intended solely for addressee.*

---

**From:** Tyler Sergent  **Sent:** Sunday, April 8, 2018 11:07:03 PM
**To:** Yabsira H. Ayele; Rachel S. Vagts; Osvaldo Flores
**Cc:** Sierra N. Turner; Kelley S. Farley  **Subject:** Re: Concern about SGA service award

Yabsira,

There are many faculty and staff members who do this and much more for students and do so without bringing harm to other members of our community and without ever being accused of unfairness or unethical actions. That is the reason for my strong objection to the SGA in my capacity as faculty advisor. If you do not think other faculty members have done every good thing you attribute to David Porter plus much more, than you are uninformed about the unending, tireless work and support the rest of us give to students day in and day out.

I am not inviting a debate with you or anyone else who would defend the unethical actions of David Porter--they are indefensible just like racism and any other of form discrimination--or any other faculty member who has caused harm to other members of our community. Rewarding those actions and the harm coming from them is not the Berean way. The administration has good reasons for suspension and the case will be adjudicated.

I gave my advice and detailed my reasons for that advice. I have no doubt that you believe you are doing what is right. But there are people giving you advice who know a great deal more about this situation than you do. You should heed their advice.

To be clear, SGA has two faculty advisors, and we are both in agreement with our objections. We are attempting to keep the SGA from making a mistake today that will not only bring additional harm to those already harmed and hurting but that will be recorded for all time in Berea College history. I'm an historian and Rachel Vagts is an archivist and the head of the college archives--you do not want to be among a group of

11/15/2019 09:51:02 AM
82451-35

student leaders on the wrong side of Berea's history. Therefore, I urge the SGA to heed our advice.

Tyler

**F. Tyler Sergent, PhD**
*Assistant Professor*
*General Studies and History*

---

**From:** Yabsira H. Ayele **Sent:** Sunday, April 8, 2018 10:22 PM
**To:** Rachel S. Vagts; Tyler Sergent; Osvaldo Flores
**Cc:** Sierra N. Turner; Kelley S. Farley
**Subject:** Re: Concern about SGA service award

Dr. Sergent,
The reason why we chose to nominate Professor Porter is because of the excellence in service to students he has exhibited. His service to students towered over the other candidates.

I ask you when was the last time a professor bought groceries for students because they do not make enough money? When was the lasts time a professor provided housing free of charge for multiple students because they did not make enough money? When was the last time a professor got a student a full ride to Cambridge? When was the last time a professor actively helped students publish papers outside of class?

Professor Porter did all of this and then some more. The choice of nominating Professor Porter was not made lightly, it was made because we believe he deserves this award. For you to bring up something that deals with faculty and an ongoing investigation is not fair, to say the slightest; the senators made their decision cognizant of the available information at hand ( The vote was 7-2-4). Secondly, your characterization of people who disagree with you is not fair. I am more than willing to have a conversation with you one on one if need be. But I do not believe this should be shared any further. I urge that your personal involvement in Faculty matter does not cloud your judgment on Student matters.

With all respect,


**Yabsira Ayele** *Speaker of the Senate*

---

**From:** Rachel S. Vagts **Sent:** Sunday, April 8, 2018 7:13:01 PM
**To:** Tyler Sergent; Osvaldo Flores **Cc:** Sierra N. Turner; Kelley S. Farley; Yabsira H. Ayele   **Subject:** Re: Concern about SGA service award

I would like to echo Tyler's concerns and include my strong objection as well. I did not have as many of the facts of the situation before, so I was reluctant to assert that objection at the Senate meeting, but now that they have been detailed here, I feel compelled to advise you to reconsider Dr. Porter's nomination for the SGA Service award.

All my best, Rachel

11/15/2019 09:51:02 AM
82451-35

**Rachel Vagts** Head of Special Collections & Archives
Hutchins Library - Berea College  Berea, KY 40404
859-985-3267  Rachel_Vagts@berea.edu

**From:** Tyler Sergent  **Sent:** Sunday, April 8, 2018 6:23:35 PM
**To:** Osvaldo Flores  **Cc:** Rachel S. Vagts; Sierra N. Turner; Kelley S. Farley
**Subject:** Concern about SGA service award

Hi, Osvaldo and SGA Executive Committee,

I just heard that the SGA Senate has voted to give David Porter the SGA Service Award
this year. I am compelled to let you know my issues with and vehement objection to this
decision. I ask that you please share this with everyone else on the executive committee
for tonight's meeting.

I am aware that some of Porter's supporters among students--who have publicly said
they will support him "no matter what to the bitter end"--are also involved in SGA. I'm
surprised how they are able to convince others in SGA that Porter's actions aren't so
bad. That's the first issue I want to address with some background and details.

Porter supported Wayne Messer throughout a Title IX/VII complaint this last year that
was upheld against Messer at every level, including appeals, in which Messer was found
guilty of creating a hostile work environment for racist, sexist, and homophobic
comments. Messer was removed as chair of the Psychology Department and removed
from his office near the other Psychology faculty members as an outcome of his actions.
Porter argued on Messer's behalf that the racist, sexist, homophobic comments were
academic freedom and that Messer had the right to say those things to colleagues and
students. This took place from February 2017 until the present, as Porter has
continued to express this view about the case that was fully adjudicated several months
ago. In the process of this case, Porter also publicly in writing and in testimony made
sexist, disparaging remarks about each of the three female faculty members in
Psychology, including disclosing personal medical records of one, which
he characterized falsely, rising to the level of slander, libel, and defamation.

**The reasons for which Porter has been suspended and is in the process of being
fired for cause center on five major wrongful acts.**

**First is academic dishonesty.** The survey he sent out to the whole community was not
a valid survey, and he was well aware of that, and made it available to the entire
campus community anyway. Even after being told to remove it because of its
invalidation (for reasons explained below), he refused.

**Second is gross ethical violations.** In the survey, Porter included actual cases from
this past year's Title IX/VII case against Messer. That is a serious violation of
professional ethics in itself. To make it even more unethical, Porter falsely stated in the
discloser section of the survey that the scenarios were not based on any actual events.

**Third is incompetence along with manipulation of students.** Porter also sent the
survey out with students' names attached without having gotten those students express
permission, and many among those students had already expressed their own ethical
concerns about the survey. Porter has continued to manipulate students--like those in
SGA supporting this award--to rally for his cause. Hero-worship is not education; this
cultish approach to answering for his unethical acts is yet another level of unethical
behavior and breach of the student-teacher relationship.

11/15/2019 09:51:02 AM
82451-35

**Fourth is refusal to abide by IRB (Institutional Review Board) and college policies for research.** Porter refused to send his survey to the IRB for review as required by college policy (and APA standards for research and ethics). When the IRB did review the survey at the request of the administration, against Porter's objections, the IRB rejected the survey as unethical for the reasons stated above.

**Fifth is harm to human subjects (and the campus community).** The people whose personal and private information was made public in the survey have been seriously harmed by Porter's actions and are having to seek care for both physical and mental health that has been damaged willfully by Porter. Contrary to what some students may have claimed, Porter has not apologized for this harm and has made no effort to repair the harm he has caused. By extension, Porter's continued manipulation of students to support him--no matter how much in the wrong he is--has caused serious (if not permanent) rifts between groups of students, and the animosity has spilled over into other classroom space, other campus spaces, and social media. Porter is actively fueling this animosity, among students and among faculty members.

The second issue at stake, however, regarding the SGA service award, is that the SGA not be reactionary in its decisions. The service award is a serious matter and should not be victim to manipulation by students who themselves are victims of manipulation by an unethical, unrepentant, academically dishonest person who is in process of rightly being fired from Berea College. That students like him is irrelevant; that his colleagues dislike him is irrelevant. Evaluate Porter--and other nominees for the award--as you would evaluate anyone: based on what they do and how they treat others. In this case, giving a service award to David Porter would add additional injury to those who Porter has already injured. This in itself would outweigh the good SGA has accomplished all year long.

Because there are remarkable people at Berea College who are worthy of the SGA service award and whose continuous work is always for the good people at all times (i.e, not unethical, not harmful, not malicious, not getting fired), I'm hoping SGA Senate will reconsider its decision. I know BOR has not yet voted on the matter. As one faculty advisor to SGA and voting member of the Senate and BOR, I will vote against this nomination. I've been so impressed with the work of SGA since my coming to Berea in 2011, and especially over the last two years when I've had the pleasure to work directly and closely with SGA leadership and members. On this particular matter, SGA can and ought to do better.

Sincerely,
Tyler

*F. Tyler Sergent, PhD*

11/15/2019 09:51:13 AM
62451-35



**WYATT, TARRANT & COMBS, LLP**

Lexington Financial Center
250 West Main Street, Suite 1600
Lexington, Kentucky 40507-1746
859.233.2012
Fax: 859.259.0649

Sharon L. Gold
859.288.7443
sgold@wyattfirm.com

May 9, 2019

**VIA ELECTRONIC AND U.S. MAIL**

Debra Ann Doss
Attorney at Law
108 Pasadena Drive
Suite 200
Lexington, KY 40503

Re:     Porter v. Berea College

Dear Debra:

Please allow this letter to serve as a response to your email on May 7, 2019 seeking to depose Yabsira Ayele on May 22, 2019. Both Judge Wilson and I are unavailable on that date and cannot make alternate arrangements given the lack of advance notice. As we consider alternate dates, please be advised that I cannot agree to the scheduling of any depositions until we receive your client's complete discovery responses and documents and have had sufficient time to review same. Furthermore, as I indicated to you previously, I would like to depose the Plaintiff first in accordance with local practice.

On the issue of written discovery, I recently received John Lackey's letter dated May 6, 2019 discussing the deadlines by which each party must respond to the outstanding discovery requests. My colleague Courtney Samford reached out to you on April 3, 2019 and requested an extension on behalf of Berea College to respond to the Plaintiff's first set of interrogatories and requests for production of documents up through and including June 4, 2019, to which you agreed. It appears that John is under the impression that Berea's responses are due on May 31, 2019. Please confirm that Berea's discovery responses are due on June 4, 2019, thereby making the Plaintiff's discovery responses due ten days later on June 14, 2019.

Do not hesitate to contact me if you have any questions or would like to discuss.

Filed          18-CI-00060     05/13/2019          David M. Fernandez, Madison Circuit Clerk

EXHIBIT
D

FILED: A TRUE COPY DOCUMENT
11/15/2019 09:51:13 AM
82451-35


WYATT, TARRANT & COMBS, LLP

Debra Ann Doss
May 9, 2019
Page 2

Sincerely,

WYATT, TARRANT & COMBS, LLP

*Sharon L. Gold* by CKS

Sharon L. Gold

cc:   Judge Wilson
      John F. Lackey

61836110.1
5/9/2019

# John F. Lackey
## Attorney at Law
214 West Main Street
Richmond KY 40475

Email: Lackeylaw @att.net                    Telephone: (859) 575-7206

May 10, 2019

Hon. Sharon L. Gold
Wyatt, Tarrant & Combs
250 West Main Street
Suite 1600
Lexington KY 40507

Re: Porter v. Berea College

Dear Ms. Gold:

Both Debra and I feel that your objection to our deposition on May 22, "given lack of advance notice," is untenable. Your earlier communications indicate three persons, in addition to Mr. Wilson, are representing the College. Surely someone can present in this situation. Accordingly, we will move forward with our planned discovery. Should you suggest alternate dates near the 22nd, we will try to accommodate, but we must accommodate Mr. Ayele as well.

Adverting to your second matter, that of deposing the plaintiff first "in accordance with local practice," we must demur. I am a 52-year practitioner locally, and know of no such policy. Perhaps we can agree to depose both President Roelofs and Dr. David Porter on sequential dates, the second the very next day. What say you?

Your understanding about written discovery is fine with us.

Yours very truly,

John F. Lackey

JL/mc

Mailed and emailed.

RECEIVED
MAY 13 2019
BY:

EXHIBIT
E

TIME_____ FILED _____A.M./P.M.

MAY 13 2019

MADISON CIRCUIT COURT
DAVID FERNANDEZ, CLERK

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
CIVIL ACTION, FILE NO. 19-CI-00060
DIVISION I

Dr. DAVID B. PORTER,                                    PLAINTIFF,

VS.

BEREA COLLEGE                                           DEFENDANT.

AND

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
CIVIL ACTION FILE NO. 19-CI-19-CI-200
DIVISION I

Dr. DAVID B. PORTER,                                    PLAINTIFF,

v.

DR. F. TYLER SERGENT                                    DEFENDANT.

**************************
NOTICE TO TAKE DEPOSITION
**************************

PLEASE TAKE NOTICE that the undersigned will, on Thursday, the 23rd day of May, 2019, beginning at the hour of 4:0o p.m., proceed to take the deposition of the following:  Mr. Yabsira Ayele.  The deposition will be taken at the following location:

OFFICES OF HON. JOHN LACKEY
214 West Main Street
Richmond KY 40475

The deposition will be taken for all purposes permitted by the Kentucky Rules of Civil Procedure, including, without limitation, for the purposes of use in evidence, discovery, and cross-examination.  The deposition will be by both stenographic and video transcription.   Wanda Brown, of Richmond, Kentucky, is the designated Court Reporter for the deposition.

JOHN F. LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475

*****************

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true copy of the foregoing NOTICE upon the following by first class mail:

Hon. Sharon L. Gold
Wyatt, Tarrant & Combs
250 West Main Street
Suite 1600
Lexington KY 40507
ATTORNEY FOR DEFENDANT, Berea College

Hon. Kif H. Skidmore
Stoll Keenon Ogden PLLC
300 West Vine Street, Ste. 2100
Lexington KY 40507
ATTORNEY FOR DEFENDANT, F. Tyler Sergent

HON. DEBRA DOSS
108 Pasadena Dr.
Lexington, Kentucky 40503
(859) 260-1980
debra.doss@qx.net
ATTORNEY FOR PLAINTIFF

Ms. Wanda Brown
Court Reporter
1320 Travis Drive
Richmond KY 40475

This the 12th day of May, 2019.

JOHN F LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475

859:575-7206

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
CIVIL ACTION, FILE NO. 19-CI-00060
DIVISION I

Dr. DAVID B. PORTER,                                            PLAINTIFF,

VS.

BEREA COLLEGE                                                   DEFENDANT.

AND

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
CIVIL ACTION FILE NO. 19-CI-19-CI-200
DIVISION I

Dr. DAVID B. PORTER,                                           PLAINTIFF,

v.

DR. F. TYLER SERGENT                                           DEFENDANT.

****************************
NOTICE TO TAKE DEPOSITION
****************************

PLEASE TAKE NOTICE that the undersigned will, on Thursday, the 23rd day of
May, 2019, beginning at the hour of 4:0o p.m., proceed to take the deposition of the
following:  Mr. Yabsira Ayele. The deposition will be taken at the following location:

OFFICES OF HON. JOHN LACKEY
214 West Main Street
Richmond KY 40475

The deposition will be taken for all purposes permitted by the Kentucky Rules of
Civil Procedure, including, without limitation, for the purposes of use in evidence,
discovery, and cross-examination.  The deposition will be by both stenographic and
video transcription.  Wanda Brown, of Richmond, Kentucky, is the designated Court
Reporter for the deposition.

JOHN F. LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475

RECEIVED
MAY 1 4 2019
BY

*******************

### CERTIFICATE OF SERVICE

I hereby certify that I have served a true copy of the foregoing NOTICE upon the following by first class mail:

Hon. Sharon L. Gold
Wyatt, Tarrant & Combs
250 West Main Street
Suite 1600
Lexington KY 40507
ATTORNEY FOR DEFENDANT, Berea College

Hon. Kif H. Skidmore
Stoll Keenon Ogden PLLC
300 West Vine Street, Ste. 2100
Lexington KY 40507
ATTORNEY FOR DEFENDANT, F. Tyler Sergent

HON. DEBRA DOSS
108 Pasadena Dr.
Lexington, Kentucky 40503
(859) 260-1980
debra.doss@qx.net
ATTORNEY FOR PLAINTIFF

Ms. Wanda Brown
Court Reporter
1320 Travis Drive
Richmond KY 40475

This the 12th day of May, 2019.

JOHN F LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475

859:575-7206

| AOC –025   Doc. Code: RS<br>Rev. 12-95 | COMMONWEALTH OF KENTUCKY | Case No. 2019-CI-00060, Div. I |
|---|---|---|
| Commonwealth of Kentucky<br>Court of Justice | | Court  CIRCUIT |
| CR 45; RCr 7.02 | **SUBPOENA DUCES TECUM** | County MADISON |

Dr. DAVID B. PORTER,                                        BEREA COLLEGE,

**Plaintiff(s)**                                        **Defendant(s)**

1. The Commonwealth of Kentucky to: <u>YABSIRA AYELE</u>
   <u>Berea KY 40403</u>

2. **You are commanded to appear before:**

   [    ] _____ Court
   [    ] The Grand Jury of _____ County
   [ X ] Other  LAW OFFICES OF JOHN F. LACKEY

3. [ X ] At  214 West Main Street
         Richmond KY 40475              4. On the  23rd  day of  May, 2019

                                        at 4:00     p .m.
                                        xx Eastern Time
                                        __ Central Time

5. ____  To testify in behalf of _____

   _X_  To produce  All documents in his possession or control relating to the above-styled
                    action.

   _X_  To Give Depositions.

6. _[signature]_                        JOHN F. LACKEY
   **Signature & Title of Issuing Officer**      **Name of Requesting Attorney**

   Date  5/12/ , 2019                            859: 575-7206
                                        Telephone No.

7. This subpoena was served by delivery of a true copy to: _____
   This the ____ day of _____, 2019.

BY: _____        Title _____

RECEIVED
MAY 14 2019
BY:

EXH : 000003 of 000004

*******************

CERTIFICATE OF SERVICE

I hereby certify that I have served a true copy of the foregoing SUBPOENA

DUCES TECUM upon the following by first class mail:

Hon. Sharon L. Gold
Wyatt, Tarrant & Combs
250 West Main Street
Suite 1600
Lexington KY 40507
ATTORNEY FOR DEFENDANT, Berea College

Hon. Kif H. Skidmore
Stoll Keenon Ogden PLLC
300 West Vine Street, Ste. 2100
Lexington KY 40507
ATTORNEY FOR DEFENDANT, F. Tyler Sergent

HON. DEBRA DOSS
108 Pasadena Dr.
Lexington, Kentucky 40503
(859) 260-1980
debra.doss@qx.net
ATTORNEY FOR PLAINTIFF

Ms. Wanda Brown
Court Reporter
1320 Travis Drive
Richmond KY 40475

This the 14th day of May, 2019.

JOHN F LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475

859;575-7206

TIME: _____ A.M./P.M.

MAY 15 2019

MADISON CIRCUIT COURT
DAVID FERNANDEZ, CLERK

**COMMONWEALTH OF KENTUCKY**

| | |
|---|---|
| AOC –025   Doc. Code:  RS<br>Rev. 12-95 | Case No. 2019-CI-00060, Div. I |
| Commonwealth of Kentucky<br>Court of Justice | Court   CIRCUIT |
| CR 45; RCr 7.02 | County  MADISON |

### SUBPOENA DUCES TECUM

Dr. DAVID B. PORTER,                                       BEREA COLLEGE,

**Plaintiff(s)**                                               **Defendant(s)**

1. The Commonwealth of Kentucky to: YABSIRA AYELE _____
   _____ Berea KY 40403 _____

2. **You are commanded to appear before:**

   [   ] _____ _____ Court
   [   ] The Grand Jury of _____ County
   [ X ] Other  LAW OFFICES OF JOHN F. LACKEY

3. [ X ] At  214 West Main Street _____        4.  On the  23rd  day of  May, 2019
          Richmond KY 40475 _____

                                                    at 4:00 ____ p .m.
                                                    xx Eastern Time
                                                    __ Central Time

5. _____ To testify in behalf of _____

   x   To produce   All documents in his possession or control relating to the above-styled
                    action.

   x   To Give Depositions.

6. _____               JOHN F. LACKEY
   **Signature & Title of Issuing Officer**        _____
                                                   **Name of Requesting Attorney**

                                                        859: 575-7206
   Date   5/12/, 2019                         Telephone No. _____

7. This subpoena was served by delivery of a true copy to: Yabsira Ayele _____
   This the 13 day of _____ , 2019.

   BY: _____        Title _____

*******************

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true copy of the foregoing SUBPOENA

DUCES TECUM upon the following by first class mail:

Hon. Sharon L. Gold
Wyatt, Tarrant & Combs
250 West Main Street
Suite 1600
Lexington KY 40507
ATTORNEY FOR DEFENDANT, Berea College

Hon. Kif H. Skidmore
Stoll Keenon Ogden PLLC
300 West Vine Street, Ste. 2100
Lexington KY 40507
ATTORNEY FOR DEFENDANT, F. Tyler Sergent

HON. DEBRA DOSS
108 Pasadena Dr.
Lexington, Kentucky 40503
(859) 260-1980
debra.doss@qx.net
ATTORNEY FOR PLAINTIFF

Ms. Wanda Brown
Court Reporter
1320 Travis Drive
Richmond KY 40475

This the 12th day of May, 2019.

JOHN F. LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475

859:575-7206

THOMSON REUTERS
WESTLAW  Kentucky Court Rules

Home Table of Contents

**CR 33.01 Availability; procedures for use**
Baldwin's Kentucky Revised Statutes Annotated
Rules of Civil Procedure

Baldwin's Kentucky Revised Statutes Annotated
  Rules of Civil Procedure
    V Depositions and Discovery
      CR 33. Interrogatories to Parties

Kentucky Rules of Civil Procedure (CR) Rule 33.01

# CR 33.01 Availability; procedures for use

Currentness

(1) Any party may serve upon any other party written interrogatories to be answered by the party served or, if the party served is a public or private corporation or a partnership or association or governmental agency, by any officer or agent, who shall furnish such information as is available to the party. Interrogatories may, without leave of court, be served upon the plaintiff after commencement of the action and upon any other party with or after service of the summons upon that party.

(2) Each interrogatory shall be answered separately and fully in writing under oath, unless it is objected to, in which event the reasons for objection shall be stated in lieu of an answer. The answers are to be signed by the person making them, and the objections signed by the attorney making them. The party upon whom the interrogatories have been served shall serve a copy of the answers, and objections if any, within 30 days after the service of the interrogatories, except that a defendant may serve answers or objections within 45 days after service of the summons upon that defendant. The court may allow a shorter or longer time. The party submitting the interrogatories may move for an order under Rule 37.01 with respect to any objection to or other failure to answer an interrogatory.

(3) Each party may propound a maximum of thirty (30) interrogatories and thirty (30) requests for admission to each other party; for purposes of this Rule, each subpart of an interrogatory or request shall be counted as a separate interrogatory or request. The following shall not be included in the maximum allowed: interrogatories requesting (a) the name and address of the person answering; (b) the names and addresses of the witnesses; and (c) whether the person answering is willing to supplement his answers if information subsequently becomes available. Any party may move the court for permission to propound either interrogatories or requests for admission in excess of the limit of thirty (30).

**Credits**
HISTORY: Amended by Order 83-4, eff. 1-1-84; prior amendment eff. 10-1-71; adopted eff. 7-1-53

Rules Civ. Proc., Rule 33.01, KY ST RCP Rule 33.01
Current with amendments received through April 1, 2019.

**END OF DOCUMENT**                          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

© 2019 Thomson Reuters

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
CIVIL ACTION, FILE NO. 19-CI-00060
DIVISION I

Dr. DAVID B. PORTER,                                          PLAINTIFF,

VS.

BEREA COLLEGE                                                DEFENDANT.

AND

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
CIVIL ACTION FILE NO. 19-CI-19-CI-200
DIVISION I

DR. DAVID B. PORTER,                                         PLAINTIFF,

v.

DR. F. TYLER SERGENT                                         DEFENDANT.

***************************
MOTIONS
***************************

Comes the plaintiff, DAVID B. PORTER, by counsel, and moves the Court as follows:

To impose sanctions pursuant to C.R. 11.01, including an ample attorney's fee for plaintiff's attorneys, on account of the frivolous and untimely motions set for hearing on May 16, 2019 by the defendant, Berea College.

Plaintiff attaches hereto and incorporates by reference his hereafter Memorandum of Law.

JOHN F. LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
CIVIL ACTION, FILE NO. 19-CI-00060
DIVISION I

Dr. DAVID B. PORTER,                                                    PLAINTIFF,

VS.

BEREA COLLEGE
                                                                       DEFENDANT.

AND

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
CIVIL ACTION FILE NO. 19-CI-19-CI-200
DIVISION I

DR. DAVID B. PORTER,                                                    PLAINTIFF,

v.

DR. F. TYLER SERGENT                                                    DEFENDANT.

***************************
MEMORANDUM OF LAW
***************************

Defendant, Berea College's, speaking motion of five (5) pages (with ninety six [96] pages of exhibits) was served on counsel for the Plaintiff on Wednesday, May 15, 2019. It was apparently tendered by courtesy copy to the Court on May 14, 2019, "via FedEx Overnight Delivery."

It is basic law that the motion is grossly untimely under C.R. 6.05, and C.R. 6.04, and local rules requiring motions to be filed on or before 12:00 p.m. on the Monday prior to the following motion day on Thursday.

But the speaking motion makes no reference to the civil rules governing the taking of depositions. Those relevant rules are C.R. 30.01 and C.R. 30.02, attached hereto as exhibits. We have highlighted the crucial phrases. Both rules permit Dr. Porter to depose *his own witness,* Yabsira Ayele, at any time thirty (30) days after service of the Summons on the defendant.

Defendant, Berea College, dodged service by certified mail but was at last served by Constable Bruce Thomas on or about February 21, 2019, or 92 days from the date Plaintiff selected for Mr. Ayele's deposition. Defendant's objection to the timeliness of Mr. Ayele's deposition is frivolous.

Plaintiff attaches hereto the courtesy efforts it made to accommodate the defendant with alternate dates—to no avail. Defendant's obduration is also sanctionable.

Finally, Plaintiff notes that the deposition falls uniquely within C.R. 30.02, because Mr. Ayele is a student graduate of Berea College who is beginning his first employment in Saint Louis in June, 2019. He leaves Berea, Kentucky on May 27, 2019. C.R. 30.02 allows, uniquely, for the taking of a deposition where

> ...the person to be examined is about to go out of the state and will be unavailable for examination unless his deposition is taken before expiration of the 30-day period.

Defendant, Berea College's, Memorandum acknowledges the unavailability of Mr. Ayele beginning on May 27, 2019.

Berea College, however, received 92 days to consider its cross-examination of Mr. Ayele.

RESPECTFULLY SUBMITTED,

JOHN F LACKEY
ATTORNEY AT LAW
214 West Main Street
Richmond KY 40475
ATTORNEY FOR PLAINTIFF

*******************

CERTIFICATE OF SERVICE

I hereby certify that I have served a true copy of the foregoing MOTIONS and

MEMORANDUM OF LAW upon the following by personal delivery and electronic mail

on the following:

Hon. Sharon L. Gold
Wyatt, Tarrant & Combs
250 West Main Street
Suite 1600
Lexington KY 40507
ATTORNEY FOR DEFENDANT, Berea College

And by electronic mail and first class mail upon the following:

Hon. Thomas W. Miller
Miller, Griffin & Marks PSc
271 West Short St., Ste. 600
Lexington KY 40507
ATTORNEY FOR DEFENDANT, F. Tyler Sergent

HON. DEBRA DOSS
108 Pasadena Dr.
Lexington, Kentucky 40503
(859) 260-1980
debra.doss@qx.net
ATTORNEY FOR PLAINTIFF

This the 15th day of May, 2019.

JOHN F LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475

859:575-7206

THOMSON REUTERS
**WESTLAW** Kentucky Court Rules

Home Table of Contents

**CR 30.01 When depositions may be taken**
Baldwin's Kentucky Revised Statutes Annotated
Rules of Civil Procedure

Baldwin's Kentucky Revised Statutes Annotated
  Rules of Civil Procedure
    V Depositions and Discovery
      CR 30. Depositions upon Oral Examination (Refs & Annos)

Kentucky Rules of Civil Procedure (CR) Rule 30.01

## CR 30.01 When depositions may be taken

Currentness

After commencement of the action, any party may take the testimony of any person, including a party, by deposition upon oral examination. Leave of court, granted with or without notice, must be obtained only if the plaintiff seeks to take a deposition prior to the expiration of 30 days after service of the summons upon any defendant, except that leave is not required (a) if a defendant has served a notice of taking deposition or otherwise sought discovery, or (b) if special notice is given as provided in Rule 30.02(2). The attendance of witnesses may be compelled by subpoena as provided in Rule 45. The deposition of a person confined in prison may be taken only by leave of court on such terms as the court prescribes.

**Credits**
HISTORY: Amended eff. 10-1-71; adopted eff. 7-1-53

**Editors' Notes**

**HISTORICAL AND STATUTORY NOTES**
**Note:** CR 30.01, formerly compiled as CR 26.01, transferred eff. 10-1-71; adopted eff. 7-1-53.

Rules Civ. Proc., Rule 30.01, KY ST RCP Rule 30.01
Current with amendments received through April 1, 2019.

**END OF DOCUMENT**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

© 2019 Thomson Reuters

THOMSON REUTERS
**WESTLAW** Kentucky Court Rules

Home Table of Contents

**CR 30.02 Notice of examination: general requirements; special notice; nonstenographic recording...**
Baldwin's Kentucky Revised Statutes Annotated
Rules of Civil Procedure

Baldwin's Kentucky Revised Statutes Annotated
    Rules of Civil Procedure
        V Depositions and Discovery
            CR 30. Depositions upon Oral Examination (Refs & Annos)

Kentucky Rules of Civil Procedure (CR) Rule 30.02

# CR 30.02 Notice of examination: general requirements; special notice; nonstenographic recording; production of documents and things; deposition of organization

Currentness

(1) A party desiring to take the deposition of any person upon oral examination shall give reasonable notice in writing to every other party to the action. The notice shall state the time and place for taking the deposition and the name and address of each person to be examined, if known, and, if the name is not known, a general description sufficient to identify him or the particular class or group to which he belongs. If a subpoena duces tecum is to be served on the person to be examined, the designation of the materials to be produced as set forth in the subpoena shall be attached to or included in the notice.

(2) (a) Leave of court is not required for the taking of a deposition by plaintiff if the notice (i) states that the person to be examined is about to go out of the state and will be unavailable for examination unless his deposition is taken before expiration of the 30-day period, and (ii) sets forth facts to support the statement. The plaintiff's attorney shall sign the notice, and his signature constitutes a certification by him that to the best of his knowledge, information, and belief the statement and supporting facts are true. The sanctions provided by Rule 11 are applicable to the certification.

(b) If a party shows that when he was served with notice under subparagraph (a) of this paragraph (2) he was unable through the exercise of diligence to obtain counsel to represent him at the taking of the deposition, the deposition may not be used against him.

(3) The court may for cause shown enlarge or shorten the time for taking the deposition.

(4) Video recorded depositions may be taken in pending actions and shall be taxed as costs. Notice to take depositions shall be in accordance with the Rules of Civil Procedure. At the deposition the video recording equipment shall be operated by a person qualified to operate such recording equipment, who is to mark the recording with the style and number of the action and the name of the witness and to file a certificate which identifies the said recording.

Video recorded depositions shall be taken under the following conditions:

(a) The party noticing the deposition shall provide the operator with a copy of this rule. At the beginning of the recording of the deposition, the operator of the video recording equipment will focus on each attorney, party and witness present at the taking of the deposition, and such person shall be identified; or the operator may read a statement introducing by name parties to the litigation and the attorneys present without focusing on each person, at the election of the noticing party.

(b) The video recording equipment will remain stationary at all times during the deposition and will not "zoom" in or out on the witness excepting those times during the deposition when the witness is displaying, for the jury's viewing, exhibits or other pieces of demonstrative proof that can only be fairly and reasonably seen on the video recording by use of the equipment "zooming" in on said evidence. The purpose of this clause is so that the video recording equipment will not "zoom" in on a witness solely to give unfair or undue influence upon the words of the witness, and does not apply to the "zooming" in for other purposes described above.

(c) A stenographic transcript, in addition to the video recording, will not be necessary. Any party desiring such a transcript may obtain it at that party's cost.

(d) The video recording shall be kept in the possession of the attorney taking the deposition and will be available for the Court and any and all counsel to view, copy, or compare with a stenographic transcript, if any. If discrepancies appear between the stenographic transcript and the video recording, the discrepancies will be resolved by agreement of counsel or ruling of the Court if counsel cannot agree. The decision on the manner in which to handle the discrepancies, insofar as the video recording is concerned, will be included in the agreement of counsel or ruling of the Court.

(e) All objections will be reserved and shall not be stated on the video recording except for objections relating to the form of the question. Objections to testimony on the video recording will be resolved by agreement of counsel or ruling of the Court if counsel cannot agree. All objections relating to said depositions must be made at least 10 days before trial. An edited version shall be presented at trial.

(f) Admissibility of the video recording may be objected to by counsel if a review of the finished video recording reveals any technical errors giving undue influence to the testimony of the witness which would unfairly prejudice the side objecting, or if the general technical quality of the video recording is so poor that its being viewed by the jury would be unfairly prejudicial to the side so objecting.

(5) The notice to a party deponent may be accompanied by a request made in compliance with Rule 34 for the production of documents and tangible things at the taking of the deposition. The procedure of Rule 34.02 shall apply to the request.

(6) A party may in his notice and in a subpoena name as the deponent a public or private corporation or a partnership or association or governmental agency and describe with reasonable particularity the matters on which examination is requested. In that event, the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which he will testify. A subpoena shall advise a non-party organization of its duty to make such a designation. The persons so designated shall testify as to matters known or reasonably available to the organization. This paragraph (6) does not preclude taking a deposition by any other procedure authorized in these rules.

**Credits**
HISTORY: Amended by Order 2006-09, eff. 1-1-07; prior amendments eff. 10-1-94 (Order 94-1), 1-1-87, 1-1-78, 10-1-71, 7-1-69; adopted eff. 7-1-53

Rules Civ. Proc., Rule 30.02, KY ST RCP Rule 30.02
Current with amendments received through April 1, 2019.

**END OF DOCUMENT**                                                  © 2019 Thomson Reuters. No claim to original U.S. Government Works.

© 2019 Thomson Reuters

# John F. Lackey
## Attorney at Law
214 West Main Street
Richmond KY 40475

---

Email: Lackeylaw @att.net                                    Telephone: (859) 575-7206

---

April 8, 2019

Hon. Sharon L. Gold
Wyatt, Tarrant & Combs
250 West Main Street
Suite 1600
Lexington KY 40507

*Exhibit B*

Re: Porter v. Berea College

Dear Ms. Gold:

I have no objection to moving with all deliberate speed on our lawsuit. We will be completely transparent and candid with you, and, of course, expect the same from your side. I am not, however, willing to agree that the deposition of the plaintiff be scheduled before any fact witnesses. I am sure you would not be willing for Dean Berry or other worthies at Berea College to be deposed before Dr. Porter. We will take that as it comes.

I am scheduled for radiation treatment, which I assume will be successful, next month, as well as an unrelated surgery. I will not be incapacitated, but will be in a diminished capacity for at least two months. I do intend to continue to move my cases along, as my condition allows. If necessary, Ms. Doss can assume first chair.

I trust you will be happy to move this case along in a more considered fashion, if we are also willing to do so. Please keep in close touch with Ms. Doss and myself, and I will do the same. I assume we can avoid any court orders, due to my medical procedures.

Please reflect on these matters, and feel free to call me if you have any further questions.

Yours very truly,

John F. Lackey

JL/mc
cc. Hon. Debra Doss
    Dr. David Porter

# John F. Lackey
## Attorney at Law
214 West Main Street
Richmond KY 40475

Email: Lackeylaw @att.net                     Telephone: (859) 575-7206

May 6, 2019

Hon. Sharon L. Gold
Wyatt, Tarrant & Combs
250 West Main Street
Suite 1600
Lexington KY 40507

Re:  Porter v. Berea College

Dear Ms. Gold:

I received today your Notice of Service for your Interrogatories and Requests for Production of Documents to our client in the above cause. We are working on same, and hope to have preliminary answers and responses by the end of May.

It is our understanding that in your colloquies with Ms. Doss, our co-counsel, it was agreed that our own Interrogatories and Requests, which were served on Berea College, along with the Complaint, would be answered first, having been served first. Accordingly, we await your client's answers and production before we respond. I understand that Ms. Doss and Ms. Gold agreed that the College would serve its answers and responses by May 31st, and that the plaintiff would take an additional ten days to respond.

Please advise me if I have misunderstood.

I assume we need no court orders to settle our dates.

Thank you in advance for your continuing professional courtesies.

Yours very truly,


John F. Lackey

JL/mc
cc. Hon. Debra Doss
    Dr. David Porter

| | COMMONWEALTH OF KENTUCKY | |
|---|---|---|
| AOC –025   Doc. Code: RS<br>Rev. 12-95 | | Case No. 2019-CI-19-CI-200, Div. I |
| Commonwealth of Kentucky<br>Court of Justice | | Court __CIRCUIT__ |
| CR 45; RCr 7.02 | **SUBPOENA DUCES TECUM** | County MADISON |

Dr. DAVID B. PORTER,                                    DR. F. TYLER SERGENT

        **Plaintiff(s)**                                **Defendant(s)**

1. The Commonwealth of Kentucky to: YABSIRA AYELE
                                    Berea KY 40403

2. **You are commanded to appear before:**

   [  ] _____ _____Court
   [  ] The Grand Jury of _____ County
   [ X ] Other LAW OFFICES OF JOHN F. LACKEY

3. [ X ] At 214 West Main Street          4.  **On the** 23rd **day of** May, 2019
          Richmond KY 40475

                                          at 4:00      p .m.
                                          xx Eastern Time
                                          __ Central Time

5. ____ **To testify in behalf of** _____

   _X__ **To produce** All documents in his possession or control relating to the above-styled
                      action.

   _X__ **To Give Depositions.**

6. _____          JOHN F. LACKEY
   **Signature & Title of Issuing Officer**        _____
                                                **Name of Requesting Attorney**

   **Date** 5/12, 2019                          859: 575-7206
                                                **Telephone No.** _____

7. This subpoena was served by delivery of a true copy to: _____
   This the ___ day of _____, 2019.

BY: _____  **Title** _____

*Tues  May 7th 2019*

Hello Sharon,                                    May 7, 2019

It is my understanding from your office that you are in Arizona the rest of this week. However, your assistant Susan advised that if I sent you an email you would be able to respond.

The Plaintiff would like to schedule the deposition of Yabsira Ayele on May 22, 2019, sometime in the morning. This witness recently graduated and is leaving Kentucky at the end of the month. Accordingly, we need to take his deposition before he leaves. Please advise if this date is available.

Thank you,

Debra

Dear Ms. Gold:

Both Debra and I feel that your objection to our deposition on May 22, "given lack of advance notice," is untenable. Your earlier communications indicate three persons, in addition to Mr. Wilson, are representing the College. Surely someone can present in this situation. Accordingly, we will move forward with our planned discovery. Should you suggest alternate dates near the 22nd, we will try to accommodate, but we must accommodate Mr. Ayele as well.

Adverting to your second matter, that of deposing the plaintiff first "in accordance with local practice," we must demur. I am a 52-year practitioner locally, and know of no such policy. Perhaps we can agree to depose both President Roelofs and Dr. David Porter on sequential dates, the second the very next day. What say you?

Your understanding about written discovery is fine with us.

> Yours very truly,
> John F. Lackey

———————————

Hi All,

This is just to confirm that we will all be available for Yabsira's deposition (in Richmond?) on Thursday, 23 May, at 4 pm. I can transport Yabsira to the deposition unless you advise otherwise. Yabsira is residing at 202 Dinsmore, Berea, 40403 where he can be served – with advance notice at 202 349 0437; Yabsira will be available to receive the notice.

Cheers,  dave

———————————

Dear John & Debra,

Yabsira is tentatively planning on departing Berea on 27. He is available May 22 (wed), 23 (Thur), 24 (Fri) or 25 (Sat). Hopefully one of these dates will work.

Cheers,

dave



**WYATT, TARRANT & COMBS, LLP**

Lexington Financial Center
250 West Main Street, Suite 1600
Lexington, Kentucky 40507-1746
859.233.2012
Fax: 859.259.0649

Sharon L. Gold
859.288.7443
sgold@wyattfirm.com

May 9, 2019

**VIA ELECTRONIC AND U.S. MAIL**

Debra Ann Doss
Attorney at Law
108 Pasadena Drive
Suite 200
Lexington, KY 40503

Re:        Porter v. Berea College

Dear Debra:

Please allow this letter to serve as a response to your email on May 7, 2019 seeking to depose Yabsira Ayele on May 22, 2019.  Both Judge Wilson and I are unavailable on that date and cannot make alternate arrangements given the lack of advance notice.  As we consider alternate dates, please be advised that I cannot agree to the scheduling of any depositions until we receive your client's complete discovery responses and documents and have had sufficient time to review same.  Furthermore, as I indicated to you previously, I would like to depose the Plaintiff first in accordance with local practice.

On the issue of written discovery, I recently received John Lackey's letter dated May 6, 2019 discussing the deadlines by which each party must respond to the outstanding discovery requests.  My colleague Courtney Samford reached out to you on April 3, 2019 and requested an extension on behalf of Berea College to respond to the Plaintiff's first set of interrogatories and requests for production of documents up through and including June 4, 2019, to which you agreed.  It appears that John is under the impression that Berea's responses are due on May 31, 2019.  Please confirm that Berea's discovery responses are due on June 4, 2019, thereby making the Plaintiff's discovery responses due ten days later on June 14, 2019.

Do not hesitate to contact me if you have any questions or would like to discuss.



COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
CIVIL ACTION, FILE NO. 19-CI-00060
DIVISION I

Dr. DAVID B. PORTER,                                    PLAINTIFF,

VS.

BEREA COLLEGE
                                                        DEFENDANT.

AND

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
CIVIL ACTION FILE NO. 19-CI-19-CI-200
DIVISION I

DR. DAVID B. PORTER,                                    PLAINTIFF,

v.

DR. F. TYLER SERGENT                                    DEFENDANT.

***************************
RESPONSE TO MOTIONS OF DEFENDANT,
F. TYLER SERGENT
***************************

Comes the Plaintiff, DAVID B. PORTER, by counsel, and for his Initial Response to the motions of the defendant, F. Tyler Sergent, states as follows:

Until Tuesday, May 14, 2019, Plaintiff was led to believe that the defendant, Mr. Sergent, was represented by Hon. Kif Skidmore of Stoll Keenon Ogden PLLC. Without prior notice to Plaintiff, defendant Sergent changed counsel by notice received by Plaintiff's counsel on May 15, 2019.

In the meanwhile, defendant Sergent has been drafting an eighteen (18) page memorandum to dismiss, without reference to which civil rule it relies upon. This memorandum was drafted by the new counsel for Mr. Sergent, first identified to Plaintiff on May 14, 2019. We don't practice bushwhacking in the Madison Circuit.

Defendant Sergent's counsel practices under Fayette County rules that are unfamiliar to Plaintiff's counsel.

In addition to defendant Sergent's Notice to Substitute Counsel, he has filed, on May 14, 2019, three motions to be heard on May 16, 2019.  We noted in our Memorandum of Law responding to the Motion of Berea College that its (and Sergent's) motions are grossly untimely under the Civil Rules and the local rules.

The motions are also without merit, because of the clear allowance of C.R. 30.02 to take the deposition of a person who will be outside the state of Kentucky. Sergent argues that no notice was served on the (new) counsel for Mr. Sergent.  But, had the new counsel notified Plaintiff of its employment while it was drafting its 18 page memorandum, that notice would have been given.

Finally, Mr. Sergent's counsel makes the ad hominem claim in its "Motion for Protective Order..." that it is "unheard of to set a deposition before a ruling on a Motion to Dismiss."  This is a strange argument coming from a lawyer who knows better.  Kentucky lawyers take depositions often before rulings on such motions—even in Madison County.

JOHN F. LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475

*******************

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true copy of the foregoing RESPONSE upon the following by personal delivery and electronic mail on the following:

Hon. Sharon L. Gold
Wyatt, Tarrant & Combs
250 West Main Street
Suite 1600
Lexington KY 40507
ATTORNEY FOR DEFENDANT, Berea College

And by electronic mail and first class mail upon the following:

Hon. Thomas W. Miller
Miller, Griffin & Marks PSC
271 West Short St., Ste. 600
Lexington KY 40507
ATTORNEY FOR DEFENDANT, F. Tyler Sergent
pwoodall@kentuckylaw.com

HON. DEBRA DOSS
108 Pasadena Dr.
Lexington, Kentucky 40503
(859) 260-1980
debra.doss@qx.net
ATTORNEY FOR PLAINTIFF

This the 15th day of May, 2019.

JOHN F LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475

859:575-7206

11/15/2019 09:51:40 AM
82451-35

*ELECTRONICALLY FILED*

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
DIVISION I
CIVIL ACTION NO. 19-CI-00060

Dr. DAVID B. PORTER                                                    PLAINTIFF

v.

BEREA COLLEGE                                                       DEFENDANT

## RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR RULE 11 SANCTIONS AND COMBINED REPLY IN SUPPORT OF DEFENDANT BEREA COLLEGE'S MOTION FOR PROTECTIVE ORDER

Comes the Defendant, Berea College ("Berea"), by counsel, and hereby states as follows as its Response in Opposition to Plaintiff Dr. David B. Porter's ("Porter" or "Plaintiff") Motion for Rule 11 Sanctions and its Reply in Support to Berea's Motion for Protective Order:[1]

### I.     Plaintiff's Rule 11 Motion for Sanctions is Frivolous

Plaintiff's motion for sanctions under Rule 11 is completely inappropriate. Not only are Plaintiff's counsel's substantive assertions factually and legally incorrect, but they are themselves indicative of poor form in interaction with his fellow lawyers. The Kentucky Bar Association's Code of Professional Courtesy ("CPC"), in pertinent part, provide that: "A lawyer should not seek sanctions against . . . another attorney unless necessary for the protection of a client and fully justified by the circumstances, not for the mere purpose of obtaining tactical advantage." It unfortunately appears counsel has elected to pursue this precise path that the Bar Association so strongly frowns upon.

---

[1] Plaintiff did not file a "Response" to Berea's Motion for Protective Order. Instead, he filed a Rule 11 Sanctions motion. To the extent the Court construes Plaintiff's Motion for Sanctions as a Response, Berea files this combined response in opposition to Plaintiff's sanctions motion, as well as reply to Berea's motion.

The express bases for this motion appear to be twofold:  (1) that Berea's Motion for Protective Order to Stay Yabsira Ayele's ("Ayele") Deposition was "grossly untimely" filed; and (2) that Berea's motion is "frivolous" and a "waste of resources."

Addressing Plaintiff's first point, Kentucky Rule of Civil Procedure 6.04(1) provides that "A written motion, other than one which may be heard ex parte, and notice of the hearing thereof shall be served a *reasonable time* before the time specified for the hearing, unless a specific period is fixed by these rules or by order of the Court." The Madison Circuit Court Local Rules offer clarity on what amounts to "reasonable time" in this circuit. Local Rule 2.13 provides that "[a]ll cases must be placed on the Motion Docket by the close of business on the Monday preceding the regular Motion Day." Contrary to Plaintiff's assertion, there is absolutely nothing under either Rule 6.04 or the Local Rules specifying that any motion to be heard on the regular Motion Day must be filed by noon on Monday.

In this case, Berea's Motion was electronically filed on Monday, May 15, 2019 at 5:09 p.m. **(See Notice of Electronic Filing, Exhibit A hereto).**  Courtesy copies were electronically mailed to Plaintiff's counsel that evening shortly after filing the Motion, and Berea sent the Court a courtesy copy via overnight delivery, as well as sending paper copies to counsel.   **(Gold Email to Plaintiff's Counsel attaching Motion dated May 13, Exhibit B hereto).**  Berea has complied with the Local Rule and the Civil Rules.

But even if this Court is inclined to disagree, Plaintiff's counsel was electronically mailed a courtesy copy of the Berea's Motion and Berea's counsel sent a courtesy copy to the Court on the date of filing via overnight mail.  Even if Berea's motion was untimely, which Berea disputes, it is hardly "grossly" untimely, and certainly does not give rise to counsel's nuclear decision to seek sanctions.  It is clear Berea made every good faith effort to timely file its

11/15/2019 09:51:40 AM
82451-35

Motion and all Plaintiff needed to do was object on that basis. Instead, Plaintiff's counsel decided to attempt to bully or intimidate Berea into backing off its position. These efforts are not well received.

Furthermore, Berea was forced to file the Motion to be heard at the May 17 motion hour because Plaintiff's counsel was threatening (but had not served copies yet) of a premature deposition to be noticed on May 22 by email on May 10 to my secretary – not myself. **(Plaintiff's Counsel's Email, May 10, Exhibit C hereto)**. Plaintiff's counsel was aware that the undersigned was out of town at a legal conference when he sent the Friday (afternoon) May 10 email that he would proceed with the deposition on May 22 regardless of our objection.

Accordingly, the undersigned drafted a motion and filed it the very next business day to be heard on May 17. The day **after** Berea filed its Motion, the undersigned received notice of the deposition that would occur on a completely different date than ever discussed – May 23. **(Notice of Deposition, Exhibit D)**. If Berea had waited until the next motion hour, which was June 13, the motion would have been moot because the deposition was scheduled for weeks before the next motion hour, on May 23.

Additionally, counsel contends that Berea's motion is "frivolous" and a "waste of resources," while then proceeding to file his own frivolous Rule 11 Motion. The irony is unmistakable. As explained more fully in Berea's Motion, May 7, 2019 is the first date Berea received notice of Plaintiff's intent to depose Ayele, with a suggested date of two weeks later on May 22, 2019. Berea has no objection to deposing Ayele after the parties exchange documents and have time to review them, but objected to that particular date given the infancy of discovery in this case and the unavailability of counsel on that date. On Friday, May 10, 2019, Plaintiff's counsel refused to accommodate those requests and set the deposition for a completely different

date that was never discussed and the undersigned is equally unavailable on that date. Given the short notice of both Plaintiff's desire to depose Ayele and counsel's refusal to acquiesce to Berea's reasonable requests to await the exchange of documents in this case prior to scheduling depositions, Berea was left with little choice. Furthermore, Plaintiff has filed another lawsuit containing some of the same subject matter against a Berea College professor and there is a pending motion to dismiss in that case. Berea's motion was well-grounded in fact and law.[2]

Regardless, these arguments are again best suited for a simple response in opposition to Berea's Motion rather than a distracting motion for sanctions without any basis in law or fact. Rule 11 is not a weapon for a lawyer to brandish for tactical advantage. Plaintiff's counsel's decision to file this motion is a disturbing and unnecessary assault on Berea's integrity, and counsel's bombastic accusations stand in stark contrast to a lawyer's expected professionalism in interacting with fellow members of the Bar. Because it is evident that Berea made every good faith effort to both resolve this dispute between the parties and to file its Motion in accordance with the state and local rules, counsel's Rule 11 motion is without merit and should be denied.

## II.    Berea's Motion for Protective Order Should Be Granted

Plaintiff's response, which is filled with inappropriate personal accusations, provides no valid reason to deny Berea's Motion.

First, Plaintiff did not provide *reasonable notice* of this deposition as is required by CR 30.01. Plaintiff's counsel knew that Mr. Ayele was going to graduate in May presumably for years as Porter was his professor, yet, Porter delayed filing this lawsuit and waited to provide notice of a date that was never discussed barely one week before his deposition - without the benefit of any documents being produced.

---

[2] While CR 30.01 and 30.02 permit depositions before documents are exchanged in certain situations, the rules do not require it and, certainly, in practice they occur after exchange of documents. Furthermore, the Court may enter a protective order for the convenience of the parties, and witnesses and in the interest of justice. CR 26.04.

11/15/2019 09:51:40 AM
82451-35

Second, Mr. Ayele is not "unavailable" for a deposition merely because he is moving from Kentucky to Missouri. The parties will be taking several depositions out of state in this case and Mr. Ayele can either travel here or counsel can travel to him. In addition, merely because Mr. Ayele will start a job does not mean that he is unavailable because the parties can accommodate a later start time or depose him on the weekend. In fact, Mr. Ayele is subject to the Rule 45 subpoena power of the state in which he is located.

Finally, it is common courtesy and in furtherance of efficiency that the parties exchange documents prior to depositions in order to avoid the necessity to re-depose a witness. With the Answer to the First Amended Complaint, Berea sent a letter to Plaintiff's counsel requesting that Plaintiff's deposition be taken first in this case. **(See Berea College Letter, Exhibit E hereto)**. Plaintiff initiated this lawsuit and he should have to submit to a deposition first so that the parties may know what claims he is asserting. Many judges agree that it is more economical and efficient for Plaintiff's deposition to be taken before any fact witnesses, and especially Defendant's deposition. In fact, the rules for economical litigation state that "the plaintiff shall be required to give his deposition before any other discovery takes place unless the defendant elects not to examine the plaintiff." CR 93.01. While this case is not on the "rocket docket", that rule promotes economy, efficiency, and the necessity for duplicative depositions.

If Berea is forced to depose Mr. Ayele with barely one week notice (the notice of deposition arrived yesterday), prior to Plaintiff's deposition, and before documents are exchanged, it will cause great prejudice to Berea and will no doubt require that Berea take Mr. Ayele's deposition again after Plaintiff's deposition and after documents are exchanged. This is most likely a strategic decision to surprise counsel and use this deposition at trial since the witness resides more than 100 miles away. This is an unfair and prejudicial attempt to bypass

11/15/2019 09:51:40 AM
82451-35

common courtesy and practice in exchanging documents before depositions and it will cause Berea great harm at trial due to inability to prepare adequately for the depositions.   Finally, delaying his deposition until after documents are exchanged prevents piecemeal depositions because Mr. Ayele will  certainly be deposed again after the parties have reviewed documents. For the foregoing reasons, and those stated in Berea's Motion, Berea's Motion for a Protective Order should be granted.

Respectfully submitted,

*/s/ Sharon L. Gold*

W. Craig Robertson III
Sharon L. Gold
WYATT, TARRANT & COMBS, LLP
250 West Main Street, Suite 1600
Lexington, KY  40507-1746
859.233.2012
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2019, I electronically filed the foregoing with the Clerk of Court via the e-filing system.  I further certify that I emailed the foregoing document to all non-eFiling participants on May 15, 2019.  On May 16, 2019, I will attempt hand delivery of same to one or more of Plaintiff's counsel at the hearing, and will place in the mail on May 16, 2019.

John F. Lackey
214 West Main Street
Richmond, KY 40475

Debra Ann Doss
108 Pasadena Drive
Lexington, KY 40503
*Counsel for Plaintiff*

*/s/ Sharon L. Gold*

Sharon L. Gold

61838281.1

11/15/2019 09:51:55 AM
82451-35

**Gold, Sharon**

| | |
|---|---|
| **From:** | noreply@kycourts.net |
| **Sent:** | Monday, May 13, 2019 5:11 PM |
| **To:** | Gold, Sharon; Hash, Susan; Gold, Sharon; Vandegrift, Sarah |
| **Subject:** | NEF, (for eFiler) MADISON 19-CI-00060, PORTER, DAVID B  VS. BEREA COLLEGE, Envelope # 1640686 |

Notice of Electronic Filing

Date and Time of Filing: May 13, 2019 at 5:09PM Eastern

eFiler: GOLD, SHARON L. (ATTORNEY FOR DEFENDANT)

Court: MADISON (CIRCUIT )

Case Caption: PORTER, DAVID B VS. BEREA COLLEGE,

Case Number: 19-CI-00060

Envelope Number: 1640686

Notice has been electronically mailed to:

Gold, Sharon - sgold@wyattfirm.com

The following document(s) were included in this eFiling:
MOTION FOR PROTECTIVE ORDER: MTN. FOR PROT. ORDER TO STAY DEPO OF YABSIRA
AYELE
EXHIBIT: EX A - PORTER AMENDED COMPLAINT AGAINST BEREA
EXHIBIT: EX B - EMAIL FROM DEBRA DOSS
EXHIBIT: EX C - PORTER COMPLANT AGAINST DR. SERGENT
EXHIBIT: EX D - LETTER FROM SHARON L. GOLD
EXHIBIT: EX E - LETTER FROM JOHN LACKEY

Additional details: https://kcoj.kycourts.net/efiling/Dashboard/Receipt?caseid=1640686

You may view the document(s) at https://kcoj.kycourts.net/eFilingRetrieval/Home/Package?id=1AF89FF7-0B97-4605-840E-685D1F946351

You may file subsequent case matters at https://kcoj.kycourts.net/efiling/Filing/?parentId=1640686

This was automatically generated by the Kentucky Court of Justice eFiling system. Do not reply to this email.

**Kentucky Court of Justice Confidentiality Notice**

This message and/or attachment is intended only for the addressee and may contain information that is privileged, confidential and/or proprietary work product. If you are not the intended recipient, or an authorized employee, agent or representative of the intended recipient, do not read, copy, retain or disseminate this message or any attachment. Do not forward attachment without the express written consent of the sender. If you have received this message in error,

**EXHIBIT**
**A**

sender immediately and delete all copies of the message and any attachment. Transmission or misdelivery shall not constitute waiver of any applicable legal privilege.

Filed          19-CI-00060      05/15/2019                          David M. Fernandez, Madison Circuit Clerk

11/15/2019 09:52:08 AM
82451-35

**Gold, Sharon**

| | |
|---|---|
| **From:** | Gold, Sharon |
| **Sent:** | Monday, May 13, 2019 5:47 PM |
| **To:** | Debra Doss (debra.doss@qx.net); 'lackeylaw@att.net' |
| **Attachments:** | Motion to be heard thursday.pdf |

We received Plaintiff's response to our objection to the May 22 deposition with your position that you intend to have the deposition regardless.  As a result, we are seeking a protective order from the Court.  The motion is to be heard this Thursday.


**Sharon L. Gold**

Wyatt, Tarrant & Combs, LLP
250 West Main Street, Suite 1600
Lexington KY 40507-1746
Direct: (859) 288-7443
Fax: (859) 259-0649
Email: sgold@wyattfirm.com



Lexington | Louisville | Memphis | Nashville | New Albany | www.wyattfirm.com


EXHIBIT
B

11/15/2019 09:52:18 AM
82451-35

## Gold, Sharon

**From:** Hash, Susan
**Sent:** Friday, May 10, 2019 11:52 AM
**To:** Gold, Sharon; Samford, Courtney
**Subject:** FW: Porter v. Berea College

-----Original Message-----
From: john lackey [mailto:lackeylaw@att.net]
Sent: Friday, May 10, 2019 11:49 AM
To: Hash, Susan
Cc: debra.doss@qx.net
Subject: Re: Porter v. Berea College

Dear Ms. Gold:

Both Debra and I feel that your objection to our deposition on May 22, "given lack of advance notice," is untenable. Your earlier communications indicate three persons, in addition to Mr. Wilson, are representing the College. Surely someone can present in this situation. Accordingly, we will move forward with our planned discovery. Should you suggest alternate dates near the 22nd, we will try to accommodate, but we must accommodate Mr. Ayele as well.

Adverting to your second matter, that of deposing the plaintiff first "in accordance with local practice," we must demur. I am a 52-year practitioner locally, and know of no such policy. Perhaps we can agree to depose both President Roelofs and Dr. David Porter on sequential dates, the second the very next day. What say you?

Your understanding about written discovery is fine with us.

Yours very truly,

John F. Lackey

------------------------------------------------
On Thu, 5/9/19, Hash, Susan <shash@wyattfirm.com> wrote:

Subject: Porter v. Berea College
To: "debra.doss@qx.net" <debra.doss@qx.net>
Cc: "Judge Wilson (wilsonju@berea.edu)" <wilsonju@berea.edu>, "lackeylaw@att.net" <lackeylaw@att.net>
Date: Thursday, May 9, 2019, 10:54 AM



EXHIBIT

11/15/2019 09:52:18 AM
82451-35

Please see attached correspondence
from Sharon Gold.

Thank you.

Susan H. Hash

Legal Secretary
Wyatt, Tarrant & Combs,
LLP

250 West Main Street,
Suite 1600

Lexington KY 40507-1746

Direct: (859)
288-7436

Fax: (859) 259-0649

Email:
shash@wyattfirm.com

Lexington | Louisville | Memphis |
Nashville | New Albany |
www.wyattfirm.com

===================================================================

The information contained in this transmission is intended
only for the person or entity to which it is addressed

and may contain confidential and/or privileged material. If

you are not the intended recipient of this information,

do not review, retransmit, disclose, disseminate, use, or
take any action in reliance upon this information. If you

received this transmission in error, please contact the
sender immediately, destroy all printed copies, and delete

the material from all computers.

==================================================================================

11/15/2019 09:52:44 AM
82451-35

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
CIVIL ACTION, FILE NO. 19-CI-00060
DIVISION I

Dr. DAVID B. PORTER,                                    PLAINTIFF,

VS.

BEREA COLLEGE                                           DEFENDANT.

AND

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
CIVIL ACTION FILE NO. 19-CI-19-CI-200
DIVISION I

Dr. DAVID B. PORTER,                                    PLAINTIFF,

v.

DR. F. TYLER SERGENT                                    DEFENDANT.

***************************
NOTICE TO TAKE DEPOSITION
***************************

PLEASE TAKE NOTICE that the undersigned will, on Thursday, the 23rd day of May, 2019, beginning at the hour of 4:0o p.m., proceed to take the deposition of the following: Mr. Yabsira Ayele. The deposition will be taken at the following location:

OFFICES OF HON. JOHN LACKEY
214 West Main Street
Richmond KY 40475

The deposition will be taken for all purposes permitted by the Kentucky Rules of Civil Procedure, including, without limitation, for the purposes of use in evidence, discovery, and cross-examination. The deposition will be by both stenographic and video transcription. Wanda Brown, of Richmond, Kentucky, is the designated Court Reporter for the deposition.

JOHN F. LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475

RECEIVED
MAY 1 4 2019
BY

EXHIBIT

11/15/2019 09:52:44 AM
82451-35

*******************

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true copy of the foregoing NOTICE upon the

following by first class mail:

Hon. Sharon L. Gold
Wyatt, Tarrant & Combs
250 West Main Street
Suite 1600
Lexington KY 40507
ATTORNEY FOR DEFENDANT, Berea College

Hon. Kif H. Skidmore
Stoll Keenon Ogden PLLC
300 West Vine Street, Ste. 2100
Lexington KY 40507
ATTORNEY FOR DEFENDANT, F. Tyler Sergent

HON. DEBRA DOSS
108 Pasadena Dr.
Lexington, Kentucky 40503
(859) 260-1980
debra.doss@gx.net
ATTORNEY FOR PLAINTIFF

Ms. Wanda Brown
Court Reporter
1320 Travis Drive
Richmond KY 40475

This the 17th day of May, 2019.

JOHN F LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475

859:575-7206

11/15/2019 09:52:44 AM
82451-35

COMMONWEALTH OF KENTUCKY

AOC –025   Doc. Code:  RS
Rev. 12-95

Case No. 2019-CI-00060, Div. I

Commonwealth of Kentucky
Court of Justice

Court  CIRCUIT

CR 45; RCr 7.02

County  MADISON

## SUBPOENA DUCES TECUM

Dr. DAVID B. PORTER,                              BEREA COLLEGE,

**Plaintiff(s)**                                  **Defendant(s)**

1. The Commonwealth of Kentucky to: YABSIRA AYELE
   Berea KY 40403

2. **You are commanded to appear before:**

   [   ] _____ Court
   [   ] The Grand Jury of _____ County
   [ X ] Other  LAW OFFICES OF JOHN F. LACKEY

3. [ X] At  214 West Main Street            4.  **On the**  23rd  **day of**  May, 2019
      Richmond KY 40475

                                              at 4:00        p .m.
                                              xx Eastern Time
                                              __ Central Time

5. ____  To testify in behalf of  _____

   _X__  To produce   All documents in his possession or control relating to the above-styled
                      action.

   _X__  To Give Depositions

6. _____              JOHN F. LACKEY
   Signature & Title of Issuing Officer    _____
                                           Name of Requesting Attorney

   Date  5/12/, 2019                        859: 575-7206
                                           Telephone No._____

7. This subpoena was served by delivery of a true copy to:_____
   This the ____ day of _____, 2019.

BY:_____Title_____

RECEIVED
MAY 14 2019
BY:

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true copy of the foregoing SUBPOENA

DUCES TECUM upon the following by first class mail:

Hon. Sharon L. Gold
Wyatt, Tarrant & Combs
250 West Main Street
Suite 1600
Lexington KY 40507
ATTORNEY FOR DEFENDANT, Berea College

Hon. Kif H. Skidmore
Stoll Keenon Ogden PLLC
300 West Vine Street, Ste. 2100
Lexington KY 40507
ATTORNEY FOR DEFENDANT, F. Tyler Sergent

HON. DEBRA DOSS
108 Pasadena Dr.
Lexington, Kentucky 40503
(859) 260-1980
debra.doss@gx.net
ATTORNEY FOR PLAINTIFF

Ms. Wanda Brown
Court Reporter
1320 Travis Drive
Richmond KY 40475

This the 12th day of May, 2019.

JOHN F LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475

859:575-7206



Lexington Financial Center
250 West Main Street, Suite 1600
Lexington, Kentucky 40507-1746
859.233.2012
Fax: 859.259.0649

11/15/2019 09:8 Sharon L Gold
82451-35                859-288-7443
sgold@wyattfirm.com

March 29, 2019

John F. Lackey
214 West Main Street
Richmond, KY 40475

Debra Ann Doss
Attorney at Law
108 Pasadena Drive
Suite 200
Lexington, KY 40503

RE:   **Dr. David Porter v. Berea College;** Madison Circuit Court, Division I;
**Civil Action No.: 19-CI-0060**

Dear Counsel:

Attached is the Defendant's Answer to the First Amended Complaint, as well as Defendant's first set of discovery requests to Plaintiff. We anticipate needing an extension of time to respond to the discovery requests you sent and ask for an extension to respond until June 4, 2019. We will, of course, provide you the same extension should you need same. Finally, we would like to take the deposition of Dr. Porter first before you take any fact witnesses. I am requesting a teleconference among counsel so that we can get some dates exchanged for Plaintiff's deposition.

Thank you.

Sincerely,

Sharon L. Gold

SG/at
Enclosures



EXHIBIT
E

Filed         19-CI-00060     05/15/2019        David M. Fernandez, Madison Circuit Clerk

| | | |
|---|---|---|
| 09:46 AM | CI | **MADISON** |

| Court | C | **CIRCUIT COURTROOM** | Prep Info.  000000050723  05/14/2019  8:22:00AM  8 |
|---|---|---|---|
| Judge | | **HON. BRANDY O. BROWN** | **05/16/2019 Court Docket** |

Start of docket 1

| 12 | CI | 19-CI-00060 | **PORTER, DAVID B  VS. BEREA COLLEGE,** |
|---|---|---|---|

☐

☐ GOLD, SHARON L.                    ATTORNEY FOR DEFENDANT
☐ ROBERTSON, W. CRAIG III            ATTORNEY FOR DEFENDANT
☐ SAMFORD, COURTNEY R.               ATTORNEY FOR DEFENDANT
☐ LACKEY, JOHN F.,                   ATTORNEY FOR PLAINTIFF              LACKJF
☐ BEREA COLLEGE,                     DEFENDANT / RESPONDENT
☐ PORTER, DAVID B                    PLAINTIFF / PETITIONER
   ☐ Bail Credit Denied    ☐ Danger to self or others    ☐ Flight Risk

```
                              ENTERED
                    TIME_____A.M./P.M.
                         MAY 1 6 2019
                    MADISON CIRCUIT COURT
                    DAVID FERNANDEZ, CLERK
```

**MOTION HOUR**
MOTION FOR PROTECTIVE ORDER                    ATTORNEY FOR DEFENDANT
   *PROTECTIVE ORDER TO STAY*

*Under Submission*
   *1. Deposition w/ Protective Order?*
   *2. Sanctions*

*( No action pending ruling.)*

| | | | | |
|---|---|---|---|---|
| 5/16/2019 | C | 09:46 AM | Page 1 of 2 | Judge Signature: |

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
DIVISION I
CIVIL ACTION NO. 19-CI-00060



TIME_____ ENTERED_____ A.M./P.M.

MAY 2 0 2019 VS

MADISON CIRCUIT COURT
DAVID FERNANDEZ, CLERK

DR. DAVID B. PORTER                                            PLAINTIFF

**ORDER GRANTING MOTION FOR
PROTECTIVE ORDER TO STAY DEPOSITION
AND
ORDER DENYING MOTION FOR SANCTIONS**

V.

BEREA COLLEGE                                              DEFENDANT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This matter comes before the Court on Defendants' Motion for Protective Order to Stay Deposition of Yabsira Ayele and Plaintiff's Motion for Rule 11 Sanctions. After reviewing the record, hearing oral arguments, and reviewing applicable law, and being otherwise sufficiently advised, the Court hereby GRANTS Defendants' Motion for Protective Order to Stay Deposition and DENIES Plaintiff's Motion for Rule 11 Sanctions for the reasons set forth below.

<u>OPINION</u>

"Rule 11 Sanctions are to be used only in extraordinary circumstances." *Yeager v. Dickerson,* 391 S.W.3d 388. Moreover, the imposition of Rule 11 Sanctions is appropriate when the very integrity of the *court* is in issue. *Bell v. Com., Cabinet for Health & Family Servs., Dep't for Cmty. Based Servs.,* 423 S.W. 3d 742, 749 (Ky. 2014). The integrity of this Court has not been violated and Defendants' Motion for a Protective Order is not deemed untimely filed, frivolous or wasteful.

Turning to the merits of Defendants' Motion for Protective Order, this Court finds Plaintiff did not afford Defendants with reasonable notice to take Mr. Ayele's deposition.

Indeed, counsel for the defendants objected to the scheduling of the deposition due to conflicts in their schedules. To obtain relief from the impasse, counsel filed the pending Motion for Protective Order.

RULING

Based upon the foregoing, Defendants' Motion for Protective Order to Stay Deposition is GRANTED and Plaintiff's Motion for Rule 11 Sanctions is DENIED.

This 20th day of May 2019.

*Brandy A. Brown*

MADISON CIRCUIT JUDGE, DIV. I



COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
CIVIL ACTION, FILE NO. 19-CI-00060
DIVISION I

Dr. DAVID B. PORTER,                                    PLAINTIFF,

VS.

BEREA COLLEGE

                                                       DEFENDANT.

****************************
MOTION FOR STATUS CONFERENCE
****************************

Comes the Plaintiff, by counsel, and moves the Court for a Status Conference

setting a schedule of dates when the parties may depose witnesses, and complete

written discovery.

JOHN F. LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475


*******************
NOTICE OF MOTION

PLEASE TAKE NOTICE that the foregoing MOTION will come on for hearing

before Hon. Brandy O. Brown, Madison Circuit Judge, Madison Circuit Court,

Madison County Courthouse, Richmond, Kentucky, on Thursday, June 13, 2019, at

the hour of 9:30 a.m., or as soon thereafter as counsel may be heard.

JOHN F LACKEY
214 West Main Street
Richmond KY 40475
ATTORNEY FOR PLAINTIFF

*********************

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true copy of the foregoing MOTION by first class mail and electronic mail on the following:

Hon. Sharon L. Gold
Wyatt, Tarrant & Combs
250 West Main Street
Suite 1600
Lexington KY 40507
ATTORNEY FOR DEFENDANT, Berea College


HON. DEBRA DOSS
108 Pasadena Dr.
Lexington, Kentucky 40503
(859) 260-1980
debra.doss@qx.net
ATTORNEY FOR PLAINTIFF

This the 24th day of May, 2019.

JOHN F LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475

859:575-7206

| 09:30 AM | CI | | MADISON | Run Date: 06/11/2019  8:02:01AM | DocketList.Rpt |

Court    C          CIRCUIT COURTROO.                                    Prep In   200000051114  06/11/2019  8:01:59AM  4
Judge    HON. BRANDY O. BROWN

**06/13/2019 Court Docket**
Page 3 of 4

5          CI   19-CI-00060          PORTER, DAVID B  VS. BEREA COLLEGE,

☐

☐ GOLD, SHARON L.                         ATTORNEY FOR DEFENDANT
☐ ROBERTSON, W. CRAIG III                 ATTORNEY FOR DEFENDANT
☐ SAMFORD, COURTNEY R.                    ATTORNEY FOR DEFENDANT
☐ LACKEY, JOHN F.,                        ATTORNEY FOR PLAINTIFF                    LACKJF
☐ BEREA COLLEGE,                          DEFENDANT / RESPONDENT
☐ PORTER, DAVID B                         PLAINTIFF / PETITIONER

☐ Bail Credit Denied    ☐ Danger to self or others    ☐ Flight Risk

ENTERED
TIME_____A.M./P.M.

JUN 13 2019

MADISON CIRCUIT COURT
DAVID FERNANDEZ, CLERK

**MOTION HOUR**
  MOTION FOR PRETRIAL CONFERENCE                    ATTORNEY FOR PLAINTIFF

*Status Hearing:* ~~scratched out~~

11-6-19 @ 10:30 am.

06/13/2019    C          09:30 AM          Page 3 of 4          Judge Signature: *Brandy Brown*

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
DIVISION I
CIVIL ACTION NO. 19-CI-00060

DR. DAVID B. PORTER                                                PLAINTIFF

v.

BEREA COLLEGE                                                     DEFENDANT

### DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR STATUS CONFERENCE

Comes the Defendant, Berea College ("Berea"), by counsel, and hereby responds to Plaintiff's motion for status conference as follows:

First, as the Court is aware, the Plaintiff has brought a case with similar facts against a professor of Berea College (*See Dr. David B. Porter v. Dr. F. Tyler Sergent*, Madison Circuit Court, Division I, Civil Action No. 19-CI-00200). Mr. Sergent has filed a motion to dismiss to be heard tomorrow. If that motion is not granted, then the defendants will be filing motions to consolidate because Plaintiff has made allegations in both arising out of the same transaction, occurrence, or series of transactions or occurrences and there are similar questions of fact and law in both. CR 20.01. That issue will need to be briefed by the parties and heard by the Court. Since it is currently unresolved whether the cases will be joined, it is premature to enter a scheduling order when it is uncertain whether additional parties will be added to this case and Mr. Sergent's counsel should be consulted about his schedule should Mr. Sergent be joined.

Second, if Mr. Sergent's motion is granted (thus mooting the reasoning behind filing a motion to consolidate), then Berea does not object to entry of a scheduling order

but the order needs to provide a sufficient amount of time for Berea to defend this case. Plaintiff's First Amended Complaint is 145 paragraphs and 43 pages long, has allegations spanning back to 2005, will involve the exchange of thousands of documents, will involve many experts, and, will likely involve 30-40 depositions. Plaintiff has not even produced documents yet, so Berea is unsure at this time who all will need to be deposed on our side and Plaintiff has not provided Berea a list of persons that Plaintiff wishes to depose. The parties have not agreed on a protective order and there are thousands of additional documents that will be produced.

Accordingly, Berea respectfully asks this Court deny Plaintiff's motion for status conference and delay entry of a scheduling order until the parties know whether the two related matters will be consolidated. In addition, due to the complexity of this case, once a scheduling order is entered, it must provide a sufficient amount of time for discovery (a minimum of nine months) and a sufficient amount of time for expert discovery and written dispositive motions prior to scheduling this for trial. There are many fact witnesses that are currently on sabbatical, some witnesses are no longer employed by the College (and thus will have to be subpoenaed), several reside out of state, and most all of the potential experts reside out of state.

Respectfully submitted,

*/s/ Sharon L. Gold*

W. Craig Robertson III
Sharon L. Gold
Courtney R. Samford
WYATT, TARRANT & COMBS, LLP
250 West Main Street, Suite 1600
Lexington, KY  40507-1746
859.233.2012
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2019, I electronically filed the foregoing with the Clerk of Court via the e-filing system.  I further certify that I mailed the foregoing document by first class mail to all non-eFiling participants.

John F. Lackey
214 West Main Street
Richmond, KY 40475

Debra Ann Doss
108 Pasadena Drive
Lexington, KY 40503
*Counsel for Plaintiff*

*/s/ Sharon L. Gold*

Sharon L. Gold

61847152.1

3

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
CIVIL ACTION, FILE NO. 19-CI-00060
DIVISION I

```
TIME_____FILED_____A.M./P.M.
          JUN 1 3 2019
MADISON CIRCUIT COURT
DAVID FERNANDEZ, CLERK
```

Dr. DAVID B. PORTER,                                     PLAINTIFF,

VS.

BEREA COLLEGE,                                          DEFENDANT.

***************************
PLAINTIFF'S ANSWERS TO DEFENDANT'S INTERROGATORIES
AND REQUESTS FOR PRODUCTION OF DOCUMENTS.
***************************

Comes the Plaintiff, by counsel, and submits the following ANSWERS TO

INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS, of the

defendant, Berea College, as follows:

I.  GENERAL OBJECTIONS.

1.  The number and sub-parts to the Interrogatories and Requests exceed the
    maximum number of Interrogatories and sub-parts permitted by C.R.33.01 (3).
    Plaintiff is without knowledge as to which Interrogatories or Requests should
    be excluded due to their unauthorized number, and accordingly objects to
    them in their entirety.

2.  The defendant's Interrogatories impermissibly seek details of evidence that
    must be sought pursuant to deposition, and impermissibly seek the identity of
    trial witnesses. Cf. *Batemore, Inc. v. Standard Brands*, 7 F.R.D. 445 (D.C., Mo.
    1947); *Sunday v. Gas Service Co.*, 10 F.R.D. 185 (D.C., Mo. 1956); *United
    States v. Proctor & Gamble Co.*, 25 F.R.D. 252 (D.C. N.Y. 1960; and *Wedding
    Tallent Transfer Co.*, 37 F.R.D. 8 (D.C. Ohio 1963, and *Jackson v. Krolin
    Refrigerated Xpress, Inc.*, 49 F.R.D. 134 (D.C. W. Va. 1970).

3.  The defendant's Interrogatories impermissibly seek legal theories on which the
    Plaintiff relies, and Plaintiff's mental impressions or conclusions, which are
    protected by C.R. 26.02 (3) (a).

4. The defendant's Interrogatories impermissibly seek the work product of Plaintiff's attorneys.

5. Defendant asserts the defenses of C.R. 33.03 and C.R. 26.02 (3) (a) and (b), where his answer or production would be derived from business records that are substantially the same burden to secure by the defendant. Where this objection is relevant, the Plaintiff will afford the defendant a reasonable opportunity to audit, inspect, and copy such documents in Plaintiff's possession, at defendant's expense.

*******************

## II. ANSWERS TO DEFENDANT'S INTERROGATORIES.

1. Identify each person responsible for preparing or supplying information for the answers to these Interrogatories and, as to each, identify the specific Interrogatory for which such information was provided.

ANSWER: Dr. David B. Porter and his attorneys of record, Hon. John F. Lackey and Hon. Debra Doss, as to each and every specific Interrogatory.

2. Identify each person who is known to possess, or believed to possess, knowledge or information that is or may be relevant to, support or refute (i) any allegation or claim asserted in the Complaint or the Answer, or (ii) the damages sought by you. For each such person identified state:

(a)     His or her name;

(b)     Present or last known home address and phone number;

(c)     The substance of the knowledge or information possessed;

(d)     The particular paragraph of the Amended Complaint to which such person has knowledge; and

(e)     A statement as to whether you expect to call him or her as a witness at trial.

ANSWER: This Interrogatory is objected to as impermissibly asking for information in its subparts (c), (d) and (e) which is not extended under C.R. 33.01 *et seq.*, and as such, is generally objected to as above. Plaintiff's Answer does not include information acquired through the work product of his attorneys. This Interrogatory/Request is also objected to as overly broad, unduly burdensome, and seeks information covered by the attorney-client privilege and the work product doctrine. Notwithstanding this objection, the following persons are believed to have

some information or knowledge relevant to the case, and the matters inquired about. Unless that information is described in Dr. Porter's Complaint and its exhibits, and the hereafter Answer to Interrogatory No. 2, or in the administrative filings and hearing below, this information is speculative as to Dr. Porter.

(1)   All of the names and addresses of persons mentioned by the defendant in plaintiff's similar interrogatory to defendant, and mentioned by name or reference in plaintiff's Complaint.

(2)   Dr. David B. Porter, of Jackson Street, Berea KY 40403. Telephone: 859-200-0878.

(3)   ~~Mr.~~ Deanna Sergel, of same address and telephone number as (2), above.

(4)   Dr. Wayne Messer, of 3483 Scaffold Cane Road, Berea KY 40403.  Telephone:  202-340-0437.

(5)   Dr. Michael Berheide of 120 Dellwood Drive, Berea KY 40403; Telephone:  859-986-2647.

(6)   Dr. Chad Berry, of unknown telephone no. and address, Berea KY 40403.

(7)   Susan Vaughn and Jim Strand (support staff of Dr. Chad Berry), of unknown telephone no. and address, Berea KY 40403.

(8)   Dr. Lyle D. Roelofs, of unknown telephone no. and address, Berea  KY 40403.

(9)   Dr. Wendy Williams, of 143 Kenneth Rose Rd., Berea KY 40403; Telephone:  859-986-5721.

(10)   Dr. Jay Baltisberger of unknown telephone no. and address, Berea KY  40403.

(11)   Dr. Carrin Vazanna, of 300 Terri Avenue, Berea KY 40403; Telephone:  859-985-7477.

(12)   Dr. John Carlevale, of unknown telephone no. and address.

(13)   Dr. Fred DeRossett, of Merlot Court, Berea KY 40403; Telephone:  859-986-1043.

(14)   Dr. Curtis Sandberg, of unknown telephone no. and address, Georgetown KY.

(15)   Dr. Robert J. Smith, of Peachbloom Hill Road, Berea KY 40403; telephone number unknown.

(16)   Dr. Ian Norris, of unknown telephone no. and address, Berea KY 40403

(17)   Dr. Ed McCormack, of unknown telephone no. and address, Berea KY 40403.

(18)   Dr. Nancy Sowers, of unknown telephone no. and address, Berea KY 40403.

(19)   Dr. Shan Ayres, at unknown telephone no. and address, in Arkansas.

(20)   Mr. Scott Lewis, of unknown address and telephone no.

(21)   Professor Amanda Wyrick, of unknown telephone no. and address,

Berea KY 40403.

(22) Professor Sarah Jones, of unknown telephone no. and address, Berea KY 40403.

(23) Dr. Tyler Sergent, of 143 Kenneth Rose Rd., Berea KY. Telephone 859-986-5721.

(24) Ms. Katie Basham, of unknown telephone no. and address, Berea KY 40403.

(25) Mr. Yabsira Ayele, of unknown telephone no. and address, St. Louis MO.

(26) Professor Jackie Burnside, of unknown telephone no. and address, Berea KY 40403.

(27) Rick Holland, of unknown telephone no. and address, Berea KY 40403.

(28) Professor Jose Pimiento-Bey, of unknown telephone no. and address, Berea KY 40403.

(29) Mr. Robert Yahng, Chairman of Board of Trustees.

(30) Mary-Robert Garrett, Neil Meachem, Peggy Rivate-Sewell, and Lisa Kriner (members of the Berea College Faculty Appeals Committee).

(31) Prof. Eric Pearson (advisor to the prosecutor, and member of the Berea College Faculty Appeals Committee).

(32) Prof. Judy Rector, unknown telephone no. and address, Berea KY 40403. (Faculty Appeals Committee).

(33) Prof. James Butler, unknown telephone no. and address, Berea KY 40403. (Faculty Appeals Committee).

(34) Prof. Linda Strong-Leek, unknown telephone no. and address, Berea KY 40403 (VP for Diversity).

(35) Mr. Scott Lewis, External Consultant re: Title IX case, unknown telephone no. and address.

(36) All members of the Institutional Review Board who provided *post hoc in absentia* opinions concerning Dr. Porter's survey research (currently unknown).

(37) All members (about 12) of campus community who submitted letters to the Dean or President of the College who commented on Dr. Porter's survey.

(38) Ashley Bradley and Rick Holland (Students enrolled in PSY 210).

(39) Other students enrolled in PSY 210 (Sp. 2018); names on roster.

(40) Dr. Katsumi Yuta Dr. S. Lee Ware, Dr. Priyanka Shrestha, and other students who've won state or regional awards, or secured graduate school selection under Dr. Porter's supervision.

(41) Dr. Mariam David M.D., (formerly of Berea College Health Services)

(42) Dr. David A Greene, MD, Geriatric Medicine, Internal Medicine, White House Clinic, 305 Estill St., Berea KY 40403, 859-985-1415.

(43) Dr. John S. Belanger MD, Family Medicine, White House Clinic,

(43A) Dr. Don Hudson, of unknown address, Berea, Ky Tel. (859) 986-9281

(43B) Dr. Amanda Wyrick of unknown address and Tel. # Berea, Ky

(43 D) Mr. *[handwritten]* ... College,
Tel 205-340-0437

480 Main Street, Paint Lick KY 40461, 859-925-2444

(44)   Dr. David O'Reilly, Cardiologist, 2105 Woodley Circle, Lexington
       KY 40502.
(45)   Dr. Michael Schaeffer, Cardiologist, CHI St. Joseph Medical Grp.,
       1401 Harrodsburg Rd., Ste. A 300, Lexington KY 40504. 859-276-4429.
(46)   Dr. William J Schoen, , Cardiologist, CHI St. Joseph Medical Grp.,
       1401 Harrodsburg Rd., Ste. A 300, Lexington KY 40504. 859-276-4429.
(47)   Steve Samuels, USAFA Colleague of Dr. Porter, unknown telephone
       no. and address
(48)   Deena Samuels, unknown telephone no. and address.
(49)   Joe Bagnoli, unknown telephone no. and address.
(50)   Randy Stiles, unknown telephone no. and address.
(51)   Barbara Millis and Scott Simins, Journal Editors, unknown
        telephone no. and address.
(52)   Loretta Breuining, unknown telephone no. and address.
(53)   Katie Herzog, writer/reporter, unknown telephone no. and address.
(54)   Former students of Dr. Porter: Michael Vydrzel, Charles Badger,
       Kaleigh McCoy, Cara Stewart, Alicia Bedolla, Shelby Cansler, unknown
       telephone no. and address.
(55)   Brigadier General Andrew Armangost, USAF Academy,
       unknown telephone no. and address. Tel (859) 617-2731

(56) Mr. Aaron Clark, Cambridge, England

3. Identify each representative of Defendant and/or any third party to whom you have
at any time communicated with regarding your complaints of discrimination and/or
retaliation, and for each communication, please provide the following: (1) the date; (ii)
the individuals present; (iii) the substance of the matter communicated; and (iv) the
relief or response, if any, that you requested.

ANSWER: This Interrogatory is objected to as grossly overbroad and not
required to be answered by C.R. 33.01. Are cousins and lawyers included? It is
unduly burdensome, and seeks irrelevant information that is not likely to lead to the
discovery of admissible evidence. Notwithstanding this objection, Dr. David B. Porter
is unaware of any person not previously identified by name, who has not been
previously so identified in his Complaint or the exhibits thereto, or the names
identified in the Answer to Interrogatory/Request No. 2, above.

4. Identify and describe each and every effort made by you to secure employment
following your termination from Berea, including, but not limited to: (i) each resume or
application submitted; (ii) the name of the prospective employer; (iii) the date of the
resume or application submission; (iv) the date of any and all interviews; and (v) all
other actions taken to attempt to secure employment.

ANSWER: My employment terminated on September 30, 2018.  I have made no written efforts to secure employment since that date.  Because of the action of the defendant, I believe I am unemployable.  A friend inquired for me about whether Eastern Ky. University was hiring in its Psychology Department.  It was not hiring.  My efforts since my termination have been directed at correcting the record concerning my alleged incompetence, and seeking justice for wrongful termination.  I have remained active as a scholar by reading, writing, and engaging with others in academic discussions.  I've read many academic texts in the last year, relating to free speech and academic freedom.  In addition to the essay I submitted to the Berea College paper, *The Pinnacle,* I have prepared and submitted papers for publication to the American Association of Higher Edication's Journal of Academic Freedom, and another professional journal.  In Spring 2019, I sponsored and let a book group of students who read Greg Lukianoff and Jonathan Haidt's *The Coddling of the American Mind.*  I received no compensation for these writings.


5.  Identify and describe each and every source of income or earnings that you have had since your termination from Berea to the present and for each such source of income or earnings, state the following:

a. the basis for such income or earnings;

b. the date you began any employment which is the basis  for such income or earnings;

c. the total amount of earnings or income from each source;

d. your annual salary or hourly wage at any such employment;

e. the number of hours worked per week by you during any such employment; and

f. your benefits during each such employment.

ANSWER:  I have had no income or earnings since my termination from Berea College, except as coming from my limited investments and retirement, which information is objected to for disclosure as being irrelevant to this action and not granted by C.R. 33.01.  My monthly income since termination is:  Social Security: $2,531.10/month; Military Service Retirement Pay:  $2,949.30/month; Veterans

Disability Pay: $276.84/month.  I also draw an unspecified retirement from TIAA-CREF.

6. Identify any person from whom you or any representative, agent, or attorney of yours has taken (or received) any statement, verbal or written, concerning any of the allegations forming the subject matter of this lawsuit and as to each statement, identify;

(a) The person who made the statement;

(b.) The person who received the statement;

(c.)    When and where the statement was take', or received;

(d.)    Whether the statement was verbal' or written;

(e,)    If the statement was verbal, whether you have any documents which memorialize, record or summarize the statement; and

(f.)    If the statement was written, whether the statement was signed and/or sworn. If you possess the statements, please provide copies of them.

ANSWER: I have not taken or received any statement from any person concerning any of the allegations forming the subject matter of this lawsuit. If my attorneys have taken or received any such statement, its disclosure is objected to as being the work product of my attorneys.  Notwithstanding the aforementioned, I have, of course, shared emails and other correspondence not understood to be a "statement" about the "allegations" of this lawsuit with friends and family.

7. Identify all the documents that are referenced in the Amended Complaint.

ANSWER: This interrogatory is objected to in accordance with the "General Objections" stated above.  The documents referenced in the plaintiff's Complaint are identified clearly in the Complaint.  Nevertheless, Plaintiff states that these documents include, without limitation:

1.  Articles relevant to hostile environment and academic freedom issues on college campuses.
2.  Dr. Porter's commentary on prosecution's closing in his termination case.

4. Contributions to Student Academics (list of award winners and graduate school admission/completion). (Student Government Award). *(See Attached Exhibit A)*

5. *Boutique of the Banal*—essay published in *The Pinnacle* in October, 2018.

6. *Journal of Academic Freedom* submission, February, 2019.

7. Analysis of Survey data—submitted April, 2019.

8. Any document listed in the Answer to the mirrored interrogatory propounded to the defendant.

9. *All documents that were a part of the Faculty Appeals Committee, and without limitation, Dr. Ber haide's letter to president Lyle Roelofs; his argument about conduct.*

8. Identify all doctors, counselors, and all other health care professionals who have ever, at any, point in time, treated you for any emotional or mental condition.

ANSWER:  I was treated for mild depression after the crib-death of my 3-month old grandson at USAF Academy in mid-1990s.  There were about three sessions.  I do not have any documentation, and received no medication and no other counselling.

9.  Identify all doctors, counselors, and all other health care professionals who have treated you for any condition or injury during the past ten years.

ANSWER:

1. Primary Care:  Berea College Health Services;
2. Dr. Mariam David, ~~Berea~~ Clinic, Berea KY;   *Dr. Nancy Ryan*
3. Dr. David Greene, Dr. John Ballenger. Berea KY.
4. Dr. David O'Reilly, Dr. Michael Shaffer, Dr. William Schoen (Cardiologists).
5. Assorted medical personnel associated with Dr. Porter's stroke and subsequent hospitalization, St. Joseph Hospital, Nov. 2018.

10.  Identify any pharmacies from which you have procured medication and identify any pharmacy records related to such procurement during the past ten years.

ANSWER: Pharmacies are Walmart, Berea KY; Knights Pharmacy, Berea KY; Express Scripts.

11. Pursuant to CR 8.01, identify and separately describe each and every category of damages you claim against Defendant, including the amount claimed for each category of damages (including, but not limited to, actual damages, compensatory damages, special damages, and punitive damages, as alleged in the prayer for relief of your Complaint). As to punitive damages, please include a description of how the Defendants conduct was "malicious and intentional and oppressive in nature

warranting the imposition of punitive damages pursuant to the provisions of KRS 411.184 and all other applicable law."

ANSWER:   See attached response.

12:    Please state with specificity how you arrived at the figure(s) identified in your Answer to Interrogatory No. 11.

ANSWER:  See attached response.

13.    If you have initiated and/or been a party to any other complaint, lawsuit, administrative charge, governmental charge, bankruptcy proceeding, or other legal proceeding, civil or criminal, then for each please:

(a.) Identify the parties and their attorneys;

(b) Provide the caption or other identifying information for the complaint, lawsuit, court, charge or proceeding;

(c.) Describe in detail the subject of the complaint, charge or proceeding add its disposition and/or status;

(d.) Describe in detail the outcome of the proceeding; and

(e.) Note if the opposing party was ever at any point in time an employer of the Plaintiff.

ANSWER:  Other than the companion lawsuit against Dr. Tyler Sergent, No. 19-CI-200, Madison Circuit Court, and a Dissolution of Marriage case, I have not been a party to any other lawsuit. The Dissolution of Marriage took place in Colorado Springs, CO, in 2007.  It was Case No. 01-DR-1344, County of El Paso.  The other party was Sharon J. Porter.

14.    State whether you have been convicted of a felony. If so, please provide details including, but not limited to, the nature of the crime, sentence received, date of the crime, and parties involved.

ANSWER:  I have never been convicted of a felony.

15:    State whether you have ever declared bankruptcy, and if so, identify the Court in which it was filed, the case number, and the disposition of the case.

ANSWER:  I have not declared bankruptcy.

16.     Identify each expert witness that you intend to have testify at the trial of this matter, including, with regard to each:

(a.)    Name and contact information;

(b.)    Qualifications;

(c)     All documents and/or information provided to him or her;

(d.)    The substance of his or her expected testimony; and

(e.)    Summary of grounds for each such opinion.

        ANSWER:  No expert witnesses have been identified herein.  If and when any such have been identified, the required information will be provided in accordance with the pre-trial orders of the Court.

**INTERROGATORY NO. 9.** Identify all doctors, counselors, and all other health care professionals who have treated you for any condition or injury during the past ten years.

**ANSWER:** BC Health Services: Dr. Mariam David (Dr. Nancy Ryan), Whitehouse Clinic: Dr David Greene, Dr. John Ballenger; Cardio Specialists: Dr. David O'Reilly, Dr. Michael Schaffer, Dr. William Schoen. Assorted medical personnel associated with stroke and subsequent hospitalization at St. Joseph Hospital, November 2018.

**INTERROGATORY NO. 10.** Identify any pharmacies from which you have procured medication and identify any pharmacy records related to such procurement during the past ten years.

**ANSWER:** Walmart, Berea; Knight's Pharmacy (Berea, Ky); for the last 5 (five) years: Express Scripts

**INTERROGATORY NO. 11.** Pursuant to CR 8.01, identify and separately describe each and every category of damages you claim against Defendant, including the amount claimed for each category of damages (including, but not limited to, actual damages, compensatory damages, special damages, and punitive damages, as alleged in the prayer for relief of your Complaint). As to punitive damages, please include a description of how the Defendants conduct was "malicious and intentional and oppressive in nature warranting the imposition of punitive damages        pursuant to the provisions of KRS 411.184 and all other applicable law."

**ANSWER:**

A) Lost earnings and benefits for 6 years; subject to further discovery, estimated lost earnings of $108,000 per year and lost benefits of approximately 24% of annual salary.

B) Humiliation and embarrassment, emotional distress, pain and suffering for remaining life expectancy, 12 years; or $500 per day or $182,500 per year; $2,190,000.00 for life expectancy.

C) Punitive damages based on facts set forth in First Amended Complaint, at discretion of jury. Plaintiff will seek $5,000,000.00.

D) Damage to Plaintiff's physical health; $2.5 million, based on stroke and medical detrimental effects of Defendant's actions as set forth in Amended Complaint.

In addition, Plaintiffs' damages for humiliation and embarrassment, emotional stress, and pain and suffering are based on his close association historically and socially with Berea College and the Berea community where he was born and intended to live the remainder of his life. His father and great-grandfather both ~~were~~ *partner* attended Berea College as students. Plaintiff and his ~~wife~~ still reside in the Berea area and have been isolated and ostracized within the community of Berea because of the public awareness of the unmerited and/or false accusations made by Berea College against Plaintiff, and his wrongful termination. *Plaintiff has also made significant financial gifts to Berea College.*

**INTERROGATORY NO. 12:**      Please state with specificity how you arrived at the figure(s) identified in your Answer to Interrogatory No. 11.

**ANSWER:** See answer to No. 11 hereinabove.

**INTERROGATORY NO. 13.**      If you have initiated and/or been a party to any other complaint, lawsuit, administrative charge, governmental charge, bankruptcy proceeding, or other legal proceeding, civil or criminal, then for each please:

(a.)    Identify the parties and their attorneys;

(b    Provide the caption or other identifying information for the complaint, lawsuit, court, charge or proceeding;

(c.)    Describe in detail the subject of the complaint, charge or proceeding add its disposition and/or status;

(d.)    Describe in detail the outcome of the proceeding; and

(e.)    Note if the opposing party was ever at any point in time an employer of the Plaintiff.

**INTERROGATORY NO. 14:** State whether you have been convicted of a felony. Iran, please provide details including, but not limited to, the nature of the clime, sentence received, date of the crime, and parties involved.

**ANSWER:** I have never been charged or convicted of a felony.

**INTERROGATORY NO. 15:** State whether you have ever declared bankruptcy, and if so, identify the Court in which it was filed, the case number; and the disposition of the case.

**ANSWER:** I have never declared bankruptcy.

**INTERROGATORY NO. 16:** Identify each expert witness that you intend to have testify at the trial of this matter, including, with regard to each:

(a.)   Name and contact information;

(b.)   Qualifications;

(c)    All documents and/or information provided to him or her;

(d.)   The substance of his or her expected testimony; and

(e.)   Summary of grounds for each such opinion,

**ANSWER:** Undetermined at this time but will be disclosed pursuant to pre-trial scheduling order.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST NO. 1:** Produce all documents requested, identified, described or relied upon in the answers to the foregoing Interrogatories or which contain or relate to the information sought by those Interrogatories.

**RESPONSE:** All documents produced by Defendant and those produced herewith.

**REQUEST NO. 2:** Produce all documents that relate, refer to, or evidence your claims and the events at issue in this lawsuit. This includes but is not limited to, all

written statements, tape recordings, and e-mails by you or any other person relating or referring to the claims or events at issue in Ibis action.

**RESPONSE:** Defendant has access to all relevant documents including emails through Berea's email system, to which Plaintiff no longer has access. Moreover, the faculty Appeals Hearing was digitally recorded and in Defendant's possession, as well as all exhibits. Attached hereto are Plaintiff's emails hereto on his Gmail account. Also see Response to Request No. 2.

**REQUEST NO. 3:** Produce a copy of all employment-related complaints you have made against any person or company, including any judicial or administrative complaints, lawsuits, internal grievances, and informal oral or written reports. This request includes any documents that relate to, refer to, or evidence any such complaint.

**RESPONSE:** All complaints related to Dr. Wayne Messer and subsequent treatment of Plaintiff have been previously furnished to Defendant. Plaintiff filed an EEOC complaint in November 2018 which should have been forwarded to Defendant. Other than the two complaints filed and pending in Madison Circuit Court, there are no other complaints related to employment. In Plaintiff's 34 years with USAF, he made no employment related complaints.

**REQUEST NO. 4:** Produce a copy of all employment-related complaints you have made against Defendant or any of Defendant's agents or employees, including any judicial or administrative complaints, lawsuits, internal grievances, and informal and or written reforms. This request includes any documents that relates to, refers to, or evidences any such complaint.

**RESPONSE:** See above response No. 3. Defendant has copied of all such employment related complaints.

**REQUEST NO. 5:** Produce all documents in your possession relating to your employment at Berea, including, but not limited to correspondence, appointment books, calendars, logs, journals, diaries, tape recordings, personnel files, policies, directives, memoranda, notes, e-mail texts, and electronically stored information (hereinafter 'ESI').

**RESPONSE:** Object as overly broad. Notwithstanding, Plaintiff has approximately 50 boxes of class/course materials that Defendant can inspect and copy at its expense. Defendant also has possession of all emails generated received by Plaintiff and related to Plaintiff, to which Plaintiff no longer has access. The only tape recordings are the ones of the Faculty Appeals hearing which are also in Defendant's possession. Plaintiff has no diaries, logs or journals. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. Otherwise, see Response to Request No. 2 hereinabove.

**REQUEST NO. 6:** All documents in your possession given to you by Berea relating to your employment.

**RESPONSE:** See Responses to Requests No. 2 & No. 5.

**REQUEST NO. 7:** Produce all calendar or diary entries or notes of any type that relate, refer to or evidence the events alleged in this lawsuit, the events referenced in your Amended Complaint, answers to the foregoing Interrogatories or communications you had with other persons concerning information related to the facts at issue in this case.

**RESPONSE:** Only Outlook electronic calendar and Moodle website in control/possession of Defendant.

**REQUEST NO. 8:** Produce any recordings of any statement of any employee or agent of defendant regarding the allegations set forth in your Amended Complaint.

**RESPONSE:** None, other than FAC hearing recorded by Defendant and in it's possession.

**REQUEST NO. 9:** Produce all documents, including but not limited to any correspondence, texts or emails you exchanged with any agent, representative, employee, or former employee of l3eroa regarding the allegations set forth in your Amended Complaint.

**RESPONSE:** See response to request No. 2 hereinabove.

**REQUEST NO. 10:** Produce all documents reflecting any communications between you and any current or former employee of Berea regarding your employment with Berea, and/or any allegations in the Amended Complaint.

**RESPONSE:** See response to request No. 2 hereinabove.

**REQUEST NO. 11.** Produce any and all Facebook, Instagram, Twitter, SnapChat, and/or any other social media platform postings, messages, tweets, etc., that relate or refer to die claims and/or allegations asserted in your Amended Complaint.

**RESPONSE:** Facebook only. *It is otherwise objected to as generally above.*

**REQUEST NO. 12:** Produce all documents relating to or reflecting any treatment or evaluation of your physical, medical, emotional or mental health including, but not limited to, all documents reports, records, etc.. of any physician, psychologist, psychiatrist, counselor, or other medical or other professional with whom you consuls as identified in response to Defendant's First Set of Interrogatories.

**RESPONSE:** Plaintiff will provide in his release and authorization for Defendant to obtain treatment records provided Defendant provides copies of same to Plaintiff's counsel.

**REQUEST NO. 13:** Produce any add all documents reflecting, referring, or relating in any way to any complaints you made to Defendant or my agent or employee of Defendant regarding the allegations in the Amended Complaint.

**RESPONSE:** See response to request No. 3 hereinabove.

**REQUEST NO. 14:** Produce any and all documents reflecting, referring, or relating in any way to the identity or knowledge of any persons whom you believe may have knowledge of the alleged incidents or events on which this lawsuit is based.

**RESPONSE:** Object as overly broad. Nevertheless, see Responses to Requests 1, 2, 3, 5 and 8 hereinabove.

**REQUEST NO.15:** Produce a copy of all of your pay  stubs, w-2s, and tax returns for tax years 2013 to the present.

**RESPONSE:** See attached

**(Note - Mr. Porter will provide attachment)**

**REQUEST NO. 16:** Produce all documents, including but not limited to, correspondence, memoranda, notes, letters, e-mails, texts, and ESI, which constitute, refer or relate to any communications with any person regarding any of the claims, defenses and/or factual bases for any claims and/or defenses in this case.

**RESPONSE:** Object as repetitive. See Responses to Requests 1 and 2 hereinabove.

**REQUEST NO. 17:** Produce all documents that relate to, refer to, or evidence any category of damages identified in your answer to Interrogatory Nos. 11 and 12, This request includes, but is not limited to, all documents that relate to, refer to, or evidence your claims for actual damages. compensatory damages (including emotional distress damages), and punitive manages.

**RESPONSE:** All documents produced herewith and by Defendant relate to or reflect various damages that Plaintiff has suffered.

**REQUEST NO. 18:** Produce all exhibits of any type that you intend to use at trial.

**RESPONSE:** Undetermined at this time, will be identified pursuant to a pre-trail scheduling order. However, exhibits will likely include all documents produced herewith and by Defendant.

**REQUEST NO. 19:** Produce the curriculum vitae and/or resume of any person(s) whom you may call as an expert witness in this matter.

**RESPONSE:** Not applicable at this time.

**REQUEST NO. 20**: Produce any and all documents provided by you or your attorney to any expert retained by you or on behalf of you.

**RESPONSE:** Not applicable at this time.

**REQUEST NO. 21:** Produce any and all correspondence reports, or drafts of reports rendered by experts who may testify at the trial of this matter.

**RESPONSE:** Not applicable at this time.

**REQUEST NO. 22:** Produce all non-privileged documents related to your unemployment, including unemployment appeals, that followed your termination from Berea.

**RESPONSE:** No such documents due to Plaintiff's termination due to alleged incompetence.

**REQUEST NO. 23:** Execute HIPAA-complaint authorizations for the release of medical records, psychotherapy notes, and pharmacy records for each health care provider and pharmacy you identified in response to Defendant's First Set of Interrogatories to Plaintiff, releasing your records maintained by those providers and pharmacies. A copy of the authorization forms we attached hereto for your use.

**RESPONSE:** See attachment.

**REQUEST NO. 24:** Produce all documents that you reference in the Amended Complaint.

**RESPONSE:** See Responses to all Requests hereinabove.

**REQUEST NO. 25:** Produce all documents reflecting communications of any kind, including, but not limited to, correspondence, texts, or e-mails between you and current or former students regarding the Survey and allegations in the Amended Complaint.

**RESPONSE:** See Responses to Requests 2, 7, and 9 hereinabove.

**REQUEST NO. 26:** Produce all documents reflecting communications of any kind, including but not limited to, correspondence, texts, or e-mails you have exchanged with any employee or former employee and/or temporary worker of Berea regarding the allegations and defenses in discuss.

**RESPONSE:** Object as repetitive. See Responses to Requests hereinabove.

**REQUEST NO. 27:** Produce any and all documents that relate, refer to, or evidence any EEOC or state agency charge you have made, including any and all communication to and from the EEOC or state agency, as well as any and all

documents statements and affidavits provided by you or on your behalf to the EEOC or state agency.

**RESPONSE:** See attached EEOC documents

***(Note - Mr. Porter is to provide attachment)***

**REQUEST NO. 28:** Produce any and all documents not previously requested which In any way relate to refer to or any in way concern the claims made in this case.

**RESPONSE:** None, other than Response to above Requests.

**REQUEST NO. 29:** Produce all documents that relate, refer to, or evidence any state or federal agency' claims you have made – i.e.,, for unemployment compensation, was compensation, disability, etc. - including all communication to and from the state or federal agencies and at documents, statements and affidavits provided by Wu or on your behalf to the state or bidder agency.

**RESPONSE:** Not applicable.

**REQUEST NO. 30:** Produce any and all notes, diaries, logs, journals, letters, e-mail, texts, calendars, Facebook postings, racetrack messages, tweets, or other social media messages or postings that relate or refer to the claims and/or allegations asserted in this case,

**RESPONSE:** See Responses to above Requests. Also, see davesfc.com website and 1 (one) blog posting, attached.

***(Note - Mr. Porter is to provide attachment)***

**REQUEST NO. 31:** Produce any and all documents which you expect or plan to use in the trial of this case as evidence, for impeachment purposes, to refresh recollection, or otherwise.

**RESPONSE:** Undetermined at this time. Will produce pursuant to pre-trail scheduling order. Will likely include all documents produced by Defendant and Plaintiff herewith.

**REQUEST NO. 32:** Produce any and all documents which reflect, refer or relate to your physical, emotional or mental condition from January 2013 to present

including but not limited to, all medical records, hospital receipts, medical, psychiatric or psychological counseling care or diagnoses and all reports prescriptions or medications of any kind taken by or administered to you, and all Statements of services provided to you for medical treatment or psychiatric psychological or emotional counseling.

**RESPONSE:** See attached release/authorization.

**REQUEST NO. 33:** Produce any and all documents which relate or pertain to your efforts to seek employment or salt-employment, if any, operating the date you were terminated, including but not limited to copies of employment advertisements, job applications, resumes, Letters written to seek employment from prospective employers and any job offers received but net accepted.

**RESPONSE:** Not applicable.

**REQUEST NO. 34:** Produce any and all documents that relate or refer to witnesses or potential witnesses that you intend to call in this case, including lay and expert witnesses.

**RESPONSE:** Plaintiff has not determined who he will call as a witness or expert witness, if any. However, will likely include those persons identified in his Interrogatory Answers herein.

**REQUEST NO. 35:** Produce all documents you prepared for the PSY 210 class for all the years that you taught the class at Berea College. Include in your Response, the syllabus, planning documents notes, surveys, research assignments, seminar outlines, any handouts and any other documents concerning same.

**RESPONSE:** Object as overly broad. Plaintiff taught the PSY 100 class for 12 years. Notwithstanding, attached herewith are various documents related to said course which Plaintiff has been able to locate. Defendant should have possession of much, if not all, of these requested documents.

***(Note – Mr. Porter is to provide attachment)***

*******************

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true copy of the foregoing

INTERROGATORIES AND REQUESTS upon the following by personal delivery:

Hon. Sharon L. Gold
Wyatt, Tarrant & Combs
250 West Main Street
Suite 1600
Lexington KY 40507
ATTORNEY FOR DEFENDANT, Berea College

HON. DEBRA DOSS
108 Pasadena Dr.
Lexington, Kentucky 40503
(859) 260-1980
debra.doss@qx.net
ATTORNEY FOR PLAINTIFF

This the 12th day of June, 2019.

JOHN F LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475

859:575-7206

## SGA Award for Service to Students
## Nomination Application

**Purpose-** The SGA Award for Service to Students is intended to recognize service and help to students, and to promote a spirit of dedication to effecting an enabling environment for them.

**Recipients and Criteria:** The Award may be given annually to a member each of the faculty and staff at Berea College who have exhibited appreciable dedication to teaching, mentoring, advising, supporting, empowering or otherwise facilitating Berea College students to better themselves.

**Selection:** Any member of the college community – students, staff and faculty – may make nominations for the Award. A Review Committee consisting of SGA President and one member from the Senate and the Board of Residents will recommend a recipient, who will then be approved by the Senate and the Board of Residents.

Exhibit A

Nominator Name: Aaron Clark

Name of Nominee: Dr. David B. Porter

Department: Psychology

Faculty ■   Staff □

Briefly share why you have chosen to nominate this individual:

I have put forward Professor David B. Porter for this award because of his unswerving dedication to his students, his unparalleled passion for education, and his lifelong pursuit of truth through scientific inquiry. He has, more than any other professor I have known, endeavored to ensure the continued success of his students. He has labored assiduously to educate, enlighten, and enkindle passion in his students. From working with them to ensure that they get the most of their time here at Berea, to teaching them valuable lessons in the classroom, to providing them with meals and place to stay over the summer, Professor Porter is an educator whose vocation spills the banks of his workplace—he is a servant-leader through and through.

How has your nominee exhibited appreciable dedication to teaching, mentoring, advising, supporting, empowering or otherwise facilitating Berea College students to better themselves?

It was Professor Porter who instilled in me a passionate interest in psychology and behavioral science—an interest which has led me to a great deal of academic and personal success here at Berea College; it was Professor Porter who was always there for me when the going got tough; it was Professor Porter who taught me how to lead through service to others.

In spite of recent events, I refuse to allow the controversy which has erupted in the wake of Professor Porter's issuance of his survey on academic freedom to cause me to forget all that

he has done for me during my time at Berea. He has taught me, nurtured my curiosity, and he initiated the process that led to my acceptance to Cambridge University in England on a full academic scholarship. If an educator is to be judged by the success of his pupils, then Professor Porter is an educator par excellence. If I have achieved anything of note during my time at Berea College, it is because of the invaluable investment Professor Porter made in me. He is the most tolerant, generous professor I know. He personally checks up on students throughout the semester, even when they are not his advisees. He worked to increase the retention rate at Berea, and succeeded. I cannot communicate how amazing Professor Porter is, or the work he has done for this college, its students, and myself.

*********************

## VERIFICATION

I, DR. DAVID B. PORTER, state that I have read my attached answers to the defendant's, Berea College's, Interrogatories, and my responses to the defendant's Interrogatories and Requests, as set forth therein, and, coincident with my stated objections, are true and correct as I verily believe.

DAVID B. PORTER

COMMONWEALTH OF KENTUCKY

                                 SCT

COUNTY OF MADISON

SWORN AND SUBSCRIBED TO before me by DAVID B. PORTER this the 12 day of _June_, 2019.

NOTARY PUBLIC
My commission expires: 7/10/2019

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
CIVIL ACTION, FILE NO. 19-CI-00060
DIVISION I

Dr. DAVID B. PORTER,                                    PLAINTIFF,

VS.

BEREA COLLEGE,                                          DEFENDANT.


*****************************
PLAINTIFF'S SUPPLEMENTAL RESPONSE TO DEFENDANT'S
INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS.
*****************************

Comes the Plaintiff, by counsel, and files the following SUPPLEMENTAL

RESPONSE to his previously filed responses to the defendant's Interrogatories and

Requests for Production of Documents, by submitting a memory stick that is enclosed

in a separate envelope, but attached to this filing, and made a part by reference to the

documents filed on June 13, 2019.

JOHN F. LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475

********************

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true copy of the foregoing SUPPLEMENTAL

RESPONSE by first class mail and electronic mail on the following:

Hon. Sharon L. Gold
Wyatt, Tarrant & Combs
250 West Main Street
Suite 1600
Lexington KY 40507
ATTORNEY FOR DEFENDANT, Berea College

HON. DEBRA DOSS
108 Pasadena Dr.
Lexington, Kentucky 40503
(859) 260-1980
debra.doss@qx.net
ATTORNEY FOR PLAINTIFF

This the 18th day of June, 2019.

JOHN F LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475

859:575-7206

TIME_____ FILED _____A.M./P.M.

JUN 14 2019

MADISON CIRCUIT COURT
DAVID FERNANDEZ, CLERK

PLAINTIFF,

DEFENDANT.

DAVID PORTER V. BEREA COLLEGE
CIVIL ACTION, FILE #19-CI-00060
Div. I
SUPPLEMENTAL RESPONSE
(Memory stick) 6.14.19

)ANT'S
DOCUMENTS.

EMENTAL

rogatories and

k that is enclosed

y reference to the

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
CIVIL ACTION, FILE NO. 19-CI-00060
DIVISION I

```
                                        ┌──────────────────────────────┐
                                        │          FILED               │
                                        │ TIME_____A.M./P.M.      │
                                        │                              │
                                        │        AUG 2 6 2019          │
                                        │ MADISON CIRCUIT COURT        │
                                        │ DAVID FERNANDEZ, CLERK       │
                                        └──────────────────────────────┘
```

Dr. DAVID B. PORTER,                                         PLAINTIFF,

VS.

BEREA COLLEGE

                                                            DEFENDANT.

****************************
MOTION TO AMEND COMPLAINT
****************************

Comes the Plaintiff, Dr. David B. Porter, and, in the event that the motion of Dr.

F. Tyler Sergent, in Madison Circuit Court, Civil Action No. 2019-CI-200, to

consolidate said action with the instant cause in Civil Action No. 2019-CI-0060 is

granted, moves that he be permitted to amend his Complaint to allege that Berea

College is liable for the Plaintiff's defamation and false light claims against Dr. F. Tyler

Sergent, for the additional reason that Dr. Sergent was acting within the nature and

scope of his employment with Berea College when he committed the complained-of

actions, and in its employment, and that Berea College approved, enabled, authorized,

or failed to take reasonable corrective action to mitigate, the complained-of behavior of

Dr. F. Tyler Sergent, and is therefore liable to the Plaintiff.

———————————————

C.R. 15.01 states that after 20 days, "a party may amend his pleading by leave

of court or by written consent of the adverse party, and leave shall be freely given

when justice so requires." This grants easy authority to amend.

> Absent a showing of significant prejudice to the opponent, an amendment to a
> complaint should be liberally granted. Rule 15 provides that leave to amend
> should be freely given when justice so requires. Rule 15 reinforces the principle
> that cases should be tried on their merits rather than on the technicalities of
> pleadings.
> 6 Ky. Practice R. Civ. Proc. Rule 15.01.

Rule 15 has particular relevance after the consolidation of related cases. The Court should allow amendment of the pleadings as a matter of course, if the amendment relates to new matters put at issue in the other case. *See, e.g., Daugherty v. Bell National Bank*, 175 Ky. 513, 194 S.W. 545, 546 (1917) ("when cases are consolidated, a defect in the pleadings of any one of the consolidated cases may be cured and supplied by necessary allegations that are contained in any of the pleadings in the other consolidated cause"); *cf. Strader v. Miller*, 236 Ky. 637, 33 S.W.2d 668, 670 (1930) (plaintiff in one of two consolidated cases had the right to rely upon the allegations made in the pleadings in the other case).

The *Daugherty* and *Strader* opinions are squarely on point here.

If consolidation is granted, Plaintiff's Amended Complaint should be allowed.

JOHN F. LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475
859-575-7206

NOTICE OF MOTION

PLEASE TAKE NOTICE that the foregoing MOTION will come on for hearing before Hon. Brandy O. Brown, Madison Circuit Judge, Madison Circuit Court, Madison County Courthouse, Richmond, Kentucky, on Thursday, September 5, 2019, at the hour of 9:30 a.m., or as soon thereafter as counsel may be heard.

JOHN F LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
CERTIFICATE OF SERVICE

I hereby certify that I have served a true copy of the foregoing MOTION by electronic mail and first class mail upon the following:

Hon. Sharon L. Gold
Wyatt, Tarrant & Combs
250 West Main Street, Suite 1600
Lexington KY 40507
ATTORNEY FOR DEFENDANT, Berea College

Hon. Thomas W. Miller
Miller, Griffin & Marks PSC
271 West Short St., Ste. 600
Lexington KY 40507
ATTORNEY FOR DEFENDANT, F. Tyler Sergent pwoodall@kentuckylaw.com

HON. DEBRA DOSS
108 Pasadena Dr.
Lexington, Kentucky 40503
ATTORNEY FOR PLAINTIFF debra.doss@qx.net

**Courtesy copy delivered to:**
Hon. Brandy O. Brown
Judge, Circuit Court, Div. 1
101 W Main St
Richmond, KY 40475

This the 26th day of August, 2019.

JOHN F LACKEY
ATTORNEY FOR PLAINTIFF

DOCUMENT
11/15/2019 09:53:23 AM
82451-35

*ELECTRONICALLY FILED*

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
DIVISION I
CIVIL ACTION NO. 19-CI-00060

Dr. DAVID B. PORTER                                                      PLAINTIFF

v.

BEREA COLLEGE                                                           DEFENDANT

## RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT

Comes the Defendant, Berea College ("Berea"), by counsel, and hereby states as follows as its Response in Opposition to Plaintiff Dr. David B. Porter's ("Porter" or "Plaintiff") Motion for Leave to File an Amended Complaint:

Porter appears to have filed his Motion as a precautionary measure in the event that the Court consolidates this case with a related matter. Additionally, he neglected to tender a proposed Amended Complaint for consideration. At this point, Porter's Motion is premature and should be denied because: (1) it is contingent on the Court's decision related to consolidation; and (2) Porter failed to tender his proposed Amended Complaint so that Berea can determine whether to object, and the Court can determine whether it is appropriate.

**I.      Porter's Motion is Not Ripe for the Court's Consideration.**

Porter's Motion to Amend his Complaint is, by its terms, completely contingent on this Court's ruling on an outstanding motion to consolidate this case with a related matter, *Dr. David M. Porter v. Dr. F. Tyler Sergent*, Madison Circuit Court, Division I, Civil Action No. 19-CI-200. Indeed, on multiple occasions, he expressly qualifies that the current Motion will only

become necessary "in the event of consolidation." [*See* Porter Motion, p. 1]. Thus, Porter makes it abundantly clear that his Motion is purely hypothetical at this point.

The Motion to Consolidate is pending before the Court. As it currently stands, Porter's contingent Motion to Amend is premature. Because he says he only seeks to amend if the Court first consolidates the cases, Porter's Motion is plainly not yet ripe for decision. Instead, Porter should wait until the Court rules on the outstanding consolidation motion before seeking leave to amend. Until then, Porter's Motion is theoretical and should not be considered.

**II.    Porter's Motion Should Be Denied Because He Did Not Tender a Proposed Amended Complaint for the Court's Consideration.**

More importantly, Porter's Motion should be denied because it does not include a proposed Amended Complaint. It is impossible for Berea to reasonably determine whether to oppose any amendment, or for the Court to determine whether an amendment is appropriate, without both parties first seeing exactly how Porter proposes to amend his Complaint. This is done by the Plaintiff actually tendering the proposed Amended Complaint to the Court.

It is true that courts have liberal discretion to allow amendments to pleadings. *See Caldwell v. Bethlehem Mines Corp.*, 455 S.W.2d 67 (Ky. 1970). However, not all amendments are appropriate. For example, in *Insight Kentucky Partners II, L.P. v. Preferred Automotive Services, Inc.*, 514 S.W.3d 537 (Ky. 2016), Kentucky's Supreme Court held that a trial court may deny the right to amend a pleading on the basis of futility of the amendment itself. There are also other legal grounds, such as failure to state a claim, which make an amendment improper. *See also Kenney v. Hanger*, 269 S.W.2d 866 (Ky. App. 2007); *First Nat. Bank of Cincinnati v. Hartmann*, 747 S.W.2d 614 (Ky. App. 1988). The only way to determine the adequacy of a requested amendment is to actually examine the proposed Amended Complaint itself.

Here, Porter denies the Court, and Berea, any meaningful opportunity to consider his Motion by failing to attach a proposed amended complaint to his Motion. Berea cannot possibly make an educated determination whether to oppose the amended complaint without first examining exactly *how* he proposes to alter his lawsuit. The same is equally true for the Court. The Court should not, and cannot, allow Porter to amend his Complaint without first seeing the proposed Amended Complaint. Because of this glaring procedural deficiency, it is impossible for the Court to exercise its discretion in ruling on Porter's Motion. As such, Porter's Motion should be denied.

## CONCLUSION

For the foregoing reasons, Berea respectfully requests that Porter's Motion to Amend be denied.

Respectfully submitted,

*/s/W. Craig Robertson, III*
W. Craig Robertson III
Sharon L. Gold
WYATT, TARRANT & COMBS, LLP
250 West Main Street, Suite 1600
Lexington, KY 40507-1746
859.233.2012
*Counsel for Defendant*

3

11/15/2019 09:53:23 AM
82451-35

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2019, I electronically filed the foregoing with the Clerk of Court via the e-filing system. I further certify that I mailed the foregoing document by first-class mail to all non-eFiling participants:

John F. Lackey
214 West Main Street
Richmond, KY 40475

Debra Ann Doss
108 Pasadena Drive
Lexington, KY 40503
*Counsel for Plaintiff*

*/s/W. Craig Robertson*, III
W. Craig Robertson, III

61071004.1

4

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
CIVIL ACTION, FILE NO. 19-CI-00060
DIVISION I

Dr. DAVID B. PORTER,                                                    PLAINTIFF,

VS.

BEREA COLLEGE,                                                        DEFENDANT.

************************
MOTION TO SET DATES FOR DEPOSITIONS
************************

Comes the plaintiff, DR. DAVID B. PORTER, by counsel, and moves the Court

to set dates for the commencement of depositions herein, as the parties have been

unable to agree on such dates themselves, since the filing of these actions.

JOHN F. LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475
859-575-7206

************************

NOTICE OF MOTION

PLEASE TAKE NOTICE that the foregoing MOTION will come on for hearing

before Hon. Brandy O. Brown, Madison Circuit Judge, Madison Circuit Court,

Madison County Courthouse, Richmond, Kentucky, on Thursday, September 5, 2019,

at the hour of 9:30 a.m., or as soon thereafter as counsel may be heard.

JOHN F LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475

*******************

CERTIFICATE OF SERVICE

I hereby certify that I have served a true copy of the foregoing MOTION upon the

following by first class mail:

Hon. Sharon L. Gold
Wyatt, Tarrant & Combs
250 West Main Street
Suite 1600
Lexington KY 40507
ATTORNEY FOR DEFENDANT, Berea College

HON. DEBRA DOSS
108 Pasadena Dr.
Lexington, Kentucky 40503
(859) 260-1980
debra.doss@qx.net
ATTORNEY FOR PLAINTIFF

This the 30th day of August, 2019.

JOHN F LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475

859:575-7206

09:34 AM        CI                **MADISON**                    Run Date: 08/30/2019  3:40:35PM      DocketList.Rpt

Court   C        **CIRCUIT COURTROO.**                          Prep F  ?00000052221  08/30/2019  3:40:34PM    8
Judge        **HON. BRANDY O. BROWN**                                    **09/05/2019 Court Docket**
                                                                                         Page 4 of 5

**14**        **CI**   **19-CI-00060**        **PORTER, DAVID B  VS. BEREA COLLEGE,**

☐

☐ GOLD, SHARON L.                    ATTORNEY FOR DEFENDANT
☐ ROBERTSON, W. CRAIG III            ATTORNEY FOR DEFENDANT
☐ SAMFORD, COURTNEY R.               ATTORNEY FOR DEFENDANT
☐ LACKEY, JOHN F.                    ATTORNEY FOR PLAINTIFF                    LACKJF
☐ BEREA COLLEGE,                     DEFENDANT / RESPONDENT
☐ PORTER, DAVID B                    PLAINTIFF / PETITIONER
   ☐ Bail Credit Denied    ☐ Danger to self or others    ☐ Flight Risk

**MOTION HOUR**
  MOTION TO AMEND                                    ATTORNEY FOR PLAINTIFF

  MOTION - OTHER                                     ATTORNEY FOR PLAINTIFF
   *MOTION TO SET DATES FOR DEPOSITIONS*  _Pass._

              Motion to Amend - pass.

       Motion to Consolidate → Under Advisement

ENTERED

TIME_____A.M./P.M.

SEP 17 2019

MADISON CIRCUIT COURT
DAVID FERNANDEZ, CLERK

**COMMONWEALTH OF KENTUCKY**
**MADISON CIRCUIT COURT**
**DIVISION I**
**CIVIL ACTION NO. 19-CI-00200**

DR. DAVID B. PORTER                                    PLAINTIFF

**ORDER GRANTING DEFENDANT'S**
**MOTION TO CONSOLIDATE**

V.

DR. F. TYLER SERGENT                                   DEFENDANT

*********************************************************************

This matter comes before the Court on Defendant Dr. Tyler Sergent's Motion to

Consolidate this action with the action *David B. Porter v. Berea College, Madison Circuit Court,*

Civil Action No. 19-CI-60. After reviewing the record, hearing oral arguments, and reviewing

Rule 42.01 and applicable law, and being otherwise sufficiently advised, the Court hereby

GRANTS Defendant's Motion to Consolidate.

This 17th day of September 2019.

*Brandy O. Brown*
MADISON CIRCUIT JUDGE, DIV.I

ELECTRONICALLY FILED
11/15/2019 09:53:35 AM

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
DIVISION I
CIVIL ACTION NO. 19-CI-00060
(CONSOLIDATED WITH 19-CI-200)

Dr. DAVID B. PORTER                                        PLAINTIFF

v.

BEREA COLLEGE                                             DEFENDANT

## NOTICE OF DEPOSITION

Please take notice that counsel for the Defendant, Berea College, will take the deposition of Plaintiff, Dr. David B. Porter, by stenographic means on Wednesday, November 13, 2019, beginning at 9:00 a.m.  If the deposition does not conclude on Wednesday, November 13, 2019, the deposition will resume on Thursday, November 14, 2019, beginning at 9:00 a.m., and will continue from day to day until completed.  The deposition will take place at the offices of Wyatt, Tarrant & Combs, LLP, 250 West Main Street, Suite 1600, Lexington, Kentucky 40507.  This deposition will be used for discovery and all other purposes that the Kentucky Rules of Civil Procedure permit.

Respectfully submitted,

*/s/ Sharon L. Gold*

W. Craig Robertson III
Sharon L. Gold
Courtney R. Samford
WYATT, TARRANT & COMBS, LLP
250 West Main Street, Suite 1600
Lexington, KY  40507-1746
859.233.2012

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2019, I electronically filed the foregoing with the Clerk of Court via the e-filing system.  I further certify that I mailed the foregoing document by first class mail to all non-eFiling participants.

John F. Lackey
214 West Main Street
Richmond, KY 40475

Debra Ann Doss
108 Pasadena Drive
Lexington, KY 40503
*Counsel for Plaintiff*

Thomas W. Miller
Miller, Griffin & Marks, P.S.C.
271 W. Short Street, Suite 600
Lexington, KY 40507
*Counsel for Tyler Sergent*

*/s/ Sharon L. Gold*

Sharon L. Gold

cc:   An/Dor Reporting and Video Technologies, Inc.
      179 East Maxwell Street
      Lexington, KY 40508
      setdepovideo@andorreporting.com

61880377.1

2



COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
CIVIL ACTION FILE NO. 19-CI-200
DIVISION I

Dr. DAVID B. PORTER,                                    PLAINTIFF,

v.

DR. F. TYLER SERGENT                                    DEFENDANT.

***************************
NOTICE TO TAKE DEPOSITION
***************************

     PLEASE TAKE NOTICE that the undersigned will, on Friday, November 15, 2019, beginning at the hour of 2:00 p.m., proceed to take the deposition of the following:  Mr. Yabsira Ayele.  The deposition will be taken at the following location:

OFFICES OF:

HON. JOHN LACKEY
214 West Main Street
Richmond KY 40475

     The deposition will be taken for all purposes permitted by the Kentucky Rules of Civil Procedure, including, without limitation, for the purposes of use in evidence, discovery, and cross-examination.  The deposition will be by stenographic transcription.  Plaintiff also reserves the right to use video transcription.   Wanda Brown, of Richmond, Kentucky, is the designated Court Reporter for the deposition.

JOHN F. LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475

********************

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true copy of the foregoing NOTICE upon the

following by first class mail:

Hon. Sharon L. Gold
Wyatt, Tarrant & Combs
250 West Main Street
Suite 1600
Lexington KY 40507
ATTORNEY FOR DEFENDANT, Berea College

Hon. Thomas W. Miller
Miller, Griffin & Marks PSC
271 West Short St., Ste. 600
Lexington KY 40507
ATTORNEY FOR DEFENDANT, F. Tyler Sergent

HON. DEBRA DOSS
108 Pasadena Dr.
Lexington, Kentucky 40503
(859) 260-1980
debra.doss@qx.net
ATTORNEY FOR PLAINTIFF

Ms. Wanda Brown
Court Reporter
1320 Travis Drive
Richmond KY 40475

This the ___ day of October, 2019.

JOHN F LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475

859:575-7206

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
CIVIL ACTION FILE NO. 19-CI-19-CI-00060
DIVISION I
AND
CIVIL ACTION FILE NO. 19-CI-00200
DIVISION I
CONSOLIDATED ACTION

Dr. DAVID B. PORTER,                                                    PLAINTIFF,

v.

DR. F. TYLER SERGENT
and
BEREA COLLEGE                                                        DEFENDANTS.

***************************
MOTION
***************************

COMES the Plaintiff Dr. David B. Porter, by and through counsel, and moves

the Court to approve the filing of the attached First Amended Complaint, pursuant to

Kentucky Rule of Civil Procedure 15.01, which holds that for such amendments,

"leave shall be freely given...". In support of such motion, Plaintiff incorporates by

reference his previously filed Memorandum and prior Motion, dated August 26, 2019,

in the consolidated actions.

_____
JOHN F. LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475

## NOTICE OF MOTION

PLEASE TAKE NOTICE that the foregoing MOTION will come on for hearing before Hon. Brandy O. Brown, Madison Circuit Judge, Madison Circuit Court, Madison County Courthouse, Richmond, Kentucky, on Thursday, November 21, 2019, at the hour of 9:30 a.m., or as soon thereafter as counsel may be heard.

JOHN F LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
## CERTIFICATE OF SERVICE

I hereby certify that I have served a true copy of the foregoing MOTION by electronic mail and first class mail upon the following:

Hon. Sharon L. Gold
Wyatt, Tarrant & Combs
250 West Main Street
Suite 1600
Lexington KY 40507
ATTORNEY FOR DEFENDANT, Berea College

Hon. Thomas W. Miller
Miller, Griffin & Marks PSC
271 West Short St., Ste. 600
Lexington KY 40507
ATTORNEY FOR DEFENDANT, F. Tyler Sergent

HON. DEBRA DOSS
108 Pasadena Dr.
Lexington, Kentucky 40503
(859) 260-1980
debra.doss@qx.net
ATTORNEY FOR PLAINTIFF

This the 20th day of October, 2019.

JOHN F LACKEY
ATTORNEY FOR PLAINTIFF

859-575-7206

TIME_____ FILED _____A.M./P.M.

AUG 2 6 2019

MADISON CIRCUIT COURT
DAVID FERNANDEZ, CLERK

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
CIVIL ACTION, FILE NO. 19-CI-00060
DIVISION I

Dr. DAVID B. PORTER,                                                    PLAINTIFF,

VS.

BEREA COLLEGE

                                                                        DEFENDANT.

***************************
MOTION TO AMEND COMPLAINT
***************************

Comes the Plaintiff, Dr. David B. Porter, and, in the event that the motion of Dr.
F. Tyler Sergent, in Madison Circuit Court, Civil Action No. 2019-CI-200, to
consolidate said action with the instant cause in Civil Action No. 2019-CI-0060 is
granted, moves that he be permitted to amend his Complaint to allege that Berea
College is liable for the Plaintiff's defamation and false light claims against Dr. F. Tyler
Sergent, for the additional reason that Dr. Sergent was acting within the nature and
scope of his employment with Berea College when he committed the complained-of
actions, and in its employment, and that Berea College approved, enabled, authorized,
or failed to take reasonable corrective action to mitigate, the complained-of behavior of
Dr. F. Tyler Sergent, and is therefore liable to the Plaintiff.

---

C.R. 15.01 states that after 20 days, "a party may amend his pleading by leave
of court or by written consent of the adverse party, and leave shall be freely given
when justice so requires." This grants easy authority to amend.

> Absent a showing of significant prejudice to the opponent, an amendment to a
> complaint should be liberally granted. Rule 15 provides that leave to amend
> should be freely given when justice so requires. Rule 15 reinforces the principle
> that cases should be tried on their merits rather than on the technicalities of
> pleadings.
> 6 Ky. Practice R. Civ. Proc. Rule 15.01.

Rule 15 has particular relevance after the consolidation of related cases. The Court should allow amendment of the pleadings as a matter of course, if the amendment relates to new matters put at issue in the other case.  See, e.g., *Daugherty v. Bell National Bank*, 175 Ky. 513, 194 S.W. 545, 546 (1917) ("when cases are consolidated, a defect in the pleadings of any one of the consolidated cases may be cured and supplied by necessary allegations that are contained in any of the pleadings in the other consolidated cause"); *cf. Strader v. Miller*, 236 Ky. 637, 33 S.W.2d 668, 670 (1930) (plaintiff in one of two consolidated cases had the right to rely upon the allegations made in the pleadings in the other case).

The *Daugherty* and *Strader* opinions are squarely on point here.

If consolidation is granted, Plaintiff's Amended Complaint should be allowed.

_____

JOHN F. LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475
859-575-7206

## NOTICE OF MOTION

PLEASE TAKE NOTICE that the foregoing MOTION will come on for hearing before Hon. Brandy O. Brown, Madison Circuit Judge, Madison Circuit Court, Madison County Courthouse, Richmond, Kentucky, on Thursday, September 5, 2019, at the hour of 9:30 a.m., or as soon thereafter as counsel may be heard.

_____
JOHN F LACKEY
ATTORNEY FOR PLAINTIFF
214 West Main Street
Richmond KY 40475

*******************
## CERTIFICATE OF SERVICE

I hereby certify that I have served a true copy of the foregoing MOTION by electronic mail and first class mail upon the following:

Hon. Sharon L. Gold
Wyatt, Tarrant & Combs
250 West Main Street, Suite 1600
Lexington KY 40507
ATTORNEY FOR DEFENDANT, Berea College

Hon. Thomas W. Miller
Miller, Griffin & Marks PSC
271 West Short St., Ste. 600
Lexington KY 40507
ATTORNEY FOR DEFENDANT, F. Tyler Sergent pwoodall@kentuckylaw.com

HON. DEBRA DOSS
108 Pasadena Dr.
Lexington, Kentucky 40503
ATTORNEY FOR PLAINTIFF debra.doss@qx.net

**Courtesy copy delivered to:**
Hon. Brandy O. Brown
Judge, Circuit Court, Div. 1
101 W Main St
Richmond, KY 40475

This the 26th day of August, 2019.

_____
JOHN F LACKEY
ATTORNEY FOR PLAINTIFF

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
CIVIL ACTION FILE NO. 19-CI-19-CI-00060
DIVISION I
AND
CIVIL ACTION FILE NO. 19-CI-00200
DIVISION I
CONSOLIDATED ACTION

Dr. DAVID B. PORTER,                                               PLAINTIFF,

v.

DR. F. TYLER SERGENT
and
BEREA COLLEGE                                                      DEFENDANTS.

***************************
FIRST AMENDED COMPLAINT
***************************

COMES NOW the Plaintiff Dr. David B. Porter ("Dr. Porter"), by and through his counsel, and who hereby brings this First Amended Complaint in this consolidated action against the above-named Defendants, in response to the Court's order to consolidate of September 17, 2019, cases  no. 19-CI-00200 and 19-CI-00060.

First, Dr. Porter brings this First Amended Complaint against Berea College ("the College") for breach of contract, for employment discrimination resulting in his wrongful suspension and termination, and for the College's illegal retaliation against him, all in violation of Title VII of the 1964 Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e-2 and 42 U.S.C. § 2000e-3, the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623(a)(1), Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), and the Kentucky Civil Rights Act (KCRA), KRS 344.040(1)(a) and KRS 344.280(1).

Second, Dr. Porter also brings this First Amended Complaint against the Defendant Dr. F. Tyler Sergent ("Dr. Sergent") for defamation of Dr. Porter, for portrayal of Dr. Porter in a false light, and for illegal retaliation against Dr. Porter in

1

violation KRS 344.280(1) of the KCRA, and against the College for its negligent hiring, negligent retention, and negligent supervision of Dr. Sergent, and in respondeat superior.

Dr. Porter further states in support of this First Amended Complaint as follows:

## PARTIES

1.      Dr. Porter is a resident of the City of Berea, Madison County, Kentucky.

2.      Dr. Sergent is a resident of the City of Berea, Madison County, Kentucky.

3.      The College is a private liberal arts college and a Kentucky corporation situated in the City of Berea, Madison County, Kentucky.

## JURISDICTION AND VENUE

4.      Paragraphs 1-3 are hereby restated and incorporated by reference.

5.      This Court has personal jurisdiction over Dr. Sergent as a Defendant as he is a resident of the City of Berea, Madison County, Kentucky.

6.      This Court has personal jurisdiction over the College as it is a corporation situated in and with its principal place of business in Madison County, Kentucky, and the relevant facts in this case occurred in this county.

7.      This Court has subject matter jurisdiction over the defamation and false light claims versus Dr. Sergent, and the negligence claims against the College under KY Const. § 112(5) and KRS 23A.010.

8.      This Court has subject matter jurisdiction under 42 U.S.C. § 2000e-5(f)(3) and 29 U.S.C. § 626(c) and concurrent jurisdiction under KY Const. § 112(5) and KRS 23A.010 as to the federal employment discrimination and illegal retaliation claims against the College and Dr. Sergent under Title VII, the ADEA, and Title IX.

9.      This Court has subject matter jurisdiction under KRS 344.450 for the claims of employment discrimination and illegal retaliation in violation of KRS 344.280(1) of the KCRA, and under KY Const. § 112(5) and KRS 23A.010.

10.      This Court is the proper venue for this Complaint under KRS 452.450.

2

**STATEMENT OF FACTS**

A.     Dr. Porter's Professional "Competence."

11.     Paragraphs 1-10 are hereby restated and incorporated by reference.

12.     Dr. Porter is a 70-year-old, white male who was a tenured professor and employee of the College for more than 17 years. Dr. Porter served as academic vice president and provost from 2001 – 2005 and as a member of the Psychology Department thereafter until the termination of his employment on Oct 1, 2018.

13.     Dr. Porter is a partially disabled United States Air Force veteran who holds a Doctorate of Philosophy from Oxford University, United Kingdom, a Master of Science from the University of California at Los Angeles, and a Bachelor of Science from the United States Air Force Academy.  He has training and leadership in claims of workplace harassment.

14.     Prior to joining the College, Dr. Porter served in the United States Air Force as Permanent Professor and Head of the Air Force Academy Department of Behavioral Sciences and Leadership. Dr. Porter retired from the Air Force in 2001, at the invitation of Berea College to serve as its Academic Vice President and Provost.  Dr. Porter was attracted by the challenge of working with students of great academic potential but limited financial resources.  Subsequently, Dr. Porter gave generously to the College, establishing an annual Servant Leadership Award in memory of his father, Homer A. Porter, Jr., a Berea College graduate, and a separate fund to support student psychology material.

15.     Dr. Porter is the author of some seventy five (75) professional publications, and has given well over a hundred professional presentations.

16.     In 2018 the Berea College Student Government Association initially chose Dr. Porter for its Student Service Award.  Dr. Porter had received other distinguished teaching and advisory and supervisory awards from the College during his tenure.  His students consistently rated his teaching effectiveness in the top 10% the faculty.  His research students won over 30 awards for excellence from state and regional undergraduate research competitions in the last decade.

3

17.    At all pertinent times, Dr. Porter was qualified for his position at the College as a tenured professor of psychology and, in the course of his academic research and teaching, he was in total compliance with all relevant and applicable rules and standards for professional conduct and ethics.

18.    In his position at the College and as a part of his employment duties, Dr. Porter advocated using peer-reviewed, scientifically approved analysis rather than subjective opinions to assess administrative policies and programs.  His observations and advocacy, at times, annoyed and rankled members of the College administration and faculty and student factions in campus workplace matters.  Dr. Porter's advocacy of science and skepticism was incorporated in many of the courses he taught, including GSTR 110 (*Questioning Authority; Skepticism and Science and Antidotes for Oppression*), GST 232 (*Introduction to the Behavioral Sciences*); PSY 208 (*Cognitive Psychology*), PSY 210 (*Industrial/Organizational Psychology*), and PSY 424 (*Senior Research*).

B.    The College's Continuous Support for Extreme "Political Correctness" and Its Pattern and Practice of Viewpoint Discrimination Versus Older, White Male Faculty Who Had Run Afoul of Campus Political Activists or Grievants

19.    In 2013 a Caucasian male faculty member made an inappropriate post on social media sarcastically suggesting that little should be expected from one of his African American students named "Tequila".  The campus community, appropriately in this instance, immediately condemned the faculty member's conduct.  The College's response, though, was to declare a mandatory "Diversity Day" training for all faculty members.  Most, but not all, faculty members attended, but two senior white male professors who had nothing to do with the post did not attend and criticized the endeavor as demeaning to them and counterproductive.  The College harshly punished

4

the two men for their criticism and noncompliance, including imposing restrictions on pay, benefits, and academic promotion. The names of these men are known to the Plaintiff and Defendant, but will not be identified in this Complaint.

20.     In 2015 during a faculty meeting discussion of institutionally provided health insurance, a young, female African American faculty member related her difficulties and traumas related to several unsuccessful pregnancies. Shortly thereafter in a chance meeting at a Walmart, a senior, white male faculty member in the same department as the female faculty member expressed his sympathy and condolences for her traumas. The College charged him with a breach of confidentiality and forced him to resign. The name of the young African American woman and her male colleague are known to the Plaintiff and to Berea College, but will not be identified in this Complaint.

21.     At the close of the 2017 school year, a quite competent and approximately ten-year employed administrator at Berea College resigned after being told by another senior administrator that he would not be further promoted because he was a Caucasian male, despite his qualifications and excellent performance. The name of this individual is known to both the Plaintiff and Defendant, but will not be identified in this Complaint.

22.     In March of 2017 the chairman of the psychology department, Dr. Wayne Messer, was subject to a civil rights grievance brought by fellow psychology professors Dr. Wendy R. Williams, Dr. Amanda Wyrick, and Dr. Sarah Jones, alleging discrimination in hiring and promotion, retaliation, and the creation of a hostile workplace environment based on race, gender, or sexual orientation.

23.     One of the charges was that Dr. Messer had demonstrated a bias against women in hiring, which was demonstrably false. Dr. Messer introduced an Excel

spreadsheet showing the contemporaneous ratings each of the five psychology department selection committee members had given to approximately 100 prior applicants. The spreadsheet showed that the top six ratings Dr. Messer gave were all assigned to women. Testimony of other selection panel participants supported the absence of Dr. Messer's bias.

24. In contrast, the grievant Dr. Williams, had exclaimed during one selection panel meeting that "The last thing we need in this department is any more old white guys!" A closer examination of Dr. Williams' own ratings of applicants revealed other evidence of her discrimination against white males. Although white males made up about 25% of the applicant pool, none appeared in Dr. Williams' top-ten rated applicants. Unlike the other four professors in the department making ratings, she used a scale of 0-5 to rate the applicants rather than the 1-5 scale to which all of the selection panel members had agreed prior to rating. White males received a disproportionately high number of Dr. Williams' "0" ratings. Similarly, she awarded disproportionately more below-average ratings to white males whom the other professors had rated in the top third of applicants. Dr. Williams anomalously withheld her ratings until all other raters had submitted their ratings. Her anomalous rating scale served to discriminate in hiring against all white males. Nonetheless, the College took no action against her despite having knowledge of her unlawful racial, age, and gender discrimination.

25. Two of the three grievants in Dr. Messer's case also asserted that due to the hostility in the department they had been forced to use the copier on a different floor rather than the copier next to the department chair's office. Copier usage records quickly showed that this claim was grossly exaggerated and misleading. The College was aware of this false claim but took no action against the grievants despite the

6

Faculty Manual's warning at page 92 of the "General Guidelines" section stating:
"Fabricated charges of alleged violations or false testimony are serious offenses.
Persons found to have fabricated charges or testified falsely will be subject to
disciplinary action up to and including termination or expulsion."

26.     After the investigation and hearing, the College dismissed the charges
against Dr. Messer for retaliation and discrimination in hiring and promotion, but the
College found that Dr. Messer had created a "hostile workplace environment" based on
sex and sexual orientation.  The College found Dr. Messer "guilty" based on three
incidents over a two-year period: telling an inappropriate joke about a "Jewish
American Princess" prior to a department meeting; attempting to engage his
psychology department colleagues in conversations about the public backlash to rock
singer Chrissy Hynde's recent NPR interview about her rape; and his use of the phrase
"militant lesbian" during an animated faculty discussion regarding one of his student's
disciplinary problems.  These findings led to the College removing Dr. Messer as
psychology department chair and revoking his then office space and banishing him to
an office in the basement of the psychology department building.

27.     Dr. Porter acted as Dr. Messer's "adviser" throughout the grievance
hearing and appeals, as allowed under page 92 of the Faculty Manual.  Dr. Porter
argued that Dr. Messer's alleged infractions were neither severe nor pervasive enough
to create a "hostile workplace environment" on the basis of sex or to warrant the
punishments levied against him.  Dr. Porter, during the proceedings before the
Campus Conduct Hearing Board (CCHB) and the Faculty Appeals Committee (FAC), in
correspondence with President Lyle Roelofs and Dean Chad Berry, and in an open
letter to campus, expressed his disappointment with the unfairness of the College's
disciplinary process, and of the result in Dr. Messer's case.  Dr. Porter's advocacy of

7

these positions subjected him to unlawful workplace hostility from members of the College's senior faculty and administration, and from the grievants who had initiated the charges against Dr. Messer.

28.     College administrators rebuffed Dr. Porter's attempts to have them address his concerns about the College's unfair lack of administrative due process and its misapplications of workplace policies and procedures in Dr. Messer's case. While many senior faculty members and mid-level administrators unofficially acknowledged problems the College's Title IX process, President Roelofs and Dean Berry refused to discuss Dr. Porter's specific concerns.

29.     In accordance with Faculty Manual procedure, President Roelofs and Dean Berry ordered the psychology department faculty members to meet face-to-face in the aftermath of Dr. Messer's contentious disciplinary proceedings to attempt to broker some sort of peace. However, the three female grievants refused to meet or interact directly with the male department members. In response, Dean Berry acquiesced and rescinded the requirement for face-to-face department meetings, even though the Faculty Manual at page 34 states that attendance at "faculty meetings" is a job requirement. This particular provision had been the College's exact justification for severely punishing the two senior, white male faculty members for not attending "Diversity Day" training. *See* ¶19, *supra*.

30.     During several meetings of the College's Strategic Planning Council, Dean Berry and the College's Vice President for Diversity and Inclusion, stated that only those who share a particular "minority identity" should have significant input on policies of the College involving inclusivity and diversity.

31.     Later, during the 2018 fall semester, the College, through Dean Berry, advised faculty members that all faculty hires would be "either black or brown".

32.     Following the unpleasant proceedings against Dr. Messer, in the late fall semester of 2017 Berea College employed W. Scott Lewis, a distinguished expert in collegiate workplace administration, to advise it about its policies and procedures regarding wrongful workplace hostility in the College's psychology department. Dr. Lewis has trained thousands of faculty and staff members on how to prevent, address and properly resolve unlawful workplace conduct. He is also a law enforcement trainer on how to investigate sensitive matters, such as abuse and assault.

33.     Dr. Lewis did a thorough investigation of workplace issues in the College's psychology department. His report supported Dr. Porter's prior criticisms. As part of its pattern of lack of transparency, and of extreme "political correctness," and in another failure to defend the protected academic freedom of its faculty, the College refused to release Dr. Lewis' report, embargoed it, kept it confidential, and took no responsible actions to implement its recommendations or to address Dr. Porter's prior criticisms of the College. Mr. Lewis had indicated grave concerns about the issues Dr. Porter raised to him in their 45-minute meeting.

34.     In all of the above events and particulars, the College demonstrated a longstanding pattern and practice of favor toward and support of some of its students' and employees' extreme "politically correct" activism and their factually and legally unsound grievances, to the gross detriment of the College's obligations to conduct academically honest, fair and even-handed hiring, retention, and supervision of its faculty and staff.

9

C.    Dr. Porter's Survey for his PSY 210 Industrial / Organizational
      Psychology Class, and the College's Resulting Suspension and
      Banishment of Him From Campus.

35.    Dr. Porter taught the PSY 210 Industrial /Organizational Psychology
course at the College for more than a decade.  Regularly featured in this course were
large, integrative student projects applying the scientific method through the
examination of archival and survey data to assess college policies, practices, and
programs and to identify areas where there were opportunities for improvement.
These studies had included, for example, reviews of the effects of characteristics of
first year general studies courses on student retention and academic success, and the
relation between first-year student labor positions and other measures of student
satisfaction and motivation.  These projects were integral to the academic content of
the course and often received praise from students and officials of the College.  There
had been no objection to his academic methodology or subject matter prior to
February 2018.

36.    After the contentious proceedings against Dr. Messer, it appeared to Dr.
Porter that the College's workplace disciplinary procedure relied almost entirely on
asserting and re-asserting the preconceived notions of the College administration, with
little attention to actual evidence of the program's effectiveness or consequences.  As
an academic researcher having authored published over seventy articles and several
book chapters concerning psychology and leadership, Dr. Porter decided to engage his
Spring 2018 PSY 210 class in developing a survey of community perceptions and
attitudes about academic freedom, freedom of speech, and hostile work environments
under civil rights law. ("the Survey").  The Survey employed methods similar to those
Dr. Porter had repeatedly used in the past in his classes.

37.    The heart of the Survey was a set of some 20 posed scenarios. Respondents were asked to read the scenarios and decide whether each situation reflected a "hostile environment," and if academic freedom should protect the action taken in the scenario.  The use of such scenarios (i.e., situational judgment tasks) is common in industrial/organizational psychology studies and often provides reliable information about implicit attitudes which may differ from explicit beliefs.  In no respect did the scenarios suggest (push) a preferred, or "right," response.

38.    Dr. Porter drew about one half of the Survey's scenarios from issues, arguments, and events he had observed as faculty adviser for Dr. Messer in the prior civil rights case.  The Survey carefully concealed participant identity by obscuring dates and altering gender, race, and other personal characteristics.  No names or other information identifying the participants were presented in any of the scenarios. The Survey instructions carefully stated that "[n]o claims are made about the relationship between these hypothetical situations and actual occurrences here at Berea College or elsewhere."

39.    Before disseminating the Survey, Dr. Porter shared drafts of it with many other faculty members and received feedback from six of them, including the academic Division Chair (Dr. Jackie Burnside), the Chair of the College's Institutional Review Board (IRB), and the Director of Academic Assessment (Dr. Rob Smith), his Departmental Chair, Dr. Jay Baltisberger, and other tenured faculty members, including Dr. Ian Norris, Dr. Jose Bey, and Dr. Wayne Messer, with applicable research experience in the social sciences.  None of them flagged any potential breaches of confidentiality, ethical concerns, or harm to others, as possible problems. Two reviewers did express concern about controversy the Survey might elicit by

11

presenting issues that the College administration did not want to have debated. Dr. Porter sent a copy of the Survey to Dean Berry three days before it was to be posted.

40.    The Survey was launched on Monday, February 19, 2018. That day Dr. Porter received a polite e-mail request from Dean Berry to meet to discuss it, which Dr. Porter quickly accepted.

41.    Meanwhile, that same day Dr. Williams published a Facebook post incorrectly claiming that all of the fact patterns in the Survey's scenarios were expressly about her and the other grievants in Dr. Messer's proceedings, that the Survey improperly made allegations of cognitive impairment against her, and that the Survey intended to punish and silence them. Dr. Williams posted:

> I've said this elsewhere, so I'll post it here, too. <u>As one of the not anonymous targets of this survey</u> I can tell you that I, and the other women who filed (and won-at every level of the process) the [civil rights] hostile work environment complaint on which this survey is based, <u>would be thrilled with some support on this</u>. <u>Every scenario in the survey</u> is either a biased portrayal of what we claimed in our complaint, or it was given by the defense to show that we were the biased ones <u>or that we were cognitively compromised in our judgment</u>, or it was given as examples of how other people had done much worse so the behavior we objected to isn't *that bad* in comparison to 'real' hostile environments. Let me repeat again-we won at every stage of the process. Yet despite the conclusion of that process three months ago (after 9 months of the process) <u>this is another attempt to silence us (and those like us)</u>. That said, <u>if this kind of behavior by a colleague in response to losing a Title IX complaint is tolerated by the community, then this is certainly one way to make sure no one ever brings another [civil rights] complaint on this campus</u>. If you feel deeply about this unethical use of students under the guise of 'research' or the not subtle attack on your female colleagues/faculty, <u>please do more than write it here. If you want to know more ways to help, let me know</u>.
> (Emphasis added).

42.    Dr. Williams' Facebook post falsely claimed that nearly every scenario was about her and the other grievants in Dr. Messer's case, and improperly revealed identities of persons she believed were involved to the entire campus community, who were otherwise not familiar with the particular fact patterns posed.

43.     In her Facebook post Dr. Williams specifically exhorted campus activists to take action to "support" her and to do "more" than just write about their anger.

44.     With the full knowledge of all pertinent members of the College's administration, including but not limited to President Roelofs, Dean Berry, and the members of the CCHB, the FAC, and the Faculty Status Committee (FSC), Dr. Williams' complaints about the Survey in public and private and in her Facebook post predictably incited her husband Dr. Sergent, a then-untenured assistant professor of history at the College, and a group of campus activists to make their anger about Dr. Porter and about the Survey known to Dr. Porter's students and to the College's administration.

45.     On Tuesday, February 20, 2018, in a message sent to the entire College campus, Dean Berry publicly requested that Dr. Porter remove the Survey and apologize to the campus community.  However, two hours later in a phone call, Dean Berry promised to forward some of the complaints to Dr. Porter directly and to provide him with a list of "problematic" Survey scenarios, so they could be deleted or amended.  The Dean never sent this information to Dr. Porter.  Dr. Porter awaited this list to no avail before withdrawing the Survey.  Within hours of Dean Berry's public demand, Dr. Porter submitted a draft apology to Dean Berry and President Roelofs. President Roelofs rejected the draft out of hand, stating that it "blamed others" and "would be used as further evidence" against Dr. Porter.

46.     Data from the Survey's 120 valid responses yielded a surfeit of scientifically valid results:

- Respondents' gender and sexual orientation predicted their political beliefs, and these beliefs predicted most of the variance in the perceptions and judgments people make about hostile environments and academic freedom.

- About 80% of the respondents stated that they did not express their beliefs on campus because of fear of judgment and retaliation.
- The Survey results revealed that most of the College's current "diversity training" programs did little to affect awareness, attitudes, or perceptions, and one such program appeared to be having a polarizing effect on its participants.
- Two thirds of the respondents did not see the Survey as contributing to a hostile environment, and nearly 80% of them believed academic freedom protected the dissemination of the Survey.
- The Survey also uncovered evidence that at the College race was unrelated to the respondents' attitudes and perceptions about civil rights or academic freedom. This was contrary to the College's claims that racism was the major threat to freedom of speech on campus. The survey also failed to support the contention that students of color experienced greater oppression than their classmates.
- About a quarter of the Survey's respondents expressed support for denying others the opportunity to express beliefs that could be considered potentially harmful or hurtful.
- Women rather than men at the College were more likely to express strong activist views. Respondents who endorsed the need for hostile environment protection were also more likely to express support for academic freedom.
- Judgments about hostile environments and academic freedom protection were significantly negatively correlated. What respondents claimed to be true was just the opposite of the pattern of what their responses to the scenarios showed to be true of their perceptions and judgments.

47. Therefore, the Survey provided valid psychological evidence that because beliefs or viewpoints determine one's perception of hostility, relying primarily on unsupported subjective reports of offense can be very problematic. The College administration's interest in suppressing this result was clear, given the past disciplinary and civil rights controversies.

48. On Thursday, February 22, 2018, Dean Berry summoned Dr. Porter and his academic division chair to the Dean's office, where Dean Berry advised Dr. Porter that charges of "incompetence" would be brought against him. Pursuant to page 121 of the Faculty Manual concerning procedure in such an instance, Dr. Porter asked to

14

discuss the matter. Dean Berry stated that the time for discussion had ended two days earlier when Dr. Porter had not immediately withdrawn the Survey and apologized to the campus.

49.     Dean Berry presented the charges against Dr. Porter to the FSC at a hearing the next afternoon, without notice to, or an appearance by, Dr. Porter. A majority of the FSC concurred with Dean Berry and supported the charges against Dr. Porter. Dean Berry claimed that the Survey was only an instrument of malicious retaliation against Dr. Messer's grievants. Dean Berry did not inform the Committee of the Survey's academic and scientific value. The College engaged in no investigation of the charges against Dr. Porter before the majority of the FSC voted to support prosecution. The FSC was a committee on which Dr. Williams served as a member, but had recused herself from this action.

50.     Shortly thereafter, President Roelofs summarily suspended Dr. Porter, and the College reassigned his classes to other faculty members. It prohibited him from communicating with students, labeled him as "dangerous" to the students, and banished him from campus. During the ten weeks between the distribution of the Survey and the eventual FAC hearing, President Roelofs and Dean Berry repeatedly refused Dr. Porter's requests to specify the "danger" Dr. Porter supposedly posed to others which justified his suspension. The College refused any conversation aimed at informally mediating the issues involved. The College also rebuffed Dr. Porter's requests for clarification of the nature of the charges against him.

51. The College's administrators, however, treated other faculty who had posted similar surveys vastly different than they treated Dr. Porter. In the spring semester of 2018, female faculty in the Student Counseling Center and in the Interracial Education had published surveys which also had studied campus attitudes and

15

opinions.  The Institutional Review Board (IRB) did not involve itself then, per the College's rules, as those surveys also did not identify particular individuals and did not meet the definition of "human subject research".  In Dr. Porter's case, however, the College used an arbitrary and contradictory standard from other inapplicable IRB procedures in the Faculty Manual as a post hoc pretext for President Roelofs' decision to embargo the Survey data.  Without allowing Dr. Porter any opportunity to defend his work, the College prohibited him from using or sharing the Survey data.

52.   In a personal and professional accommodation and in an interest and attempt to calm the turmoil in the psychology department, on March 11, 2018 Dr. Porter authored and sent an e-mail to each of the grievants in which he offered his sincere apology for any hurt that Dr. Porter may have unintentionally caused or that they may have perceived or suffered as a result of Dr. Porter's preparing and disseminating the Survey.  One grievant, Dr. Sara Jones, responded immediately, accepting the apology.

D.   <u>The SGA's Decision to Give Dr. Porter a Teaching Award, and Dr. Sergent's False Statements and His Retaliatory Efforts Made to Have the Award Overturned.</u>

53.   In the midst of the Survey controversy, the student-members of the Berea College Student Government Association ("SGA") voted to award Dr. Porter its 2018 Student Service Award despite the prevailing politically-motivated agitation against Dr. Porter personally and against his continued tenured employment at the College.

54.   Upon hearing of the SGA's vote to give Dr. Porter the award, Dr. Sergent was again very angry and spiteful toward him and wanted to derail the SGA's decision. Dr. Sergent wanted to punish Dr. Porter and to retaliate against him for his past

16

support of Dr. Messer and for his dissemination of the Survey, which Dr. Sergent hastily and incorrectly inferred to be a "personal attack" on his wife for her prior grievances against Dr. Messer. Dr. Sergent falsely claimed that Dr. Porter issued no apology to the grievants, one of whom was his wife.

55.     At all pertinent dates and times, the College's administrators knew of and were well aware of Dr. Sergent's continuing anger and spite toward Dr. Porter personally and about the dissemination of the Survey and knew that Dr. Sergent vehemently sided with his wife and the "politically correct" College employees and campus activists who were agitating against Dr. Porter.

56.     Throughout the Survey controversy, the College's administrators did not caution Dr. Sergent and other College employees from personally attacking, threatening, or inciting opposition to Dr. Porter. The College's administrators also purposely refrained from making any public defense of Dr. Porter's right to academic freedom, his right to administrative due process, or his right to his personal and professional safety. Instead, the College followed and fomented the opposition to Dr. Porter and to the Survey.

57.     Accordingly, on April 8, 2018 at 6:23 p.m. through April 9, 2018 at 12:09 a.m., Dr. Sergent, apparently acting as a "Faculty Advisor to the SGA," used his College e-mail address and the College's computer network to send a series of e-mails to SGA board members vehemently attacking their decision to give Dr. Porter the award and making false statements linking Dr. Messer, Dr. Porter's advocacy for Dr. Messer, and the Survey. Dr. Sergent's emails also threatened the SGA board members with negative educational and career repercussions if they gave the award to Dr. Porter (*See* Exhibit 1).

58.    Specifically, Dr. Sergent, in a retaliatory attempt to discredit Dr. Porter in front of the students and to injure Dr. Porter's academic career at the College, falsely stated in these e-mails that Dr. Porter had been found guilty of racist comments and of fraudulently defending the alleged unlawful and discriminatory sexist remarks of Dr. Messer under the guise of academic freedom:

> Porter supported Wayne Messer throughout a Title IX/VII complaint this last year that was upheld against Messer at every level, including appeals, in which Messer was found guilty of creating a hostile work environment for racist, sexist, and homophobic comments. Messer was removed as chair of the Psychology Department and removed from his office near the other Psychology faculty members as an outcome of his actions. Porter argued on Messer's behalf that the racist, sexist, homophobic comments were academic freedom and that Messer had the right to say those things to colleagues and students. This took place from February 2017 until the present, as Porter has continued to express this view about the case that was fully adjudicated several months ago. In the process of this case, Porter also publicly in writing and in testimony made sexist, disparaging remarks about each of the three female faculty members in Psychology[.]

59.    Dr. Sergent, in a retaliatory attempt to discredit Dr. Porter in front of the students and to injure the Dr. Porter's academic career at the College, falsely stated in these e-mails that Dr. Porter in his defense of Dr. Messer had improperly disclosed and purposely mischaracterized Dr. Williams' personal medical information in an attempt to defame her:

> Porter also publicly in writing and in testimony made sexist, disparaging remarks about each of the three female faculty members in Psychology, including disclosing personal medical records of one, which he characterized falsely, rising to the level of slander, libel, and defamation.

60.    Dr. Sergent, in a retaliatory attempt to discredit Dr. Porter in front of the students and to injure the Dr. Porter's academic career at the College, falsely stated in these e-mails that Dr. Porter had committed academic fraud and gross violations of professional ethics:

18

**The reasons for which Porter has been suspended and is in the process of being fired for cause center on five major wrongful acts.**

**First is academic dishonesty**. The survey he sent out to the whole community was not a valid survey, and he was well aware of that, and made it available to the entire campus community anyway. Even after being told to remove it because of its invalidation (for reasons explained below), he refused.

**Second is gross ethical violations** [sic]. In the survey, Porter included actual cases from this past year's Title IX/VII case against Messer. That is a serious violation of professional ethics in itself. To make it even more unethical, Porter falsely stated in the discloser [sic] section of the survey that the scenarios were not based on any actual events.
(**Bold** in original).

61.    Dr. Sergent, in a retaliatory attempt to discredit Dr. Porter in front of

students and to injure the Dr. Porter's academic career at the College, falsely stated in

these e-mails that Dr. Porter had committed academic fraud and gross violations of

professional ethics and was an incompetent psychology professor who had improperly

and unprofessionally "manipulated" his students for his own purposes:

**Third is incompetence along with manipulation of students**. Porter also sent the survey out with students' names attached without having gotten those students express permission, and many among those students had already expressed their own ethical concerns about the survey. Porter has continued to manipulate students--like those in SGA supporting this award--to rally for his cause. Hero-worship is not education; this cultish approach to answering for his unethical acts is yet another level of unethical behavior and breach of the student-teacher relationship.
(**Bold** in original).

62.    Dr. Sergent, in a retaliatory attempt to discredit Dr. Porter in front of

students and to injure the Dr. Porter's academic career at the College, falsely stated in

these e-mails that Dr. Porter had committed academic fraud and gross violations of

professional ethics by violating the College's IRB academic research requirements:

**Fourth is refusal to abide by IRB (Institutional Review Board) and college policies for research**. Porter refused to send his survey to the IRB for review as required by college policy (and APA standards for research and ethics). When the IRB did review the survey at the request

19

of the administration, against Porter's objections, the IRB rejected the survey as unethical for the reasons stated above. (**Bold** in original).

63.    Dr. Sergent's actions were not authorized by the Faculty Manual (page 29). Dr. Sergent, in a retaliatory attempt to discredit Dr. Porter in front of students and to injure the Dr. Porter's academic career at the College, falsely stated in these e-mails that Dr. Porter had committed academic fraud and gross violations of professional ethics and had willfully caused mental and emotional harm to his students and to his colleagues in an effort to divide the College campus for his own political reasons, without apology:

> **Fifth is harm to human subjects (and the campus community)**. The people whose personal and private information was made public in the survey have been seriously harmed by Porter's actions and are having to seek care for both physical and mental health that has been damaged willfully by Porter. Contrary to what some students may have claimed, Porter has not apologized for this harm and has made no effort to repair the harm he has caused. By extension, Porter's continued manipulation of students to support him--no matter how much in the wrong he is--has caused serious (if not permanent) rifts between groups of students, and the animosity has spilled over into other classroom space, other campus spaces, and social media. Porter is actively fueling this animosity, among students and among faculty members.
> (**Bold** in original).

64.    Dr. Sergent, in a retaliatory attempt to discredit Dr. Porter in front of students and to injure the Dr. Porter's academic career at the College, then reiterated in these e-mails his false statements that Dr. Porter had committed academic fraud and gross violations of professional ethics and that the SGA should rescind the award:

> The second issue at stake, however, regarding the SGA service award, is that the SGA not be reactionary in its decisions. The service award is a serious matter and should not be victim to manipulation by students who themselves are victims of manipulation by an unethical, unrepentant, academically dishonest person who is in process of rightly being fired from Berea College.

65.    After receiving some pushback in a reply e-mail from SGA member Yabsira Ayele, Dr. Sergent sent an e-mail response in which he repeated his false

statements that Dr. Porter had committed academic fraud and gross violations of professional ethics and had willfully caused harm to students and faculty at the College, and Dr. Sergent also added an implicit threat of negative academic repercussions for Ayele if the SGA did not rescind the award to Dr. Porter:

> I am not inviting a debate with you or anyone else who would defend the unethical actions of David Porter--they are indefensible just like racism and any other of form discrimination--or any other faculty member who has caused harm to other members of our community. Rewarding those actions and the harm coming from them is not the Berean way. The administration has good reasons for suspension and the case will be adjudicated. I gave my advice and detailed my reasons for that advice. I have no doubt that you believe you are doing what is right. But there are people giving you advice who know a great deal more about this situation than you do. You should heed their advice.

66.     After another reply e-mail from Ayele, Dr. Sergent in his next e-mail expressly threatened Ayele with negative academic and career repercussions if the SGA did not rescind the award to Dr. Porter:

> Clearly you have no interest in my advice or the advice of your other faculty advisor, both of whom know much more than you about a great many things directly related to this situation. So I hope you at least listen to those around you among the SGA leadership who are wiser and better informed. One last bit of advice: I would caution you against burning bridges this early in your education, particularly for the wrong side of a cause.
> Do not email me again regarding this issue.

67.     Though immediately aware of Dr. Sergent's false statements in his e-mails in retaliation against Dr. Porter and with knowledge of Dr. Sergent's express threats against SGA board members, the College's administrators did nothing to investigate or repudiate Dr. Sergent's actions.  On the contrary, the College supported Dr. Sergent's acts by thereafter interpreting the SGA award requirements, based on no rule or precedent, to prohibit giving the SGA award to a faculty member on suspension for an alleged workplace-related offense.

68.    Though immediately aware of Dr. Sergent's false statements in his e-mails in retaliation against Dr. Porter and with knowledge of Dr. Sergent's express threats against SGA board members, the College's administrators did not investigate or discipline Dr. Sergent and later rewarded Dr. Sergent by promoting him to a tenure-track position as an associate professor of history at the College, and a larger office.

E.    The College's Wrongful Disciplinary Proceedings Against Dr. Porter, Leading to His Termination.

69.    Dean Berry and the FSC on behalf of the College ostensibly sought the termination of Dr. Porter under a section of the Faculty Manual entitled "Professional Competence and Dismissal for Cause." The College specified charges against Dr. Porter for trial before the FAC, accusing him of "incompetence" and also of (i) disclosing personal information of Dr. Williams, and harassing her, Dr. Wyrick, and Dr. Jones, (ii) retaliating against them for their participation in the prior proceedings against Dr. Messer, (iii) causing them emotional distress, (iv) jeopardizing trust in the process, and (v) perpetuating a hostile environment in the psychology department.

70.    The Faculty Manual states: "Once the question of competence or effectiveness has [a]risen, the Division Chair, the Academic Vice President and Dean of the Faculty, and the faculty member shall discuss the matter in personal conference." *See* Faculty Manual, page 121. However, Dean Berry refused to allow any such mediation of these issues.

71.    At the FAC hearing, Dean Berry both prosecuted and acted as a witness in the case against Dr. Porter, over Porter's objection. Dean Berry had been involved in, and had been criticized by Dr. Porter, about the proceedings against Dr. Messer, and the Dean also headed the College's response to the Survey and its aftermath. The Dean acted as both a witness and the prosecutor at the FAC hearing, while also being

22

the direct supervisor of the four FAC members concerning their compensation and the terms of their employment at the College. This behavior was in clear conflict with administrative due process.

72.   At Dean Berry's insistence and over Dr. Porter's objections that the Faculty Manual and administrative due process required a standard of "clear and convincing evidence," the FAC adopted the minimal "preponderance of the evidence" standard in the proceedings. The FAC allowed Dr. Porter only a single day to present his defense rather than the two days he had requested, precluding Dr. Porter from presenting all of his evidence. The prosecutor's summation was not provided to Dr. Porter prior to his preparation of his summation.

73.   The grievants, Dr. Williams and Dr. Wyrick, did not testify at the FAC hearing but submitted written witness statements concerning the events at issue and their alleged emotional distress resulting from the Survey and Dr. Porter's acts and statements in defense of Dr. Messer. Dr. Porter did not have the opportunity to cross examine Dr. Williams or Dr. Wyrick or to serve any interrogatories on them. He wished to inquire how each learned of the contents of the Survey and what alleged objections they had to its academic rigor and its appropriateness. Dr. Porter was unable even to ask Dr. Williams as to why she publicized the Survey on Facebook. Dr. Porter could not question Dr. Williams and Dr. Wyrick about the authenticity of their emotional distress or the nature of their alleged personal or professional harm. He was not allowed to confront her about her wrongful identification of individuals in her email post.

74.   Dr. Porter defended his use and distribution of the Survey on the basis of the College's contractual promise of academic freedom as defined and guaranteed in the Faculty Manual. Dr. Porter submitted written and telephonic testimony from

national experts familiar with the research the Survey represented. These experts supported the use of situational judgment indexes (i.e., scenarios) composed of incidents drawn from real life events.

75.     At the hearing, one member of the FAC showed his preconceived bias by likening Dr. Porter's Survey to pouring gasoline in a dry forest and then argued that the inflammatory Facebook posting was the equivalent of someone dropping a match. Later, that same FAC member compared the Survey and the grievants' alleged harm to that done to the Tuskegee inmates being infected with syphilis. Contrary to the College's policies, this FAC member failed to disclose his motives or conflict prior to the proceedings.

76.     Following the FAC report, Dr. Porter learned that two members of the FAC committee had, contrary to Faculty Manual procedures and administrative due process, participated in biased and preconceived actions which disqualified them from participating in adjudication of Dr. Porter's case. On February 20, 2018, Dr. Karin Vazanna, who had been a Chair of the FSC committee that had recommended Dr. Porter's termination to the FAC, was overheard discussing with Dr. Ed McCormack and another faculty member the charges against Dr. Porter. Dr. Vazzana adamantly claimed that Dr. Porter's survey was wrong. Dr..McCormack asked: "Is this the consensus....well...all right ." Dr. McCormack afterwards participated on the FAC that heard Dr. Porter's case. As a member of the FAC, the Faculty Manual required Dr. McCormack's absence of bias and preconceived opinion, but he wrongfully failed to reveal his preconceptions, bias, or the ex parte influence on him.

77.     The second instance of blatant bias contrary to the Faculty Manual and administrative due process involved Dr. Jay Baltisberger, Chair of the FAC that heard Dr. Porter's charges. On or about February 19, 2018, Dr. Baltisberger expressed his

24

clear bias and preconceived opinion that Dr. Porter's use of realistic scenarios was "almost malicious." He apologized to President Roelofs for not reading the survey more closely when he had been provided it two weeks prior to its publication. President Roelofs selected Dr. Baltisberger to remain as Chair of the FAC that heard Dr. Porter's charges. This was a blatant violation of Faculty Manual procedures and administrative due process.

78.    After the hearing on the charges against Dr. Porter, the FAC Report submitted to President Roelofs stated that academic freedom did not protect the Survey. The FAC Report states that two conditions are necessary for academic freedom protection at the College: (i) the speech must be made in an academic occasion, and (ii) the participants must speak and conduct themselves in a manner consistent with the motives, methods, and ends of the academic enterprise. The FAC found only that the survey was inconsistent with the "methods" of the academic enterprise. It also decided that Porter's motives and ends were not inconsistent with an academic exercise. The result was contrary to both the procedures in the Faculty Manual and to administrative due process.

79.    The FAC Report also relied on a factual error claiming that the Survey identified Dr. Williams as having a "documented disability" pertaining to an alleged post-chemotherapy cognitive impairment. The Survey's reference to a "documented disability" actually referred to Dr. Messer's post-hearing diagnosis of having Attention Deficit Hyperactivity Disorder, which manifested itself in the "impulsive," "aggressively oblivious," and "erratic" behaviors of which the College had accused Dr. Messer during the proceedings against him and in creating a hostile work environment. Dr. Messer consented to Dr. Porter's inclusion of this information about his disability in the survey.

80.     Despite Dean Berry's arguments that Dr. Porter's intentions did not matter (as the Dean had also argued with respect to Dr. Messer), the FAC Report specifically did not find that in creating and distributing the Survey Dr. Porter had intended to retaliate against the grievants in Dr. Messer's proceedings. The FAC Report stated that "[t]hough social media surely played a part in escalating the backlash on the PSY 210 students, social media could only have done so after and in light of the [S]urvey's dissemination." This finding constitutes an unlawful "heckler's veto" of protected speech.

81.     The FAC Report specifically found that Dr. Porter's actions in pursuing the Survey were properly based on academic principle. The FAC found that Dr. Porter created and used the Survey in an academic setting for "a reasonable and proper (albeit controversial) purpose". The FAC acknowledged that criticism of the College's hostile environment procedures is a permissible topic of academic discussion and inquiry, relevant to Dr. Porter's PSY 210 Industrial / Organizational Psychology class.

82.     The FAC Report faulted Dr. Porter for not "disclosing" to his PSY 210 students the factual events which served as the basis of the scenarios in the Survey. On the other hand, the FAC Report criticized the Survey's alleged disclosure of "confidential information" to the campus community concerning the prior Dr. Messer proceedings and the alleged resulting harm to Dr. Porter's colleagues. Accordingly, while the FAC Report claimed that Dr. Porter's "methods" precluded an academic freedom defense, the stated basis for the FAC Report's conclusion that Dr. Porter should be terminated was that he "cannot be trusted" to handle "confidential" information in the future and that "the personal conduct of Dr. Porter has hindered his professional responsibilities to an extent" that he should be dismissed. No criticism of Dr. Williams' identification of individuals was mentioned.

26

83.   Dean Berry falsely testified to the FAC that "ten to twelve" faculty members had recommended to him that the FAC terminate Dr. Porter when, in fact, only four (4) such recommendations were introduced in evidence, which included two by the grievants themselves.  Dean Berry's testimony was a gross exaggeration.

84.   President Roelofs in a letter dated June 13, 2018 affirmed the FAC Report's recommendation and ordered Dr. Porter's termination.

85.   The Faculty Manual expressly states that there is no enforceable confidentiality in the College's civil rights proceedings. *See* Faculty Manual, page 92. The only circumstance where confidentiality is guaranteed in such proceedings is "[u]pon receipt of a complaint of Sexual Violence."  President Roelofs' concluding letter in Dr. Messer's case confirmed that the College administration knew this by stating that "I have scanned our policy documents in vain for any requirement of confidentiality and so do not have the latitude to impose it."  This finding was blatantly ignored, however.

86.   Pursuant to the terms of the Faculty Manual, Dr. Porter appealed the President's decision to the Berea College Board of Trustees Executive Committee.

87.   On July 27, 2018, the College Executive Committee issued a Resolution describing the possible grounds for reversal of Dr. Porter's termination on appeal, pursuant to the Committee's duty to hear any such appeal as provided in the Faculty Manual and, as such, part of Dr. Porter's employment contract.  In pertinent part, these ostensibly would be grounds to reverse President Roelofs' decision:

(i)    In violation of Faculty Manual provisions;

(ii)   In excess of the authority granted to the Faculty Appeals Committee or the President in the Faculty Manual;

(iii)  Without support of substantial evidence on the whole record;

(iv)  Arbitrary, capricious, or characterized by abuse of discretion;

27

\* \* \*

(vi)     Prejudiced by a failure of

    [a]     any member of the Faculty Appeals Committee, prior
         to the evidentiary hearing, or

    [b]     the President, prior to any involvement in the faculty
         disciplinary process, to disclose any conflict of
         interest or bias which would prevent the faculty
         member or Berea College from receiving an impartial
         evidentiary hearing or decision; or

(vii)    Deficient as otherwise provided by the Faculty Manual or Berea
    College policies.

88.     In his appeal, Dr. Porter pointed out the obvious contradiction between
the stated basis for his termination and the lack of any confidentiality requirements.
He also argued, in pertinent part, that: (i) his termination violated his right to
academic freedom, (ii) the Dean's failure to allow mediation prior to bringing charges
against Dr. Porter was contrary to the terms of the Faculty Manual, (iii) the Dean's
multi-part role as participant, witness, and prosecutor violated Dr. Porter's right under
the Faculty Manual to fundamental fairness in the termination proceedings, (iv) the
FAC's denial of Dr. Porter's right to confront all of the witnesses against him was
contrary to the terms of the Faculty Manual and administrative due process, and (v)
that the Committee use of the preponderance of the evidence standard violated his
rights under the Faculty Manual and administrative due process.  In summation, the
proceedings against Dr. Porter were a sham, a show trial.

89.     Nonetheless, the Executive Committee affirmed President Roelofs'
decision, and Dr. Porter's employment at Berea College officially ended on September
30, 2018.

90.     In all of the above events and particulars, the College's administrators
demonstrated its longstanding pattern and practice of favor toward and support of

28

some of its students' and employees' extreme "politically correct" activism and factually and legally unsound grievances, to the gross detriment of the College's obligations to conduct academically honest, fair, and even-handed hiring, retention, and supervision of its faculty and staff.

91.    As a proximate result of the College's false charges against Dr. Porter, its suspension and banishment of him from campus, and its ultimate termination of him, and as a proximate result of Dr. Sergent's false and malicious statements against him, Dr. Porter has suffered and will continue to suffer substantial harm, including irreparable damage to his reputation, embarassment, humiliation, severe emotional distress, mental anguish, and physical injury, manifesting in a stroke (cerebral vascular accident) he suffered on November 12, 2018, when he was treated in the emergency room of St. Joseph Berea Hospital, transferred via ambulance to the Neurological Intensive Care Unit and St Joseph Lexington Hospital, and released on November 14th, 2018.  Dr. Porter's consequent prolonged stress and mental anguish has also contributed to his high blood pressure and greatly disturbed sleep patterns.

F.    Dr. Porter's Contractual Rights to Continued Employment, Academic Freedom, and Administrative Due Process According to the Faculty Manual.

92.    As a tenured member of the College faculty, Dr. Porter had an employment contract with the College which was subject to automatic annual renewal. The last executed annual employment contract the College provided to Dr. Porter was dated June 1, 2018, which stated in part that he was re-hired for the school year 2018-2019 at a small increase in salary.  This letter creates an estoppel on all subsequent actions to terminate Dr. Porter.

29

93.     Dr. Porter's employment contract expressly stated that it was subject to the terms of the Berea College Faculty Manual ("the Faculty Manual"), which sets forth the College's policies on appointment, promotion, tenure, academic freedom, non-discrimination, harassment, retaliation, sexual misconduct, and grievance proceedings, as published on the College's website at:

http://catalog.berea.edu/en/Current/Faculty-Manual.

94.     As a tenured member of the faculty, Dr. Porter was entitled to continued employment and the protection of academic freedom at the College according to the Faculty Manual, except for a showing of "adequate cause" for his termination:

> A tenured appointment represents Berea College's commitment to academic freedom, and its trust in the appointee's promise as teacher and scholar. The granting of tenure is not automatic; it is the result of a considered judgment that the faculty member will make a significant, long-term contribution to the fulfillment of the College's purposes. Tenure is a continuous appointment. It continues until (1) the appointee resigns or retires, or chooses to reduce teaching responsibilities below one-half of a normal teaching load, or (2) a situation develops that is demonstrably adequate cause for discontinuation of the appointment. Academic freedom is essential to the College's success in meeting its educational obligations to its students and the larger society. A well-conceived and soundly administered tenure system is considered the best means to assure such freedom.
> (Emphasis added).

95.     The Faculty Manual states that the specific principles of academic freedom are substantially based on "[t]he substance and the wording of this statement are drawn in part from the 1940 Statement of Principles on Academic Freedom and Tenure, developed by the Association of American Colleges and the American Association of University Professors" (AAUP), and that each faculty member is entitled to academic freedom in the classroom and in his or her research:

> This statement summarizes the understanding between the faculty and administration of Berea College on the principles and practices of academic freedom at this institution . . .

* * *

30

Freedom in the Classroom

The faculty member is entitled to freedom in the classroom and should
be supported by the College administration and colleagues in its exercise.
Academic freedom, however, carries with it duties correlative with rights.
In exercising freedom in discussion of the subject matter, the faculty
member should be careful not to introduce controversial matter <u>which
has no relation to the subject</u>. This should not be narrowly construed,
but the faculty member has a responsibility to the entire College
community <u>to refrain from habitually substituting extraneous materials
for the proper subject matter of the course.</u>

Freedom of Research

Freedom of research is fundamental to the advancement of truth. The
faculty member is entitled <u>to full freedom in ordering and recommending
library materials, presenting a variety of perspectives, and in research
and in the publication of the results</u>. . .

* * *

(Emphasis added).

96.     In its report upon Dr. Messer's appeal in the prior disciplinary

proceedings, the FAC outlined the College's interpretation of its academic freedom

policy which it also applied in its Report on Dr. Porter's case:

Two conditions must be met . . . to create an 'environment that is
protected by academic freedom': (1) it must be an academic occasion,
and (2) the participants must speak and conduct themselves in a manner
consistent with the motives, methods, and ends of the academic
enterprise.

. . . <u>Where the academic purpose is not apparent or where the academic
purpose is plainly not significant enough to warrant the offense</u>, it will be
safe to conclude that the speaker has not been conducting himself or
herself in a manner consistent with the motives, methods, and ends of
the academic enterprise.

. . . [T]he academic enterprise, as understood by the Committee
presumes that <u>no subjects are inherently taboo or off-limits because they
are 'objectively offensive'</u>; and it nurses no phobic aversion to
controversial topics or strong emotions.

<u>The content and/or viewpoint of speech by [itself] will very seldom, if
ever, disqualify speech from protection by academic freedom</u>.  In
intramural academic occasions, self-disqualification occurs when a
speaker departs from an academic agenda to further personal grievances,

31

animosities, or grudges; to exert power for private gain or satisfaction; to advocate (rather than to analyze) partisan political causes; to stage an emotional catharsis before a captive audience; to browbeat or shame interlocutors into submission, acquiescence, or agreement; in short, to pursue any ulterior purpose likely to thwart the motives, methods, and ends of the academic enterprise.
(Emphasis added).

97.    The Faculty Manual states the College's "Harassment Policy" and expressly subjects the policy to a balancing test with a faculty member's right to academic freedom:

Harassment prohibited by this policy includes verbal or physical conduct that, because of its severity and/or persistence, substantially interferes with the mutual respect and collegiality afforded all individuals at Berea College. In particular, harassment may include verbal or physical behavior directed at an individual that is abusive of that individual's distinguishing characteristics, including race, gender, age, religion, sexual orientation, or national origin, to such an extent as to substantially interfere with the individual's work or education or adversely affect one's living conditions.

In prohibiting harassment in all its forms, Berea seeks to preserve and enhance academic freedom for all members of the campus community. Nothing in this policy is intended to limit the freedom of inquiry, teaching, or learning necessary to the College's educational purposes, or to inhibit scholarly, scientific, or artistic treatment of subject matter appropriate to an institution of higher education.
(Emphasis added).

98.    The Faculty Manual specifies the promised procedures in the formal hearing process in the event a complaint is made against a faculty member for conduct in violation of civil rights, and makes clear that an accused has the right to confront all witnesses under the College's incorporated AAUP standards. The AAUP burden of proof is set at "clear and convincing evidence" which, as stated in ¶ 93, *supra,* has been incorporated in the College's Faculty Manual. *There is no right to confidentiality for any participant in the proceedings* including criticisms by Dr. Porter. Specifically:

Resolving Complaints through the Formal Hearing Process

32

\*\*\*

4.  Except in extraordinary circumstances, the respondent is entitled to confront his or her accuser and any witnesses at the hearing. The right of confrontation may be waived by the absence or gross misconduct of the respondent.

6.  The standard of proof in a formal hearing is whether, based on all the evidence presented, a reasonable person would conclude that it is more likely than not that the alleged Violation did occur (preponderance of evidence standard).

\* \* \*

General Guidelines

1.  In the reporting, investigating, and hearing of alleged Violations, every effort shall be made to ensure confidentiality and the privacy of the parties involved, but complete confidentiality cannot be guaranteed, particularly if formal charges are filed. Requests for confidentiality shall be addressed to and decided by the College's Title IX Coordinator. At all stages, investigations, administrative hearings, and formal hearings complaints are to be handled discreetly and expeditiously. Every effort will be made to contain hearsay and to minimize the potential for harmful effects on the individuals involved and the College community.

2.  Both the complainant and the respondent shall be assured of fair treatment throughout the investigation, administrative hearing and formal hearing processes. Retaliation or intimidation by either party is prohibited by law and College policy; neither will be tolerated. Any such retaliation or intimidation is subject to disciplinary action up to and including termination or expulsion. (Emphasis added).

99.  In the stated procedure in a proceeding for dismissal with cause, the Faculty Manual provides that the College will provide the accused with the right to confront any witnesses against him, except where there are "unusual" or "urgent" reasons to take a witness' written statement:

> The faculty member and advisor should have the opportunity to question all persons who testify orally and to confront all who testify adversely. When unusual and urgent reasons move the Committee to deny this opportunity, or when the knowledgeable person cannot appear, the identity of the person, as well as the person's statements, should nevertheless be disclosed to the faculty member. Subject to these

safeguards, statements may, when necessary, be taken outside the
hearing and reported to it.
(Emphasis added).

100.   In Dr. Porter's case, the College made no inquiry and made no

findings of any "unusual" or "urgent" reasons to allow the two (2) most crucial

witnesses, Drs. Williams and Wyrick, to submit written statements before the

FAC, and the College arbitrarily and capriciously denied Dr. Porter his

contractual and legal rights to confront and to cross examine these witnesses.

101.   The Faculty Manual defines "retaliation" for the purposes of the College's

Sexual Harassment Policy" and "Sexual Misconduct Policy" as "[t]he act of seeking

revenge upon another person." The FAC specifically found that Dr. Porter *had not*

committed this act.

102.   The Faculty Manual includes the College's "Nondiscrimination Policy,"

and its "Community Aspirations Statement" and provides that "[h]indrances to

dialogue and free expression can very much impede learning. The concept and

application of academic freedom at Berea College protect these values and are

articulated in the Faculty Manual." The "Community Aspirations Statement" further

provides that "[t]his statement does not mandate these values and is not intended to

restrict any person's conscience or academic or personal freedoms."

103.   The Faculty Manual states the following possible grounds for the

termination of a faculty member for "incompetence" in the performance of his duties:

> The following are considered adequate cause for dismissal of tenured
> faculty, or of faculty under term appointment before the appointment
> expires:
>
> - Demonstrated incompetence or dishonesty in teaching or research.
> - Substantial, persistent and demonstrated neglect of professional
>   responsibilities or failure to observe the terms of appointment to the
>   faculty.
> - Personal conduct which demonstrably hinders fulfillment of
>   professional responsibilities.

- Infirmities serious enough to qualify for total disability payments under the College's disability plan and/or social security.

104.   The College did not properly apply these criteria for the termination of a faculty member for "incompetence" in the case against Dr. Porter.

## CAUSES OF ACTION

### COUNT I vs. Berea College:

### Breach of Contract for Suspension from Employment in Violation of the Required Due Process and Dr. Porter's Academic Freedom

105.   Paragraphs 1-104 are hereby restated and incorporated by reference.

106.   The Faculty Manual, which is part of Dr. Porter's employment contract with the College, states that during proceedings for termination for cause "the faculty member shall be suspended only if continuance threatens immediate danger to persons or property." (Emphasis added).

107.   In the present case, after Dean Berry initially charged Dr. Porter, President Roelofs summarily suspended Dr. Porter and barred him from campus without any prior notice nor any evidence or reasonable basis to determine that he posed any "immediate danger to persons or property." These actions constituted a forbidden "prior restraint" in violation of the clear language in the Faculty Manual guaranteeing Dr. Porter administrative due process. Neither President Roelofs nor Dean Berry specified to Dr. Porter the nature of any such "immediate danger" he may pose and refused to discuss the Survey with him or to convene any mediation between the parties about the controversy.

108.   The College's unfounded suspension and banishment of Dr. Porter from campus needlessly tarnished his reputation, denied him access to materials needed to

defend himself, and interfered with his academic work by denying his access to crucial resources such as a library, licensed computer software, and his own office.

109.   The College's unfounded suspension and banishment of Dr. Porter from campus, without the opportunity for mediation, created a presumption of his guilt, impeded his ability to defend himself, and strongly prejudiced the case against him prior to the FAC hearing.

110.   The College suspended Dr. Porter from employment, banished him from campus, and refused mediation in breach of his employment contract and the terms of the Faculty Manual.

111.   Dr. Porter's employment contract and the Faculty Manual guarantee him the right of academic freedom in the classroom and in his research, when such speech and conduct pertains to an academic occasion and is made in a manner consistent with the motives, methods, and ends of the academic enterprise.

112. Dr. Porter, at all pertinent times, created and distributed the Survey pursuant to legitimate academic inquiry and in a manner consistent with the motives, methods, and ends of the academic enterprise. Particularly, he tendered the Survey to the proper persons for vetting prior to its release, and received no feedback forbidding its release. Accordingly, all of Dr. Porter's speech and conduct associated with or related to the creation and distribution of the Survey was protected under his right to academic freedom and free speech under his employment contract and the terms of the Faculty Manual. Indeed, Dr. Rob Smith provided hours of essential technical support required to publish the survey, and Dr. Burnside spent hours editing it.

113.   The College denied Dr. Porter his right to academic freedom and free speech by bringing false charges of "incompetence" against him, suspending him, and

banishing him from campus in breach of his employment contract and the terms of the Faculty Manual.

114.   Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of the College's breaches of contract, including but not limited to, irreparable harm to his reputation, embarassment, humiliation, emotional distress, mental anguish and physical injury, manifesting in his cerebral vascular stroke on November 12, 2018.  Dr. Porter's consequent prolonged stress and mental anguish has also contributed to his high blood pressure and greatly disturbed sleep patterns.

COUNT II vs. Berea College:
Breach of Contract for Termination of Dr. Porter's Employment for "Incompetence" After the College's Denial of the Required Administrative Due Process.

115.   Paragraphs 1-114 are hereby restated and incorporated by reference.

116.   The College's unfounded suspension and banishment of Dr. Porter, without proper notice, without the opportunity for mediation, without any reasonable basis or evidence that Dr. Porter was an "immediate danger to persons or property" on campus, and without affording him any due process with a reasonable investigation, specification of charges, discovery of evidence, or opportunity to defend himself, was in breach of his employment contract and the terms of the Faculty Manual.

117.   The FAC Chair advised Dr. Porter prior to the hearing that the FAC would give "little weight" to written witness statements that could not be cross-examined. However, the FAC thereafter placed great emphasis on the written statements of Dr. Williams and of Dr. Wyrick in its conclusion to recommend Dr. Porter's termination.

118.   The charges brought against Dr. Porter at the FAC hearing involved alleged "incompetence," on account of specific violations of the College's civil

37

rights policies concerning harassment, creation of a hostile work environment, and retaliation.

119.   The grouping or conflation of charges seeking Dr. Porter's dismissal for cause based on "incompetence" while also accusing him of violations of the College's civil rights policies on harassment, creation of a hostile work environment, and retaliation accordingly rendered the FAC hearing a proceeding under and subject to the requirements of both the dismissal with cause and the civil rights hearing procedures set forth in the Faculty Manual.

120.   In breach of the Faculty Manual's promise that Dr. Porter would be able to confront all witnesses against him at the FAC hearing, the College terminated Dr. Porter's employment without allowing him to confront or cross examine his main accusers, Dr. Williams or Dr. Wyrick, who instead only submitted written statements to the FAC about the alleged hostile work environment in the psychology department, the alleged sexual harassment and retaliation against them, and the alleged harm and emotional distress they suffered as a result.  The grievants did not allege or offer to prove any "unusual" or "urgent" circumstances as a basis for them not to have to testify in person.

121.   The FAC Report then frequently referred to Dr. Williams' and Dr. Wyrick's written testimony in concluding that Dr. Porter's Survey had caused them professional and personal harm and emotional distress, contrary to the FAC's stated promise to place little weight on such statements and in breach of Dr. Porter's right under his employment contract and the Faculty Manual to confront and cross examine the witnesses against him.

122.   Dean Berry was a participant in the prior hostile environment proceedings against Dr. Messer and was also an actor in and witness of the events and

circumstances involved in the termination proceedings against Dr. Porter. The Dean served as a witness and the prosecutor at the FAC hearing, while also being the direct supervisor of the FAC members concerning their compensation and the terms of their employment at the College. Dean Berry refused to recuse himself over Dr. Porter's written objections and in blatant violation of Dr. Porter's right to administrative due process.

123.   The Faculty Manual states that the College's stated procedures in a termination proceeding against a faculty member "are intended to insure fair process." *See* Faculty Manual, page 129.

124.   However, the College's Board of Trustees allowed Dean Berry to assume the multi-part role as participant, witness, and prosecutor in the termination proceedings against Dr. Porter in violation of Dr. Porter's right to fundamental fairness in the proceedings under the terms of his employment contract, the Faculty Manual, and the Executive Committee Resolution at Items (i) - (iv).

125.   Also, at least three members of the FAC displayed a previously undisclosed and unfair prejudgment and bias against Dr. Porter's defense at the hearing, *see* ¶¶ 75-77, *supra*, in violation of Dr. Porter 's right to fundamentally fair termination proceedings under the terms of the Faculty Manual and the Executive Committee Resolution at its Items (iii) - (iv).

126.   The College denied Dr. Porter his guaranteed administrative due process throughout the termination proceedings against him in breach of his employment contract, the terms of the Faculty Manual, and the Executive Committee Resolution.

127.   Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of the College's breaches of contract, including but not limited to, irreparable harm to his reputation, embarassment, humiliation, emotional distress,

mental anguish and physical injury, manifesting in his cerebral vascular stroke on November 12, 2018. Dr. Porter's consequent prolonged stress and mental anguish has also contributed to his high blood pressure and greatly disturbed sleep patterns.

## COUNT III vs. Berea College:

### Breach of Contract for Termination of Dr. Porter's Employment in Violation of His Academic Freedom.

128.  Paragraphs 1-127 are hereby restated and incorporated by reference.

129.  Dr. Porter's employment contract and the Faculty Manual offered him continued employment under a guarantee of tenure, absent an "adequate cause" for his termination, and the College breached his employment contract by terminating him without adequate cause.

130.  Dr. Porter's employment contract and the Faculty Manual guarantee him the right of academic freedom in the classroom and in his research, when such speech and conduct pertains to an academic occasion and is made in a manner consistent with the motives, methods, and ends of the academic enterprise.

131.  Dr. Porter, at all pertinent times, created and distributed the Survey pursuant to legitimate academic inquiry and in a manner consistent with the motives, methods, and ends of the academic enterprise. Accordingly, all of Dr. Porter's speech and conduct associated with or related to the creation and distribution of the Survey was protected under his right to academic freedom under his employment contract, the terms of the Faculty Manual and the Executive Committee Resolution at Items (i) – (iv).

132.  The College denied Dr. Porter his right to academic freedom throughout the termination proceedings against him in breach of his employment contract, the terms of the Faculty Manual, and the Executive Committee Resolution.

40

133.   Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of the College's breaches of contract, including but not limited to, irreparable harm to his reputation, embarassment, humiliation, emotional distress, mental anguish and physical injury, manifesting in his cerebral vascular stroke on November 12, 2018.  Dr. Porter's consequent prolonged stress and mental anguish has also contributed to his high blood pressure and greatly disturbed sleep patterns.

### COUNT IV vs. Berea College:

### Violations of Title VII, Title IX, the ADEA, and the KCRA for Employment Discrimination

134.   Paragraphs 1-133 are hereby restated and incorporated by reference.

135.   The College has participated in and supported a pattern and practice of illegal discrimination based on age, race, and sex against white males over the age of 40 in the College's employment, discipline, and termination of members of the faculty in the psychology department and in the overall faculty of the College.

136.   As part of this pattern and practice and because of the illegal discriminatory animus against Dr. Porter on the part of President Roelofs and Dean Berry, and due to the severe personal and political coercion of other College faculty members and administrators, with the knowing participation of the College, the College intentionally discriminated against Dr. Porter in suspending him, banishing him from campus, and ultimately terminating his employment without adequate cause and based on his age, race, and sex in violation of 42 U.S.C. § 2000e-2, 20 U.S.C. § 1681(a), 29 U.S.C. § 623(a)(1), or KRS 344.040(1)(a).

A.     Discrimination Based on Age.

137.   Paragraphs 1-136 are hereby restated and incorporated by reference.

138.   Dr. Porter is a 70-year-old, white male.

139.   Under 29 U.S.C. § 623(a)(1) "[i]t shall be unlawful for an employer--(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." *See also* 29 U.S.C. § 631 (age discrimination is actionable under § 623(a)(1) when directed at an employee who is 40-years-old or more).

140.   Under KRS 344.040(1)(a) "[i]t is an unlawful practice for an employer: (a) To fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's [age forty (40) and over]."

141.   The College, in furthering its prior pattern of age discrimination, intentionally discriminated against Dr. Porter because of his age and in violation of 29 U.S.C. § 623(a)(1) and KRS 344.040(1)(a) when the College brought false charges of "incompetence" against him, suspended him, and banished him from campus without any evidence of showing that he posed any "immediate danger to persons or property."

142.   The Faculty Manual expressly states that there is no enforceable guarantee of confidentiality in the College's civil rights proceedings. The only circumstance where confidentiality is guaranteed in such proceedings is "[u]pon receipt of a complaint of Sexual Violence." President Roelofs' concluding letter in Dr. Messer's case confirmed the College administration knew this by stating that "I have scanned our policy documents in vain for any requirement of confidentiality and so do not have the latitude to impose it."

143.   The College intentionally discriminated against Dr. Porter because of his age and in violation of 29 U.S.C. § 623(a)(1) and KRS 344.040(1)(a) when the College brought false charges of "incompetence" against him and terminated him on the

42

pretext that he had allegedly violated a fabricated requirement for all participants in the College's civil rights proceedings to maintain confidentiality, and specifically concerning Dr. Porter's knowledge of and involvement in the prior proceedings against Dr. Messer. The College knowingly and unlawfully treated Dr. Porter differently from and less favorably than other similarly situated, younger employees, and differently and less favorably than persons who supported Dr. Messer's punishment, and condoned the unlawful discriminatory acts of other faculty members who participated as grievants against Dr. Messer and, later, against Dr. Porter.

144.   Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of the College's illegal discrimination based on age in violation of 29 U.S.C. § 623(a)(1) and KRS 344.040(1)(a), including but not limited to, irreparable harm to his reputation, embarassment, humiliation, emotional distress, mental anguish and physical injury, manifesting in his cerebral vascular stroke on November 12, 2018. Dr. Porter's consequent prolonged stress and mental anguish has also contributed to his high blood pressure and greatly disturbed sleep patterns.

### B.   Discrimination Based on Race.

145.   Paragraphs 1-144 are hereby restated and incorporated by reference.

146.   Dr. Porter is now a 70-year-old, white male.

147.   Under 42 U.S.C. § 2000e-2(a)(1) "[i]t shall be an unlawful employment practice for an employer-- (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race[.]"

148.   Under KRS 344.040(1)(a) "[i]t is an unlawful practice for an employer: (a) To fail or refuse to hire, or to discharge any individual, or otherwise to discriminate

against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's race[.]"

149.   The College, in furthering its prior pattern of race discrimination, intentionally discriminated against Dr. Porter because of his race and in violation of 42 U.S.C. § 2000e-2 and KRS 344.040(1)(a) when the College brought false charges of "incompetence" against him, suspended him, and banished him from campus without any evidence of showing that he posed any "immediate danger to persons or property."

150.   The Faculty Manual expressly states that there is no enforceable guarantee of confidentiality in the College's civil rights proceedings. The only circumstance where confidentiality is guaranteed in such proceedings is "[u]pon receipt of a complaint of Sexual Violence." President Roelofs' concluding letter in Dr. Messer's case confirmed the College administration knew this by stating that "I have scanned our policy documents in vain for any requirement of confidentiality and so do not have the latitude to impose it."

151.   The College intentionally discriminated against Dr. Porter because of his race and in violation of 42 U.S.C. § 2000e-2 and KRS 344.040(1)(a) when the College brought false charges of "incompetence" against him and terminated him on the pretext that he had allegedly violated a fabricated requirement for all participants in the College's Civil Rights proceedings to maintain their confidentiality and specifically concerning Dr. Porter's knowledge of and involvement in the prior proceedings against Dr. Messer. The College knowingly and unlawfully treated Dr. Porter differently and less favorably than similarly situated non-white employees, and differently and less favorably from persons who supported Dr. Messer's punishment, and condoned the unlawful discriminatory acts of other faculty members who participated as grievants against Dr. Messer, and, later, against Dr. Porter.

44

152.    Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of the College's illegal discrimination based on race, in violation of 42 U.S.C. § 2000e-2 and KRS 344.040(1)(a), including but not limited to, irreparable harm to his reputation, embarassment, humiliation, emotional distress, mental anguish and physical injury, manifesting in his cerebral vascular stroke on November 12, 2018.  Dr. Porter's consequent prolonged stress and mental anguish has also contributed to his high blood pressure and greatly disturbed sleep patterns.

C.    Discrimination Based on Sex

153.    Paragraphs 1-152 are hereby restated and incorporated by reference.

154.    Dr. Porter is now a 70-year-old, white male.

155.    Under 42 U.S.C. § 2000e-2 ) "[i]t shall be an unlawful employment practice for an employer-- (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's [sex]."

156.    Under 20 U.S.C. § 1681(a) "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]"

157.    Under KRS 344.040(1)(a) "[i]t is an unlawful practice for an employer: (a) To fail or refuse to hire, or to discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's [sex]."

158.    The College, in furthering its previous pattern of sex discrimination, intentionally discriminated against Dr. Porter because of his sex and in violation of 42

45

U.S.C. § 2000e-2, 20 U.S.C. § 1681(a), and KRS 344.040(1)(a) when the College brought false charges of "incompetence" against him, suspended him, and banished him from campus without any evidence of showing that he posed any "immediate danger to persons or property."

159.   The Faculty Manual expressly states that there is no enforceable guarantee of confidentiality in the College's civil rights proceedings. The only circumstance where confidentiality is guaranteed in such proceedings is "[u]pon receipt of a complaint of Sexual Violence." President Roelofs' concluding letter in Dr. Messer's case confirmed the College administration knew this by stating that "I have scanned our policy documents in vain for any requirement of confidentiality and so do not have the latitude to impose it."

160.   The College intentionally discriminated against Dr. Porter because of his sex and in violation of 42 U.S.C. § 2000e-2, 20 U.S.C. § 1681(a), and KRS 344.040(1)(a) when the College brought false charges of "incompetence" against him and terminated him on the pretext that he had allegedly violated a fabricated requirement for all participants in the College's civil rights proceedings to maintain their confidentiality and specifically concerning Dr. Porter's knowledge of and involvement in the prior proceedings against Dr. Messer. The College knowingly and unlawfully treated Dr. Porter differently and less favorably than other similarly situated female faculty, and differently and less favorably from persons who supported Dr. Messer's punishment, and condoned the unlawful discriminatory acts of other faculty members who participated as grievants against Dr. Messer, and, later, against Dr. Porter.

161.   Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of the College's illegal discrimination based on sex in violation of 42

U.S.C. § 2000e-2, 20 U.S.C. § 1681(a), and KRS 344.040(1)(a), including but not limited to, irreparable harm to his reputation, embarrassment, humiliation, emotional distress, mental anguish and physical injury, manifesting in his cerebral vascular stroke on November 12, 2018. Dr. Porter's consequent prolonged stress and mental anguish has also contributed to his high blood pressure and greatly disturbed sleep patterns.

<u>COUNT V vs. Berea College</u>:

<u>Violations of Title VII, Title IX, the ADEA, and the KCRA</u>
<u>for Illegal Retaliation</u>

162.   Paragraphs 1-161 are hereby restated and incorporated by reference.

163.   Under 42 U.S.C. § 2000e-3(a) [i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

164.   Under 20 U.S.C. § 1681(a) "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]". Retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action.

165.   Under 29 U.S.C. § 623(d) "[i]t shall be unlawful for an employer to discriminate against any of his employees . . . because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter."

166.    Under KRS 344.280(1) "[i]t shall be an unlawful practice for a person, or for two (2) or more persons to conspire: (1) To retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this chapter, or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter . . ."

167.    Dr. Porter acted as Dr. Messer's "adviser" throughout his hostile environment hearing and appeals, as allowed under the Faculty Manual. Dr. Porter argued that Dr. Messer's alleged infractions were neither severe nor pervasive enough to create a "hostile workplace environment" on the basis of race, sex, or sexual orientation or to warrant the punishments levied against him. Dr. Porter, during the proceedings before the CCHB and the FAC and in correspondence with President Roelofs and with Dean Berry and in an open letter to the campus, expressed his disappointment with the unfairness of the College's processes and the result in Dr. Messer's case, thereby antagonizing the College's administration as well as the grievants who had placed the charges against Dr. Messer. This animus is blatantly expressed in the postings by Dr. Sergent and Dr. Williams, in which the College conspired and enabled.

168.    The College intentionally retaliated against Dr. Porter because of his participation in Dr. Messer's defense in the proceedings against him and because of Dr. Porter's verbal and written criticism of the College's disciplinary procedures in general, of the proceedings against Dr. Messer in particular, and of the roles and actions President Roelofs and Dean Berry took with regard to both and in violation of 42 U.S.C. § 2000e-3, 20 U.S.C. § 1681(a), 29 U.S.C. § 623(a), and KRS 344.280(1), when the College brought false charges of "incompetence" against him, suspended him, and banished him from campus without any evidence of showing that he posed

48

any "immediate danger to persons or property." The College enabled Dr. Williams' and Dr. Sergent's retaliation against Dr. Porter, generally, and particularly because of his defense of himself and Dr. Messer as older, white males.

169.   The Faculty Manual expressly states that there is no enforceable guarantee of confidentiality in the College's hostile environment proceedings. The only circumstance where confidentiality is guaranteed in such proceedings is "[u]pon receipt of a complaint of Sexual Violence." President Roelofs' concluding letter in Dr. Messer's case confirmed the College administration knew this by stating that "I have scanned our policy documents in vain for any requirement of such confidentiality and so do not have the latitude to impose it."

170.   The College intentionally retaliated against Dr. Porter because of his participation in Dr. Messer's defense in the proceedings against him and because of Dr. Porter's verbal and written criticism of the College's civil rights procedures in general, the College's hostile environment proceedings against Dr. Messer, in particular, and of the roles and actions President Roelofs and Dean Berry took with regard to both and in violation of 42 U.S.C. § 2000e-3, 20 U.S.C. § 1681(a), 29 U.S.C. § 623(a), and KRS 344.280(1), when the College brought false charges of "incompetence" against him and terminated him on the pretext that he had allegedly violated a fabricated requirement for all participants in the College's civil rights proceedings to maintain their confidentiality and specifically concerning Dr. Porter's knowledge of and involvement in the prior proceedings against Dr. Messer. The College's treatment of Dr. Porter was directly retaliatory against him because of his defense of Dr. Messer, and his criticisms of College policies and practices.

171.   Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of the College's illegal retaliation against him in violation of 42 U.S.C. §

49

2000e-3, 20 U.S.C. § 1681(a), 29 U.S.C. § 623(a), and KRS 344.280(1) including but not limited to, irreparable harm to his reputation, embarassment, humiliation, emotional distress, mental anguish and physical injury, manifesting in his cerebral vascular stroke on November 12, 2018. Dr. Porter's consequent prolonged stress and mental anguish has also contributed to his high blood pressure and greatly disturbed sleep patterns.

<u>COUNT VI vs. Dr. Sergent:</u>

<u>Defamation Per Se and Defamation Per Quod</u>

172.   Paragraphs 1-171 are hereby restated and incorporated by reference.

173.   Dr. Sergent, in his April 8-9, 2018 emails, made false and defamatory statements, as specified in ¶¶ 57-66 above, falsely accusing Dr. Porter of racist, sexist, and homophobic comments and conduct as a professor at the school.

174.   Dr. Sergent, in his April 8-9, 2018 emails, made false and defamatory statements, as specified in ¶¶ 57-66 above, falsely accusing Dr. Porter of improperly disclosing to the public the personal medical information of Dr. Williams in an attempt to defame her in order to disparage and discredit her personally and professionally.

175.   Dr. Sergent, in his April 8-9, 2018 emails, made false and defamatory statements, as specified in ¶¶ 57-66 above, falsely accusing Dr. Porter of committing academic fraud and gross violations of professional ethics in preparing and disseminating a scientifically invalid survey and in including in the Survey actual cases from the proceedings against Dr. Messer, after purposely misstating in the disclosure section that the scenarios were not based on any actual events.

176.   Dr. Sergent, in his April 8-9, 2018 emails, made false and defamatory statements, as specified in ¶¶ 57-66 above, falsely accusing Dr. Porter of being an

"incompetent" psychology professor who had improperly and unprofessionally "manipulated" his students for his own political purposes.

177.   Dr. Sergent, in his April 8-9, 2018 emails, made false and defamatory statements, as specified in ¶¶ 57-66 above, falsely accusing Dr. Porter of violating the College's IRB academic research requirements by refusing to submit the Survey to the IRB for review prior to its dissemination.

178.   Dr. Sergent, in his April 8-9, 2018 emails, made false and defamatory statements, as specified in ¶¶ 57-66 above, falsely accusing Dr. Porter of committing academic fraud and gross violations of professional ethics by willfully causing mental and emotional harm to his students and to his colleagues in an effort to divide the College campus for his own political reasons, without apology.

179.   Dr. Sergent, in his April 8-9, 2018 emails, made false and defamatory statements, as specified in ¶¶ 57-66 above, falsely accusing Dr. Porter of being "an unethical, unrepentant, academically dishonest person who is in process of rightly being fired from Berea College."

180.   Dr. Sergent published these false and defamatory statements in his April 8-9, 2018 emails to more than one member of the SGA board.

181.   Dr. Sergent published these false and defamatory statements in his April 8-9, 2018 emails with knowledge of their falsity and with actual malice toward Dr. Porter due to Dr. Sergent's sinister or corrupt motives, hatred, revenge, personal ill will, spite and desire to injure and retaliate against Dr. Porter.

182.   In the alternative, Dr. Sergent published these false and defamatory statements in his April 8-9, 2018 emails due to Dr. Sergent's gross indifference and recklessness and wanton or wilful disregard of Dr. Porter's right to personal security

including in his uninterrupted entitlement to enjoyment of his good reputation in the community.

183.   Dr. Sergent's false and defamatory statements in his April 8-9, 2018 emails were defamatory per se as they falsely charged Dr. Porter or imputed to him dishonesty or engagement in fraudulent enterprises and detrimentally reflected upon his character and integrity as a person and subjected him to the loss of public confidence and respect.

184.   Dr. Sergent's false and defamatory statements in his April 8-9, 2018 emails were defamatory per se as they imputed to Dr. Porter unfitness to perform the duties of his office or employment or directly tended to prejudice or injure him in his profession, trade, or business.

185.   As a result of Dr. Sergent making and publishing the false and defamatory per se statements in his April 8-9, 2018 emails, Dr. Porter is presumed to have suffered general damages to her reputation.

186.   Furthermore, as a result of Dr. Sergent making and publishing the false and defamatory per se statements in his April 8-9, 2018 emails, Dr. Porter has suffered special damages in that Dr. Sergent's e-mails led to the rescission of the SGA Service Award, and Dr. Porter has suffered continuous and irreparable harm to his reputation, embarassment, humiliation, severe emotional distress, mental anguish, and physical injury, manifesting in his cerebral vascular stroke on November 12, 2018.  Dr. Porter's consequent prolonged stress and mental anguish has also contributed to his high blood pressure and greatly disturbed sleep patterns.

<u>COUNT VII vs. Dr. Sergent:</u>

<u>Portrayal of Dr. Porter in a False Light</u>

187.   Paragraphs 1-186 are hereby restated and incorporated by reference.

188.   To any extent that Dr. Sergent false statements about Dr. Porter in his April 8-9, 2018 emails are not defamatory per se or defamatory per quod, Dr. Sergent, nonetheless, made the false statements as specified in ¶¶ 57-66 above and published them to more than one member of the SGA board in order to portray Dr. Porter in a false light and to attribute to him characteristics, conduct or beliefs that are false and which placed him before the public in a false position that is highly offensive to a reasonable person of this Commonwealth.

189.   Dr. Sergent published these false statements in his April 8-9, 2018 emails portraying Dr. Porter in a false light with knowledge of their falsity and with actual malice toward Dr. Porter due to Dr. Sergent's sinister or corrupt motives, hatred, revenge, personal ill will, spite and desire to injure and retaliate against Dr. Porter.

190.   In the alternative, Dr. Sergent published these false statements in his April 8-9, 2018 emails portraying Dr. Porter in a false light due to Dr. Sergent's gross indifference and recklessness and wanton or wilful disregard as to the falsity of the statements and as to the false light in which Dr. Porter was placed.

191.   Furthermore, as a result of Dr. Sergent making and publishing the false statements in his April 8-9, 2018 emails portraying Dr. Porter in a false light, Dr. Porter has suffered damages in that Dr. Sergent's e-mails led to the rescission of the SGA Service Award, and Dr. Porter has suffered continuous and irreparable harm to his reputation, embarassment, humiliation, severe emotional distress, mental anguish, and physical injury, manifesting in his cerebral vascular stroke on November

12, 2018.  Dr. Porter's consequent prolonged stress and mental anguish has also contributed to his high blood pressure and greatly disturbed sleep patterns.

## COUNT VIII vs. Dr. Sergent:

### Illegal Retaliation under the KCRA

192.    Paragraphs 1-191 are hereby restated and incorporated by reference.

193.    Under KRS 344.280(1) "[i]t shall be an unlawful practice for a person, or for two (2) or more persons to conspire: (1) To retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this chapter, or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter . . ."

194.    Dr. Porter acted as Dr. Messer's "adviser" throughout his hostile environment hearing and appeals, as allowed under the Faculty Manual.  Dr. Porter argued that Dr. Messer's alleged infractions were neither severe nor pervasive enough to create a "hostile workplace environment" on the basis of race, sex, or sexual orientation or to warrant the punishments levied against him.  Dr. Porter, during the proceedings before the CCHB and the FAC and in correspondence with President Roelofs and with Dean Berry and in an open letter to the campus, expressed his disappointment with the unfairness of the College's processes and the result in Dr. Messer's case, thereby antagonizing the College's administration as well as Dr. Sergent and the grievants who had placed the charges against Dr. Messer.

195.    Upon hearing of the SGA's vote to give Dr. Porter the award, Dr. Sergent was again very angry and spiteful toward him and wanted to derail the SGA's decision. Dr. Sergent wanted to punish Dr. Porter and to retaliate against him for his past support of Dr. Messer and for his dissemination of the Survey, which Dr. Sergent

hastily and incorrectly inferred to be an "attack" on his wife for her prior grievances against Dr. Messer.

196.    In violation of KRS 344.280(1) and in retaliation for Dr. Porter's participation in and defense of Dr. Messer in the prior hostile workplace proceedings, and in an attempt to discredit Dr. Porter in front of the students and to injure Dr. Porter's academic career at the College, Dr. Sergent made the false and defamatory statements against Dr. Porter, in his April 8-9, 2018 emails, as specified in ¶¶ 57-66 above.

197.    Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of Dr. Sergent's illegal retaliation against him in violation of KRS 344.280(1), including but not limited to irreparable harm to his reputation, embarassment, humiliation, emotional distress, mental anguish and physical injury, manifesting in his cerebral vascular stroke on November 12, 2018.  Dr. Porter's consequent prolonged stress and mental anguish has also contributed to his high blood pressure and greatly disturbed sleep patterns.

COUNT IX vs. Berea College:

Negligence in Hiring, Retaining, and Supervising Dr. Sergent

198.    Paragraphs 1-197 are hereby restated and incorporated by reference.

199.    At all pertinent dates and times, the College's administrators failed to use reasonable care in the hiring, retention, and supervision of Dr. Sergent as an employee.

200.    The College knew of and was well aware of Dr. Sergent's continuing anger and spite toward Dr. Porter and about the dissemination of the Survey and knew that Dr. Sergent vehemently sided with his wife and the "politically correct" College employees and campus activists who were agitating against Dr. Porter.  The

College's administrators knew that under these circumstances Dr. Sergent posed an unreasonable risk of harm to Dr. Porter's reputation and academic career and to the rights Dr. Porter was entitled to under his tenured employment contract with the College.

201.   Furthermore, throughout the Survey controversy, the College's administrators did not caution Dr. Sergent or other College employees from personally attacking, threatening, or inciting opposition to Dr. Porter.  The College's administrators failed to control or prevent Dr. Sergent from acting in a manner designed to harm Dr. Porter's reputation and academic career and to the rights which Dr. Porter was entitled under his tenured employment contract with the College.  The College's administrators also purposely refrained from making any public defense of Dr. Porter's rights under his employment contract with the College to enjoy academic freedom, administrative due process, and his personal and professional safety. Instead, the College followed and fomented the opposition to Dr. Porter and to the Survey.

202.   Due to the College's knowledge that Dr. Sergent was unfit for his job at the College as a then-untenured assistant professor, and as a result of the College's lack of reasonable care in its hiring, retention, and supervision of Dr. Sergent as its employee, the College created an unreasonable risk of harm to Dr. Porter, which resulted in and allowed Dr. Sergent to use his College e-mail address, the College computer network, and his position as "Faculty Advisor to the SGA" to retaliate against Dr. Porter for his participation in and defense of Dr. Messer in the prior hostile workplace proceedings and to attempt to discredit Dr. Porter in front of the students and to injure Dr. Porter's academic career at the College by making the false and

defamatory statements against Dr. Porter in the April 8-9, 2018 emails, as specified in ¶¶ 57-66 above.

203.   As a result of the College's lack of reasonable care in its hiring, retention, and supervision of Dr. Sergent as its employee, Dr. Porter has suffered and will continue to suffer substantial harm as a direct result of Dr. Sergent's illegal retaliation against him in violation of including but not limited to irreparable harm to his reputation, embarassment, humiliation, emotional distress, mental anguish and physical injury, manifesting in his cerebral vascular stroke on November 12, 2018, high blood pressure, and greatly disturbed sleep patterns.

COUNT X vs. Berea College:

Liability in Respondeat Superior

204.   Paragraphs 1-203 are hereby restated and incorporated by reference.

205.   In the alternative, at all pertinent times Dr. Sergent was an employee of the College subject to the supervision, direction, and control of the College in his position a then-untenured assistant professor and as "Faculty Advisor to the SGA." The College is, therefore, vicariously liable in respondeat superior as a result of Dr. Sergent's April 8-9, 2018 emails, as specified in ¶¶ 57-66 above, making false and defamatory statements against Dr. Porter, portraying Dr. Porter in a false light, and illegally retaliating against Dr. Porter in violation of KRS 344.280(1), all within the course and scope of Dr. Sergent's employment at the College.

206.   As a result of the College's vicarious liability in respondeat superior for the tortious and illegal actions of its employee Dr. Sergent within the course and scope of his employment, the College is liable to Dr. Porter for his damages, including but not limited to, irreparable harm to his reputation, embarassment, humiliation,

emotional distress, mental anguish and physical injury, manifesting in his cerebral vascular stroke on November 12, 2018. Dr. Porter's consequent prolonged stress and mental anguish has also contributed to his high blood pressure and greatly disturbed sleep patterns.

WHEREFORE, Dr. Porter hereby respectfully requests this Court enter Judgment against the Defendants on each and all counts in this Complaint and for the following relief, including but not limited to:

1. Compensatory damages in an amount in excess of the minimum jurisdictional limits of this Court;

2. Punitive damages;

3. Interest;

4. Reasonable attorney's fees and costs.

5. All other equitable and legal relief which this Court deems just and due.

6. Plaintiff specifically requests trial by jury on all issues so triable.

Respectfully Submitted,

HON. JOHN F. LACKEY
214 West Main Street
Richmond KY 40475
(859) 575-7206
lackeylaw@att.net

by Permission
To JFL
10/25/19

HON. DEBRA DOSS
108 Pasadena Dr.
Lexington, Kentucky 40503
(859) 260-1980
debra.doss@qx.net

58

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
DIVISION I
19-CI-60

## ORDER NEEDING TO RESCHEDULE SPECIAL HEARING

The special hearing originally scheduled for **Wednesday, November 6, 2019** will need to be rescheduled.  Please call 859-624-4750 or email melissaburkhart@kycourts.net to reschedule.

This the 4th day of November, 2019

*Brandy O. Brown*

MADISON CIRCUIT JUDGE, DIVISION I

FILED ELECTRONICALLY DOCUMENT
11/15/2019 09:53:47 AM
*ELECTRONICALLY FILED*

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
DIVISION I
CIVIL ACTION NO. 19-CI-00060
(CONSOLIDATED WITH 19-CI-200)

Dr. DAVID B. PORTER                                          PLAINTIFF

v.

BEREA COLLEGE and
Dr. F. TYLER SERGENT                                        DEFENDANTS

## **NOTICE OF CANCELLATION**

Please take notice that the deposition of Plaintiff that was scheduled for Wednesday, November 13, 2019, and Thursday, November 14, 2019, is hereby cancelled. The deposition will be re-noticed at a later time for a date mutually agreed upon by the parties.

Respectfully submitted,

*/s/ W. Craig Robertson III*

W. Craig Robertson III
Sharon L. Gold
Courtney R. Samford
WYATT, TARRANT & COMBS, LLP
250 West Main Street, Suite 1600
Lexington, KY 40507-1746
859.233.2012

*Counsel for Defendant, Berea College*

11/15/2019 09:53:47 AM
82451-35

## CERTIFICATE OF SERVICE

I hereby certify that on November 8, 2019, I electronically filed the foregoing with the Clerk of Court via the e-filing system. I further certify that I mailed the foregoing document by first class mail to all non-eFiling participants.

Thomas W. Miller
Miller, Griffin & Marks PSC
271 West Short Street, Ste. 600
Lexington, KY 40507
*Counsel for Defendant, Dr. F. Tyler
Sergent*

John F. Lackey
214 West Main Street
Richmond, KY 40475

Debra Ann Doss
108 Pasadena Drive
Lexington, KY 40503
*Counsel for Plaintiff*

*/s/ W. Craig Robertson III*

W. Craig Robertson III

cc:   An/Dor Reporting and Video Technologies, Inc.
      179 East Maxwell Street
      Lexington, KY 40508
      setdepovideo@andorreporting.com

61893730.1

2

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
DIVISION I
CIVIL ACTION NO. 19-CI-00060
and
CIVIL ACTION NO. 19-CI-00200
(Consolidated)

*Electronically Filed*

Dr. DAVID B. PORTER                                                                  PLAINTIFF

v.

DR. F. TYLER SERGENT

and

BEREA COLLEGE                                                                      DEFENDANTS

### MOTION FOR PROTECTIVE ORDER

Comes the Defendant, Berea College ("Berea"), by counsel, and hereby moves the Court to enter a Protective Order precluding the Plaintiff, Dr. David Porter ("Porter"), from moving forward with depositions until: (1) Plaintiff's Motion for Leave to File an Amended Complaint has been resolved and Berea knows what claims are in issue; and (2) Porter submits to a deposition before any other witness is deposed. As grounds for this Motion, Berea states as follows:

On October 29, 2019, Porter filed a Motion for Leave to file an Amended Complaint. The tendered Amended Complaint substantially alters the nature of his claims and includes numerous additional allegations against Berea. These new allegations contend that Berea violated various federal statutes, including Title VII, Title IX, the Age Discrimination in Employment Act, and makes additional state law claims of negligent hiring, retention and supervision and respondeat superior liability. None of these claims had previously been asserted. Berea believes that several of these new allegations are facially deficient and anticipates filing a

FILED DOCUMENT
11/15/2019 09:54:00 AM
82451-35

motion to dismiss some of them. Thus, as matters currently stand, there is great uncertainty as to what claims will be in issue in this litigation and subject to proper discovery.

Prior to Porter filing his Motion for Leave to File an Amended Complaint, the parties had agreed to a deposition schedule that involved Berea deposing Porter first and then the parties proceeding with other discovery as they deemed appropriate. This is typical of any case as the defendant is entitled to know the claims and allegations of the Plaintiff before having to respond.[1] As such, Berea had noticed Porter's deposition for November 13, 2019 and Porter had noticed a third party witness, Yabsira Ayele ("Yabsira"), for a deposition on November 15, 2019.

In light of Porter's Motion for Leave to File an Amended Complaint, which could **substantially** alter the claims in issue, Berea postponed its previously scheduled deposition of Porter until the matters involving the Amended Complaint are resolved. After all, it makes no sense for Berea to depose Porter (or anyone else) until it knows what claims it must address. Otherwise, depositions could devolve into days of unnecessary questioning over claims that are not in issue. Postponing Porter's deposition is not a delay tactic, but a natural consequence of Porter's own attempts to try and move the goalposts by adding additional claims against Berea. Further, judicial economy dictates not deposing Porter until Berea can question him on the claims it will actually be required to defend.

With that principle in mind, Berea naturally sought to apply the same standard to other depositions scheduled prior to Porter's recent effort to re-write his pleading, particularly the deposition of Yabsira. Berea asked Porter to postpone the deposition of Yabsira because it is not fair for Berea to have to defend against any depositions until: (1) Berea knows what claims are

---

[1] While Kentucky's general Civil Rules are silent on the order of discovery, Kentucky's rules for economical litigation state that "the plaintiff shall be required to give his deposition before any other discovery takes place unless the defendant elects not to examine the plaintiff..." CR 93.01. This has become standard practice in all cases.

FILED DOCUMENT
11/15/2019 09:54:00 AM
82454-35

properly before the Court; and (2) Porter has been deposed first.  Unfortunately, Porter has refused Berea's reasonable request and insists on moving forward with Yabsira's deposition.

Under Kentucky Rule of Civil Procedure 26.03(1), "[u]pon motion by a party or by the person from whom discovery is sought, and for good cause shown . . .the court in the judicial district where the deposition is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Such orders include, but are not limited to, "that the discovery not be had," and "that the discovery may be had only on specified terms and conditions, including a designation of the time or place." *Id.  See also V.S. v. Commonwealth, Cabinet for Human Resources*, 706 S.W.2d 420, 425 (Ky. App. 1986) (holding that trial court correctly entered protective order limiting discovery when voluminous written discovery presented an undue burden).  In this instance, good cause exists for this Court to order that Yabsira's deposition should not occur until after Porter's pending motion to amend his complaint is fully resolved and Porter submits to a deposition first.  Berea has no objection to Yabsira being deposed – it simply needs to occur in an orderly fashion at a later date.

Moving forward with Yabsira's deposition at this time makes little sense because the Berea cannot be certain of the claims it will be defending.  This is doubly true if Berea is forced to proceed without first taking Porter's deposition.  The most logical administration of a case is to require the plaintiff to submit to a deposition prior to the defendants being called upon to defend themselves.  This general practice principle is sound because the plaintiff is the one who filed the lawsuit and should therefore bear the burden of informing the defendants of the nature of his claims and allegations at the forefront.  By contrast, it is illogical to require the defendants

to defend against depositions when they don't even know what claims are in issue or the basis for the claims against them.

Here, it is illogical to force Berea to defend against the deposition of a witness who is sympathetic to Porter when there is no preliminary baseline understanding as to the claims in issue, let alone Porter's own testimony regarding the basis of his claims. Berea has asked Porter to reschedule Yabsira's deposition in good faith, and explained to Porter why logic dictates postponing the deposition. Porter has affirmatively declined. Berea was therefore left with little choice other than to seek this Court's protection, pursuant to CR 26.03, to prevent immense prejudice to Berea as a result of Porter's intentional decision to seek leave to amend and his deliberate refusal to postpone the deposition while his motion is pending.

## CONCLUSION

For the foregoing reasons, Berea respectfully requests that this Court grant its Motion for a Protective Order to temporarily stay all depositions until: (1) Plaintiff's Motion for Leave to File Amended Complaint has been resolved and Defendants know what claims are in issue; and (2) Porter submits to a deposition before any other witnesses are deposed.

## NOTICE

This matter shall come on for hearing before the Court as soon as counsel may be heard.

Respectfully submitted,

___/s/W. Craig Robertson, III_____
W. Craig Robertson III
Sharon L. Gold
WYATT, TARRANT & COMBS, LLP
250 West Main Street, Suite 1600
Lexington, KY 40507-1746
859.233.2012
*Counsel for Defendant*

11/15/2019 09:54:00 AM
82451-35

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2019, I electronically filed the foregoing with the Clerk of Court via the e-filing system. I further certify that I mailed the foregoing document by first-class mail to all non-eFiling participants:

John F. Lackey
214 West Main Street
Richmond, KY 40475

Debra Ann Doss
108 Pasadena Drive
Lexington, KY 40503
*Counsel for Plaintiff*

Thomas W. Miller
Miller, Griffin & Marks PSC
271 West Short Street, Suite 600
Lexington, KY 40507
*Counsel for Defendant, F. Tyler Sergent*

*/s/W. Craig Robertson* III
W. Craig Robertson III

61894847.1

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
DIVISION I
19-CI-00060
And
19-CI-00200
(Consolidated)

```
TIME____ENTERED____A.M./P.M.
NOV 13 2019
MADISON CIRCUIT COURT
DAVID FERNANDEZ, CLERK
```

DR. DAVID B. PORTER                    )
         PLAINTIFF          )
                         )
                         )
VS                                     )          **ORDER SETTING**
                         )
DR. F. TYLER SERGENT                   )          **SPECIAL HEARING**
                         )
   and                                 )
                         )
BEREA COLLEGE                          )
         DEFENDANTS          )

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

Upon notification by Defendant's Counsel, Hon. Robertson on the 13th day of November, 2019 and the Court being otherwise advised;

IT IS NOW; THEREFORE, ORDERED AND ADJUDGED that the above captioned case shall be set for a Special Hearing on **14th day of November, 2019 at 12:00 p.m.**

This the 13th day of November, 2019

_[signature]_ with permission of
MADISON CIRCUIT JUDGE DIVISION I

_Melissa Burchart_

12:00 PM          CI                    **MADISON**

Court    C3        CIRCUIT COURTROOM.                    Date: 11/14/2019 11:26:15AM    DocketList.Rpt

Judge        HON. JAMES D. ISHMAEL. JR.        Prep Info. 00000053276  11/14/2019 11:26:11AM  2

**11/14/2019 Court Docket**

Page 1 of 2

Start of docket I

1        CI    19-CI-00060        **PORTER, DAVID B  VS. BEREA COLLEGE,**

☐

TIME _____ ENTERED _____ AM./PM.

NOV 14 2019

MADISON CIRCUIT COURT
DAVID .......... DEZ, CLERK

☐ GOLD, SHARON L.                    ATTORNEY FOR DEFENDANT
☐ ROBERTSON, W. CRAIG III            ATTORNEY FOR DEFENDANT
☐ SAMFORD, COURTNEY R.               ATTORNEY FOR DEFENDANT
☐ LACKEY, JOHN F..                   ATTORNEY FOR PLAINTIFF            LACKJF
☐ BEREA COLLEGE.                     DEFENDANT / RESPONDENT
☐ PORTER. DAVID B                    PLAINTIFF / PETITIONER

☐ Bail Credit Denied    ☐ Danger to self or others    ☐ Flight Risk

By November 26, 2019 at 5:00 p.m. business
all counsel shall confer and agree on a
day definite for the P to take the depo of the

**OTHER HEARING**
MOTION FOR PROTECTIVE ORDER            ATTORNEY FOR DEFENDANT

By agreement of all counsel per the Agreed
Order, the Motion to file a 2nd amended complaint
is ORDERED filed of record as of Nov 14, 2019.

It is further Ordered that the d's
Motion for Protective Order is Sustained &
The depo of witness Yakira Ayele is
cancelled as noticed for November 15, 2019.
If the witness bears any financial loss
by reason of the depo being cancelled, d
Berea will bear that expense upon
submission of documentation to support the
claim.

11/14/2019    C3        12:00 PM            Page 1 of 2            Judge Signature:

*ELECTRONICALLY FILED*

COMMONWEALTH OF KENTUCKY
MADISON CIRCUIT COURT
DIVISION I
CIVIL ACTION NO. 19-CI-00060
(CONSOLIDATED WITH 19-CI-00200)

> ENTERED
> TIME_____A.M./P.M.
> **NOV 14 2019**
> MADISON CIRCUIT COURT
> DAVID FERNANDEZ, CLERK

Dr. DAVID B. PORTER                                              PLAINTIFF

v.

BEREA COLLEGE and
DR. F. TYLER SERGENT                                         DEFENDANTS


### AGREED ORDER GRANTING PLAINTIFF'S
### MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

On October 29, 2019, Plaintiff, Dr. David B. Porter ("Plaintiff"), filed a Motion

asking the Court for leave to amend his complaint[1]. While the Defendants, Berea College

and Dr. F. Tyler Sergent, ("Defendants"), reserve the right to raise any and all defenses to

the claims asserted in the Second Amended Complaint, they do not object to the Plaintiff

being allowed to file the Second Amended Complaint.

Accordingly, IT IS HEREBY ORDERED that the Second Amended Complaint

tendered by Plaintiff on October 29, 2019, is filed as of the date of entry of this Agreed

Order.

Entered this _14_ day of ___November___, 2019.

---

[1] Plaintiff filed a First Amended Complaint in this action on February 4, 2019; however, Plaintiff
refers to the amended complaint tendered with his recent Motion as "First Amended Complaint."
For clarity, the amended complaint tendered with Plaintiff's October 29, 2019 motion is referred
to herein as the Second Amended Complaint.

_(signature)_

HON. BRANDY O. BROWN
MADISON CIRCUIT JUDGE, DIVISION
ONE

HAVE SEEN AND AGREED:

/s/ W. Craig Robertson

W. Craig Robertson III
Sharon L. Gold
Courtney R. Samford
WYATT, TARRANT & COMBS, LLP
250 West Main Street, Suite 1600
Lexington, KY 40507-1746
859.233.2012
_Counsel for Defendant, Berea College_

_(signature) Tom Miller by Wcd w/ permission_

Thomas W. Miller
Miller, Griffin & Marks PSC
271 West Short Street, Ste. 600
Lexington, KY 40507
859-255-6676
_Counsel for Defendant, Dr. F. Tyler Sergent_

_(signature)_

John F. Lackey
214 West Main Street
Richmond, KY 40475
859-575-7206

Debra Ann Doss
108 Pasadena Drive
Lexington, KY 40503
859-260-1980

_Counsel for Plaintiff_

2

## CLERK'S CERTIFICATE OF SERVICE

I hereby certify that on ___November 14th___, 2019, I mailed the foregoing document by first class mail, postage prepaid, to the following counsel of record:

W. Craig Robertson III
Sharon L. Gold
Courtney R. Samford
WYATT, TARRANT & COMBS, LLP
250   West   Main   Street,   Suite   1600
Lexington, KY 40507-1746
*Counsel for Defendant, Berea College*

John F. Lackey
214 West Main Street
Richmond, KY 40475

Debra Ann Doss
108 Pasadena Drive
Lexington, KY 40503
*Counsel for Plaintiff*

Thomas W. Miller
Miller, Griffin & Marks PSC
271 West Short Street, Ste. 600
Lexington, KY 40507
*Counsel for Defendant, Dr. F. Tyler Sergent*

Clerk, Madison Circuit Court

61893707.1

3