**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

| | |
|---|---|
| **DR. DAVID B. PORTER,** | **CIVIL ACTION NO. 5:19-455-KKC** |
| **Plaintiff,** | |
| **v.** | **OPINION AND ORDER** |
| **DR. F. TYLER SERGENT AND BEREA COLLEGE,** | |
| **Defendants.** | |

*** *** ***

This matter is before the Court on the cross-motions for summary judgment filed by Plaintiff David B. Porter (DE 69; DE 77), and Defendants Berea College (DE 78) and Tyler Sergent (DE 63). For the reasons stated in this opinion, Porter's motion is DENIED, the College's motion is GRANTED, and Sergent's motion is GRANTED.

BACKGROUND

This action arises from Berea College's September 2018 decision to terminate David B. Porter, a tenured faculty member, after he released a survey to students and faculty that included hypothetical scenarios based on real facts from a Title IX case against his friend and colleague, Wayne Messer.

Porter has been a tenured, full-time professor in psychology and general studies at Berea College (the "College") since 2005. In 2017, there were three women in the College's psychology department—Wendy Williams, Sarah Jones, and Amanda Wyrick. At that time, Porter was also a member of the department, and Messer was

1

the department chair.  Williams initiated a Title VII/IX complaint against Messer, which was later joined by Wyrick and Jones.  Porter served as his faculty advisor during the process which ultimately resulted in Messer being found responsible for creating a hostile work environment in September 2017.

### The College's Disciplinary Proceedings Against Porter

Porter believed that the College's disciplinary process had been unfair.  He penned an open letter to the campus expressing that view as well as his disappointment with the result of Messer's case.  Porter also criticized the College's process and expressed his belief in the unfairness of the proceedings against Messer in correspondence with the College's president and dean.  But Porter's criticisms were not addressed to his satisfaction.

During the spring 2018 semester, Porter taught a course called Industrial/Organization Psychology.  He taught the course for many years and as part of that course, regularly released surveys to the campus.  After the contentious proceedings against Messer, Porter decided that the course would develop a survey of "community perceptions and attitudes about academic freedom, freedom of speech, and hostile work environments under civil rights law."  (Second Am. Compl.[1] at ¶ 36.)

The survey included twenty scenarios, many of which were based on matters disclosed during the Title IX proceedings against Messer.  While the survey did not use the names of any of the proceeding's participants and changed the gender, race, and other personal characteristics in the scenarios, it included the personal

---

[1] Porter erroneously labels his second amended complaint as the "First Amended Complaint."

information of the female members of the psychology department who brought the complaint against Messer.  Porter did not ask his female colleagues for permission to use the details of their complaint against Messer and did not submit the survey to the College's Institutional Review Board for approval.  Porter did, however, send the survey to several other faculty members, including Messer.  In his response, Messer stated that he had "mixed feelings" about the survey and was "a little worried it will be seen as highly inflammatory."  (DE  78-14 at 11.)  Another colleague expressed concerns about what impact the survey would have on students, relaying to Porter that "[s]ome are clearly distressed by the project" and that the survey would make students feel that they have to take sides "in a war they shouldn't even know is happening." (DE  78-14 at 12.)  The colleague also told Porter that "[r]egardless of how anonymous or 'fictional' you try to make the questions/scenarios sound, it seems clear to anyone who knows anything about our Title IX fiasco who each question likely involves." (*Id.*)

The students in Porter's course asked if the survey's scenarios were based on real events, but he never told the students about the connection to Messer's disciplinary proceedings.  And even though Porter was aware that at least some students in the course were concerned about the effect the survey would have and were uncomfortable with it, Porter released the survey on February 19, 2018.

The survey immediately caused controversy on campus.  That day, Williams published a post on Facebook about the survey:

> I've said this elsewhere, so I'll post it here, too.  As one of the not anonymous targets of this survey I can tell you that I, and the other

women who filed (and won-at every level of the process) the hostile work environment complaint on which this survey is based, would be thrilled with some support on this.  Every scenario in the survey is either a biased portrayal of what we claimed in our complaint, or it was given by the defense to show that we were the biased ones or that we were cognitively compromised in our judgment, or it was given as examples of how other people had done much worse so the behavior we objected to isn't *that bad* in comparison to 'real' hostile environments.  Let me repeat again-we won at every stage of the process.  Yet despite the conclusion of that process three months ago (after 9 months of the process) this is another attempt to silence us (and those like us).  That said, if this kind of behavior by a colleague in response to losing a Title IX complaint is tolerated by the community, then this is certainly one way to make sure no one ever brings another [civil rights] complaint on this campus.  If you feel upset by this unethical use of students under the guise of 'research' or the not subtle attack on your female colleagues/faculty, please do more than write it here.  If you want to know more ways to help, let me know.

(Second Am. Compl. at ¶ 41.)  The next day, Chad Berry, the Dean, sent a campus wide message requesting that Porter take down the survey and apologize to the campus community.  Porter removed the survey, and sent Dean Berry and Lyle D. Roelofs, the President, a draft apology later that day.  Porter alleges that they "rejected the draft out of hand" because it "blamed others." (Second Am. Compl. at ¶ 45.)

Porter later recognized the negative impact the survey had on students, his female colleagues, and the campus community.  He acknowledged that some of his students were "deeply distressed" by the survey and felt like they were forced to pick sides.  He also agreed that the survey "ignited great turmoil and consternation," that he "should have gone about developing this survey differently" and his "efforts to disguise the incidents . . . were inadequate," that the survey obviously "might trigger

emotional responses and feelings of re-victimization," and that the survey caused "anxiety and distress . . . for [his] female colleagues." (DE 78-6; DE 78-7.)

On February 22, 2018, Dean Berry issued a Statement of Grounds for Dismissal. (DE 78-2 at 5.) In the statement, the Dean identified ten grounds for dismissal, four related to the survey's impact on students and six related to the impact on faculty and the campus community. The Dean's statement cited a provision of the College's Faculty Manual (the "Manual") that states that faculty can be terminated for cause if they engage in "[p]ersonal conduct which demonstrably hinders fulfillment of professional responsibilities." (DE 77-14 at 15.)

As an initial step in the College's disciplinary procedure, Dean Berry presented the charges to a faculty disciplinary committee, and the committee agreed that the charges against Porter should go forward. The President then suspended Porter and reassigned his classes to other faculty members.

At the next stage, Porter opted for a hearing before the Faculty Appeals Committee (the "FAC"), a committee composed of faculty members. The hearing was held over two days on April 26, 2018, and April 27, 2018. Dean Berry presented the case for terminating Porter, while Porter and his advisor presented his defense. Both sides called witnesses, introduced documents into the record, and submitted closing arguments in writing. After considering the evidence and arguments, the FAC ultimately recommended that Porter be terminated. The President subsequently considered the FAC's recommendation, agreed with it, and determined Porter should be terminated.

Porter appealed the decision to a committee of the College's Board of Trustees. The committee considered the record, briefs from each side, and issued a decision upholding Porter's termination.  Porter was subsequently terminated on September 30, 2018.

### The Faculty Manual

Each year, the Dean sends a salary increase letter to faculty members, notifying them of their salary increase for the upcoming academic year.  The letter states that "[t]he terms and conditions of your employment remain subject to the provisions of the Berea College Faculty Manual and the Berea College Employee Handbook."  (DE 77-24 at 2.)  The Faculty Manual (the "Manual") includes the procedures used to dismiss a faculty member "for cause" based on professional incompetence.

### Dr. F. Tyler Sergent's Emails

Defendant F. Tyler Sergent is a history professor for the College who previously served as one of two faculty advisors to the College's Student Government Association ("SGA").  Sergent also happens to be married to Williams, the psychology professor who initiated the complaint against Messer.  Following Porter's suspension but before his termination, the SGA voted to award Porter with the Student Service Award.  Using his university email address, Sergent sent the following email dated April 8, 2018, to three of the SGA Executive Committee's student members and his fellow faculty advisor, Rachel Vagts:

> I just heard that the SGA Senate has voted to give David Porter the SGA Service Award this year.  I am compelled to let you know my issues with

6

and vehement objection to this decision.  I ask that you please share this with everyone else on the executive committee for tonight's meeting.

I am aware that some of Porter's supporters among students – who have publicly said they will support him "no matter what to the bitter end" – are also involved in SGA.  I'm surprised how they are able to convince others in SGA that Porter's actions aren't so bad.  That's the first issue I want to address with some background and details.  Porter supported Wayne Messer throughout a Title IX/VII complaint this last year that was upheld against Messer at every level, including appeals, in which Messer was found guilty of creating a hostile work environment for racist, sexist, and homophobic comments.  Messer was removed as the chair of the Psychology Department and removed from his office near the other Psychology faculty members as an outcome of his actions.  Porter argued on Messer's behalf that the racist, sexist, homophobic comments were academic freedom and that Messer had the right to say those things to colleagues and students.  This took place from February until the present, as Porter has continued to express this view about the case that was fully adjudicated several months ago.  In the process of this case, Porter also publicly in writing and in testimony made sexist, disparaging remarks about each of the three female faculty members in Psychology, including disclosing personal medical records of one, which he characterized falsely, rising to the level of slander, libel, and defamation.

**The reasons for which Porter has been suspended and is in the process of being fired for cause center on five major wrongful acts.**

**First is academic dishonesty.**  The survey he sent out to the whole community was not a valid survey, and he was well aware of that, and made it available to the entire campus community anyway.  Even after being told to remove it because of its invalidation (for reasons explained below), he refused.

**Second is gross ethical violations.**  In the survey, Porter included actual cases from this past year's Title IX/VII case against Messer.  That is a serious violation of professional ethics in itself. To make it even more unethical, Porter falsely stated in the discloser [sic] section of the survey that the scenarios were not based on any actual events.

**Third is incompetence along with manipulation of students.**  Porter also sent the survey out with students' names attached without having gotten those students express permission, and many among

7

those students had already expressed their own ethical concerns about the survey.  Porter has continued to manipulate students – like those in SGA supporting this award – to rally for his cause.  Hero-worship is not education; this cultish approach to answering for his unethical acts is yet another level of unethical behavior and breach of the student-teacher relationship.

**Fourth is refusal to abide by IRB ([Institutional Review Board) and college policies for research.**  Porter refused to send his survey to the IRB for review as required by college policy (and APA standards for research and ethics).  When the IRB did review the survey at the request of the administration, against Porter's objections, the IRB rejected the survey as unethical for the reasons stated above.

**Fifth is harm to human subjects (and the campus community).**  The people whose personal and private information was made public in the survey have been seriously harmed by Porter's actions and are having to seek care for both physical and mental health that has been damaged willfully by Porter.  Contrary to what some students may have claimed, Porter has not apologized for this harm and has made no effort to repair the harm he has caused.  By extension, Porter's continued manipulation of students to support him – no matter how much in the wrong he is – has caused serious (if not permanent) rifts between groups of students, and the animosity has spilled over into other classroom space, other campus spaces, and social media.  Porter is actively fueling this animosity, among students and among faculty members.

The second issue at stake, however, regarding the SGA service award is that the SGA not be reactionary in its decisions.  The service award is a serious matter and should not be victim to manipulation by students who themselves are victims of manipulation by an unethical, unrepentant, academically dishonest person who is in process of rightly being fired from Berea College.  That students like him is irrelevant; this his colleagues dislike him is irrelevant.  Evaluate Porter – and other nominees for the award – as you would evaluate anyone: based on what they do and how they treat others.  In this case, giving a service award to David Porter would add additional injury to those who Porter has already injured.  This in itself would outweigh the good SGA has accomplished all year long.

Because there are remarkable people at Berea College who are worthy of the SGA service award and whose continuous work is always for the good people at all times (i.e., not unethical, not harmful, not malicious, not getting fired), I'm hoping SGA Senate will reconsider its decision.  I

know BOR has not yet voted on the matter. As one faculty advisor to SGA and voting member of the Senate and BOG, I will vote against this nomination. I've been so impressed with the work of SGA since my coming to Berea in 2011, and especially over the last two years when I've had the pleasure to work directly and closely with SGA leadership and members. On this particular matter, SGA can and ought to do better.

(DE 68-3 at 6-9 (emphasis in original).)

Vagts voiced her agreement and copied Yabsira Ayele, another student member of the executive committee.  In response to Ayele's defense of the award, Sergent later responded:

Yabsira,

There are so many faculty and staff members who do this and much more for students and do so without bringing harm to other members of our community and without ever being accused of unfairness or unethical actions.  That is the reason for my strong objection to the SGA in my capacity as faculty advisor.  If you do not think other faculty members have done every good thing you attribute to David Porter plus much more, than you are uninformed about the unending, tireless work and support the rest of us give to students in and day out.

I am not inviting a debate with you or anyone else who would defend the unethical action of David Porter – they are indefensible just like racism and any other of form discrimination – or any other faculty member who has caused harm to other members of our community.  Rewarding those actions and the harm coming from them is not the Berean way.  The administration has good reasons for suspension and the case will be adjudicated.

I gave my advice and detailed my reasons for that advice.  I have no doubt that you believe you are doing what is right.  But there are people giving you advice who know a great deal more about this situation than you do.  You should heed their advice.

To be clear, SGA has two faculty advisors, and we are both in agreement with our objections.  We are attempting to keep the SGA from making a mistake today that will not only bring additional harm to those already harmed and hurting but that will be recorded for all time in Berea

College history. I'm an historian and Rachel Vagts is an archivist and the head of the college archives – you do not want to be among a group of student leaders on the wrong side of Berea's history. Therefore, I urge the SGA to heed our advice.

(DE 68-3 at 3-4.)

Sergent replied to another email from Ayele, which expressed his disappointment in Sergent's stance:

Yabsira,

Until you actually know something about the situation, there is no basis for debate or dialogue. I voiced my advice as part of my role as elected faculty advisor. Again, I am not the only one, and so you need to include Rachel Vagts in your messages.

Clearly you have no interest in my advice or the advice of your other faculty advisor, both of whom know much more than you about a great many things directly related to this situation. So I hope you at least listen to those around you among the SGA leadership who are wiser and better informed.

One last bit of advice: I would caution you against burning bridges this early in your education, particularly for the wrong side of a cause.

Do not email me again regarding this issue.

(DE at 68-3 at 1-2.)

## **Procedural History**

Porter filed his original complaint in state court on January 29, 2019. In it, he brought claims against the College for breach of contract based on the Manual and unlawful discrimination under Kentucky state law. (DE 1-1 at 1-42.) On October 25, 2019, Porter filed a second amended complaint, which added federal claims for unlawful discrimination and retaliation under the ADEA, Title VII, and Title IX against the College. (Second Am. Compl. at 156-213.) The Second Amended

10

Complaint also included Sergent as a party, bringing claims for defamation, false light, and illegal retaliation under KRS § 344.280(1). (*Id.*) The College then removed the case to this Court, where the parties have filed their cross-motions for summary judgment.[2]

## ANALYSIS

### I.   Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the initial burden and must identify "those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citation and quotation marks omitted). All evidence, facts, and inferences must be viewed in favor of the non-moving party. *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "In order to defeat a summary judgment motion, . . . [t]he nonmoving party must provide more than a scintilla of evidence," or, in other words, "sufficient evidence to permit a reasonable jury to find in that party's favor." *Van Gorder v. Grand Trunk W. R.R., Inc.*, 509 F.3d 265, 268 (6th Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

### II.   Porter's Statutory Civil Rights Claims Against the College

In Counts IV and V of his complaint, Porter asserts claims for age, race, and sex discrimination and for illegal retaliation under the Age Discrimination in

---

[2] The Court previously dismissed Porter's claims of negligent hiring, retaining, and supervising of Sergent, and liability under respondeat superior. (DE 29.)

Employment Act (ADEA), Title VII, Title IX, and the Kentucky Civil Rights Act (the "KCRA"). The College argues in its motion for summary judgment that Porter's claims are fatally deficient on several grounds. First, it argues that Porter's federal civil rights claims are time-barred. Second, it argues that even if his claims are not time-barred, Porter has failed to establish either a pattern-or-practice claim, individual disparate treatment claim, or retaliation claim. The Court addresses each argument in turn.

### A.    Porter's Federal Civil Rights Claims Are Not Time-Barred

In its motion for summary judgment, the College first argues that Porter's federal civil rights claims are time-barred. The ADEA and Title VII require plaintiffs to file a complaint within 90 days of receiving a "right to sue" letter. 42 U.S.C. § 2000e-5(f)(1); *Garrett v. Structured Cabling Sys., Inc.*, 2010 WL 3862994, *2 (E.D. Ky. Sept. 28, 2010). Title IX claims must be filed within a year of the adverse action. *Lillard v. Shelby Bd. of Educ.*, 76 F.3d 716, 729 (6th Cir. 1996). Porter's ADEA, Title VII, and Title IX claims were filed on October 25, 2019, more than a year after his termination on September 30, 2018, and eleven months after the receipt of his "right to sue" letter on November 27, 2018.

However, under Federal Rule of Civil Procedure 15's relation back doctrine, Porter's claims are not time-barred. Under Rule 15, an amended complaint relates back to the date of the original pleading when the amendment asserts a claim "that arose out of the conduct, transaction, or occurrence set out . . . in the original pleading." FED. R. CIV. P. 15(c)(1)(B). In other words, "a court will permit a party to

add even a new legal theory in an amended pleading as long as it arises out of the same transaction or occurrence," even if the claim would otherwise be time-barred. *Hall v. Spencer Cnty.*, 583 F.3d 930, 934 (6th Cir. 2009) (citation and quotation marks omitted). "When applying this standard to the facts of a given case, we give meaning to those terms 'not by generic or ideal notions of what constitutes a "conduct, transaction, or occurrence," but instead by asking whether the party asserting the statute of limitations defense had been placed on notice that he could be called to answer for the allegations in the amended pleading.'" *Id.* (citation omitted).

Here, both Porter's original complaint and second amended complaint are based on the same nexus of facts and actions. The original complaint was based on the same allegations of unfairness and discrimination in the College's termination of Porter. Porter's original complaint included claims for unlawful discrimination under KCRA. His federal claims under the ADEA, Title VII, and Title IX are based on the same operative facts and thus relate back to the date of his original complaint, January 29, 2019, which was within the 90-day period required for ADEA and Title VII claims, and the one-year statute of limitations for Title IX claims. Accordingly, Porter's federal statutory civil rights claims are not time-barred.

### B.    Porter Cannot Bring a Pattern-or-Practice Claim

The College argues that Porter cannot state a pattern-or-practice claim for discrimination because such claims are not available to individual plaintiffs. (DE 78-1 at 20-21.) Porter alleges that the College "has participated in and supported a pattern and practice of illegal discrimination based on age, race, and sex against

white males over the age of 40 in the College's employment, discipline, and termination of members of the faculty in the psychology department and in the overall faculty of the College." (Second Am. Compl. at ¶ 135.)[3] But in his response to the College's motion for summary judgment, Porter does not appear to argue that he can bring a pattern-or-practice claim. Instead, he argues that evidence of a pattern or practice of discrimination is "relevant and admissible to show the requisite 'background circumstances' in a reverse-discrimination case such as this." (DE 79 at 23.)

The Sixth Circuit Court of Appeals has held that

> [T]he pattern-or-practice method of proving discrimination is not available to individual plaintiffs. We subscribe to the rationale that a pattern-or-practice claim is focused on establishing a policy of discrimination; because it does not address individual hiring decisions, it is inappropriate as a vehicle for proving discrimination in an individual case. . . . However, pattern-or-practice evidence may be relevant to proving an otherwise-viable individual claim for disparate treatment under the *McDonnell Douglas* framework.

*Bacon v. Honda of America Mfg., Inc.*, 370 F.3d 565, 575 (6th Cir. 2004).

Notwithstanding his apparent argument to the contrary, Porter's complaint seems to assert a pattern-or-practice claim. Throughout Count IV of the complaint, Porter alleges that individual instances of discrimination against him were part of the College's pattern or practice of discrimination on the basis of age, race, and sex. (Second Am. Compl. at ¶¶ 135-36, 141, 149, 158.) Because he is an individual

---

[3] Unless otherwise stated, citations to the complaint refer to Porter's Second Amended Complaint found in the record at DE 1-2 at 156-213.

plaintiff, Porter cannot bring a pattern-or-practice claim for discrimination under the ADEA, Title VII, Title IX, or the KCRA.  To the extent that he asserts such claims, they are dismissed.  However, pattern-or-practice evidence may be used to prove Porter's individual claims for disparate treatment under the *McDonnell Douglas* framework.

### C.    Porter Has Not Submitted Sufficient Direct or Indirect Evidence to Establish a Disparate Treatment Claim

Both federal and Kentucky law prohibit employers from discriminating against individuals based on age, race, or sex when making certain employment decisions. 29 U.S.C. § 623(a)(1) (ADEA) (prohibiting age-based discrimination); 42 U.S.C. § 2000e-2(a) (Title VII) (prohibiting race- and sex-based discrimination); Ky. Rev. Stat. § 344.040(1)(a) (prohibiting age, race, and sex-based discrimination).  Federal law also prohibits sex-based discrimination in educational settings.  20 U.S.C. § 1681(a) (Title IX).  Here, Porter claims that the College violated the ADEA, Title VII, Title IX, and the KCRA by "suspending him, banishing him from campus, and ultimately terminating his employment without adequate cause" based on his age, race, and sex. (Second Am. Compl. ¶ 136.)

When alleging unlawful discrimination, employees typically assert "disparate treatment" claims.  A disparate treatment claim is an assertion that the employer treated the individual employee less favorably than other similarly situated individuals because of the employee's membership in a protected category—precisely what Porter has asserted in his complaint.

To survive a motion for summary judgment on an employment discrimination claim, a plaintiff may seek to raise a genuine issue of material fact by offering either direct or indirect evidence of discrimination in accordance with the *McDonnell Douglas* burden-shifting framework. *Thomas v. Clarksville Montgomery Cnty. Sch. Sys.*, No. 3:19-cv-00956, 2022 U.S. Dist. LEXIS 69851, at *8-9 (M.D. Tenn. Apr. 15, 2022); *see also Snyder v. Pierre's French Ice Cream Co.*, 589 F. App'x 767, 770 (6th Cir. 2014) (applying *McDonnell Douglas* to ADEA claims); *Serrano v. Cintas Corp.*, 699 F.3d 884, 892 (6th Cir. 2012) (holding a plaintiff may prove a disparate treatment claim through either direct or circumstantial evidence); *Hashem-Younes v. Danou Enters.*, 311 F. App'x 777, 779 (6th Cir. 2009) (applying *McDonnell Douglas* to Title VII claims); *Arceneaux v. Vanderbilt Univ.*, 25 F. App'x 345, 347 (6th Cir. 2001) (applying Title VII analytical framework to Title IX claims); *Charalambakis v. Asbury Univ.*, 488 S.W.3d 568, 576 (Ky. 2016) (holding that the *McDonnell Douglas* framework applies to claims under the KCRA).

### 1.   *Direct Evidence*

Direct evidence is "evidence that proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (*en banc*) (cleaned up). "In this instance, that would mean evidence that, if believed, requires a finding that" the College's adverse employment decisions against Porter happened "at least in part because of" Porter's age, race, or sex. *Brewer v. New Era, Inc.*, 564 F. App'x 834, 838 (6th Cir. 2014). Direct evidence may "take the form,

16

for example, of an employer telling an employee, 'I fired you because you are disabled [or elderly].'" *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998).

In this case, Porter appears to assert there is direct evidence of discrimination in the form of a statement made by a member of the College's psychology department sometime before March 2017.[4]  (*See* DE  79 at 21-22.)  Porter alleges that during a selection panel meeting where professors were discussing potential faculty hires, a psychology professor stated that "[t]he last thing we need in this department is any more old white guys".  (Second Am. Compl. at ¶ 24.)  According to Porter, this isolated statement is sufficient direct evidence to support his claim because "[t]he Sixth Circuit has held in that [sic] past discriminatory comments can be considered as 'direct evidence' that a discriminatory bias was a motivating factor in the employer's decision to terminate an employee."  (DE  79 at 21.)  In support of his argument, Porter cites the Sixth Circuit's unreported decision in *Brewer v. New Era, Inc.*, 564 Fed. App'x. 834 (6th Cir. 2014).

In *Brewer*, two New Era, Inc. employees sued for age and race discrimination after they were terminated along with six other employees in the wake of the 2008 recession.  *Id.* at 837.  Two or three months before the layoffs were announced, a

---

[4] In his response brief, Porter argues that "past discriminatory comments can be considered as 'direct evidence' that a discriminatory bias was a motivating factor in the employer's decision to terminate an employee," and asserts that he "pled and proved these comments."  (DE 79 at 21.)  However, he fails to point to any "specific portions of the record" where the Court might find these comments or the evidence that purportedly proves them. *See Bormuth v. Cty. of Jackson*, 870 F.3d 494, 500 (6th Cir. 2017).  The Court is therefore left to assume that Porter is referring to the comments made by a member of the College psychology faculty that he refers to on the next page of his brief.

corporate officer (who was also the son of the company's owner) told the plant manager responsible for hiring and firing decisions that the plaintiffs were "too old" and "needed to retire." *Id.* The Sixth Circuit held that summary judgment in favor of the company was improper because those statements "could arguably constitute direct evidence of age discrimination." *Id.* at 839. The court emphasized that even though the person who made the statements "was not closely involved in the selection of employees to lay off," the statement was made just a couple of months before the plaintiffs were terminated, and were specifically about the plaintiffs and their ability to continue working. *Id.*

But the facts of *Brewer* are materially distinct from this case in at least three ways. First, the statement in *Brewer* was "made specifically about" the plaintiffs and directly stated that their age made them unfit for employment, whereas the alleged discriminatory statement in this case was about unidentified third parties and did not make any reference to the plaintiff's fitness for his position. *See Brewer*, 564 Fed. App'x. at 839. In other words, the statements in *Brewer* made clear that the *plaintiff's* age made them unfit to continue working, whereas the statement in this case made clear that Williams believed the *potential hires'* age, race, and sex made them unfit to be hired. Second, the statements in *Brewer* were made to the plant manager, who was the person responsible for deciding to terminate the plaintiffs, by a corporate officer and son of the company's owner. Here, the statement was not made by or to a person with any role in the decision-making process for the adverse actions taken against Porter. *See Bledsoe v. TVA Bd. of Dirs.*, 42 F.4th 568, 581 (6th Cir. 2022)

("Discriminatory remarks . . . are direct evidence of discrimination only when they come from a supervisor with at least a meaningful role in the decision[-]making process.") (cleaned up).  And third, the statements in *Brewer* occurred two or three months before the plaintiffs were fired, a period during which the company was deciding who to terminate, whereas the statement in this case was made at over a year before any adverse actions were taken against Porter, a period long before those actions were even contemplated.[5]

The statement allegedly made by Williams is not direct evidence of discrimination by the College.  The statement was not made in reference to Porter's continued fitness for his position, was not made to persons who were involved in the decisions to take adverse actions against Porter, and was temporally removed from the adverse actions against Porter.  Even when considered in the light most favorable to Porter, the connection between Williams's statement and the adverse actions against Porter are far too tenuous to constitute direct evidence of discrimination.

### 2.    *Indirect Evidence/*McDonnell Douglas *Framework*

Since Porter has failed to produce direct evidence, his discrimination claims are evaluated using the *McDonnell Douglas* burden-shifting framework.  Under the traditional version of this framework, a plaintiff claiming that he was unlawfully terminated on the basis of age, race, or sex must establish a prima facie case of discrimination by showing: "(1) he is a member of a protected class; (2) he was

---

[5] Though he does not identify when Williams allegedly made the statement about not hiring "old white guys," Porter's complaint makes clear that it would have been prior to the civil rights grievance brought against Dr. Messer in March 2017, which is a year and a half prior to Porter's termination.  (Second Am. Compl. at ¶¶ 22-24.)

qualified for his job; (3) he suffered an adverse employment decision; (4) he was replaced by someone outside the protected class or treated differently than similarly situated non-protected employees." *Nelson v. Ball Corp.*, 656 F. App'x 131, 134 (6th Cir. 2016) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008)). If the plaintiff meets his burden and establishes a prima facie discrimination case, the burden shifts to the employer to offer a nondiscriminatory reason for the adverse action. *Bledsoe*, 42 F.4th 568 at 581 (citation omitted). The plaintiff then must show that the employer's reason is pretext for discrimination. *Id.*

When a plaintiff alleges "reverse discrimination," as Porter does in his race and sex discrimination claims, "he bears the heightened burden of demonstrating that he was intentionally discriminated against despite his majority status." *Nelson*, 656 F. App'x at 134 (cleaned up). Thus, in a reverse discrimination case the first prong of the prima facie test has been modified to require "that the plaintiff demonstrate 'background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority.'" *Id.* at 134-35 (citations omitted).

### 3. *Porter Has Failed to Establish a Prima Facie Case Under the* McConnell Douglas *Framework*

The College argues that Porter has failed to provide any evidence of discrimination against him. Porter argues that he has established a prima facie case of discrimination by presenting evidence of (1) discriminatory comments made by a fellow faculty member and (2) the College's past disciplinary actions involving older, white male faculty. (DE 79 at 22.) According to Porter, this comment and the

College's actions establish a prima facie discrimination claim because they show that "the College was more concerned with political correctness against Dr. Porter's protected class, than with . . . [his] 'fitness' for the job." (DE 79 at 22.)  The Court disagrees.  Even taking his allegations as true, the evidence Porter cites does not show that his age, race, or sex was a factor in the College's decisions against him.

Porter first points to comments allegedly made by Williams.  According to Porter, during a meeting where the College's faculty was considering applicants for faculty positions, Williams's stated that the psychology department did not need any more old, white males.  (Second Am. Compl. at ¶ 24.)  He also alleges that Williams disproportionately rated white, male applicants lower than other applicants during the faculty's selection process.  (*Id.*)

First, while Williams's comment was potentially reflective of personal discriminatory bias, it does not indicate any bias or discriminatory animus by the College.  She was not acting on behalf of the College when she made her statement, and Porter has not offered any reason as to why her potential bias should be imputed to the College.  In his response brief, Porter states that *Pettway v. Logistics Solutions Group*, Civil Action No. 3:17-cv-73-DJH-CHL, 2020 U.S. Dist. LEXIS 34442 (W.D. Ky. Feb. 28, 2020) "includes a valuable analysis of how the employer's or decisionmaker's adoption of the discriminatory or retaliatory animus of one or more of its employees means that evidence of those employee's improper statements or conduct should be considered evidence" that the employer discriminated against the employee.  (DE 79 at 22.)  However, Porter makes no effort to explain how that analysis applies to this

21

case.  "It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."  *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (citation and quotation marks omitted).  But once again, that is precisely what Porter has done.  On this issue, his response to the College's motion "is bereft of any legal argumentation," and he has therefore waived any argument regarding the College's liability for Williams's allegedly discriminatory comments. *Doe v. City of Detroit*, No. 18-11295, 2020 U.S. Dist. LEXIS 27752, at *15 (E.D. Mich. Feb. 19, 2020) (citing *McPherson*, 125 F.3d at 996).

Even if he did not waive arguments on the issue, a theory of "cat's paw" liability is inapplicable here.  As *Pettway* explains, "[w]hen a supervisor with alleged discriminatory animus is not the decision-maker, a plaintiff can still demonstrate discrimination with direct evidence by establishing a 'causal nexus between the ultimate decision-maker's decision to [demote] the plaintiff and the supervisor's discriminatory animus.'"  *Pettway*, 2020 U.S. Dist. LEXIS 34442, at *26-27 (quoting *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 350 (6th Cir. 2012)).  That nexus can be established through evidence of "cat's paw" liability, which requires the plaintiff to show that "[b]y relying on th[e] discriminatory information flow, the ultimate decisionmakers acted as the conduit of [the supervisor's] prejudice—his cat's paw."  *Chattman*, 686 F.3d at 350 (citation and quotation marks omitted).  "[I]f a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate

cause of the ultimate employment action, then the employer is liable . . . ." *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011) (emphasis in original).

But the Supreme Court's decision in *Staub* did not resolve whether cat's paw liability can be predicated on actions taken by co-workers, rather than supervisors, *Staub*, 562 U.S. at 422 n.4, and the Sixth Circuit has not extended the cat's paw theory of liability to employment discrimination claims involving the actions of non-supervisory employees, *Shazor v. Pro. Transit Mgmt.*, 744 F.3d 948, 956 (6th Cir. 2014). Further, the Court is unaware of any district court in this circuit holding that cat's paw liability applies to the actions of a co-worker, rather than a supervisor. To the extent that Porter intended to claim that a cat's paw theory applies in this case, his claim is without legal support.[6]  Williams's comment does not show any discriminatory bias in the College's decision to take adverse action against Porter, and thus does not help him establish a prima facie case under *McDonnell Douglas*.

Porter next appears to argue that the College's allegedly disparate treatment of similarly situated younger, female professors establishes a prima facie case of age

---

[6] Even if it was applicable to this case, evidence of Williams's bias is not enough to sustain a cat's paw theory. "[A]n in-depth and truly independent investigation" that shows the decision-maker acted "based on an independent evaluation of the situation . . . defeats a cat's paw claim . . . when the investigation 'determin[es] that the adverse action was, apart from the supervisor's [discriminatory animus], entirely justified.'" *Marshall v. Rawlings Co. LLC*, 854 F.3d 368, 380 (6th Cir. 2017) (citation omitted). Here, the College conducted a thorough investigation of the actions that ultimately led to Porter's termination. Even if Williams's allegations against Porter were motivated by bias and intended to cause an adverse action against him, the College's investigation "result[ed] in an adverse action for reasons unrelated to [Williams]'s original biased action." *Staub*, 562 U.S. at 421. Accordingly, the College is not liable under a cat's paw theory. *Id.*

discrimination.  When a plaintiff attempts to sustain a discrimination claim based on differential treatment, he must show that he was "treated differently than similarly situated non-protected employees." *Nelson v. Ball Corp.*, 656 F. App'x at 134 (citation and quotation marks omitted).  "Generally, to be considered similarly situated, employees 'must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Voltz v. Erie Cnty.*, 617 F. App'x 417, 427 (6th Cir. 2015) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

As best the Court can tell, Porter argues that the College selectively brought disciplinary charges against older, white male professors, but not younger female ones.  (DE  79 at 24.)  "To succeed with this type of argument, [Porter] must provide 'evidence that other employees, particularly employees outside the protected class, were not disciplined even though they engaged in substantially identical conduct to that which [the College] contends motivated its discipline of [Porter].'" *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 893 (6th Cir. 2020) (citation omitted).  But as explained below, the conduct of the younger female professors cited by Porter is not "substantially identical" to his own.

In addition to his own discipline, Porter points to three instances in which the College took disciplinary action against older, white male faculty members.  The first occurred in 2013 when "two senior white male professors" were punished with "restrictions on pay, benefits, and academic promotion" after they failed to attend a

24

mandatory faculty diversity training.  (Second Am. Compl. at ¶ 19.)  The second occurred in 2015.  In that instance, a faculty member had discussed "her difficulties and traumas related to several unsuccessful pregnancies" during a faculty meeting regarding health insurance, and later a "senior, white male faculty member in the same department as the female faculty member expressed his sympathy and condolences for her traumas" when he saw her in a Walmart store. (*Id.* at ¶ 20.)  The College "charged him with a breach of confidentiality and forced him to resign." (*Id.*)  And the third instance is the discipline Messer received for creating a hostile work environment.

In contrast to the College's actions against these older, white male faculty members, Porter points to ways in which younger, female professors allegedly engaged in misconduct that went unpunished.  First, he alleges that Williams engaged in "unlawful racial, age, and gender discrimination" by giving white male applicants disproportionately lower ratings when evaluating them for faculty positions in the department.  Second, Porter alleges that in the Title IX proceeding against Messer, two of the professors "grossly exaggerated" a claim that hostility in the psychology department forced them to use a different copier. (Second Am. Compl. at ¶ 25.)  And third, he alleges that the female members of the psychology department refused to meet face-to-face with the rest of the department following Messer's Title IX proceeding, even though College administrators had directed them to do so. (*Id.* at ¶ 29.)

Though the younger female professors were "treated differently," they did not engage in the substantially identical conduct as Porter or the other older, white male professors. Each instance cited by Porter involves entirely different conduct, and each involved (or would have involved) different disciplinary charges. The only instances that are even arguably similar are the two senior, white male faculty members who were disciplined for not attending a mandatory diversity training and the younger, female professors who refused to meet in-person with Porter and Dr. Messer, even though the College had directed their department to meet face-to-face following the Title IX proceeding against Messer. Though in both situations professors refused to attend a required meeting, the instances are distinguishable. The female professors were initially required to meet with the rest of the psychology department, but the College administrators later rescinded that requirement. Thus, there were differentiating circumstances that distinguish the employer's treatment of them.

Further, there were mitigating circumstances that distinguish the College's treatment of the female professors. The meeting they refused to attend would have involved coming face-to-face with a man they had accused of creating a hostile workplace and the man who had advised him throughout proceedings based on those allegations. Even if refusing to attend the meeting was a technical violation of faculty rules, the context and nature of the meeting explains why the College did not bring disciplinary charges for that violation.

Neither the statements made by Williams nor the College's disciplinary actions are circumstantial evidence of age discrimination.  Porter has thus failed to meet his burden to establish a prima facie case under the *McDonnell Douglas* framework, and accordingly, the College is entitled to summary judgment in its favor on Porter's claims for age, race, and sex discrimination.

### 4.    *The College Has Proffered a Legitimate, Non-Discriminatory Reason for Terminating Porter, and He Has Failed to Show Pretext*

Even if Porter established a prima facie case, the College has articulated a legitimate, non-discriminatory reason for his termination, and Porter has failed to show that reason is pretext for discrimination.  "Employers who provide a legitimate, non-discriminatory reason for their [employment] decision will be entitled to summary judgment unless plaintiffs can rebut the employer's explanation by demonstrating pretext." *Bartlett v. Gates*, 421 F. App'x 485, 488 (6th Cir. 2010).  At this stage, the employer does not have to show its decision was motivated by the proffered reason, only that the non-discriminatory reason is legally sufficient to justify the adverse employment action taken against the plaintiff. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981).

If the employer gives a sufficient non-discriminatory reason, then the presumption created by the prima facie case is rebutted, and the burden shifts back to the plaintiff to demonstrate that the employer's proffered reasons were pretext for unlawful discrimination. *Bledsoe*, 42 F.4th 568, 2022 U.S. App. LEXIS 20724, at *20. To do so, the plaintiff "need only produce enough evidence . . . to rebut, but not to

disprove, the defendant's proffered rationale." *Shazor*, 744 F.3d at 957; *see also Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009) ("At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation.").

The College's stated reason for terminating Porter was his "preparation and dissemination" of the survey, which it described as "personal conduct which demonstrably hinders fulfillment of professional responsibilities" and was charged as a violation of the Manual. (DE 78-2 at 5, 7.) According to the College, Porter's actions violated the terms of his employment and caused harm to students, the campus community, and the College. The College has thus met its burden to proffer a legitimate, non-discriminatory reason for its actions against Porter. *See, e.g., Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (holding allegations of misconduct and failure to follow procedure were legitimate, non-discriminatory reasons for discharge).

Porter has failed to demonstrate that the College's proffered reasons were pretext. To demonstrate pretext, he must show that the College's allegations of misconduct "(1) had no basis in fact; (2) did not actually motivate the adverse action; or (3) w[ere] insufficient to warrant" his termination. *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 421 (6th Cir. 2021). Porter appears to argue that he has provided evidence of the second factor—that the alleged misconduct did not actually motivate his termination.

Porter's first argument is the same argument that he advanced in support of his prima facie case—he points to the previously described remarks of Williams and College's past disciplinary decisions. (See DE 79 at 22.) And for the same reasons, his argument fails.

Porter also argues that the College's proffered reason is pretext because "it was a protected academic activity for Dr. Porter to change the names or identities of the subjects referred to in the Survey in the context of addressing or criticizing the College's Title IX procedures" and "the Faculty Manual expressly disavows any 'guarantee' of confidentiality in Title IX proceedings." (DE 79 at 22–23.) But Porter has failed to explain how either of these points demonstrates that the College's proffered reasons for terminating him were pretext for age, race, or sex discrimination. It is not at all clear that he engaged in protected academic activity, and the College addressed that claim at great length in the proceedings against him. (DE 78-5 at 16-20.) Porter's conclusory assertion that his actions were protected academic activity is insufficient to show that the College's proffered reasons for his termination were pretextual.

Porter's assertion that he had no obligation regarding confidentiality in Title IX proceedings also does not hold water. As explained in the proceedings against him, the Manual states that "every effort shall be made to ensure confidentiality and the privacy of the parties involved but confidentiality cannot be guaranteed." (DE 78-5 at 10.) This provision does not support Porter's contention that because there is no guarantee of confidentiality, he could not have committed misconduct by

29

disseminating personal information from a Title IX proceeding in the survey.  Even if Porter was not required to maintain confidentiality regarding Title IX proceedings, he was required to refrain from personal conduct that would hinder his ability to fulfill his professional responsibilities.   And the College asserted that his dissemination of personal information from a Title IX proceeding hindered his ability to fulfill his professional responsibilities because it "caus[ed] emotional distress to persons within and outside of the department," "perpetuat[ed] and exacerbate[ed] a hostile environment within the Psychology Department," and "frustrat[ed] efforts to restore effective working relationships in the department."  (DE  78-2 at 6-7.)  Porter is incorrect that the College's position on the confidentiality issue is "untenable," and it does not show that the College's reasons for his termination were pretext for discrimination.

Porter has not only failed to establish a prima facie case of unlawful discrimination, but has also failed to rebut the College's legitimate, non-discriminatory reasons for its actions.  He has offered no evidence showing that the College terminated him because of his age, race, or sex.  Accordingly, the College is entitled to summary judgment on Porter's disparate impact claims under the ADEA, Title VII, Title IX, and the KCRA.

### D.   Porter's Illegal Retaliation Claims Fail for the Same Reasons as His Discrimination Claims

In Count V of his complaint, Porter brings claims against the College for illegal retaliation in violation of the ADEA, Title VII, Title IX, and the KCRA, alleging that the College retaliated against him for his role in the Title IX proceedings against Dr.

30

Messer and his subsequent criticism of the College's Title IX policies.  In its motion for summary judgment, the College argues that Porter's retaliation claims fail as a matter of law because (1) retaliation claims are unavailable to persons who represented an accused in a separate Title IX proceeding, and (2) he has failed to produce evidence of any causal nexus between his participation in Dr. Messer's proceedings and his own termination.  (DE  78-1 at 23-25.)

Illegal retaliation claims in ADEA, Title VII, Title IX, and KCRA actions are analyzed using the same framework as a disparate treatment claim.[7]  The plaintiff can establish retaliation through direct or circumstantial evidence, and when only circumstantial evidence is proffered, it is subject to the same *McDonnell Douglas* framework used to assess discrimination claims.  *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010).  A prima facie case of retaliation is established by showing that: (1) the plaintiff engaged in protected activity when he made his age discrimination complaint; (2) the defendant knew about his exercise of the protected activity; (3) the defendant took adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action.  *Id.*  at 491-92.

---

[7] The Supreme Court of Kentucky "interpret[s] unlawful retaliation [claims] under the KCRA consistent with the interpretation of unlawful retaliation under federal law." *Brooks v. Lexington-Fayette Urban Hous. Auth.*, 132 S.W.3d 790, 802 (Ky. 2004). "Thus, the standards for evaluating federal Title VII retaliation claims also generally apply to [Porter]'s KCRA retaliation claim." *Thompson-Mooney v. Metro. Sec. Servs.*, Civil Action No. 5:21-194-DCR, 2022 U.S. Dist. LEXIS 141431, at *24 (E.D. Ky. Aug. 9, 2022) (citation omitted).

Here, Porter has not produced any direct evidence, so his retaliation claims are analyzed under *McDonnell Douglas*. Porter's evidence and arguments for retaliation are the same as for his discrimination claims, (DE 79 at 21-24), and they fail for the same reasons.  He has failed to establish a prima facie case of discrimination because he has not produced evidence showing a causal connection between any protected activity and his termination; the College has proffered a legitimate, non-discriminatory reason for his termination; and Porter has failed to show that the proffered reason was pretext for retaliation.  Accordingly, the College is entitled to summary judgment on Porter's claims for illegal retaliation, and those claims are dismissed with prejudice.

III.   **Porter's State Law Claims Against the College**

A.   **Porter's Breach of Contract Claims Against the College Do Not Survive Summary Judgment**

Porter raises three separate breach of contract claims against the College: (1) breach of contract for suspension of employment in violation of the required due process and his academic freedom (Count I); (2) breach of contract for termination of employment after denial of administrative due process (Count II); and (3) breach of contract for termination of employment in violation of his academic freedom (Count III).   Thus, Porter's breach of contract claims are intertwined with his two overarching arguments that the College denied him due process and academic freedom.

To establish a breach of contract claim in Kentucky, a plaintiff must show 1) the existence of a contract, 2) a breach of that contract, and 3) the breach of that

contract caused damages. *EQT Prod. Co. v. Big Sandy Co., L.P.*, 590 S.W.3d 275, 293 (Ky. Ct. App. 2019). In interpreting a contract, courts look to the contract's plain language. *Kentucky Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694 (Ky. 2016). Courts analyze the plain language of the contract based on "its ordinary meaning and without resort to extrinsic evidence." *Id.* (citations and quotation marks omitted).

Parties do not dispute that the Manual constitutes a contract but rather if the College breached any provision of the Manual. The Court's analysis will therefore focus on whether Porter has submitted sufficient evidence to establish that the College breached its obligations under the Manual. For the reasons given below, Porter's breach of contract claims do not withstand the College's motion for summary judgment.

### 1. *The Constitution and the Policies of External Organizations Do Not Bind the College*

In bringing all three breach of contract claims, Porter partially relies upon allegations that the College has not complied with the Constitution or the policies of the American Association of University Professors ("AAUP"). Such reliance is misplaced.

### a. **The Constitution**

At the outset, the Court notes that, as a private institution, the College is not a state actor bound by the Constitution. *See e.g., Doe v. Transylvania Univ.*, Civil Action No. 5:20-145-DCR, 2020 WL 1860696, at *5 (E.D. Ky. Apr. 13, 2020) ("Transylvania is a private university; thus, there is no state actor or state

proceeding.")  "Typically, a plaintiff needs to assert that the constitutional violation was 'committed by a person acting under state law' to allege a violation of a constitutional right."  *Id.* at *8 (citation and quotation marks omitted).  Because the Constitution does not apply to the College, Porter cannot assert any Constitutional claims against the College under the auspices of a breach of contract claim.

Porter argues that the Constitution governs the College's actions because the Manual provides, "[T]he faculty member enjoys the Constitutional rights which belong equally to all citizens."  (DE 81 at 13; DE 81-3 at 5.)  The Manual, as written, simply states that faculty members maintain Constitutional rights equivalent to those of other citizens; the plain language of the Manual does not convert the College into a public university subject to Constitutional requirements.  Instead, the College only has the duty to comply with the obligations—including its internal processes for suspending and terminating tenured faculty—created by the Manual.  As evidentiary support that the Constitution applies to the College, Porter cites to the deposition testimony of Mike Berheide, his faculty advisor during his proceedings.  (Berheide Dep. at 11:12-18.)  Berheide testified that "[t]here are no differences" between protections of academic freedom offered at the College versus at the University of Kentucky, presumably equating the Constitutional rights enjoyed by professors at a private institution to those employed at public institutions.  (*Id.* at 96:12-16.)  This is not a factual statement but an "improper legal conclusion" inappropriate for consideration at summary judgment.  *See Cutlip v. City of Toledo*, 488 F. App'x 107, 121 (6th Cir. 2012).

The cases that Porter cites in arguing that his Constitutional rights were violated are inapposite. *Buchanan v. Alexander*, 919 F.3d 847 (5th Cir. 2019), *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2020), and *Bonnell v. Lorenzo*, 241 F.3d 800 (6th Cir. 2001) all involve public universities, which, unlike the College, are state actors subject to the Constitution. While *McAdams v. Marquette University*, 383 Wis. 2d 358 (2018) involves a private university, that case analyzes a faculty manual specific to that particular institution and is irrelevant to the Court's analysis of an entirely different contract.

To the extent that Porter premises his claims on alleged Constitutional violations, those claims are unfounded.

### b.    The AUUP

By the same token, the policies and procedures of other entities do not displace the contractual language of the Manual. Porter appears to argue that the policies and procedures of AAUP dictate the College's own internal processes because of a footnote found within the Manual's section on academic freedom: "The substance and the wording of this statement are drawn in part from the 1940 Statement of Principles on Academic Freedom and Tenure, developed by the Association of American Colleges, and the American Association of University Professors." (DE 77-1 at 13 n.4; DE 81-3 at 5.) The footnote only provides that the Manual "draw[s]" upon a statement from the AAUP in that particular section, i.e., that portion of the Manual reflects language drafted by the AAUP. The footnote plainly does <u>not</u> incorporate the AAUP's statement into the Manual, or imply that the AAUP's policies and procedures

are binding on the College.  Indeed, the Manual explicitly says, "The College is *bound only by its own procedures and policies*, not by the policy statements of any external organization."  (DE 79-8 at 3 (emphasis added).)  An argument that the Manual adopts the policies and procedures of the AAUP wholesale is contrary to the language of the Manual.  To the extent Porter depends upon deviations between the College's policies and that of the AAUP in alleging his breach of contract claims, those claims fail.

Accordingly, the Court grants summary judgment for the College as to all of Porter's breach of contract claims based on violations of the Constitution and the AAUP's policies and procedures.

### 2. *Porter Has Not Established Breach of Contract Claims Based on Violations of Due Process*

At different times throughout his summary judgment briefing, Porter raises numerous due process theories as to how the College breached the Manual in suspending and ultimately terminating his employment.  Due to the scattershot way Porter has presented his theories for Counts I and II, the Court has consolidated those theories in an effort to decipher Porter's position.  None of these theories succeeds under the summary judgment standard.

### a. Porter's Suspension

As it relates to his suspension, Porter contends that the College breached the Manual when it failed to give him "prior notice" of his suspension or a "reasonable basis" for its decision to suspend him.  To support this contention, Porter points to the following Manual provision: "The faculty member shall be suspended only if

36

continuance threatens immediate danger[8] to persons or property." (DE 79-8 at 4.) Absent from this clause is any explicit obligation that the College provide Porter with prior notice of his suspension or a reasonable basis for doing so.

Even if such requirements existed, the undisputed evidence shows that the College fulfilled them. The College provided Porter with prior notice of his suspension in a letter from President Roelofs. (*See generally* DE 78-2.) The letter stated, in part, "In view of the gravity of grounds for dismissal advanced for consideration by Dean Berry and the Faculty Status Council, and concerns regarding the immediate welfare of students, I have determined that you are immediately suspended, with pay, from all teaching and professional responsibilities[.]" (*Id.* at 2.) The letter attached Dan Berry's Statement of Grounds for Dismissal, which noted the impact of the survey on the College's students, faculty, and community. (*Id.* at 5-7.) Porter has not submitted any evidence to dispute that he received this letter and its corresponding documentation. Therefore, Porter has not produced sufficient evidence to support that the College breached the Manual by suspending him in violation of due process.

To the extent Porter raises Count I based on violations of due process, the Court grants summary judgment for the College, and the claim is dismissed on that ground.

### b.    Porter's Termination

---

[8] Porter also argues that "immediate danger" may only "pertain to direct threats of physical injury to persons or property." (DE 79 at 14 n.3.) However, the Manual does not define "immediate danger" as such or otherwise provide a definition for "immediate danger." Most glaring, Porter has not submitted any evidence that supports his interpretation of "immediate danger."

In claiming that his termination proceedings did not comport with due process, Porter cites to a litany of ways that the College allegedly breached the Manual.  The best the Court can tell, Porter contends that the breaches are as follows: (1) he was not permitted to confront and cross-examine Williams or Wyrick (DE 77-1 at 14); (2) faculty members involved in Porter's proceedings failed to disclose their bias and conflicts of interest (DE 77-1 at 7-8, 13, 18-19; DE 81 at 10-11); (3) the College used the incorrect evidentiary standard in the proceedings (DE 77-1 at 13); (4) no witness was placed under oath (DE 77-1 at 14); (5) the College failed to investigate or offer proof of certain charges against Porter (DE 77-1 at 14); (6) the College failed to call certain witnesses to testify (DE 77-1 at 14); (7) the College only "charged" him with breach of confidentiality, which is a non-existent charge (DE 77-1 at 21, 24); (8) the College refused to engage in "mediation" prior to initiating his suspension and the termination process (DE 79 at 14); (9) the Dean failed to voice disapproval of Porter's survey until after Porter posted the survey (DE  81 at 10); (10) Porter did not have an attorney present during his proceedings (DE 81 at 14); (11) the College forbid Porter's faculty advisor from "object[ing], summariz[ing], or interrogat[ing] witnesses" (DE 79 at 3; DE 81 at 14); (12) the College failed to consider "[p]ost chemotherapy cognitive impairment and its treatment (as well as treatment for anxiety/depression)" in assessing witness credibility (DE 79 at 5); and (13) the College misinterpreted "personal conduct which demonstrably hinders fulfillment of professional responsibilities" (DE 79 at 12).  As outlined further below, no theory successfully

38

establishes that the College breached the Manual in terminating Porter by violating due process.

### i.    *Confrontation and Cross-Examination of Witnesses*

In claiming that the College violated due process because it did not allow Porter to confront or cross-examine Williams and Wyrick, Porter points to two separate provisions in the Manual.  Both are inapplicable.

The first provision states, "Except in extraordinary circumstances, the respondent is entitled to confront the accuser(s) and any witnesses at the hearing." (DE 77-14 at 11.)  However, according to the plain language of the Manual, that procedure only applies to "complaints of personal conduct violating the College's policies concerning: (i) harassment, (ii) sexual misconduct, (iii) prohibited discrimination, and (iv) the College's policy on consensual relationships between employees and students" as well as "other matters involving alleged violations of college policy where no specific investigative or hearing procedures have been designated." (*Id.* at 10.)  Parties do not dispute that the action against Porter was a dismissal "for cause" based on professional incompetence and governed by the procedures established in the Manual's Appendix B.  (*See* DE 77-1 at 15; DE 79-8 at 3; DE 81 at 5; DE 80 at 7-8.)  Therefore, this provision did not govern Porter's proceedings, and he was not entitled to confront witnesses pursuant to that provision.

The second provision says, "The faculty member and advisor should have the opportunity to question all persons who *testify orally* and to confront all who *testify* adversely." (DE 77-14 at 18 (emphasis added).)  Parties likewise do not dispute that

Williams and Wyrick did not testify orally in person but rather submitted written statements against him.  (DE 77-1 at 14; DE 78-1 at 13.)  Accordingly, the provision did not apply, and Porter was not entitled to confront or cross-examine witnesses under this provision.  To the extent Porter relies on this theory in raising Count II, his breach of contract claim fails.

### ii.     Failure to Disclose Bias and Conflicts of Interests

Porter claims that the College violated due process by failing to disclose the bias of three faculty members who were involved in his termination proceedings and their conflicts of interest.  (DE 79 at 14-15.)  The faculty members are Dean Berry; Ed McCormack, a FAC member who presided over Porter's hearing; and Jay Baltisberger, the Chair of the FAC.  Porter does not cite to any provision within the Manual guaranteeing that the committee presiding over a faculty member's disciplinary proceedings will be free from bias.  Nor does he point to any provision requiring that those involved in such proceedings disclose any preexisting bias or conflicts of interest.  Absent a corresponding contractual provision, Porter cannot establish, as a matter of law, that the College breached the Manual in this way.

Porter alleges that Dean Berry impermissibly acted as an investigator, prosecutor, and witness in the proceedings, all while supervising members of the FAC.  (DE 77-1 at 14.)  Once again, Porter does not identify any provision that prohibited Dean Berry from maintaining multiple roles throughout the proceedings or supervising other members of the FAC at the same time.  Because no provision

prohibits this procedure, Dean Berry's participation in the proceedings did not breach the Manual.

Even if impartiality is an inherent requirement of the College's dismissal procedures, Porter has not produced sufficient evidence that McCormack and Baltisberger were biased.  According to Porter, McCormack was biased due to the influence of his peers.  (DE 77-1 at 7-8, 24.)  Baltisberger was allegedly biased because he received an advanced copy of the survey before it was posted, and President Roelofs later appointed him as the Chair of the FAC.  (*Id.* at 18-19.)  To support a showing of McCormack's bias, Porter only submitted evidence of a conversation between McCormack and his colleague, Caryn Vazzana, in which Vazzana described Porter's survey as "[c]ompletely . . . inappropriate." (*Id.* at 7-8; Ayele Dep at 22:6-15.)  At most, this is evidence of Vazzana's bias, not McCormack's.  And, in attempting to establish Baltisberger's bias, Porter references an email from Baltisberger to President Roelofs and Dean Berry where Baltisberger voices his concerns that the survey "opened a confidential matter to the public" and involved students in an "almost malicious and deceptive" way.  (DE 77-17 at 2.)  In the email, Baltisberger notes that although he received the survey in advance, he did not review it before Porter distributed the survey.  (*Id.*)  Notably, Porter does not point to any evidence that demonstrates *how* Baltisberger's advanced receipt of the survey and his concerns about the survey impacted his ability to act as an unbiased FAC chair.[9]  Without

---

[9] Separately, evidence shows that before the FAC hearing, Baltisberger, indeed, disclosed to Porter, Dean Berry, and others that he both received the survey in advance and subsequently raised concerns about the survey in an email to President Roelofs and Dean Berry.  (DE 78-23 at 2-3.)  Porter has not submitted any evidence

"affirmative evidence to support [his] position;" Porter has not sufficiently shown the bias of McCormack and Baltisberger. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584 (6th Cir. 1992).

For this reason and the reasons provided *supra*, Porter's claim that the College breached the Manual by failing to disclose the bias of participants involved in his termination proceedings cannot survive summary judgment.

### iii.   *Breach of Confidentiality Charge*

Porter also complains that the College violated due process when it "charged" him with breaching confidentiality because he revealed information disclosed in the proceedings against Messer. (DE 77-1 at 21.) Porter maintains this "charge" does not exist. (*Id.*) Porter does not tie this claim to any provision in the Manual prohibiting the College from disciplining a faculty member for breaching confidentiality or a provision otherwise specifying the "charges" the College may bring against a faculty member. Porter only points to language providing that, during Title IX proceedings, "complete confidentiality cannot be guaranteed, particularly if formal charges are filed." (DE 77-14 at 12.) However, Porter conveniently omits the first portion of that clause, which dictates "[i]n the reporting, investigating, and hearing of alleged Violations, *every effort shall be made to ensure confidentiality* and the privacy of the parties involved." (*Id.* (emphasis added).) As previously explained and as relevant

---

showing that he objected to Baltisberger's participation in the hearing despite this knowledge. Because Porter did not object prior to the hearing, this argument is also waived. *Edwards v. Hambel*, No. 2003-CA-000940-MR, 2005 WL 3116096, at *2 (Ky. Ct. App. Nov. 23, 2005) ("A waiver is defined as the intentional and voluntary relinquishment of a known right.")

here, that clause plainly does not bar the College from disciplining a faculty member for failing to uphold confidentiality or from finding that a breach of confidentiality is an indicator of professional incompetence. Moreover, Porter has not produced evidence demonstrating that he made an "effort . . . to ensure confidentiality" as the Manual requires. For purposes of summary judgment, such "[c]onclusory allegations, speculation, and unsubstantiated assertions are not evidence." *Hawkins v. Helton*, CIVIL ACTION NO. 20-135-DLB, 2021 WL 4097274, at *6 (E.D. Ky. Sept. 7, 2021) (citation and quotation marks omitted). Without evidence that the Manual forbid the College for bringing this charge against Porter, the Court cannot find that the College breached the Manual.

The sole evidence Porter submits in support of this claim is a statement from President Roelofs in a letter discussing the outcome of the proceedings against Messer. President Roelofs states, "I have scanned our policy documents in vain for any requirement of confidentiality, and so I do not have the latitude to impose it." (DE 77-6 at 1.) However, this statement constitutes hearsay, and "hearsay evidence cannot be considered on a motion for summary judgment." *Wiley v. United States,* 20 F.3d 222, 226 (6th Cir. 1994). Given the lack of evidence to support Porter's breach of contract theory, the Court grants summary judgment for the College as to that claim.

### iv. *Refusal to Mediate*

Next, Porter contends that the College violated due process by refusing to engage in mediation before suspending and terminating him. (DE 77-1 at 20, 24.)

But Porter does not recognize any provision in the Manual that requires mediation in these circumstances.  Instead, Porter raises a provision that states, "Once the question of competence or effectiveness has arisen, the Division Chair, the Academic Vice President and Dean of the Faculty, and the faculty member, shall discuss the matter in a personal conference."  (DE 77-1 at 20; DE 79-8 at 3.)  However, the evidence Porter himself cites undisputedly establishes that he met with Dean Berry and Jackie Burnside (the Division Chair) prior to his suspension to the discuss the survey.  (Burnside Dep. at 93:13-95:5.)  Because Porter has not submitted any other evidence showing that the College breached this provision of the Manual, this particular breach of contract theory fails, and the Court grants summary judgment for the College regarding that claim.

### v.    *Lack of an Attorney*

Porter also alleges that the College violated due process because he did not have an attorney present at his hearing, while the College had its own lawyers.  (DE 81 at 14.)  Porter also does not show any part of the Manual that entitled him to an attorney during his disciplinary proceedings.  Instead, he cites to a provision stating that "[i]f any party has an attorney present, then the College may also have an attorney present."  (DE 77-14 at 11.)  First, this provision simply does not apply because it is not found in the procedures for "for cause" dismissals but in the procedures governing complaints of harassment, sexual misconduct, discrimination, and violations of the College's consensual relationship policy.  (*Id.* at 10-11.)  Further, the provision plainly does not state that the inverse is true—if the *College* has an

attorney present, then the *party* may also have an attorney present.  Regardless, the Court may not consider this claim, as Porter raised it for the first time in his reply brief.  *See Madison Cap. Co. v. Smith*, Civil Action No. 07-27-ART, 2009 WL 1119411, at *3 (E.D. Ky. Apr. 27, 2009) ("As an initial matter, this argument is not properly before the Court because it was raised for the first time in a reply brief.").  Therefore, the Court grants summary judgment for the College as to this breach of contract theory.

### vi.    *Erroneous Interpretation of Professional Competence*

Under the terms of the Manual, the College may dismiss a faculty member for cause for "[p]ersonal conduct which demonstrably hinders fulfillment of professional responsibilities."  (DE 77-14 at 15.)  Porter contends that "[t]he in-class activity of constructing and publicizing a legitimate Psychology study cannot be 'personal conduct which . . . hinders fulfillment of professional responsibilities.'"  (DE 79 at 12.) However, he submits no evidence to support his assertion.  A "[m]ere conclusory allegation[]" such as this cannot withstand summary judgment.  *Moore v. Cnty. of Muskegon*, 70 F.3d 1272 (Table), 1995 WL 697200 at *1 (6th Cir. 1995).  The Court grants summary judgment for the College as to this breach of contract claim.

### vii.   *Remaining Theories*

As for the remaining theories. Porter does specify the provisions of the Manual the College breached in allegedly using the incorrect evidentiary standard in the proceedings; failing to place witnesses under oath; failing to investigate and offer proof of certain charges against Porter; failing to call certain witnesses to testify;

prohibiting Porter's faculty advisor from "object[ing], summariz[ing], or interrogat[ing] witnesses;"[10] and failing to adequately assess witness credibility. Porter also does not identify the provision that the Dean breached in allegedly failing to timely voice his disapproval of Porter's survey.[11]  As a matter of law, the Court cannot find that the College breached contractual provisions that do not exist within the Manual.  Accordingly, the Court grants summary judgment for the College to the extent that Count II depends on these theories.

To the extent Porter raises Count II based on violations of due process, the Court grants summary judgment for the College, and the claim is dismissed on that ground.

### 3.    *Porter's Breach of Contract Claims Based on Violations of Academic Freedom Similarly Fail*

Porter also raises Count I and Count III based on the theory that the College breached the Manual because it violated his academic freedom in suspending and terminating him.  Similar to many of the breach of contract claims Porter raised on due process grounds, Porter does not identify a single provision of the Manual that the College breached.  Instead, he states to ideals of academic freedom contained in the Constitution and the policies of the AAUP.  (*See* DE 77-1 at 24; DE 79 at 13, 19; DE 81 at 10-11).  As explained above, the Constitution and the policies of external organizations do not govern the College.  Consequently, Porter has not produced

---

[10] In any event, the undisputed evidence shows that Porter himself was allowed to object during the hearings.  (Berheide Dep. at 81:4-5.)

[11] This theory also fails because Porter only raised it in his reply brief.  *See Madison Cap. Co.*, 2009 WL 1119411, at *3.

sufficient evidence beyond his bare assertions that the College violated his academic freedom.  To the extent Porter raises Counts I and III based on violations of academic freedom, the Court grants summary judgment for the College.

Accordingly, the Court grants summary judgment for the College as to all of Porter's breach of contract claims.  Counts I, II, and III are dismissed.

## IV.   Porter's State Law Claims Against Sergent

Porter brings three state law claims against Sergent, arising out of Sergent's emails regarding Porter's eligibility to receive the SGA Award: (1) a defamation claim (Count VI); (2) a false light claim (Count VII); and (3) a retaliation claim under KRS § 344.80(1) (Count VIII).  All three claims fail.

### A.   Sergent's Statements Are Protected by Qualified Privilege

To survive summary judgment on a defamation claim, a plaintiff must submit sufficient evidence of (1) a "false and defamatory statement" about the plaintiff; (2) a publication of that statement; (3) injury caused to the plaintiff's reputation; and (4) "fault amounting at least to negligence" on behalf of the defendant.  *Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276, 282 (Ky. 2014); *Smith v. Martin*, 331 S.W.3d 637, 640 (Ky. Ct. App. 2011).  If a statement is defamatory per se, courts presume malice and injury to the plaintiff's reputation without proof of special damages.  *Toler*, S.W.3d at 282.  Defamatory per se statements include comments on a plaintiff's "unfitness to perform a job" or allegations "having a tendency to prejudice [the plaintiff] in his trade, calling, or profession."  *Id.*; *Gerstle v. Moore*, No. 2002-CA-001403-MR, 2004 WL 259213, at *2 (Ky. Ct. App. Feb. 13, 2004) (citation and quotation marks omitted);

*see also Boles v. Gibson*, No. 2003-CA-001064-MR, 2005 WL 32810, at *2 (Ky. Ct. App. Jan. 7, 2005) (finding that comments regarding the employee's "qualifications, efficiency or competency" were defamatory per se).

However, if the defendant establishes that a qualified privilege applies, the privilege negates the presumption of malice and reputational injury, and the defendant is protected from liability. *Toler*, 458 S.W.3d at 283. Once a defendant establishes a qualified privilege, the burden shifts to the plaintiff to prove abuse of that privilege.[12] A plaintiff may prove an abuse of privilege upon a showing of:

> "(1) the publisher's knowledge or reckless disregard as to the falsity of the defamatory matter; (2) the publication of the defamatory matter for some improper purpose; (3) excessive publication; or (4) the publication of defamatory matter not reasonably believed to be necessary to accomplish the purpose for which the occasion is privileged.

*Id.* at 284. "[T]he question of privilege is a matter of law for the court's determination." *Landrum v. Braun*, 978 S.W.2d 756, 758 (Ky. Ct. App. 1998) (citation and quotation marks omitted).

As an initial matter, the Court notes that the parties do not appear to disagree that the statements in Sergent's emails are defamatory per se, which makes good sense. (DE 63-1 at 20; DE 68 at 11.) At bottom, those statements bear on whether Porter was qualified to receive the SGA Award due to the actions he took during the course of his employment as a professor for the College. Sergent's allegations regarding Porter's "five major wrongful acts" that resulted in his suspension therefore "hav[e] a tendency to prejudice" Porter in his role as a college professor. *Gerstle*, 2004

---

[12] Case law seems to recognize that "malice" is one form of "abuse of privilege" in the qualified privilege analysis. The Court conducts the analysis accordingly.

WL 259213, at *2.  Instead, parties dispute if the qualified privilege of common interest applies, relieving Sergent of liability.

The qualified privilege of common interest applies when "the communication is one in which the party has an interest[,] and it is made to another having a corresponding interest." *Toler*, 458 S.W.3d at 282.  Kentucky law recognizes that the common interest privilege applies in the employment context, including in the academic setting.  *Id.* at 283; *Haas v. Corr. Corp. of Am.*, NO. 2014-CA-001143-MR, 2016 WL 1739771, at *4 (Ky. Ct. App. Apr. 29, 2016); *Harstad v. Whiteman*, 338 S.W.3d 804, 810 (Ky. Ct. App. 2011); *see also Booher v. Bd. of Regents, N. Kentucky Univ.*, Civil Action No. 2:96-CV-135, 1998 WL 35867183, at *16 (E.D. Ky. July 22, 1998) (applying the common interest privilege to statements made to students by the chairperson of a university's academic department).

Regardless of whether Porter could ultimately establish the elements of a defamation claim against Sergent, the qualified privilege of common interest applies because of the corresponding interests of Sergent and the recipients of his emails.  As the faculty adviser of the SGA and despite that fact that he was married to Williams, Sergent and his co-adviser had an interest in providing relevant information about the potential recipient of the SGA Student Service Award to ensure that the executive committee's decision was well-informed.  The executive committee had a corresponding interest in bestowing the award to a deserving recipient based on the information available to it.  *Cf. Booher*, 1998 WL 35867183, at *16 ("As the chairperson of an academic department talking with students, [Defendant] would

49

have an interest in providing information about procedures for pursuing a sexual harassment grievance and an appeal of a grade; the student would have a corresponding interest."). Because these emails arose in the employment context, the invocation of the common interest privilege in this case is consistent with Kentucky law. *Booher*, 1998 WL 35867183, at *16; *Toler*, 458 S.W.3d at 282; *Haas*, 2016 WL 1739771, at *4; *Harstad*, 338 S.W.3d at 810.

Since Sergent has demonstrated that the qualified privilege of common interest applies, the burden shifts to Porter to demonstrate that Sergent abused the privilege. Porter has not met his burden. Porter cites to several pieces of evidence that he contends show malice on Sergent's part. On its face, none of the evidence relates to the four areas of abuse articulated under Kentucky law. All pose issues of admissibility or accuracy.

First, Porter contends that Sergent advised the Board of Residents ("BOR"), not the SGA. (Sergent Dep. at 35:5-17.) To support this contention, Porter points to Sergent's statements that he was not on the student senate committee and did not attend SGA executive committee meetings because it "wasn't part of [his] job." (*Id.* at 33:1-7;41:24-42:5; 90:20-22.) This is a mischaracterization. In actuality, Sergent testified that he was an advisor for the SGA, which includes the BOR. (*Id.* at 35:5-17.)

Second, Porter argues that the College denied that Sergent was acting on behalf of the College in its Answer to his Complaint. (DE 68 at 10.) The Answer to the initial Complaint is no longer relevant. The Second Amended Complaint is the

operative complaint, and therefore, the College's Answer to the Second Amended Complaint is its operative answer.  This answer does not speak on whether Sergent was acting on behalf of the College.  In any event, "the nonmoving party cannot respond by merely resting on the pleadings," and Porter cannot rely on the College's Answer in its response to Sergent's motion.  *Wiley,* 20 F.3d at 225.

Third, Porter claims that Sergent's "evasive" answer to a question in his deposition establishes his malice.  (DE 68 at 10.)  When asked if he had "gotten any criticism from any administrator about these emails," Sergent responded, "About the emails?  Yeah, not that --- I mean yeah, not that I can think of."  (Sergent Dep. at 30:21-24.)  Porter does not explain *how* this response was evasive or relates to any abuse of privilege.  Without further support, the Court cannot find that the College abused its privilege based on this evidence alone.

Next, Porter references an email from Robert Smith, another faculty member, in which Smith states that Sergent should "recuse" himself from the SGA Award process.  (DE 68-2 at 1.)  He also cites testimony from Messer, who said that President Roelefs told him that Sergent was not "speaking as a representative of the college." (Aug. 17, 2021, Messer Dep. at 123:14-21.)  Both statements are inadmissible hearsay inappropriate for consideration on summary judgment.  *Wiley,* 20 F.3d at 226.

Finally, Porter argues that a subsequent confrontation between him and Sergent proves Sergent's malice.  (DE 68 at 11.)  A year and a half *after* Sergent sent the emails at issue, he directed an expletive to Porter when he encountered Porter, his partner, and his dog on the sidewalk.  (Sergent Dep. at 94:8-95:2.)  While this

51

incident is undisputed, a passing comment made a year and a half later cannot show that Sergent acted with malice <u>at the time</u> he sent the emails, as is relevant here.

Because Porter has not met his burden to show that Sergent abused the common interest privilege, Sergent's emails were privileged, and Porter cannot maintain a defamation claim against Sergent. The Court grants summary judgment for Sergent as to that claim.

### B.    For the Same Reasons, Porter's False Light Claim Fails

To establish a false light claim, the plaintiff must prove (1) "publicity that unreasonably places [him] in a false light before the public;" (2) the false light would be "highly offensive to a reasonable person;" and (3) the defendant "had knowledge of, or acted in reckless disregard as to the falsity" of the publicity. *Stewart v. Pantry, Inc.*, 715 F. Supp. 1361, 1369 (W.D. Ky. 1988); *McCall v. Courier-J. & Louisville Times Co.*, 623 S.W.2d 882, 887 (Ky. 1981). A plaintiff cannot fulfill the "publicity" requirement unless "the matter is made public by communicating it to the public at large or to so many persons that the matter must be regarded as *substantially* certain to become one of public knowledge." *Tucker v. Heaton*, Civil Action No. 5:14-CV-00183-TBR, 2015 WL 3935883, at *8 n.3 (W.D. Ky. June 26, 2015) (citation and quotation marks omitted) (emphasis in original); *Robison v. Watson*, No. CIV.A. 2010-211 WOB, 2012 WL 4217050, at *10 (E.D. Ky. Sept. 19, 2012).

Because qualified privilege applies to false light claims, Porter's false light claim fails for the same reasons as his defamation claim. *Warinner v. N. Am. Sec.*

*Sols., Inc.*, No. CIV.A.3:05-CV-244-S, 2008 WL 2355727, at *3 (W.D. Ky. June 5, 2008) (applying qualified privilege to false light claim under Kentucky law).

In the alternative, Porter's false light claim also fails because he cannot fulfill the publication requirement.  Sergent did not distribute the emails to the public at large.  Instead, he only sent emails to four students on the SGA Executive Committee and his co-advisor, Rachel Vagts.  (*See* DE 68-3 at 6; Sergent Dep. at 34:15-17.) Emails sent to a small, insular group focused on a singular issue are not "*substantially* certain" to become "public knowledge." *Tucker*, 2015 WL 3935883, at *8 n.3.  Porter argues that "the proof is that many, many people received and read the emails."  (DE 68 at 11.)  But Porter presents <u>no</u> proof to establish that the emails were disseminated on such a large scale.  "[T]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (citation and quotation marks omitted).  Accordingly, absent further evidence, the Court grants summary judgment for Sergent as to the false light claim.

## C.    Porter's Retaliation Claim Does Not Fulfill the Necessary Statutory Requirements

Porter also raises a retaliation claim under KRS § 344.80(1) against Sergent. KRS § 344.80(1) states:

> It shall be an unlawful practice for a person, or for two (2) or more persons to conspire: (1) To retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this chapter, *or* because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing *under this chapter*.

Ky. Rev. Stat. Ann. § 344.280(1) (emphasis added).  KRS § 344.80(1) consists of two clauses, the opposition clause (the first clause) and the participation clause (the second clause).  *White v. Commonwealth*, NO. 2018-CA-001850-MR, 2020 WL 748864, at *6 (Ky. Ct. App. Feb. 14, 2020).  "In Kentucky, the [Kentucky Commission on Human Rights] must be involved . . . to invoke statutory protection under the participation clause."  *Id.*

Porter appears to bring his retaliation claim under the participation clause. In his Second Amended Complaint, he alleges that his participation arises out of his role as Messer's adviser during his disciplinary proceedings.  (*See* Second Am. Compl. ¶¶ 193-96.)  However, in his response to Sergent's motion for summary judgment, he appears to raise an additional theory: Sergent retaliated against him because Porter "made a charge or filed a complaint" that the College's Psychology Department targeted him in an "unlawful . . . scheme to get them fired because they were 'old, white men.'"  (DE 68 at 14.)  Because "a party may not raise new legal theories in response to summary judgment," the Court will not consider this additional theory. *Gray v. Charter Commc'ns, LLC*, No. 3:19-CV-686-DJH-LLK, 2021 WL 1186320, at *2 (W.D. Ky. Mar. 29, 2021) (citing *Bridgeport Music, Inc. v. WB Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007)).

As for Porter's initial theory, Porter has not submitted any evidence establishing that Messer's disciplinary proceedings constituted "a proceeding[] or hearing *under this chapter*," i.e., under KRS § 344.010, *et seq.*  Ky. Rev. Stat. Ann. § 344.280(1) (emphasis added.)  Nor has he submitted evidence that the Kentucky

Commission on Human Rights was involved in the disciplinary proceedings whether through the filing of a charge or otherwise.  Because Porter has failed to meet the statutory requirements necessary to raise a retaliation claim under KRS § 344.80(1), the Court grants summary judgment for Sergent as to that claim.

CONCLUSION

For the reasons stated in this opinion, the Court hereby ORDERS as follows:

1.   Plaintiff David B. Porter's motions for summary judgment (DE 69; DE 77) are DENIED;

2.   Defendant Berea College's motion for summary judgment (DE 78) is GRANTED;

3.   Defendant F. Tyler Sergent's motion for summary judgment (DE 63) is GRANTED;

4.   The entirety of Plaintiff David B. Porter's claims are DISMISSED with prejudice;

5.   The Court will enter a judgment consistent with this opinion; and

6.   All other outstanding motions are DENIED AS MOOT, and this matter is STRICKEN from the Court's active docket.

This 28th day of September, 2022.



KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY