UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON

| | |
|---|---|
| DR. DAVID B. PORTER, | CIVIL ACTION NO. 5:19-455-KKC |
| **Plaintiff,** | |
| v. | **ORDER AND OPINION** |
| DR. F. TYLER SERGENT and BEREA COLLEGE, | |
| **Defendants.** | |

*** *** ***

This matter is before the Court on a motion filed by Dr. David B. Porter to alter or amend (DE 131) the Court's September 28, 2022 Judgment (the "Judgment"). (DE 130.) For the following reasons, that motion is denied.

I.      **Facts**

The facts of this case have been detailed in the Court's prior opinions in this matter. As such, the Court focuses on the facts most relevant to the instant motion.

A.      **Background of Case**

This case involves Berea College (the "College") and its September 2018 decision to terminate David B. Porter, a tenured faculty member, after he released a survey to students and faculty. This survey included hypothetical scenarios based on real facts from a Title IX case against his friend and colleague, Wayne Messer. In 2017, Porter served as Messer's faculty advisor during the process which ultimately resulted in Messer being found responsible for creating a hostile work environment affecting the three women who worked in the College's psychology department—Wendy Williams, Sarah Jones, and Amanda

Wyrick. Williams initiated the complaint against Messer, which was later joined by Jones and Wyrick. Porter believed that the College's disciplinary process had been unfair to Messer and sharply criticized it in an open letter to the campus and private correspondence with the College's president and dean. Porter's criticisms, however, were not addressed to his satisfaction.

During the spring 2018 semester, Porter decided that his Industrial/Organization Psychology course would develop a survey of "community perceptions and attitudes about academic freedom, freedom of speech, and hostile work environments under civil rights law." (Second Am. Compl.[1] at ¶ 36.) This survey included twenty scenarios, many of which were based on matters and details disclosed during the proceedings against Messer—such as the personal information of the female members of the psychology department who brought the Title IX complaint. Porter failed to ask his female colleagues for permission to use details of the complaint and did not submit the survey to the College's Institutional Review Board for approval, as was common practice for the College's faculty. Porter did, however, send the survey to several other faculty members and was met with varying degrees of concern.[2] Porter nevertheless released the survey to the public.

The survey was met with immediate controversy, which prompted Chad Berry, the College's dean, to send out a campus-wide message requesting that Porter take down the survey and apologize to the community. Porter complied and later recognized the negative impact that the survey had on students, his female colleagues, and the campus as a whole—

---

[1] As noted in the Court's previous opinion, Porter erroneously labels his second amended complaint as the "First Amended Complaint."

[2] Messer himself stated that he had "mixed feelings" about the survey and was "a little worried it will be seen as highly inflammatory." (DE 78-14 at 11.) Another colleague informed Porter that some students were already "clearly distressed by the project[,]" while another told Porter that "anyone who knows anything about our Title IX fiasco" would recognize who each question in the survey was about. (*Id.*)

even admitting that his "efforts to disguise the incidents . . . were inadequate[.]" (DE 78-6.) On February 22, 2018, Dean Berry issued a Statement of Grounds for Dismissal and identified ten grounds: four related to the survey's impact on students and six related to the impact on faculty and the campus community. (DE 78-2 at 5.) The Dean's statement cited a provision of the College's Faculty Manual (the "Manual") that states that faculty can be terminated for cause if they engage in "[p]ersonal conduct which demonstrably hinders fulfillment of professional responsibilities." (DE 77-14 at 15.)

To address these claims, Porter opted for a hearing before the Faculty Appeals Committee (the "FAC"), a committee composed of faculty members. Over the course of April 26, 2018 and April 27, 2018, the College and Porter argued their positions and the FAC ultimately recommended that Porter be terminated. Lyle Roelofs, the President of the College, subsequently agreed with the recommendation and determined Porter's employment with the College should be terminated. Porter appealed President Roelofs's decision to a committee of the College's Board of Trustees but was ultimately unsuccessful. Porter was officially terminated on September 30, 2018.

### B.    Dr. F. Tyler Sergent's Emails to the Student Government Association

Defendant F. Tyler Sergent is a history professor for the College who previously served as one of two faculty advisors to the College's Student Government Association ("SGA"). Sergent also happens to be married to Williams, the psychology professor who initiated the complaint against Messer. Following Porter's suspension but before his termination, the SGA voted to award Porter with the Student Service Award. Using his university email address, Sergent sent an email to three of the SGA Executive Committee's student members and his fellow faculty advisor, Rachel Vagts, voicing his strong objection to the voting result. (*See* DE 68-3 at 6-9.) Vagts agreed, but Sergent continued to debate executive committee member Yabsira Ayele over his perspective on the issue. (*Id.* at 1-4.) Sergent informed Ayele of

Porter's previous "sexist, disparaging remarks" about the three female faculty members involved in the Messer complaint, but eventually ended the conversation by telling him, "Do not email me again regarding this issue." (*Id.* at 1-2.)

### C.    Procedural History

Porter filed his original complaint in state court on January 29, 2019. In it, he brought claims against the College for breach of contract based on the Manual and unlawful discrimination under Kentucky state law. (DE 1-1 at 1-42.) On October 25, 2019, Porter filed a second amended complaint, which added federal claims for unlawful discrimination and retaliation under the ADEA, Title VII, and Title IX. (Second Am. Compl. at 156-213.) The Second Amended Complaint also included Sergent as a party, bringing claims against him for defamation, false light, and illegal retaliation under KRS § 344.280(1). (*Id.*) The College then removed the case to this Court, where the parties filed cross-motions for summary judgment.[3] The Court granted the Defendants' motions for summary judgment and denied Porter's motion for summary judgment. (DE 129 at 55.)  Accordingly, the Court dismissed the entirety of Porter's claims with prejudice. (DE 130.)

This Judgment is the subject of Porter's motion to alter or amend judgment.

## II.    Motion to Alter or Amend Judgment

### A.    Standard

Pursuant to Federal Rule of Civil Procedure 59(e), a party must file a motion to alter or amend judgment "no later than 28 days after the entry of the judgment."  Fed. R. Civ. P. 59(e).  The standard for a motion under Rule 59(e) is "necessarily high."  *Hewitt v. W. & S. Fin. Grp. Flexibly Benefits Plan*, CIVIL ACTION NO. 16-120-HRW, 2017 WL 2927472, at *1

---

[3] The Court previously dismissed Porter's claims of negligent hiring, retaining, and supervising of Sergent, and liability under respondeat superior. (DE 29.)

(E.D. Ky. July 7, 2017). The moving party may not use a Rule 59(e) motion as a tool to "re-litigate issues the Court previously considered." *Id.* at *1. A court may only grant a Rule 59(e) motion if the moving party sets forth (1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in the controlling law; or (4) a manifest injustice. *GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999) (citations omitted). Further, "Rule 59(e) motions cannot be used to present new arguments that could have been raised prior to judgment." *Howard v. U.S.*, 533 F.3d 472, 475 (6th Cir. 2008). It "allows for reconsideration; it does not permit parties to effectively 're-argue a case.'" *Id.* (quoting *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998) (explaining that a district court "may well deny the Rule 59(e) motion on that ground.")).

### B.    Analysis

Porter files his motion based on clear errors of law and fact. (DE 131 at 1.) He argues the Court erroneously found that: (1) Porter did not identify specific Manual provisions that the College breached; (2) Porter's retaliation claims against Sergent failed because Porter did not involve the Kentucky Human Rights Commission (KHRC); (3) Porter did not have a right to cross examine Drs. Williams and Wyrick; (4) statements respectively made by Roelofs, Dr. Robert Smith, and Messer were hearsay; (5) the Manual's right of confrontation and cross-examination of witnesses was limited to certain complaints; (6) the College's breach of confidentiality charge against Porter was valid; (7) Sergent was protected by qualified privilege; and (8) the Defendants' summary judgment could be sustained without "sworn denials." (*Id.* at 1, 3, 5-8.)

The Court will address each of these arguments in turn.

### 1.    Specific Manual Provisions

Porter argues that the Court erred in finding that he did not identify any specific provisions of the Manual that provided him with a contractual right to academic freedom.

5

(*Id.* at 1-2.) He claims that specific "Academic Freedoms" guaranteed in the Manual were cited to in his memorandum in support of his motion for summary judgment, which referenced testimony from Dr. Mike Berheide. (DE 77-1 at 13-15.) Yet, upon investigation of the record, the Court can find no instance where Porter identifies specific provisions of the Manual that provided him with a contractual right to academic freedom. Porter only briefly mentions that Berheide allegedly "criticized the [College's] failure to insure academic freedom guaranteed by the [Manual]." (*Id.* at 13.) If anything, Berheide focuses his testimony on his dissatisfaction with the "administrative due process" elements of Porter's termination. (*Id.* at 14.) After reviewing Berheide's deposition testimony, the Court finds no identification of specific Manual provisions to support Porter's claim for breach of academic freedom.

Further, Porter alleges that he identifies specific academic freedom provisions in his reply in support of his motion for summary judgment. Again, the only section of the Manual that Porter broadly points to is the one titled Academic Freedom and Responsibility. (DE 81 at 13.) As previously discussed by the Court, nowhere does Porter "identify a single provision of the Manual that the College breached" regarding his academic freedom. (DE 129 at 46.) "A trial court is not required to speculate on which portion of the record the non-moving party relies, nor is there an obligation to 'wade through' the record for specific facts." *United States v. WRW Corp.*, 986 F.2d 138, 143 (6th Cir. 1993). He gestures to the ideals espoused in the section, but fails to identify any particular provision that was breached by the College. He additionally does not specify whether the breached provision is in the Freedom in Teaching, Freedom of Research, or any other paragraph in the section.

It might follow that his alleged breached academic freedom right arose from the Freedom of Research paragraph—since the underlying matter was born from an awry research survey—but the Court finds no enforceable provision that guarantees academic freedom therein. In reality, the Court notes that the Manual states that "research and

publications should not detract from the adequate performance of one's other academic duties[,]" and that "the faculty member should be careful not to introduce controversial matter which has no relation to the subject." (DE 81-3 at 5.) Accordingly, the Court did not err in finding that Porter did not identify specific provisions to support his breach of academic freedom claims.

### 2.    Retaliation Claims against Sergent

Porter argues that the Court erred in dismissing his retaliation claims against Sergent because he had not involved the KHRC. (DE 131-1 at 3.) He claims that: (1) contacting the Equal Employment Opportunity Commission (EEOC) and receiving a letter to sue was sufficient action to sustain a participation clause claim under KRS 344.280(1); (2) his pleading sufficiently invoked KRS 344.280(1)'s opposition clause; and (3) the parties waived whether his inquiry with a governmental agency was sufficient. (*Id.* at 3-4.)

Porter relies on the Sixth Circuit's 1989 decision in *Booker v. Brown & Williamson Tobacco Co., Inc.* to support his first claim. 879 F.2d 1304 (6th Cir. 1989). In that case, the Sixth Circuit found that a plaintiff who filed retaliation claims under the Elliott-Larsen Civil Rights Act[4] had failed to invoke the law's participation clause because he did not involve a governmental agency. *Id.* at 1313.  The Sixth Circuit explained that "the language of the statute should be read literally, and, therefore, the instigation of proceedings leading to the filing of a complaint or charge, including 'a visit to a government agency to inquire about filing a charge' is a prerequisite to protection under the participation clause." *Id.* (quoting *Polk v. Yellow Freight Sys., Inc.*, 801 F.2d 190, 200 (6th Cir. 1986)). Relying on this language, Porter claims that inquiry for KRS 344.280(1) purposes "may be made to either the KHRC or the [EEOC]." (DE 131-1 at 3.) This argument misstates the law.

---

[4] This statute is Michigan's equivalent to KRS 344.280(1).

The statute at issue states that it shall be unlawful for a person to: "retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this chapter, or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter[.]" KRS 344.280(1). As previously discussed by the Court, "[i]n Kentucky, the [KHRC] must be involved . . . . to invoke statutory protection under the participation clause." *White v. Commonwealth*, NO. 2018-CA-001850-MR, 2020 WL 748864, at *6 (Ky. Ct. App. Feb. 14, 2020). Further, the Sixth Circuit has also noted that "the focus is . . . whether the employer's decision to discharge was motivated by an improper desire to retaliate against an employee **for pursuing rights granted by the [Elliot-Larsen Act]**." *Polk*, 801 F.2d at 199 (emphasis added). As a result, a visit to a government agency "**to inquire about rights granted under the Act** is a protected activity." *Id.* (emphasis added). The key to the inquiry regarding whether the participation clause has been sufficiently invoked hinges on the motivation behind the plaintiff's activity.

Here, Porter invoked the authority of the EEOC and eventually received a right to sue letter. This letter serves as acknowledgment from the EEOC that the recipient has the right to sue their employer in federal court on federal discrimination grounds. It does not, however, consider the recipient's rights under *state* discrimination claims. Despite Porter's claim that an inquiry may be made to either the KHRC or the EEOC to sustain Kentucky's participation clause retaliation claim, he provides no authority to support that claim. The fact remains that there is no evidence in the record that the KHRC was involved at any time before Sergent's alleged retaliation. Accordingly, Porter did not "[make] a charge, [file] a complaint . . . or [participate] in any manner . . . **under this chapter**," KRS 344.280(1) (emphasis added), nor did he visit a government agency to inquire about rights granted under the

8

Kentucky Civil Rights Act. Because Porter failed to do this, the Court did not erroneously find that his state law retaliation claims against Sergent failed.

Further, Porter argues that it sufficiently invoked KRS 344.280(1)'s opposition clause in its pleadings. The Court has noted that "a party may not raise new legal theories in response to summary judgment[.]" *Gray v. Charter Commc'ns, LLC*, No. 3:19-CV-686-DJH-LLK, 2021 WL 1186320, at *2 (W.D. Ky. Mar. 29, 2021) (citing *Bridgeport Music, Inc. v. WB Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007)). After investigating the record and Porter's Second Amended Complaint, the Court cannot find that Porter sufficiently invoked the opposition clause. Porter did not sufficiently allege that Sergent's actions were made in retaliation against Porter "because he [] opposed a practice declared unlawful by this chapter[.]" KRS 344.280(1). Nowhere does Porter specify how Sergent's alleged retaliation was due to Porter's opposition to unlawful acts under the KCRA. Accordingly, Porter did not sufficiently invoke the opposition clause for his retaliation claim.

Porter also argues that neither defendant raised objection to the sufficiency of his inquiry with a government agency, and so the Court must not consider that information when making its decisions on summary judgment. (DE 131-1 at 4.) This argument is without merit. Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court was entitled to examine the record and Porter's showing of evidence when deciding the pending summary judgment motions. Given there is caselaw about the requirements of bringing participation clause claims under KRS 344.280(1), the Court was within its power to examine whether Porter had shown sufficient evidence to convince a reasonable jury that he properly involved a governmental agency in order to bring his retaliation claim. Accordingly, the Court did not err in considering the sufficiency of Porter's inquiry with a government agency.

9

### 3.    Right to Cross Examine Drs. Williams and Wyrick

Porter argues that the Court erred when it found that he did not have a right to cross examine Williams and Wyrick under the terms of the Manual. (DE 131-1 at 3.) He claims that the Court's decision is "at odds with the inherent requirements of administrative due process, under the terms of the parties' private contract and pursuant to the ordinary principles of adjudicative fairness espoused in constitutional text and jurisprudence." (*Id.*) The only due process that Porter was entitled to, however, is whatever due process is given by the terms of the Manual. Berea College is a private entity, not a state actor; Porter is not entitled to whatever constitutional protections he claims to have. The Manual is clear about when accused faculty members have the right to cross-examine witnesses. The relevant provision states: "The faculty member and advisor should have the opportunity to question all persons who **testify orally** and to confront all who *testify* adversely." (DE 77-14 at 18 (emphasis added).)

As previously explained, neither Williams nor Wyrick testified orally. Instead, both faculty members submitted written statements. The plain language of the Manual makes it clear that, in this case, Porter has no right to cross-examine either faculty member. Porter raises issues of fairness of this policy in his motion to alter judgment, (DE 131-1 at 5) but the College correctly notes that this is the first time that he has raised this argument. This new argument is untimely as Rule 59(e) motions are for reconsideration, not reargument. *See Howard v. United States*, 533 F.3d 472, 475 (6th Cir. 2008) (explaining that Rule 59(e) motions do not permit parties to effectively reargue a case and district courts can deny motions on those grounds). Because the Manual's plain language does not grant Porter a right to cross-examine faculty members who submit written statements, the Court did not err in finding that he possessed no right to cross-examine Williams and Wyrick.

### 4.    Hearsay Statements

Porter points to two instances in which the Court found statements to be hearsay. The first instance arose when the Court addressed Porter's claim regarding the College's breach of confidentiality charge against him. Here, the Court found that a statement by Roelofs in a letter regarding the outcome of the proceedings against Messer was hearsay. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted in the statement. Fed. R. Civ. P. 801(c). A statement offered against an opposing party and was "made by the party's agent or employee on a matter within the scope of that relationship and while it existed[,]" however, is considered non-hearsay. Fed. R. Civ. P. 801(d)(2). As this particular claim was against the College, Roelofs was an employee of the College at the time this statement was made, and the statement involved a matter within the scope of Roelofs' employment, the Court finds that this statement by Roelofs was not hearsay.

Even if Roelofs' statement was considered non-hearsay, it does not change the outcome of Porter's motion for summary judgment. The Court properly noted that this statement was the "sole evidence" Porter submitted in support of this particular due process claim. Nothing in the record suggests that Roelofs, as the College's president, had expertise in the interpretation of the Manual's terms. Further, the plain language of the Manual imposes a confidentiality requirement on College employees as it clearly states, "[E]very effort shall be made to ensure confidentiality and the privacy of the parties involved [in violations]." (DE 77-14 at 12.) By Porter's own admission, he could have been much more prudent in crafting his survey to protect the privacy of the female faculty members involved in the prior Title IX proceedings. (DE 78-6.) Porter, accordingly, relies solely on Roelofs' statement to support this breach of contract theory. Placed against the plain language of the Manual, Porter's claim cannot survive and the Court did not err in granting summary judgment for the College.

Porter also alleges that the Court erred when it found that two statements by Robert Smith and Messer were both inadmissible hearsay statements. Smith's statement was an email that stated that Sergent should "recuse" himself from the SGA Award process, (DE 68-2 at 1) and Messer's statement was testimony in which he claimed that Roelofs told him that Sergent was not "speaking as a representative of the College." (Aug. 17, 2021, Messer Dep. at 123:14-21.) These statements arose in the course of Porter's argument of state law claims against Sergent—not the College—to demonstrate that Sergent acted with malice when advising the SGA. These statements do not fall under the party opponent exception to the hearsay rule because the opposing party in this claim is Sergent, not the College. As a result, neither Smith, Messner, nor Roelofs were acting as agents or employees of Sergent and these statements were correctly found to be inadmissible hearsay. Even if these statements were considered as non-hearsay, the evidence overwhelmingly leans against Porter's claim as previously examined in the Court's opinion. Accordingly, the Court did not err in finding that these statements were both inadmissible hearsay statements.

### 5.    Confrontation and Cross-Examination Limitations

Porter argues that the Court erred in finding that the rights to confrontation and cross-examination under the Manual were limited in scope. Specifically, Porter takes issue with the Court finding that these rights were limited to "complaints of personal conduct violating the College's policies concerning (i) harassment, (ii) sexual misconduct, (iii) prohibited discrimination and (iv) the College's policy on consensual relationships between employees and students." (DE 77-14 at 10.) He claims that there is "no such limiting language" in the paragraph detailing the rights, (DE 131-1 at 6) but that completely ignores the context of that paragraph.

These rights and procedures are found in one continuous section of the Manual titled "Procedures for Reporting, Investigating, and Hearing Alleged Violations of Certain College

Policies." (DE 77-14 at 10.) The "Violations" that are constantly referenced throughout this section are expressly identified as "complaints of personal conduct violating the College's policies concerning (i) harassment, (ii) sexual misconduct, (iii) prohibited discrimination and (iv) the College's policy on consensual relationships between employees and students." (*Id.*) The Court cannot ignore the context from which the rights to confrontation and cross-examination arise. Accordingly, the Court did not err in limiting these rights to those specific complaints listed in the Manual.

### 6.      Breach of Confidentiality Charge

For the reasons discussed above in Part II(B)(4) of the Court's opinion, Porter's claim regarding the College's breach of confidentiality charge fails. The plain language of the Manual establishes that faculty members have a contractual duty to use "every effort . . . to ensure confidentiality and the privacy of the parties involved" in Title IX proceedings. (DE 77-14 at 12.) Even if the Court considered Roelofs' statement as non-hearsay, Porter's claim fails in light of the Manual's express provisions. Further, Porter admits that confidentiality matters are addressed by the College's Title IX Coordinator—not the College's president. (DE 131-1 at 7.) Accordingly, the Court did not erroneously find that Porter's claim against the College for its breach of confidentiality charge could not survive summary judgment.

### 7.      Sergent's Qualified Privilege

Porter argues that the Court erred in finding that Sergent's actions to deny the grant of the Student Service Award were protected by qualified privilege. (DE 131-1 at 7.) Porter claims that he met his burden of proving abuse of privilege because there was already a presumption of malice from Sergent's defamatory per se statements. (*Id.*) Because of this presumption, Porter would have the Court find that no additional evidence of abuse was necessary. This claim misstates the law of qualified privilege.

The qualified privilege of common interest applies when "the communication is one in which the party has an interest[,] and it is made to another having a corresponding interest." *Toler v. SudChemie, Inc.*, 458 S.W.3d 276, 282 (Ky. 2014). As previously explained by the Court's prior opinion, Kentucky law recognizes that the common interest privilege applies in the employment context, including in the academic setting. *Id.* at 283; *Haas v. Corr. Corp. of Am.*, NO. 2014-CA-001143-MR, 2016 WL 1739771, at *4 (Ky. Ct. App. Apr. 29, 2016); *Harstad v. Whiteman*, 338 S.W.3d 804, 810 (Ky. Ct. App. 2011); *see also Booher v. Bd. of Regents, N. Kentucky Univ.*, Civil Action No. 2:96-CV-135, 1998 WL 35867183, at *16 (E.D. Ky. July 22, 1998) (applying the common interest privilege to statements made to students by the chairperson of a university's academic department). Qualified privilege of common interest applied because Sergent, an SBA advisor, had an interest in telling the SBA executive board, who had an interest in preserving the integrity of its award, relevant information pertaining to the prospective award recipient. Once the defendant establishes that a qualified privilege applies, the privilege *negates the presumption of malice* and reputational injury. *Toler*, 458 S.W.3d at 283. The burden then shifts to the plaintiff to prove abuse of that privilege.

Porter argues that because the Court noted in a footnote that "malice" can be one form of "abuse of privilege," he has already met his burden because there was originally a presumption of malice. That is incorrect. The presumption of malice due to defamatory per se statements serves to support Porter's defamation and false light claims, but as explained, that presumption of malice is negated if qualified privilege applies. As a result, it falls to Porter to bring forward other evidence to establish an abuse of privilege—which can, as the Court noted, come in the form of malice. To accept Porter's argument would defeat the point of qualified privilege protections because it would essentially provide *no* protections in cases of defamatory per se statements. Accordingly, the Court did not err in finding that Sergent was protected by qualified privilege against Porter's state law claims.

14

Further, Porter alleges that the Court erroneously dismissed evidence that "Sergent acted maliciously for his own purposes" in the College's Answers. Previously, the Court found that the Answer to the initial Complaint was "no longer relevant." (DE 129 at 50.) Porter argues that this was erroneous because "state court [admissions] continue as binding authority after Berea's removal to federal court." (DE 131-1 at 8.) Despite its claim that this argument is supported by "copious authority," Porter does not cite any authority for the Court. (*Id.*) Nevertheless, even if the Court considered statements in the original complaint, the outcome does not change. The Court already noted that "the nonmoving party cannot respond by merely resting on the pleadings," and so Porter cannot rely on the College's Answer in its response to Sergent's motion. *Wiley v. United States*, 20 F.3d 222, 225 (6th Cir. 1994). It was Porter's burden to prove an abuse of privilege, and "the question of privilege is a matter of law for the court's determination." *Landrum v. Braun*, 978 S.W.2d 756, 758 (Ky. Ct. App. 1998). Accordingly, the Court did not err in finding that Porter did not meet his burden to prove that Sergent abused his privilege.

## 8. Sworn Denials for Summary Judgment

Porter argues that summary judgment against him cannot be sustained absent some sworn denials. (DE 131-1 at 8.) In order to defeat a summary judgment motion, the nonmoving party must "show sufficient evidence to create a genuine issue of material fact." *Prebilich-Holland v. Gaylord Entm't Co.*, 297 F.3d 438, 442 (6th Cir. 2002). In other words, the nonmoving party must present sufficient evidence to permit a reasonable jury to find in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). While Porter presents hypothetical examples of sworn statements that the College *could* have put

forward as evidence, the fact that the College declined to does not defeat its summary judgment motions. As discussed extensively in the Court's prior opinion, Porter failed to present sufficient evidence that would permit a reasonable jury to find in favor of his claims. Accordingly, the Court did not err in granting summary judgment against Porter.

## III.    Bill of Costs

After the Court entered its Judgment against Porter, the College tendered a Bill of Costs. (DE 132.) The College requested that a total of $11,232.95 be assessed against Porter. This amount consisted of $400.00 in fees of the Clerk and $10,832.95 in fees for printed or electronically recorded transcripts necessarily obtained for use in the case. Porter objects to the College's Bill of Costs and argues that: (1) the College's bill should be limited to its own depositions and to the Clerk's fee for removal; and (2) Porter should not have to pay for the additional five (5) days of Porter's six-day deposition. The Court is not persuaded by either argument.

Under 28 U.S.C. § 1920, the Court may tax "[f]ees for printed or electronically recorded transcripts necessarily obtained for use in the case." The plain language of the statute does not limit taxing to a party's own depositions. Porter argues that there is "no need to purchase hard copies" because parties live in an "age of electronic documents." (DE 139 at 1.) If this was truly the case, Congress would not have included the express language permitting taxable costs "for **printed or electronically recorded** transcripts[.]" 28 U.S.C. § 1920(2) (emphasis added). Further, Porter takes issue with the length of Porter's six-day deposition. Nothing in the record suggests that the six days were unnecessary or excessive. In fact, the College relied upon excerpts from the full deposition in the filing of its dispositive motions and responses. (DEs 78-8, 80-2.) Accordingly, the Court finds the requested amount by the College reasonable and sufficiently documented.

## IV.    Conclusion

The Court hereby orders as follows:

1.     Porter's motion to alter or amend (DE 131) the Court's Judgment (DE 130) is

       DENIED;

2.     The College's Bill of Costs (DE 132) is APPROVED;

3.     The Clerk of the Court is DIRECTED to tax the costs in the total of $11,232.95

       against Porter in favor of the College;

4.     Porter's motion to set aside the College's bill of costs (DE 135) is DENIED; and

5.     The case SHALL remain DISMISSED and STRICKEN from the docket.

This 25th day of September, 2023.

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY